CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 11-2129

DIVISION "D-16"

CONCRETE BUSTERS OF LOUISIANA, INC.
AND WASTE REMEDIATION OF PLAQUEMINES, LLC

VERSUS

FREDERICK R. HEEBE, ALBERT J. WARD, JR.,
RIVER BIRCH INCORPORATED AND HWY 90, LLC

FILED: _____        _____

                                              DEPUTY CLERK

## AMENDING PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, come petitioners, Concrete Busters of Louisiana, Inc., a Louisiana corporation domiciled in the Parish of Jefferson, and Waste Remediation of Plaquemines, LLC, a Louisiana limited liability company domiciled in the Parish of Jefferson, for the purpose of amending their original Petition for Damages, and allege as follows:

I.

Petitioners re-allege and re-affirm all allegations and prayers of their original Petition for Damages and Jury Demand.

II.

Petitioners hereby amend their original Petition for Damages by adding the following:

**The Co-Conspirators**

94.

Co-conspirator Shadow Lake Management, Inc. ("Shadow Lake") is a corporate entity with its principal place of business in Gretna, Louisiana.  Shadow Lake is owned and controlled by Defendants Fred Heebe ("Heebe") and James Ward ("Ward").  Shadow Lake is a holding company that serves as the parent company of a number of corporate entities, including River Birch, Inc. ("River Birch") and several others.  Upon information and belief, Shadow Lake served as an instrumentality through which many of the Defendants' unlawful actions were implemented.

95.

Co-conspirator Henry Mouton ("Mouton") is a resident of Louisiana. Mouton served as Commissioner of the Louisiana Department of Wildlife and Fisheries from January 2003 until his resignation in November 2008. Mouton was indicted in the United States District Court for the Eastern District of Louisiana for unlawful actions in connection with the Defendants in 2011, and pled guilty, as described herein.

96.

Co-conspirator Aaron F. Broussard ("Broussard") is a resident of Louisiana. Broussard served as President of the Jefferson Parish Council from 2004 until his resignation in January 2010. Broussard has been indicted for theft and bribery in the United States District Court for the Eastern District of Louisiana, and pled guilty, as described herein.

97.

Co-conspirator Timothy Whitmer ("Whitmer") is a resident of Louisiana. Whitmer served as the Chief Administrative Officer for Jefferson Parish from 1998 until his resignation in January 2010. Whitmer was also an owner of Lagniappe Industries, LLC ("Lagniappe"), an entity through which Defendants provided undisclosed financial benefits to Whitmer, Broussard and/or other members of the Jefferson Parish administration. Whitmer has been indicted in the United States District Court for the Eastern District of Louisiana, and pled guilty, as described herein.

98.

Co-conspirator Thomas Wilkinson ("Wilkinson") is a resident of Louisiana. Wilkinson served as the Parish Attorney for Jefferson Parish from 1996 until his resignation in March 2010. Wilkinson has been indicted in the United States District Court for the Eastern District of Louisiana, and pled guilty, as described herein.

99.

Co-conspirator Dominick Fazzio ("Fazzio") is a resident of Louisiana. Fazzio served as CEO of River Birch Incorporated at times pertinent. Fazzio has been indicted in the United States District Court for the Eastern District of Louisiana.

2

100.

Upon information and belief, additional co-conspirators included numerous shell corporations and limited liability companies owned and/or controlled by the Defendants and/or their co-conspirators, including:

a)  Aaron Broussard, Parish President Campaign Committee, Inc.;

b)  Anne's Properties, LLC;

c)  B&A Insurance Agency, Inc.;

d)  B & C Contractors, LLC;

e)  Big Bang Properties, LLC;

f)  B.L.U., LLC;

g)  B.L.U. II LLC;

h)  B.L.U. Communications Services, LLC;

i)  Caribe Resort Properties, LLC;

j)  Cerro Coyote, SA;

k)  Coulon Consultants, LLC;

l)  CT Investments, LLC;

m)  CWC Gaming, LLC;

n)  Dangle & Associates, LLC;

o)  Debris Management, LLC;

p)  Deft, LLC;

q)  DHP LLC;

r)  Door Lock, LLC;

s)  Katz & Katz, LLC;

t)  Kempt Wilderness Lodge Services;

u)  Lagniappe Industries, LLC;

v)  N.C. General Contractors, Inc.;

w)  Nova Scotia Enterprises, LLC;

x)       Pasture Land, LLC;

y)       Ring Associates, LLC;

x)       Trout Point Lodge, Ltd.;

aa)     Waterfront Properties, Inc.;

ab)     Westside Construction Services, Inc.;

ac)     Willow Incorporated; and

ad)     Zydeco Holdings, LLC.

101.

The Defendants and various co-conspirators, including those listed above, have, in various combinations, conspired together, acted in concert and/or as alter egos, agents, tools or instrumentalities of each other, and, such that, in various combinations, some have constituted single business enterprises as they have shared:

(a)      identity or substantial identity of ownership;

(b)      common directors or officers;

(c)      unified administrative control;

(d)      similar or supplementary business functions;

(e)      salaries and other expenses or losses,

(f)      common employees;

(g)      common offices;

(h)      centralized accounting; and/or

(i)      finances; or

(j)      one or some have financed another or others; or

(k)      some have been inadequately capitalized; or

(l)      one or some have caused incorporation of one or others; or

(m)     one or some have paid another or others; or

(n)      one or some have received no business other than from another or others; or

(o)      one or some have used property of another or others as its own; or

(p)     they have not complied with corporate formalities; or

(q)     services have been rendered by the employees of one or some on behalf of another or others;

(r)     there have been undocumented transfers of funds between some; .

(s)     there have been unclear allocation of profits and losses between some; and/or

(t)     they have bundled campaign contributions together, and/or acted as a "straw man" for another, to subvert campaign finance laws.

### Chef Menteur and Old Gentilly Landfills Attacked

102.

Defendants and their co-conspirators, known and unknown, targeted a Construction & Demolition ("C&D") landfill in New Orleans East owned and operated by Waste Management, popularly known as the "Chef Menteur" landfill. In August 2006, after only six (6) months of operations, the Chef Menteur landfill was permanently closed, diverting profitable waste streams from the Chef Menteur to the River Birch and HWY-90 landfills, and depriving New Orleans of a safe and cost-effective C&D disposal option for the immense volume of storm-related debris in the wake of Hurricane Katrina. Defendants and their co-conspirators, known and unknown, also targeted a C&D landfill owned and operated by AMID/Metro Partnership, LLC ("AMID/Metro").

103.

In early 2001, the City of New Orleans publicly issued a Request for Proposal ("RFP") for the operating of a Type III C&D Landfill atop the existing City of New Orleans Gentilly Landfill. Numerous companies with varying proposals competed in the RFP process. The contract to assist the City of New Orleans with obtaining a permit from the Louisiana Department of Environmental Quality ("LDEQ") and to subsequently operate the Gentilly Landfill was awarded to AMID/Metro in March of 2002.

104.

AMID/Metro is a local company whose member companies have over 50 years of experience in obtaining regulatory approval to operate permitted landfills and waste disposal companies in

5

Louisiana.

<div align="center">105.</div>

In June of 2002, LDEQ received a permit application from AMID/Metro on behalf of the City of New Orleans to construct and operate the Gentilly Landfill for the disposal of C&D debris and woodwaste. AMID/Metro spent over two (2) years performing costly engineering, environmental design, construction, and site preparation work in accordance with the proposed permit. After determining that the permit application was technically complete and complied with the rigorous requirements of the Solid Waste Regulations, a public notice was published noting the technical completeness of the application and inviting the public to comment on the application. LDEQ's permitting process was extensive and included public notices in both the *Times Picayune* and *The Morning Advocate* newspapers. LDEQ did not receive any public comments or requests for hearing on the application at any time pre-Katrina. On December 28, 2004, LDEQ's Assistant Secretary of the Office of Environmental Services issued Standard Permit P-0375 to the City of New Orleans for the operation of the Gentilly Landfill.

<div align="center">106.</div>

During the Spring and Summer of 2005, the Gentilly Landfill underwent additional preparatory construction in order to ready the site for acceptance of C&D debris. The facility was scheduled to open in September of 2005. On August 26, 2005, Governor Blanco issued Proclamation No. 48 KBB 2005, declaring a state of emergency, as Hurricane Katrina threatened Louisiana. On August 29, 2005, under Proclamation No. 54 KBB 2005, Governor Blanco extended the state of emergency due to the extreme damage caused by Hurricane Katrina. Also on August 29, 2005, the Federal Emergency Management Agency ("FEMA") issued a Disaster Declaration, FEMA-1603-DR, which was a broad-based declaration providing federal relief for the catastrophic damage.

<div align="center">107.</div>

One of the first needs in New Orleans, after the floodwaters receded, was to remove and dispose of massive amounts of debris blocking streets and inhibiting emergency vehicle response.

<div align="center">6</div>

The U.S. Army Corps of Engineers ("USACE") and the LDEQ established an emergency waste disposal plan. In addition, the Gentilly Landfill was selected by federal and state officials to play a lead role in helping the overall emergency clean-up operation get underway with federal, state and local assistance. On September 29, 2005, after much discussion and deliberation between federal, state and local authorities, Dr. Chuck Brown, the Assistant Secretary for the Office of Environmental Services of LDEQ issued an Order Authorizing Commencement of Operation for Standard Permit P-0375. At this time, LDEQ also expanded the permissible waste stream volumes that all regulated landfills in the New Orleans market could accept as a result of the various federal, state and local emergency orders.

108.

C&D landfills are typically authorized to handle construction and debris materials, but not industrial or municipal solid waste. Ordinarily, a C&D landfill in Louisiana would not be authorized to handle the full range of waste materials from a clean-up operation on the scale of Hurricane Katrina because of the presence of unauthorized waste. To accommodate the needed flexibility to clean up the City, the LDEQ and/or City issued Emergency Orders that expanded Louisiana's definition of C&D debris to permit disposal of certain related materials (e.g., plaster, carpet, furniture). In addition, by express approval of the LDEQ, and consistent with the Emergency Orders in place following Hurricane Katrina, the Chef Menteur landfill and several others were granted approval to operate as "enhanced" C&D disposal sites, which authorized those sites for the disposal of waste from certain residential structures pursuant to government demolition that were presumed to contain asbestos-containing materials.

109.

In addition to the environmental and regulatory oversight of the LDEQ, the Environmental Protection Agency ("EPA") also oversaw and approved of the operations at the Gentilly Landfill. The EPA conducted a three-day onsite investigation of the Gentilly Landfill in early November of 2005, following an unprecedented media and political attack leveled at the City of New Orleans and AMID/Metro. EPA and LDEQ continued to support the operations of the Gentilly Landfill,

7

notwithstanding what has recently been revealed as a well-coordinated attack against these agencies too.

<div align="center">110.</div>

In February 2006, in the wake of Hurricane Katrina, then Mayor C. Ray Nagin ("Mayor Nagin"), utilizing his emergency powers, executed an Emergency Disaster Cleanup Site Request authorizing Waste Management to operate a C&D landfill at its "pre-approved" site in New Orleans East, off the Chef Menteur Highway. In exercising his emergency authority, Mayor Nagin's Order superseded the normal processes of the Comprehensive Zoning Ordinance applicable to permitting a C&D landfill and granted the necessary approval. Waste Management expended considerable sums to prepare the site and to obtain the requisite approvals to operate the Chef Menteur landfill.

<div align="center">111.</div>

In 2006, LDEQ publicly recognized that the Chef Menteur landfill "is technically sound, meets requirements and is in close proximity to some of the most devastated areas of Orleans Parish." After completing its analysis of Chef Menteur, the LDEQ concluded that "[t]his site is needed to clean up New Orleans in a timely, environmentally sound manner." Chef Menteur commenced operations in April 2006. Steps were taken by Waste Management, the LDEQ, and the EPA to minimize unauthorized waste streams. Air and water sample testing by the LDEQ in May and June 2006 found no health risks from its operation.

<div align="center">112.</div>

Almost immediately following its opening, the Chef Menteur landfill (as well as the Old Gentilly landfill that was re-opened and authorized to handle post-Katrina C&D, and the proposed Two Rivers landfill in Catahoula Parish that also would have received post-Katrina debris) became the target of a wide-ranging public opposition campaign that was financed, organized and supported by the Defendants, their co-conspirators, known and unknown, and certain political and public figures acting at their behest.

<div align="center">113.</div>

The Defendants set in motion a widespread and well-organized local, state and federal

<div align="center">8</div>

campaign against the competitors of the Defendants, including Waste Management's Chef Menteur landfill, AMID/Metro Old Gentilly landfill, and the proposed Two Rivers Recycling Landfill in Catahoula Parish that also would have received post-Katrina debris if permitted. The vast majority of the opposition campaign was financed, organized, orchestrated, directed, and supported by the Defendants and at least one former state official and public figure at their behest.

114.

Upon information and belief, Defendants and their co-conspirators, known and unknown, sponsored sham lawsuits challenging the issuance, authorization, and permitting of the landfill, proposed blocking legislation, sought additional and unprecedented environmental compliance testing of the waste and the imposition of unnecessary leachate barriers, and manufactured the appearance of other forms of public outcry and widespread opposition.

115.

Mouton, then a Louisiana Department of Wildlife and Fisheries Commissioner, fomented public opposition while receiving illegal bribes from the Defendants to use his position and influence to further the commercial interests of the Defendants.

116.

On May 6, 2011, Mouton executed a *Factual Basis*, which, on June 1, 2011, was filed in the United States District Court for the Eastern District of Louisiana in the matter entitled *United States of America v. Henry M. Mouton*, case no. 11-048. Upon information and belief, the allegations of the *Factual Basis* are adopted herein as if copied *in extenso*. *See Factual Basis*, Document 18, attached hereto as Exhibit "A."

117.

Acting secretly on behalf of the Defendants, Mouton personally contacted, including through use of the mail and/or wires, numerous public officials, including persons at the EPA, the FBI, the U.S. Attorney's Office, seventeen (17) U.S. Senators, and others to spread misleading information and to seek their assistance in stopping other C&D landfills, including the Chef Menteur landfill, the re-opened Old Gentilly landfill, and the proposed Two Rivers landfill, from competing with River

9

Birch for post-Katrina waste disposal services under the guise of various environmental concerns. Each such communication was part of a scheme to defraud the recipients of such communications by stating or implying that Mouton was acting in his official capacity as a protector of Louisiana's natural resources while concealing that he was acting on behalf of Defendants.

<center>118.</center>

As one example noted in the 44-page federal indictment of Mouton, "On or about November 10, 2005, Henry M. Mouton, acting on behalf of co-conspirator 'A'," believed to be a person or company associated with the Defendants, "wrote to an official with the Environmental Protection Agency in Dallas" while concealing the financial motivations of himself and others "and represented himself as a Commissioner of the State of Louisiana Department of Wildlife and Fisheries Commission." In that correspondence, Mouton "attempted to affect the EPA officials actions in an effort to keep closed the Old Gentilly Landfill located in New Orleans."

<center>119.</center>

Yet another example noted in the 44-page federal indictment of Mr. Mouton, "On or about January 3, 2006, defendant Henry M. Mouton, acting on behalf of co-conspirator 'A'," believed to be a person or company associated with the Defendants, "wrote to a Colonel with the U.S. Army Corp of Engineers while concealing the financial motives of himself and others and represented himself as a Commissioner of the State of Louisiana Department of Wildlife and Fisheries Commission and attempted to gain the assistance of the official in an effort to keep closed the Old Gentilly Landfill located in New Orleans." Mouton took this action on the same date he received an illegal payoff of $17,000.00 from a co-conspirator of the Defendants "to influence and reward him for his official action."

<center>120.</center>

One of the primary criticisms repeatedly leveled against the Gentilly Landfill concerned its environmental safety, based in large part on its construction and location. This criticism continued, notwithstanding the environmental and geographical approval by the United States Army Corps of Engineers ("USACE"), LDEQ and EPA. In that regard, the public opposition fomented by Henry

<center>10</center>

Mouton, then a Louisiana Department of Wildlife and Fisheries Commissioner, was particularly influential.

121.

In 2006, the Chef Menteur landfill was the subject of various environmental and permitting challenges filed in federal court. This series of court actions included a claim by the Louisiana Environmental Action Network and other interested citizens and putative public interest groups (hereinafter collectively "LEAN") challenging the LDEQ's issuance of permits to open and operate the landfill. Upon information and belief, the Defendants and their co-conspirators, known and unknown, supported and helped to finance the cost of the frivolous LEAN litigation. Counsel in the related judicial challenges brought by "concerned citizens" of New Orleans East seeking to challenge "the basis under which Waste Management sough to operate its landfill in an area of the City of New Orleans that is not zoned for such use," Kyle Schonekas ("Schonekas") and Joelle Evans ("Evans"), upon information and belief, were both secretly on retainer by the Defendants as undisclosed "lobbyists."

122.

Upon information and belief, the Defendants and their secret lobbyists, Schonekas and Evans, also enlisted the services of Walter Willard ("Willard") to assist with their litigation against the Chef Menteur landfill and challenging Mayor Nagin's emergency authorization. Upon information and belief, Willard was retained, at least in part, to curry favor and political influence. In particular, Willard is the brother of Cynthia Willard-Lewis ("Willard-Lewis"), then the New Orleans Councilperson for District E where the Chef Menteur landfill was located. At one point, Willard-Lewis was one of the strongest proponents and supporters of the Chef Menteur landfill because she deemed it critical to expediting the clean-up and recovery of her district in New Orleans East. This district is located most remotely from the River Birch and HWY-90 landfills. Upon information and belief, upon the retention of her brother to allegedly "assist" in the litigation against the landfill, Willard-Lewis suddenly reversed course and became a vocal opponent to the continued operation of the Chef Menteur landfill. Willard-Lewis attributed her changed position to the public

11

outcry over health and safety concerns arising from the location of the landfill.

123.

During the Summer of 2006, after the herein described improper influence of the Mayor's Office and New Orleans City Council, Mayor Nagin unexpectedly reversed his position and withdrew his emergency authorization for the Chef Menteur landfill.

124.

But for the opposition that the Defendants and their co-conspirators, including Mouton, artificially created, and/or other improper influence, it is highly unlikely that Mayor Nagin would have withdrawn his emergency authorization for the Chef Menteur landfill.

125.

When Mayor Nagin withdrew his emergency authorization, the Chef Menteur landfill became subject to, and out of compliance with, the zoning ordinances. As a result, the LDEQ took the position that, although a superior and less costly option, Chef Menteur would be unavailable for waste disposal. Similarly, FEMA announced that it would not fund the costs of disposal at unapproved sites, such as Chef Menteur, although superior to its other options.

126.

By August 2006, Waste Management closed the Chef Menteur landfill.

127.

Upon information and belief, the conspiracy to close all landfills in the Greater New Orleans Area extended beyond the Chef Menteur landfill, and also to the Old Gentilly Landfill, the Jefferson Parish landfill, the proposed Two Rivers landfill in Catahoula Parish, the Pecan Grove and Central landfills in Southern Mississippi, and the Woodside landfill in Walker, Louisiana.

128.

Upon information and belief, the River Birch Defendants and their co-conspirators used or caused to be used mail and/or wires as a part of their illegal and fraudulent scheme to improperly prevent and influence the political process to secretly advance their private financial interests at the expense of AMID/Metro, other competitors, and the consumers and citizens of the New Orleans

12

Market.

## Jefferson Parish Monopoly

129.

Since 1996, Jefferson Parish and Waste Management had been parties to a Landfill Contract pursuant to which Waste Management operates the Jefferson Parish landfill. By its own terms, the Landfill Contract was designed to terminate when the Jefferson Parish landfill has reached its full permitted capacity (defined as "final elevation" under the subject permit). However, the Defendants secured from Jefferson Parish in the *Time Contract For Disposal Services Between the Parish of Jefferson and River Birch, Inc. and its Wholly Owned Subsidiary Hwy 90, LLC* ("River Birch contract")—a commitment to shut down the Waste Management-operated Jefferson Parish landfill for a period of 25 years, costing the citizens of Jefferson Parish millions more to dispose of their waste, and rendering one of Jefferson Parish's most valuable assets, its landfill, worthless. Further, the River Birch contract eliminated the Jefferson Parish landfill and Waste Management as a source of waste disposal competition.

130.

The River Birch contract with Jefferson Parish was designed and intended to leave the commercial waste generators that previously had benefitted from the competition between the Jefferson Parish landfill and Waste Management vulnerable to the Defendants' resulting monopoly over landfill disposal rates.

131.

Defendants secured this windfall by, among other things, providing undisclosed financial benefits to members of the Jefferson Parish administration and certain of the administration's principal staff members involved in the manipulation, solicitation, evaluation, negotiation, and approval of that waste disposal contract. Parish co-conspirators included Broussard, Whitmer, and Wilkinson. They drafted the River Birch contract to include a provision requiring that Jefferson Parish's current valid contract for waste disposal services with Waste Management be prematurely terminated as a condition to the River Birch contract becoming effective.

13

132.

Jefferson Parish Ordinance No. 21587 establishes a uniform set of procedures for the purchase of materials, supplies, equipment, services and public works, and mandates the use of an RFP process. Pursuant to Ordinance No. 21587, and specifically Section 2-895 therein, a mandatory process is provided for the development, specification, weighing and use of specific criteria to evaluate proposals. Ordinance No. 21587 requires that the RFP include the specific criteria that will be used to evaluate the proposals, including price and other factors such as experience, staff capability, and cost breakdown. The Ordinance further requires that the criteria be carefully developed and a weighing scheme formulated around the most important features of each procurement action. The evaluation criteria must be included in the RFP along with the stated relative order of importance. The Ordinance further requires that a scoring system be devised and impartially applied to each proposal. Ordinance No. 21587 further requires that all proposals must be evaluated by an Evaluation Committee in accordance with the published criteria and that no change in the scope of the evaluation criteria is allowed. The evaluation shall be conducted with the sole objective to achieve the contract agreement most advantageous to the Parish of Jefferson based upon the published criteria. This ordinance was blatantly violated in the awarding of the River Birch contract.

133.

Under the then existing Jefferson Parish-Waste Management contract, commercial generators of municipal solid waste in the region had the option of disposing that waste at either the Jefferson Parish landfill or at the nearby River Birch landfill. That existing competition between the landfills, however, would be eliminated if the Jefferson Parish landfill were closed, as required by the River Birch contract, and the commercial waste generators would be subject to the unregulated disposal rates at River Birch. River Birch thereby illegally obtained an exclusive franchise for landfill disposal services in violation of Louisiana law and, specifically, La. R.S. 33:4169.1(A)(2).

14

134.

The repeated assertions that there would be "substantial cost savings" in the range of approximately $25 million by shifting waste disposal to River Birch have been exposed as a complete sham and fraud. Jefferson Parish considered an extrapolation created by Rick Bueller, which was expanded upon by Wilkinson, when it made its determination that a savings would result if the contract with Waste Management were terminated in favor of River Birch. This false analysis was made specifically in an effort to deceive the Parish Council, the citizens of Jefferson Parish, and to justify termination of the Waste Management contract prior to its natural term in order to provide a new exclusive contract to River Birch.

135.

Commercial waste generators not subject to the Jefferson Parish disposal contract would have been expected to lose millions more through higher tipping charges.

136.

Upon information and belief, the health insurance contract between Shadow Lake and River Birch, and Lagniappe, owned by Tim Whitmer, and brokered by Dawn Whitmer, was a *quid pro quo* payment for the Jefferson Parish waste disposal contract. But for the corrupt influence and unlawful and undisclosed payments and financial benefits provided by Defendants, the Jefferson Parish Council would not have hijacked the RFP process, denied Petitioners a contract, entered the 25-year contract with River Birch, or sought to terminate their operating contract with Waste Management.

137.

Current Jefferson Parish Council members have publicly stated that they believe that they were misled regarding the River Birch contract and the undisclosed financial relationships at issue, and thus, expressed the view that the contract be declared void and unenforceable.

**The Continuing Conspiracy**

138.

The execution of the River Birch contract did not effectuate the contract and complete the conspiracy. Rather, the existing contract with Waste Management had to be canceled so the River

15

Birch contract could become effective.  The Defendants and their co-conspirators, known and unknown, plotted continuously to employ the "annual appropriation dependency clause" of the Landfill Contract with Waste Management to prematurely terminate the contract with Waste Management in order to assure that the River Birch contract could be implemented.

139.

River Birch itself explained the need for the termination of the Waste Management contract in its *Memorandum in Support of Rule 12(B)(1) Motion To Dismiss Second Amended and Supplemental Counterclaim* filed in *Consolidated Garbage District No. 1 of the Parish of Jefferson and the Parish of Jefferson through the Jefferson Parish Council v. Waste Management of Louisiana, L.L.C.*, case no: 09-06270, on the docket of the United States District Court for the Eastern District of Louisiana:

> River Birch, Inc. bid for and won a contract with Jefferson Parish for the disposal of residential and Parish-generated solid waste, RACM, sewerage, sludge, special waste, construction and demolition debris, and yard and woody waste. That contract, ratified by Parish Council resolution # 112564, was contingent on the termination of the Parish's waste disposal contract with Waste Management of Louisiana, L.L.C. Specifically, section 36 of River Birch's contract with the Parish stated that it was suspended until
>
> > A) A "final judgment" has been rendered declaring that the Time Contract between the Parish and Waste Management may be terminated under the Annual Appropriation Dependency Clause or in light of contractual breaches by Waste Management, and that in the event of such termination the Parish has no obligation to Waste Management except for payment of disposal fees which have been earned prior to the termination date, and that Waste Management is responsible for installation of final cover, at Waste Management's expense, over Phase IIIA and IIIB cells in which Waste Management has placed solid waste; or
> > B) The Parish and Waste Management voluntarily terminate the existing Kelvin Landfill Time Contract on terms and conditions acceptable to both parties.
>
> First Am. & Suppl. Compl.¶ 49.
>
> The Parish and Parish Council, on behalf of Consolidated Garbage District No. 1, filed the present suit in 24th Judicial Court, Parish of Jefferson, seeking a declaration that the Waste Management contract could be terminated under the Annual Appropriation Dependency Clause. *See* Pet. Decl. J., Liq. Dam. Contract, & Recovery Overcharges, *Prayer for Relief.*

140.

River Birch, despite the filing of peremptory exceptions attempting to dismiss this litigation,

further argued in the *Memorandum* that the demand by Waste Management for a declaratory

judgment voiding the contract should be dismissed because:

> To the extent that there were any irregularities with the bidding process
> (which is denied), the party with the most incentive to make a challenge
> would be the disappointed bidder, not Waste Management. The disappointed
> bidder for Request for Proposal No. 176 in fact has brought a suit in state
> court to invalidate the River Birch contract for substantially the same reasons
> given by Waste Management. *See Concrete Busters of Louisiana, LLC v.
> Heebe*, No. 11-2129, Civil District Court, Parish of Orleans, State of
> Louisiana. The public's interest in the integrity of the bidding process for
> Request for Proposal No. 176 is sufficiently safeguarded by this suit, brought
> by an actual bidder for the River Birch contract. This Court need not
> recognize Waste Management's standing, as a non-bidder, in order to protect
> the same.

141.

River Birch further argued in its *Reply Memorandum in support of its Rule 12(b)(1) Motion

to Dismiss Waste Management's Second Amended and Supplemental Counterclaim* that "The River

Birch contract is entirely contingent on the Parish obtaining a final judgment declaring the Waste

Management contract invalid or Waste Management's voluntary termination of its contract."

142.

These actions were consistent with an October 11, 2004 memorandum prepared by former

Parish Attorney Tom Wilkinson and addressed to the Jefferson Parish Council. The subject of the

memorandum was "non-appropriations clause in Landfill Contract." Upon information and belief,

the concept addressed in the memorandum of employing the non-appropriations clause in the Waste

Management contract, was referenced in a James Gill opinion piece in the *Times-Picayune*

newspaper, dated December 19, 2004. In the column Gill commented that some Council members

were evidently "planning to give Waste Management the early heave-ho" and "Parish Attorney

Wilkinson had suggested how they might go about doing it," and further noted that Wilkinson

conceded the Parish might be found liable in court unless it could prove that Waste Management had

been stiffed "in good faith." Thus, the acts described herein are consistent with a long-standing

conspiracy.

143.

To effectuate cancellation of the Landfill Contract with Waste Management through the Annual Appropriation Dependency Clause, the co-conspirators, known and unknown, altered subsequent budgets, and, on August 21, 2009, Jefferson Parish filed a *Petition for Declaratory Judgment,* through co-conspirator Wilkinson, against Waste Management in the 24th Judicial District Court for the Parish of Jefferson, in the matter entitled *Consolidated Garbage District No.1 of the Parish of Jefferson and the Parish of Jefferson through the Jefferson Parish Council v. Waste Management of Louisiana, L.L.C.* and numbered 677003, citing the Annual Appropriation Dependency Clause in the Waste Management Landfill Contract, seeking, *inter alia,* a declaratory judgment "that in the event the Parish Council decides not to appropriate funds for the fiscal year 2010 for continuation of the [Waste Management] Landfill Contract, the Landfill Contract shall be deemed terminated without penalty or expense to the Parish except for tipping fees which have been earned by Waste Management prior to the termination date." The suit further sought to obtain a "'final judgment' ... declaring that the Time Contract between the Parish and Waste Management may be terminated under the Annual Appropriation Dependency Clause." The filing of this lawsuit was consistent with the long-standing conspiracy to utilize the non-appropriations clause to terminate the Waste Management contract, close the Parish landfill, and redirect Jefferson Parish waste to River Birch. Co-conspirator Wilkinson so acted because he had received *quid pro quo* benefits from Broussard described herein, who had received *quid pro quo* benefits from Defendants and/or their co-conspirators, known and unknown, as described herein.

144.

On September 14, 2009, the suit was removed to the United States District Court for the Eastern District of Louisiana and assigned Case No. 09-06270. The Parish filed an Amended Complaint stating that it sought the Court's approval to use the Annual Appropriation Dependency Clause due to alleged substantial savings to the Parish which could be achieved by effectuating an already-executed contract with Defendants.

145.

Jefferson Parish later admitted in its *Answer to Waste Management's First Amended and Supplemental Counterclaim* in the federal litigation that "in October of 2009 Whitmer directed the Finance Director to reduce the landfill budget to one month of charges and add the difference to the professional services budget." Further, Gwenn Bolotte, Finance Director of Jefferson Parish, has testified that, in preparation of the 2010 budget, she received instructions from Whitmer to reduce the landfill budget to only one month of charges.

146.

Wilkinson continued to pursue the litigation through his suspension in February of 2010. On May 21, 2010, Wilkinson finally withdrew from the Waste Management litigation when a *Joint Motion to Substitute Counsel* was filed in the federal litigation.

147.

Waste Management filed a Counterclaim, then filed its *First and Second Amended and Supplemental Counterclaims* against the Parish, in the federal litigation, alleging that the 2009 waste disposal contract between the Parish and River Birch that would have diverted all waste from the Parish Landfill was entered illegally, and prayed that the actual contract between Jefferson Parish and River Birch be invalided. Documents 74, 128 and 170. Waste Management claimed that the Parish sought to terminate its contract with Waste Management and divert its waste disposal business to River Birch. The *Second Amended and Supplemental Counterclaim* subsequently was dismissed by order of the Court for lack of standing. See Documents 234 and 259.

148.

Judge Ivan Lemelle found, in an *Order and Reasons* granting *River Birch's Rule 12(B)(1) Motion to Dismiss Second Amended and Supplemental Counterclaim* that:

> Section 36 of the River Birch/Jefferson Parish contract states, in pertinent part:
>
>> If a final judgment is not rendered by December 31, 2009, declaring that upon an event of non-appropriation under the Annual Appropriation Dependency Clause, or in light of contractual breaches by Waste Management, that the Kelvin Landfill Time Contract may be terminated by the Parish with no liability for any claims, costs or expenses of Waste Management, including but not limited to lost future profits or

construction costs, and that Waste Management is obligated at its expense to install final cover in accordance with the Time Contract provisions and the LDEQ permit over cells in Phase IIIA and IIB in which Waste Management has placed waste, then the implementation and commencement date of this Time Contract will be postponed until the earlier of the following events:

a) A "final judgment" has been rendered declaring that the Time Contract between the Parish and Waste Management may be terminated under the Annual Appropriation Dependency Clause or in light of contractual breaches by Waste Management, and that in the event of such termination the Parish has no obligation to Waste Management except for payment of disposal fees which have been earned prior to the termination date, and that Waste Management is responsible for installation of final cover, at Waste Management's expense, over Phase IIIA and IIIB cells in which Waste Management has placed solid waste; or

b) The Parish and Waste Management voluntarily terminate the existing Kelvin Landfill Time Contract on terms and conditions acceptable to both parties. (Rec. Doc. No. 191-1 at 31).

Thus, unless the Court issues a judgment terminating the current Waste Management/Jefferson Parish contract or until Waste Management and Jefferson Parish mutually decide to terminate their contract, River Birch's contract will not activate. (Rec. Doc. No. 76 at 3-4.). The River Birch contract is wholly contingent upon some affirmative action being taken with regard to the Waste Management/Jefferson Parish contract. (Id.).

149.

On January 18, 2011, Waste Management and Jefferson Parish filed in the federal litigation a *Consent Joint Motion to Continue Hearing on Cross-Motions for Partial Summary Judgment.* In the motion the parties stated that:

Recent developments may render moot some or all of the issues raised in the cross-motions for summary judgment. Counsel for the Parish and Consolidated Garbage District No. 1 needs time to meet with Parish representatives and thereafter advise the Court of the Parish's position with respect to these developments.

As described above, until the filing of this Motion, Jefferson Parish had aggressively pursued the scheme, conceived of years before, to divert all Jefferson Parish waste to Defendants.

150.

On January 20, February 1, February 3, February 11, February 13, and February 14, 2011, Defendants placed advertisements and/or opinions of its expert economist Dr. Loren Scott in the *Times Picayune,* falsely claiming that Jefferson Parish would achieve cost savings through disposal of Parish waste at the River Birch landfill as compared to the Jefferson Parish landfill. Further, in

20

January 2011, Defendants issued mailers with the same falsehoods to citizens of Jefferson Parish.

**Away With The Whistleblower**

151.

In August 2009, Anne Marie Vandenweghe, the Assistant Parish Attorney in charge of responding to public records requests, received a Public Records Request from legal counsel for Waste Management, the then operator of the Jefferson Parish landfill, seeking the production of any contracts which may exist between River Birch and the Parish. As part of her duties, she obtained a copy of an un-executed contract between River Birch and the Parish from Eula Lopez, the Clerk and Custodian of Records for the Parish Council. Shortly afterward, she received yet another contract between River Birch and the Parish—this one signed only by the Parish Council Chairman. Upon bringing this apparent discrepancy to the attention of then-Parish Attorney Wilkinson, she was ordered by Wilkinson, her ultimate supervisor, not to make any further inquiries. Wilkinson directed her that he would personally handle this issue. Wilkinson then provided her with a fully-executed copy of a contract between River Birch and the Parish. She then brought these blatant discrepancies in the River Birch contracts to the attention of Parish Attorney Wilkinson, who failed to take any appropriate action thereto. The Parish, against her advice, issued a letter of non-production of the documents requested pursuant to the public records request.

152.

In preparation for a return for a federal subpoena request, Eula Lopez, certified a return dated December 16, 2009, of a partially-executed River Birch contract signed only by Jim Ward of River Birch, knowing that there were other multiple, signed copies of the same contract in the possession of the Parish. Lopez informed Anne Marie Vandenweghe, via an email, that her brother-in-law, Wilkinson, had instructed her not to send it to the Council Chairman for signature. All different versions of said document were made part of Vandenweghe's return to the Federal Grand Jury subpoena in December of 2009.

21

153.

Petitioners hereby adopt and allege the allegations of paragraphs 4, 5, 16, 17, 20, 21, 25, 26

and 28 of the *Complaint* in the matter entitled *Anne Marie Vandenweghe v. The Parish of Jefferson*

and numbered 2:11-cv-2128 on the docket of the United States District Court for the Eastern District

of Louisiana as if copied herein *in extenso*. *See Complaint,* Document 1, attached hereto as Exhibit

"B."

154.

These above-described unlawful acts were committed by Defendants and/or their co-

conspirators, known and unknown, in furtherance of the conspiracy to effectuate the River Birch

contract.

**Payola Radio**

155.

The Defendants made a substantial, undisclosed, interest-free, and unrecorded "loan" of

$250,000.00 through its CEO and co-conspirator Dominick Fazzio and co-conspirator Westside

Construction Services, Inc. to radio host Garland Robinette ("Robinette") after Robinette, armed

with false and misleading information in direct contravention of the LDEQ's informed opinion,

routinely railed against the purportedly harmful environmental consequences of opening and

operating the Chef Menteur and Old Gentilly landfills. So effective was Robinette in corrupting the

public dialogue that even the LDEQ felt it was unable to communicate its position on the benefits

of the Chef Menteur and Old Gentilly landfills as safe and valuable alternatives to disposal at the

River Birch and HWY-90 landfills.

156.

Further, Robinette, after receiving the $250,000.00 payment, contrary to his railings against

the Chef Menteur and Old Gentilly landfills, never criticized the River Birch landfill or the River

Birch contract. His silence continued at least through the filing of the original petition.

157.

The undisputed payments by Defendants and their co-conspirators, known and unknown, to

Robinette for attacks on competitor landfills and silence regarding their landfill and River Birch

contract violate 47 USC 317 and 47 CFR 73:1212.

### Pattern Of Abusing Public Office

#### 158.

On December 2, 2011, a federal grand jury issued an *Indictment for Conspiracy to Commit*

*Theft Concerning Programs Receiving Federal Funds, Conspiracy to Commit Wire Fraud, Wire*

*Fraud and Notice of Forfeiture* alleging, *inter alia*, that Broussard, Karen Parker and Wilkinson

entered into a conspiracy to defraud and obtain money and/or property from Jefferson Parish. The

*Indictment for Conspiracy to Commit Theft Concerning Programs Receiving Federal Funds,*

*Conspiracy to Commit Wire Fraud, Wire Fraud and Notice of Forfeiture* was filed in the United

States District Court for the Eastern District of Louisiana in the matter entitled and numbered *United*

*States v. Aaron Broussard and Thomas G. Wilkinson*, Criminal Docket No. 11-299 "HH. Upon

information and belief, the allegations of the *Indictment for Conspiracy to Commit Theft Concerning*

*Programs Receiving Federal Funds, Conspiracy to Commit Wire Fraud, Wire Fraud and Notice of*

*Forfeiture* are adopted herein as if copied *in extenso. See Indictment,* Document 1, attached hereto

as Exhibit "C."

#### 159.

On January 12, 2012, Karen Parker Broussard plead guilty to Conspiracy to Commit

Misprison of a Felony in violation of Title 18 U.S.C. 4. Karen Parker Broussard further executed a

*Factual Basis.* In the Factual Basis, Karen Parker Broussard swore that

> from approximately 2004 through 2010, Broussard received monies, totaling
> hundreds of thousands of dollars, that were characterized as, among other
> things, "retainers," "consulting fees" or "finder's fees" with various
> contractors and vendors, all of whom were doing business with Jefferson
> Parish during the period of time Broussard was the President of Jefferson
> Parish. Moreover, Broussard was a majority owner in a holding company
> which owned an investment property in Canada. Broussard received income
> from this Canadian property. This property was partially funded by
> individuals and/or entities who were contractors and/or vendors doing
> business with Jefferson Parish during the period of time Broussard was the
> Jefferson Parish President.

Petitioners hereby adopt and allege the allegations contained in the *Factual Basis,* filed in the United

States District Court for the Eastern District of Louisiana in the matter numbered 2:12-cr-00239, as if copied herein *in extenso*.   *See Factual Basis*, attached hereto as Exhibit "D."

160.

On February 3, 2012, a federal grand jury issued a *Superceding Indictment for Conspiracy to Commit Theft Concerning Programs Receiving Federal Funds, Conspiracy to Commit Wire Fraud, Wire Fraud and Notice of Forfeiture*, Document 53, alleging, *inter alia*, that Broussard and Wilkinson "did knowingly and willfully combine, conspire, and agree together and with each other to: 1. Embezzle, steal, and obtain by fraud, property valued at $5,000 or more and owned by, or under the care, custody and control of, the Parish of Jefferson; in violation of Title 18, United States Code, Section 666(a)(1)(A) 2.  Use and cause to be used bank wire transfers to be transmitted by means of wire communication in interstate commerce the signals and sounds in furtherance of the scheme and artifice to defraud ... ; in violation of Title 18, United States Code, United States Code Section 1343." The *Superceding Indictment for Conspiracy to Commit Theft Concerning Programs Receiving Federal Funds, Conspiracy to Commit Wire Fraud, Wire Fraud and Notice of Forfeiture* was filed in the United States District Court for the Eastern District of Louisiana in the matter entitled and numbered *United States v. Aaron Broussard and Thomas G. Wilkinson*, Criminal Docket No. 11-299 "HH.  Upon information and belief, the allegations of the *Superceding Indictment for Conspiracy to Commit Theft Concerning Programs Receiving Federal Funds, Conspiracy to Commit Wire Fraud, Wire Fraud and Notice of Forfeiture* are adopted herein as if copied *in extenso*.  *See Superceding Indictment*, Document 53, attached hereto as Exhibit "E."

161.

On January 20, 2012, the United States Attorney for the Eastern District of Louisiana filed a *Bill of Information for Misprison of a Felony* against Timothy A. Whitmer for, *inter alia*, allegedly "having knowledge of the actual commission of a felony cognizable by a court of the United States, to wit: wire fraud, theft concerning programs receiving federal funds, and other federal criminal violations, [and concealing same by participating in: 1) the hiring of certain parish employees, 2) the awarding of salary increases to certain parish employees, and 3) the contract selection processes that

24

were all contrary to the best interests of the citizens of Jefferson Parish, and did not as soon as possible make known the same to [authorities]; all in violation of Title 18, United States Code, Section 4." The *Bill of Information for Misprison of a Felony* was filed in the United States District Court for the Eastern District of Louisiana in the matter numbered 2:12-cr-046. Upon information and belief, the allegations of the *Bill of Information for Misprison of a Felony* are adopted herein as if copied *in extenso*. See *Bill of Information for Misprison of a Felony,* Document 1, attached hereto as Exhibit "F." Upon information and belief, "the contract selection processes that were all contrary to the best interests of the citizens of Jefferson Parish" included the contract selection process for RFP 176 and the eventual River Birch contract.

162.

On March 22, 2012, Whitmer executed a *Factual Basis*. Petitioners hereby adopt and allege the allegations contained in the *Factual Basis,* filed in the United States District Court for the Eastern District of Louisiana in the matter numbered 2:12-cr-046, as if copied herein *in extenso*. See *Factual Basis,* Document 17, attached hereto as Exhibit "G." In the *Factual Basis* Whitmer swore, *inter alia,* that (1) after Hurricane Katrina, he left the position of CAO because of job-related stress and because he became frustrated by the "culture of corruption" that occurred under the Broussard administration; (2) he returned as CAO when Broussard promised him a significant raise in salary; (3) he, at the instruction of Broussard, hired Karen Parker as a "Paralegal Supervisor," a position for which she was not qualified, trained or certified, nor which duties she performed, and then provided her raises in salary and improper overtime/comp. pay, to the romantic and financial benefit of Broussard; (4) Wilkinson knew of, and aided and abetted the hiring and raises; (5) Wilkinson rescinded Karen Parker's resignation to the benefit of Karen Parker; (6) Broussard received a "consulting fee" and "retainer" from a company to steer business to the company and feigned a "recusal" and drafted a tailored RFP when the company sought Parish business; (7) Broussard repeatedly used campaign funds for personal expenses; (8) Broussard provided Wilkinson with pay raises for concealing, aiding and abetting the preceding and helping Broussard with a private family matter; (9) Whitmer was aware that Broussard would improperly interject himself into contract

negotiations and would secretly advocate on behalf of certain businesses.  In the *Factual Basis* Whitmer swore that:

> Whitmer, along with two other business partners, operated an insurance business that sold insurance policies to various businesses and municipalities.  In 2009, Whitmer approached Broussard and asked Broussard if he would be willing to assist Whitmer in securing additional insurance business. Whitmer and his partners agreed to pay Broussard $1,000 per month for Broussard's assistance. The payments continued for five months and were discontinued when media reports began to investigate Whitmer's insurance dealings.  Neither Whitmer nor Broussard sought Jefferson Parish Council approval for their self-dealings.

Upon information and belief, the "insurance business" referenced in the *Factual Basis* is co-conspirator Lagniappe Industries, LLC, and Broussard, as a *quid pro quo* for the payments of $1,000.00 per month, assisted Lagniappe in "securing additional insurance business" from and through Defendants and their co-conspirators.

163.

Petitioners hereby adopt and allege the allegations contained in the *Factual Background* section of the *Response in Opposition to Defendant Broussard's Motion for  Discovery*, Document 78, filed on or about April 20, 2012, in the United States District Court for the Eastern District of Louisiana in the matter entitled and numbered *United States v. Aaron Broussard and Thomas G. Wilkinson*, Criminal Docket No. 11-299 "HH," as if copied herein *in extenso.  See Response in Opposition to Defendant Broussard's Motion for  Discovery*, Document 78, attached hereto as Exhibit "H."

164.

On July 27, 2012, a federal grand jury issued a *Second Superceding Indictment for Conspiracy to Commit Bribery Concerning Programs Receiving Federal Funds, Conspiracy to Commit Theft Concerning Programs Receiving Federal Funds, Conspiracy to Commit Wire Fraud, Bribery, Wire Fraud, Theft and Notice of Forfeiture*, Document 117, alleging, *inter alia*, that Broussard and Wilkinson committed bribery, specifically by Bill Mack ("Mack"), the owner of First Communications Company ("FCC"), and theft in violation of Title 18, United States Code 666(a)(1)(A) and (B) and 2. The *Second Superceding Indictment* was filed in the United States District Court for the Eastern District of Louisiana in the matter entitled and numbered *United States*

*v. Aaron Broussard and Thomas G. Wilkinson*, Criminal Docket No. 11-299 "HH. Upon information and belief, the allegations of the *Second Superceding Indictment* are adopted herein as if copied *in extenso*. *See Second Superseding Indictment*, Document 117, attached hereto as Exhibit "I."

165.

Mack would corruptly pay Broussard approximately $1,500.00 per month in exchange for Broussard's efforts to steer Mack and FCC telecommunications work. Wilkinson knew of, never reported, and acted in furtherance of, the Broussard-Mack bribery.

166.

On July 27, 2012, the United States Attorney for the Eastern District of Louisiana filed a *Bill of Information for Conspiracy to Commit Bribery Concerning Programs Receiving Federal Funds* against Mack for, *inter alia*, allegedly bribing Broussard for official acts, including steering a telecommunications contract to a company owned by Mack. The *Bill of Information for Conspiracy to Commit Bribery Concerning Programs Receiving Federal Funds* was filed in the United States District Court for the Eastern District of Louisiana in the matter numbered 2:12-cr-00239. Upon information and belief, the allegations of the *Bill of Information for Conspiracy to Commit Bribery Concerning Programs Receiving Federal Funds* are adopted herein as if copied *in extenso*. *See Bill of Information*, Document 1, attached hereto as Exhibit "J."

167.

On August 16, 2012, Mack plead guilty as charged to the one-count *Bill of Information* charging him with conspiracy to commit bribery concerning programs receiving federal funds, in violation of Title 18, United States Code, Section 371. Mack further executed a *Factual Basis*. Petitioners hereby adopt and allege the allegations contained in the *Factual Basis*, filed in the United States District Court for the Eastern District of Louisiana in the matter numbered 2:12-cr-00239, as if copied herein *in extenso*. *See Factual Basis*, Document 16, attached hereto as Exhibit "K." In the *Factual Basis*, Mack swore that, beginning in or around 1982 through in or around July 2012, he was an owner and/or President of FCC, a company that provided telecommunications services

27

and equipment for commercial customers, including governments and municipalities. From at least in or around 2004 through in or about 2007, his company, FCC, bid on and received contracts let by Jefferson Parish for telecommunications services and equipment.

<center>168.</center>

Beginning in or around 2002, Mack met Broussard, then a sitting Jefferson Parish council member. Around this time, in 2002, Mack began paying Broussard approximately $1,500.00 per month in exchange for Broussard's official acts, as a Parish councilman and later Parish President, to, among other things, steer telecommunications work to FCC. From at least in or around 2004 through in or about November 2007, Mack and then Jefferson Parish President, Broussard, reached an arrangement where Mack would corruptly give Broussard monthly installments of money in exchange for, among other things, Broussard's efforts, as Parish President, to steer Parish telecommunications work to FCC. During this time period, FCC provided Broussard with approximately $66,000.00, paid in monthly installments of approximately $1,500.00, intending to influence Broussard in connection with his official duties as Jefferson Parish President. From in or around 2004 through in or around 2008, in exchange for the money he was receiving and had been receiving from Mack, Broussard undertook official actions as Jefferson Parish President to steer Parish work to FCC and FCC did, in fact, receive multiple contracts for telecommunications services in Jefferson Parish, collectively worth approximately $40,000.00. Broussard also undertook other official actions as Jefferson Parish President, ultimately unsuccessful, to steer more lucrative Parish telecommunications work, including a 2008 Request for Proposal released by Jefferson Parish, to FCC. Additionally, Broussard and Mack, on several occasions in between 2004 and 2007, sought to conceal their improper relationship and the illegal payoffs by masking the purpose of the payoffs to make them appear legitimate.

<center>169.</center>

Petitioners hereby adopt and allege the allegations contained in the *Factual Background* section of the *Government's Response in Opposition to Defendant Thomas G. Wilkinson's Motion to Dismiss Counts One and Seven Through Twenty-Seven*, Document 142, filed on or about August

<center>28</center>

23, 2012, in the United States District Court for the Eastern District of Louisiana in the matter entitled and numbered *United States v. Aaron Broussard and Thomas G. Wilkinson*, Criminal Docket No. 11-299 "HH," as if copied herein *in extenso*. *See Government's Response in Opposition to Defendant Thomas G. Wilkinson's Motion to Dismiss Counts One and Seven Through Twenty-Seven*, attached hereto as Exhibit "L."

<center>170.</center>

Petitioners hereby adopt and allege the allegations contained in the *Government's Notice of Intent to Introduce Intrinsic Evidence Or, Alternatively, Notice of "Other Act" Evidence Pursuant to Rule 404(b) of the Federal Rules of Evidence*, Document 146, filed in the United States District Court for the Eastern District of Louisiana in the matter entitled and numbered *United States v. Aaron Broussard and Thomas G. Wilkinson*, Criminal Docket No. 11-299 "HH," as if copied herein *in extenso*. *See Government's Notice of Intent to Introduce Intrinsic Evidence Or, Alternatively, Notice of "Other Act" Evidence Pursuant to Rule 404(b) of the Federal Rules of Evidence*, attached hereto as Exhibit "M."

<center>171.</center>

Broussard and his wife, Parker, falsely listed her occupation and job title on numerous government documents, including State of Louisiana Ethics Disclosures, as well as Federal Income Tax Returns through at least 2010.

<center>172.</center>

On September 24, 2012, Wilkinson plead guilty to Conspiracy to Commit Misprison of a Felony in violation of Title 18 U.S.C. 371 . Wilkinson further executed a *Factual Basis*. Petitioners hereby adopt and allege the allegations contained in the *Factual Basis*, filed in the United States District Court for the Eastern District of Louisiana in the matter numbered 2:12-cr-00239, as if copied herein *in extenso*. *See Factual Basis*, Document 191, attached hereto as Exhibit "N."

<center>173.</center>

On September 25, 2012, Broussard pled guilty to Conspiracy to Commit Bribery, Federal Program Fraud and Wire Fraud in violation of Title 18 U.S.C. 371 and Theft Concerning a Program

<center>29</center>

Receiving Federal Funds in violation of Title 18 U.S.C. 666(a)(1)(A). Broussard further executed a *Factual Basis*. Petitioners hereby adopt and allege the allegations contained in the *Factual Basis*, filed in the United States District Court for the Eastern District of Louisiana in the matter numbered 2:12-cr-00239, as if copied herein *in extenso*.   *See Factual Basis*, Document 197, attached hereto as Exhibit "O."

<div align="center">174.</div>

Thus, Broussard, with the assistance of Wilkinson and Whitmer, engaged in widespread pattern of abusing his political office for private gain by: (1) Broussard accepting bribes and payoffs from, among others, Mack of FCC, a Jefferson Parish vendor, in exchange for his influence and official acts to steer Parish and other business to FCC, with Wilkinson and Whitmer failing to report, aiding and/or abetting same; (2) devising a scheme to employ, among others, his girlfriend and later-wife, Karen Parker, with a job paid for by the taxpaying citizens of Jefferson Parish that she was not qualified and, in fact, did not perform, with Wilkinson and Whitmer failing to report, aiding and/or abetting same; (3) rewarding Wilkinson for, among other things, undertaking personal favors for Broussard including Wilkinson's efforts to use his influence at a local private school to assist a Broussard family member with the competitive admissions process, and failing to report, aiding and/or abetting the above, as well as failing to report, aiding and abetting the hijacking of the RFP and filing litigation to effectuate the River Birch contract; and (4) accepting payments from Lagniappe Industries, LLC for benefitting Whitmer by assisting Lagniappe in receiving business from Defendants and/or their co-conspirators, including Shadow Lake, in exchange for official acts to benefit Defendants in obtaining the River Birch contract.

<div align="center">175.</div>

Further, beginning in or around 2002, a company named Nova Scotia Enterprises, LLC ("NSE"), was formed. NSE was a holding company for several pieces of vacation rental property located in the Canadian province of Nova Scotia. At various times from 2002 through 2010, there were up to twelve partners in NSE—many of which were Jefferson Parish contractors or prospective contractors. Broussard was also a partner in NSE. However, unlike almost every other partner in

<div align="center">30</div>

NSE, Broussard was given a large, 42% interest in NSE for a small capital contribution to the company. By contrast, nearly $50,000.00 was contributed by several other NSE partners for the upkeep and maintenance of properties. Significantly, many of the NSE investors who supplied the vast majority of the funds obtained a much smaller ownership interest than Broussard in NSE. Most importantly and not coincidentally, during Broussard's tenure, many of the NSE partners, through their various corporations, received contracts with, and work in, Jefferson Parish, worth millions of dollars, at the same time they were funding NSE and Broussard's corporate interest in it. Finally, Broussard sought, at the conclusion of his tenure as Parish President, to sell his ownership share in NSE—which was purchased for very little—for nearly $200,000.00, an extraordinary return on the minimal investment supplied by Broussard. Upon information and belief, co-conspirators of the Defendants were NSE partners.

<p style="text-align:center">176.</p>

From 2003, when he was first elected, through 2007, when he was re-elected, Broussard ran a political campaign that took in thousands of dollars annually from contributors. By law, such contributions are made for the purpose of supporting, opposing, or otherwise influencing the nomination or election of a person to public office. See La. R.S. 18:1483(6)(a). Broussard was prohibited by law from expending contributions for any personal use unrelated to a political campaign or the holding of public office or party position, See La. R.S. 18:1505.2(1)(1). Broussard was also required to report, on his annual campaign finance report, all legitimate campaign expenditures, which are defined as payments made for the purpose of supporting election to public office and included monies spent for general operating expenses. See La. R.S. 18:1483(9)(a). During this period of time (2003-2007), though being prohibited from doing so, Broussard spent tens of thousands of dollars in campaign contributions for personal expenses, all unrelated to political campaigns or the holding of public office. Wilkinson participated in some of Broussard's events paid for by campaign funds. Upon information and belief, Wilkinson knew of, never reported, and aided and abetted the misappropriation of campaign funds by Broussard. Upon information and belief, the Defendants and/or their co-conspirators, known and unknown, have made campaign

<p style="text-align:center">31</p>

donations to Aaron Broussard, Parish President Campaign Committee, Inc.

177.

Broussard, during his tenure as Parish President, received other things of value from Jefferson Parish contractors, including dinners, gifts, and other things of value totaling thousands of dollars.

178.

The Louisiana Board of Ethics has charged Broussard with a violation of La. R.S. 42:1111A for receiving an improper thing of value from a Jefferson Parish employee.

179.

The acts alleged above constitute a conspiracy, a common plan and pattern of conduct, and a pattern of racketeering.  The abuse of their offices by the acceptance of bribes, through various mechanisms, all enriched Broussard, Whitmer and Wilkinson.

180.

Broussard benefitted, including by his family collecting hundreds of thousands of dollars in unearned salary due to Parker's employment, and tens of thousands of dollars in bribes from his bribe payor(s).

181.

Wilkinson benefitted from the conspiracy he had with Broussard as he enjoyed, among other things, Broussard's retention as Parish Attorney upon his taking office, and an approximately 84% increase in salary during Broussard's tenure.

182.

Upon information and belief, Whitmer benefitted, knew of, failed to report, and aided and abetted some or all of the above-described acts of malfeasance.

183.

Whitmer benefitted from the conspiracy he had with Broussard as he enjoyed, among other things, Broussard's retention as CAO upon his taking office, and monies made through the sale of insurance by Lagniappe Industries, LLC, of which Whitmer and his wife were owners.

32

## Fraudulent Misrepresentations and Concealment

184.

Defendants and their co-conspirators, known and unknown, acted in a manner designed to actively conceal their participation in the anti-competitive and unlawful scheme described above.

185.

Defendants' unlawful payments, for example, were by their very nature not disclosed to the public. In many cases, Defendants acted through proxies, such as co-conspirator government officials illicitly paid for their services, including Mouton, Whitmer, and Broussard, that were not known to be connected to the Defendants. In fact, these public officials, although working on behalf of Defendants, held themselves out as performing their public duties.

186.

Most, if not all, of the unlawful payments made to influence public officials to favor the Defendants, and disadvantage Petitioners' environmentally-friendly waste disposal alternatives and competing landfills, were made by co-conspirators, including Shadow Lake, but not directly by the Defendants. Similarly, the phone banks, lawsuits, media broadcast payola, and other efforts to foster public opposition to competitor landfills and suppress opposition to the River Birch landfill and River Birch contract were not conducted under the name of the Defendants.

187.

The concealment of the Defendants' role in the conduct described above was part and parcel of the effectiveness of the conspiracy. For example, even when questioned directly about Defendants' role in orchestrating the opposition campaign to the operation of the Chef Menteur, Old Gentilly, and Two Rivers landfills, Mouton lied to federal investigators about any connection between his conduct and Defendants Ward, Heebe, or River Birch. Mouton claimed he had received over $450,000.00 in payments from the Defendants for "air conditioning" repair work. In fact, Mouton faced a federal criminal charge for lying to federal investigators regarding his connection to the Defendants and their role in his efforts to prevent the operations of the Chef Menteur, Old Gentilly, and Two Rivers landfills. Those lies were made in furtherance of the conspiracy launched

33

by Defendants, and intentionally and knowingly obstructed ongoing federal criminal investigations, constituting obstruction of justice in furtherance of the conspiracy.

188.

On February 12, 2010, Henry Mouton, to conceal his relationship with the co-conspirators, lied to FBI special agents when he said a wealthy friend from Mobile, Alabama provided a helicopter and a pilot for Mouton to fly over the Old Gentilly landfill and obtain aerial video and photographs, when in truth and fact, a co-conspirator actually paid for the helicopter rental. Mouton further lied to FBI agents claiming not to have a business relationship with any landfill and said that he had not received any compensation from any landfill when in truth he did know a director of a landfill company and he had received compensation from companies closely related to a landfill company owned by Defendants and/or their co-conspirators.

189.

Co-conspirators, associates and/or agents of Defendants prosecuted SLAPP lawsuits against the *Times-Picayune*, Fox 8 News, Anne Marie Vandenweghe, and bloggers, in foreign countries that lack the same constitutional protection of free speech as guaranteed by the laws of the State Louisiana and the United States of America, in an effort to silence investigation and to conceal the acts of the Defendants and their co-conspirators, committing libel tourism to thwart the protections of, and in contravention of, the First Amendment to United States Constitution, Article I, Section 7 of the Louisiana Constitution, the federal SPEECH Act 28 U.S.C. 4101-4105, the Louisiana Rachel's Law Louisiana Code of Civil Procedure Article 2542, and the Louisiana American Laws for American Courts Act La. R.S. 9:6000. Said lawsuits include the suits: entitled *Trout Point Lodge, Ltd, A Nova Scotia Company, Vaughn Perret and Charles Leary v. Doug K. Handshoe* and numbered 12-cv-90LG-JMR on the docket of the United States District Court for the Southern District of Mississippi; and, *Trout Point Lodge, Ltd, A Nova Scotia Company, Vaughn Perret and Charles Leary v. Louisiana Media Company, LLC,* and numbered Yar. No. 328248 on the docket of the Supreme Court of Nova Scotia.

190.

Defendants also orchestrated their unlawful payments to co-conspirator Jefferson Parish officials in a manner designed to evade public knowledge. No requirement to terminate the Waste Management contract, accept all of the Parish waste, or to close the Jefferson Parish landfill was included in the RFP. Moreover, upon information and belief, the pay-offs to co-conspirator Jefferson Parish officials, including Broussard, Whitmer and Wilkinson, for the exclusive landfill contract were accomplished via a *quid pro quo* award of the Shadow Lake insurance business to Lagniappe Industries, LLC connected with Whitmer and Broussard. Some members of the Jefferson Parish council that awarded the River Birch contract have expressly stated that they were unaware of the financial connections and corrupting influence between Defendants and co-conspirators Broussard and Whitmer, and deceived about the alleged benefits of that contract at the time it was awarded. Further, Defendants' co-conspirators Broussard and Whitmer failed to disclose or recuse themselves from conflicts of interest, as required by La. R.S. 42:1112.

191.

For years after the awarding of the River Birch contract, Petitioners did not know, and could not be expected to know in the exercise of reasonable diligence, of the Defendants' unlawful and anti-competitive conspiracies and acts taken in opposition to Petitioners' business interests.

192.

On May 18, 2012, the Louisiana Board of Ethics filed a Petition in the matter entitled *Louisiana Board of Ethics Acting in its Capacity as the Supervisory Committee on Campaign Finance Disclosure versus River Birch, Inc., Westside Construction Services, Inc., Dominick J. Fazzio, Big Bang Properties, LLC, Anne's Properties, LLC, Dangle & Associates, LLC, B&C Contractors, LLC, Waterfront Properties, LLC, Ring Associates, LLC and N.C. General Contractors, Inc.* and numbered 715-029 on the docket of the 24th Judicial District Court for Parish of Jefferson. In the Petition the Board of Ethics alleges, *inter alia*, that "River Birch knowingly and willfully gave, furnished or contributed money to or in support of candidates and political committees, through or in the name of another, directly, or indirectly, in violation of La. R.S.

18:1505.2A." Upon information and belief, the allegations of the *Petition* are adopted herein as if copied *in extenso*. *See Petition*, attached hereto as Exhibit "P."

193.

Upon information and belief, Defendants made "straw man" contributions to politicians and/or elected officials who had the ability, or potentially had the ability, to influence the waste disposal industry, through official acts and otherwise, including, *inter alia*, Broussard, Byron Lee, Cynthia Willard-Lewis, Jennifer Sneed and Ray Nagin.

194.

Upon information and belief, Defendants made "straw man" contributions not only to avoid campaign contribution limits, but also to conceal their donations and relationships.

**Playing Monopoly With Real Money**

195.

The landfill disposal of C&D waste is a relevant product market, as is the market or sub-market for the disposal of post-Hurricane Katrina debris in enhanced C&D disposal sites. C&D disposal is subject to regulation under Louisiana state law, and only those landfills permitted to accept C&D waste (Type I, II, and III) may do so. Because waste streams from the Katrina debris removal contained C&D waste that was commingled with other waste streams (e.g., carpet, furniture), Emergency Orders were issued to expand Louisiana's definition of C&D debris to accommodate the full range of Katrina storm debris. Given the declaration of emergency following Katrina, the LDEQ and/or the City of New Orleans also used their Emergency Orders to approve certain "enhanced" C&D landfills for the purpose of expediting the disposal of debris from certain residential structures demolished on governmental orders.

196.

Defendant HWY-90, LLC possesses substantial market power in the C&D landfill disposal market for the Greater New Orleans Area. Defendants own and operate one of the few permitted C&D landfills serving the Greater New Orleans Area and one of only three C&D landfills specifically authorized to accept the full range of Hurricane Katrina debris as an "enhanced" C&D

36

disposal site. That landfill contains the greatest permitted size and has the greatest remaining capacity. During the period in question for post-Katrina debris clean-up, the principal competition for the HWY-90 landfill came from the Chef Menteur and Old Gentilly landfills in East New Orleans and the Two Rivers landfill in Catahoula Parish.

<div align="center">197.</div>

As described in the original petition and this amending petition, through the unlawful conspiracy and actions of the Defendants and their co-conspirators, including Mouton, the Defendants sought to place unreasonable restraints and conditions on the operation of at least the Chef Menteur, Old Gentilly, and Two Rivers landfills, with the goal of closing or preventing the operation of the landfills. By late 2006, the River Birch Defendants had succeeded in closing the Chef Menteur landfill and blocked the operation of both the Old Gentilly and Two Rivers landfills.

<div align="center">198.</div>

The Defendants' conduct has restricted choice and negatively impacted the consumers of C&D landfill disposal services in the Greater New Orleans Area, including those services purchased for storm debris disposal post-Katrina by FEMA.

<div align="center">199.</div>

The Defendants have attempted to monopolize the municipal ("MSW") landfill disposal market for the Greater New Orleans Area.

<div align="center">200.</div>

Defendant River Birch possesses substantial market power in the MSW landfill disposal market for the Greater New Orleans Area. According to the LDEQ, Defendants own and operate one of the few permitted MSW landfills serving the Greater New Orleans Area and the only privately-owned landfill in that region. The River Birch landfill disposes of more MSW and commercial waste than any landfill serving New Orleans by an order of magnitude. The River Birch landfill also contains the greatest remaining capacity of any Type I or II landfill in the entire state.

<div align="center">201.</div>

During the period in question, the River Birch landfill competed with the Jefferson Parish

<div align="center">37</div>

landfill for MSW disposal from areas within Jefferson Parish, and for commercial generators in Jefferson Parish and surrounding areas.

202.

The landfill disposal of MSW is a relevant product market. MSW disposal is subject to regulation under Louisiana state law, and only those landfills permitted to accept MSW (Type I and II landfills) may do so.

203.

C&D landfills are not reasonably interchangeable with other landfills, such as Type I and II landfills that are capable of accepting industrial waste or MSW. MSW may only be disposed of in a Type I or II landfill. C&D landfills lack liners and other protections necessary to prevent leachates, as would be required to dispose of MSW.

204.

Although C&D may be disposed of in a Type I or II landfill, typically, it would not be economical to do so. Given the additional regulations, permits, and construction and operational requirements associated with Type I and II landfills, the disposal fees (or "tipping fees") associated with such waste disposal is significantly greater than that to dispose of C&D. A ten percent (10%) increase in the price of disposal at a C&D landfill would not cause customers to dispose of C&D waste at an MSW landfill of equal distance.

205.

The United States Department of Justice has recognized landfills for the disposal of C&D and for the disposal of MSW as separate relevant products. The LDEQ also tracks MSW landfills and C&D landfills separately and subjects them to different regulations. Highlighting the differences between C&D landfills and MSW landfills, Defendants operate both a C&D Type III landfill (the "HWY-90" landfill) and an MSW Type II landfill ("River Birch") on adjacent parcels of land in Avondale, Louisiana. Woody waste may be disposed of at both C&D landfills and MSW landfills.

206.

The Greater New Orleans Area is a relevant geographic market for the disposal of C&D,

38

MSW, and woody waste. The New Orleans market consists of Orleans, Jefferson, Plaquemines and St. Tammany Parishes and the immediately surrounding areas.

207.

As described in the original petition and this amending petition, including through the corrupt and unlawful actions of the Defendants and their co-conspirators, known and unknown, River Birch entered an illegally-obtained contract with Jefferson Parish that would require Jefferson Parish to close its own landfill then operated by Waste Management and eliminate competition from that landfill.

208.

The Defendants' conduct has restricted choice and negatively impacted the consumers of MSW landfill disposal services in the Greater New Orleans Area.

209.

The transportation of C&D, MSW, and woody waste is bulky and expensive. Moreover, landfills in Louisiana and surrounding states are extensively regulated, including with respect to the transportation or disposal of vegetation and woody waste from the Greater New Orleans Area ostensibly to prevent the spread of Formosa termite infestation, which would have included all of the Katrina-related woody waste generated in the Greater New Orleans Area, and all of the woody waste addressed in the original version of RFP 176. Additionally, transfer stations, which would help reduce the transportation costs to more distant landfills are prohibited. As a result, landfills that are located at more distant locations were and are not realistic alternatives, and do not provide a meaningful constraint on the pricing of New Orleans area landfills. Moreover, many landfills in other parts of Louisiana are publicly-owned and do not accept waste from outside their Parish. The United States Department of Justice has recognized that markets for landfill disposal are typically limited to those in or surrounding a metropolitan statistical area.

210.

Entry into the markets for C&D landfill disposal (Type III landfills) and for MSW landfill disposal (Type I or II) in the Greater New Orleans Area is difficult and time consuming. The landfill

siting and permitting process is political in nature and heavily regulated, and thus, it is frequently the subject of organized opposition and litigation. It would take many years to find suitable land, obtain the necessary permits, and construct a new landfill. This process takes substantially longer than two years.

211.

The market for alternative, environmentally-friendly disposal of woody waste, including Type III Wood Waste Separation and Processing, in the Greater New Orleans Area is a relevant product market. By hijacking RFP 176, the Defendants and their co-conspirators, known and unknown, prevented Petitioners from meaningfully developing an alternative, environmentally-friendly disposal method for woody waste. Further, by closing, and conspiring to close, landfills other than landfills owned by Defendants, Defendants prevented Petitioners from providing alternative, environmentally-friendly disposal of woody waste at those landfills. Entry into the markets for alternative, environmentally-friendly disposal of woody waste is difficult and time consuming, requiring capital investment, permitting and competition with owners of landfills who stand to profit more from just burying waste. Defendants conspired to, and effectively did, destroy the entire market for alternative, environmentally-friendly disposal of woody waste in the Greater New Orleans Area, restricting choice and negatively impacting the consumers of landfill disposal services in the Greater New Orleans Area

212.

The Defendants have conspired to monopolize the C&D landfill disposal market and the MSW landfill disposal market for the Greater New Orleans Area.

213.

Defendants River Birch and HWY-90, LLC possess substantial market power in the C&D and MSW landfill disposal markets for the Greater New Orleans Area.

214.

During the period from 2006 to present, the Defendants have conspired with others, including public officials, known and unknown, to take unlawful and anticompetitive actions designed and

40

intended to disrupt, disadvantage, and eliminate competing landfills serving or capable of serving the Greater New Orleans Area, as well as prevent the alternative, environmentally-friendly disposal of woody waste at those landfills.  Landfills targeted for anti-competitive acts include at least the Chef Menteur, Old Gentilly, Jefferson Parish, and Two Rivers landfills. The Defendants may also have targeted other competing landfills including, but not limited to, Woodside landfill, to prevent them from serving as disposal facilities for the Greater New Orleans Area.

215.

The Defendants' conduct has restricted choice and negatively impacted the consumers of C&D and MSW landfill disposal services in the Greater New Orleans Area.

216.

By the conspiracies and acts alleged in the original petition and amending petition, the Defendants conspired to, and damaged and injured competition in the markets of C&D, MSW, woody waste and environmentally-friendly woody waste disposal in the Greater New Orleans Area, all in violation of La. R.S. 51:122.

217.

The conspiracies and acts alleged in the original petition and amending petition damaged and injured competition in the markets of C&D, MSW, woody waste and environmentally-friendly woody waste disposal in the Greater New Orleans Area, such that in 2009, 2010 and 2011, the River Birch landfill took in about 1.2 million tons of trash each year, receiving approximately $36 million in tipping fees per year—almost twice as much as its nearest rival

218.

As a result of Defendants' unlawful conduct as set forth in the original petition and this amending petition, Petitioners have suffered financial injury including lost profits, lost business opportunity, and costs expending pursuing hijacked RFP 176.

**Federal RICO**

219.

The above-described acts by Defendants and their co-conspirators, known and unknown,

41

constitute the basis for Petitioners to state a claim under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO").  18 U.S.C. Section 1961, *et seq.*

220.

Defendants, Frederick R. Heebe, Albert J. Ward, Jr., River Birch Incorporated, and HWY-90 LLC are "persons" within the meaning of 18 U.S.C. Section 1961(3).

221.

In the alternative, Defendants, Frederick R. Heebe and Albert J. Ward, Jr. are "persons" within the meaning of 18 U.S.C. Section 1961(3) for purposes of 18 U.S.C. Section1962(c).

222.

The enterprise for purposes of 18 U.S.C. Sections 1961(3) and 1962(b), (c) and (d) is an association-in-fact of some or all of the co-conspirators listed in Paragraphs 94 to 100 above. Defendants utilized co-conspirator legal entities, including those under the umbrella of Shadow Lake, to implement their unlawful scheme and to make the unlawful bribes to co-conspirator public officials. Upon information and belief, Defendants utilized multiple, separate legal entities operating under the Shadow Lake umbrella, including the companies known as "W. Inc.," "W.C.S. Inc.," "D.A." and "A.P. LLC," and/or other entities listed above as co-conspirators in Paragraphs 95 to 100. Upon information and belief, the company known as "W. Inc." is Willow, Inc; the company known as "W.C.S. Inc." is Westside Construction Services, Inc.; the company known as "D.A." is Dangle & Associates, LLC; and, the company known as "A.P. LLC" is Anne's Properties, LLC.

223.

In the alternative, the enterprise for purposes of 18 U.S.C. Sections 1961(3) and 1962(b), (c) and (d) is an association-in-fact of River Birch Incorporated and HWY-90, LLC and some or all of the co-conspirators listed in Paragraphs 94 to 100 above.

224.

In the alternative, the enterprise for purposes of 18 U.S.C. Sections 1961(3) and 1962(b), (c) and (d) is an association-in-fact of Broussard, Whitmer, Wilkinson and Jefferson Parish Government.  In the alternative, the enterprise for purposes of 18 U.S.C. Sections 1961(3) and

1962(b), (c) and (d) is Jefferson Parish Government. The Defendants, directly and through co-conspirators, including entities related to Shadow Lake, caused Broussard, Whitmer and Wilkinson, and at their direction, Jefferson Parish Government, to unlawfully hijack an RFP, manipulate the RFP process, misrepresent facts to the Jefferson Parish Council and public, file and pursue baseless litigation, and obstruct the proper response to a federal subpoena.

225.

The Defendants worked together to share costs, information, resources, strategies and the fruits of their predicate acts. The association-in-fact enterprise of Defendants and co-conspirators is an informal, ongoing relationship which functions as a continuing unit, pursuing a course of conduct (i.e., the predicate crimes listed herein), and with a common or shared purpose (i.e., restraining trade in the landfill business in the Greater New Orleans Area) and continuity of structure and personnel. The Defendants understood, and took acts in furtherance of, as described in the original petition and this amending petition, the common and shared purpose.

226.

Defendants, which engage in interstate commerce, have conducted for years, and continue to conduct, the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. Section 1962(c) and have conspired to violate Sections 1962(a) and (c) in violation of Section 1962(d).

227.

Defendants engaged in and continue to engage in the described pattern of racketeering activities affecting interstate commerce, in violation of 18 U.S.C. Section 1962(b). Defendants, Petitioners, affected competitors of Defendants, and the Parish of Jefferson, all engage in, and/or affect, interstate commerce. The racketeering activities affected interstate commerce through the impact on landfill disposal competition among those landfills serving the Greater New Orleans Area. Further, the Petitioners, affected competitors of Defendants, and the Parish of Jefferson, all employed equipment, such as trucks, tractors, burners and other equipment, acquired and transported in interstate commerce, some of which, because of the actions of Defendants, were redeployed to

43

other locations outside of Louisiana.   Additionally, the Defendants used and/or directed co-conspirators to use the interstate mail and/or wires as part of the pattern of racketeering activity. Also, the Defendants and their co-conspirators have diverted local and national resources of the FBI, the U.S. Department of Justice, the EPA, and the U.S. Army Corps of Engineers.

228.

All Defendants have violated § 1962(d), inasmuch as they knowingly, intentionally, and unlawfully, aiding and abetting each other, conspired to: (a) acquire or maintain, directly or indirectly, any interest in or control of any of the enterprise(s) heretofore described through the pattern of racketeering activity described in the original, and this amending, petition; and (b) conduct and participate, directly or indirectly, in the conduct of the affairs of the enterprise(s), through the pattern of racketeering activity described in the original, and this amending, petition.

229.

Defendants and their co-conspirators, known and unknown, committed the predicate offenses of conspiracy to solicit and give bribes to a public official; wire fraud; mail fraud; money laundering; engaging in monetary transactions in property derived from specified unlawful activity; obstruction of justice; bribery of a public official; and corrupt influencing, under federal and/or state laws, all as described  in the original, and this amending, petition, all amounting to continuous unlawful activity. Title 18 United States Code Sections 201, 1341, 1343, 1503, 1510, 1956 and 1957; La. R.S. 14:14:118 and 120.

230.

The multiple misrepresentations described in the original, and this amending, petition, constitute "false or fraudulent pretenses, representations or promises" within the meaning of the mail fraud (18 U.S.C. §1341) and wire fraud (18 U.S.C. §1343) provisions.

231.

Bribery of public officials, under both state and federal laws, is a specifically enumerated predicate crime under civil RICO.  As outlined above, Defendants and their co-conspirators, have paid or arranged bribes of public officials, by giving things of value, over a period of many years,

44

starting at least as early as 2005, with the intent to influence their conduct in relation to their positions, employment, and duties in violation of La. R.S. § 14:118.. 18 U.S.C. Section 1962(C); La. R.S. § 14:118. Public official co-conspirators, known and unknown, including, upon information and belief, Mouton, Whitmer, Broussard, and at least one former member of the Jefferson Parish Council, have also repeatedly accepted bribes. In many cases, the Defendants and each of the co-conspirators, known and unknown, understood and took acts in furtherance of the Defendants' goals. 18 U.S.C. Section 1962(D). In many cases, those acts were detrimental to Petitioners. But for the corrupt influence and unlawful and undisclosed payments and financial benefits provided by the Defendants to these co-conspirators, the Jefferson Parish Council would not have entered into, and acted to effectuate, the River Birch contracts.

<div align="center">232.</div>

Defendants and/or their co-conspirators engaged in mail and wire fraud with respect to the fraudulent communications of Mouton and the rigging of the bidding and contracting process for the disposal of waste within Jefferson Parish.

<div align="center">233.</div>

The Defendants' and/or their co-conspirators' innumerable conspiracies, racketeering activities and/or predicate acts are related and also amount to a continuous unlawful activity.

<div align="center">234.</div>

Mouton alone was indicted for accepting more than 100 separate illegal and undisclosed payments from Defendants and/or their co-conspirators worth more than $450,000.00 over a period of several years. Upon information and belief, other public officials who have received improper and undisclosed *quid pro quo* payments include at least Jefferson Parish officials Broussard, Whitmer, and Wilkinson. In each case, the illicit payments were made for the purpose of allowing the Defendants to obtain a monopoly on the disposal of Jefferson Parish waste and dominate the Greater New Orleans Area landfill disposal markets by limiting competition, both from other landfills and from alternative and environmentally-friendly methods of woody waste disposal.

235.

These predicate acts are related in the sense that they have the same purpose (to obtain a monopoly on the disposal of Jefferson Parish waste and dominate the Greater New Orleans Area landfill disposal markets by limiting competition, both from other landfills and from alternative and environmentally-friendly methods of woody waste disposal); result (illegal hijacking of public contracts and closure of competitor landfills); victims (Petitioners and other competitors of Defendants); method of commission (the predicate crimes, including bribery); and are otherwise interrelated by distinguishing characteristics and are not isolated events, since they were carried out for the same purpose.

236.

The association-in-fact of some or all of the co-conspirators, including Shadow Lake and its associated entities, and/or the association-in-fact of River Birch Incorporated and HWY-90, LLC and some or all of the co-conspirators, and/or the association-in-fact of Broussard, Whitmer, Wilkinson and Jefferson Parish Government, and/or Jefferson Parish Government, constitute enterprise(s) as the co-conspirator businesses existed beyond their racketeering, fronting as legitimate waste disposal businesses, and as Jefferson Parish Government, with Broussard, Whitmer, Wilkinson as high officials, existed as a legitimate political subdivision of the State of Louisiana, existing beyond the corrupt activities of Broussard, Whitmer, Wilkinson.  The co-conspirator businesses entities maintained an ongoing structure of persons associated over time, joined in purpose, and organized in a manner amenable to hierarchical and consensual decision making. Jefferson Parish Government also maintained an ongoing structure of persons associated over time, joined in purpose, and organized in a manner amenable to hierarchical and consensual decision making.

237.

The numerous unlawful conspiracies and acts described in the original, and this amending, petition constitute a pattern of racketeering activity designed to enrich Defendants by seizing the Jefferson Parish waste disposal business, and restraining competition in the waste disposal business,

as well as enrich Defendants' public actor co-conspirators, known and unknown, through corruption and malfeasance. Although it may be difficult to identify every coupling in the orgy of monopolizing greed and public corruption thrown by Defendants and their co-conspirators, there clearly existed a pattern of racketeering activity.

238.

The predicate acts are closely intertwined as far as actors, goals, nature, functioning and structure of the operations described in the original, and this amending, petition.

239.

The continuity and relatedness of these racketeering activities constitute a pattern of racketeering activities within the meaning of 18 U.S.C. § 1961(5).

240.

Defendants' corrupt and unlawful conduct was targeted, in part, at Petitioners, as well as other common victims, including competitor landfills and the taxpayers of Orleans and Jefferson Parishes. The bribes were intended, and succeeded, in wresting a Jefferson Parish contract from Petitioners and awarding the contract to Defendants, as well as closing other landfills at which Petitioners could have employed their alternative, environmentally-friendly method of woody waste disposal.

241.

As a result of Defendants' unlawful conduct as set forth in the original, and this amending, petition, Petitioners have suffered financial injury, including lost profits, lost business opportunities, and expenditures in connection with pursuit of the stolen contract.

242.

Petitioners continued to suffer financial injury through the attempts of Defendants to terminate the Waste Management-Jefferson Parish Contract. Petitioners had no possible opportunity to reduce waste in Jefferson Parish while Jefferson Parish, at the behest of the Defendants and their co-conspirators, sought implementation of the River Birch contract. Petitioners continue to suffer financial injury while other landfills, including Chef Menteur and Old Gentilly, remain closed, and

other potential landfill owners and operators are discouraged from entering such a corrupted market.

**Louisiana RICO**

243.

The acts by Defendants and their co-conspirators, known and unknown, described in the original petition, and this amending petition, constitute the basis for Petitioners to state a claim under the Louisiana Racketeer Influenced and Corrupt Organizations Act ("RICO"). La. R.S. 15:1351, *et seq.*

244.

Defendants and their co-conspirators, known and unknown, conspired to, and/or committed, the predicate offense of theft.  La. R.S. 15:1352(A)(10) and La. R.S. 14:67.

245.

Defendants and their co-conspirators, known and unknown, engaged in multiple incidents of racketeering activity, to wit, theft, that had the same or similar intents, results, principals, victims, or methods of commission within five (5) years of each other.  Defendants and their co-conspirators, known and unknown, engaged in multiple acts of theft, including: (1) the misappropriation and taking, and/or attempted misappropriation and taking, of contractual opportunities and rights of Petitioners and Waste Management; (2) the diversion of profitable waste streams to River Birch and HWY-90 landfills; (3) the misappropriation and taking, and/or attempted misappropriation and taking, of public funds; and/or (4) the misappropriation and taking, and/or attempted misappropriation and taking, of campaign funds.

246.

Petitioners were injured by reason of a violation of La. R.S. 15:1353 committed by Defendants and/or their co-conspirators, known and unknown, suffering actual damages.

247.

Defendants' and their co-conspirators, known and unknown, racketeering activities were conducted through a pattern of acts and transactions which occurred and/or had their effect within the State of Louisiana.

## Tortious Conduct

### 248.

Upon information and belief, Defendants and their co-conspirators, known and unknown, have engaged in actions which are unethical, oppressive, unscrupulous, and substantially injurious to Concrete Busters of Louisiana, Inc. and Waste Remediation of Plaquemines, LLC, in that they:

a) violated Jefferson Parish Ordinance 21587;

b) violated the Louisiana Code of Governmental Ethics, including La. R.S. 42:1112;

c) violated La. R.S. 33:4169.1(A)(2);

d) violated La. R.S. 18:1483(6)(a);

e) violated La. R.S. 18:1483(9)(a);

f) violated La. R.S. 18:1505.2(1)(l);

g) violated La. R.S. 18:1505.2A;

h) forged and maintained false public records;

i) injured public records;

j) obstructed justice;

k) committed misprison of felonies;

l) violated 47 U.S.C. 317;

m) violated 47 CFR 73:1212;

n) violated 18 USC 666(a)(1)(A);

o) violated 18 USC 666;

p) committed libel tourism to thwart the protections of, and in contravention of, the First Amendment to United States Constitution, Article I, Section 7 of the Louisiana Constitution, the federal SPEECH Act 28 U.S.C. 4101-4105, the Louisiana Rachel's Law Louisiana Code of Civil Procedure Article 2542, and the Louisiana American Laws for American Courts Act La. R.S. 9:6000; and

q) undertook such other acts or omissions which shall be shown, including without limitation and on information and belief which may be in violation of La. R.S. 14:73, 14:118(A)(1) and 14:120.

### 249.

The Defendants had a duty of fair dealing to Petitioners, a duty not to negligently,

49

intentionally, and/or fraudulently misrepresent, conceal, and/or fail to or purposely not disclose information to Petitioners or other third-parties in transactions or other matters in which the Defendants had a pecuniary interest, a duty to not conspire with and/or aid and abet others to act in tortious, intentional, and/or unlawful ways to injure or damage Petitioners, a duty not to tortiously, intentionally, or criminally interfere with Petitioners' business and/or contractual relations, a duty not to abuse its rights to compete in the marketplace by tortious, intentional, and/or unlawful conduct predominately motivated to harm Petitioners and other business competitors and against all moral rules, good faith, and elementary fairness expected in a civilized and law-abiding society, a duty not to conduct a single-business enterprise and/or a racketeering enterprise to perpetuate tortious, intentional, and/or unlawful wrongs against Petitioners, a duty not to commit unfair and deceptive trade practices against Petitioners, a duty not to convert and interfere with Petitioner's rights to bid on RFP 176, a duty not to unjustly enrich themselves at the expense and impoverishment of Petitioners due to the tortious, intentional, and/or unlawful scheme conducted covertly and surreptitiously by the Defendants, and a duty not to commit crimes such as bribery, lying to federal and state public officials, mail fraud, and/or wire fraud to injure and damage Petitioners and other business competitors.

<div align="center">250.</div>

The tortious, surreptitious, unethical, and unlawful conduct, including but not limited to bribery, lying to state and federal officials, and/or mail/wire fraud, of the Defendants breached their duty to exercise any level of care, much less reasonable care, under the circumstances.

<div align="center">251.</div>

Based on the tortious, unethical, surreptitious, and/or unlawful conduct of the Defendants outlined herein, they are liable to Petitioners based on their legal duty in the course of their business dealings and other matters in which they had a pecuniary interest to supply correct and not false or misleading information, a duty which they breached by affirmative misrepresentation, concealment and non/disclosure, as well as by omission, causing Petitioners to sustain losses and/or damages.

<div align="center">50</div>

252.

Based on the tortious, deceitful, fraudulent, surreptitious, and/or unlawful conduct of the Defendants outlined herein, they are liable to Petitioners for intentional and/or fraudulent misrepresentation, concealment, and/or non-disclosure to Petitioners and other direct and/or third parties in transactions or other matters where the Defendants had a pecuniary interest and where there was a reason to expect that the misrepresentations and/or erroneous and fraudulent information would be relied upon, directly or indirectly, and influence the transactions at issue, including but not limited to conspiring to act in concert and/or aiding and abetting with the intent to commit and actively and willfully participating in the intentional, fraudulent, and/or unlawful conspiracy and venture, which was perpetuated with the intent to deceive and caused losses and/or damages to Petitioners.

253.

The tortious, deceitful, unethical, surreptitious, and/or unlawful conduct of the Defendants outlined above was taken with the predominant motive to cause harm to Petitioners and other business competitors in the market and against all moral rules, good faith, and elementary fairness, causing Petitioners losses and/or damages.

254.

Based on the tortious, unethical, surreptitious, and/or unlawful conduct of the Defendants outlined herein, they are liable to Petitioners for conversion due to the unlawful interference with the ownership or possession of the woody waste to be disposed by Petitioners, depriving Petitioners of their rights to a contract with Jefferson Parish.

255.

Based on the tortuous, deceitful, fraudulent, surreptitious, and/or unlawful conduct of the Defendants outlined herein, they are liable to Petitioners for detrimental reliance under La. C.C. art. 1967 for their misrepresentations, concealments, and non-disclosures by conduct or purposeful omissions, which were justifiably relied upon by third-parties and those persons and/or entities charged with implementing the business of Jefferson Parish, all of which detrimentally affected

Petitioners.

## Continuing Tort and Course of Conduct

256.

All of the above alleged acts and omissions continued and constituted a continuing tort and continuing course of conduct at least through the filing of the original petition.

257.

The injuries suffered by Petitioners caused by the acts and conspiracies alleged in the original petition and this amending petition continued at least through the filing of the original petition.

## Damages

258.

Petitioners re-allege and re-aver the allegations of Paragraph 91 of the original Petition for Damages. Petitioners further allege and aver that as a consequence of the above-described actions of Heebe, Ward, River Birch and HWY-90, LLC, and/or their co-conspirators, in violation of state and federal laws, Petitioners Concrete Busters of Louisiana, Inc. and Waste Remediation of Plaquemines, LLC are entitled to the following remedies:

a) Recovery of actual damages, including expenses of bid application, lost profits, damage to business reputation, and loss of business opportunity, plus attorneys' fees and penalties, against Heebe, Ward, River Birch and HWY-90, LLC, *in solido*, for the unfair trade practices perpetrated by Heebe, Ward, River Birch and HWY-90, LLC, pursuant to La. R.S. 51:1409;

b) Recovery of actual damages, including expenses of bid application, lost profits, damage to business reputation, and loss of business opportunity, plus attorneys' fees and threefold damages, against Heebe, Ward, River Birch and HWY-90, LLC, its corporate officers, directors, and/or agents, *in solido*, for the uncompetitive practices perpetrated by Heebe, Ward, River Birch and HWY-90, LLC, pursuant to La. R.S. 51:137;

c) Recovery of actual damages, including expenses of bid application, lost profits,

52

damage to business reputation, and loss of business opportunity, against Heebe, Ward, River Birch and HWY-90, LLC, *in solido*, pursuant to Louisiana Civil Code Articles 1953, 1767, 2298, 2315, 2316 and 2324;

d)  Recovery of damages, including expenses of bid application, lost profits, damage to business reputation, and loss of business opportunity, plus attorneys' fees and threefold damages, against Heebe, Ward, River Birch and HWY-90, LLC, its corporate officers, directors, and/or agents, *in solido*, for claims asserted under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. Section 1961, et seq.;

e)  Recovery of actual damages, including expenses of bid application, lost profits, damage to business reputation, and loss of business opportunity, plus attorneys' fees in the trial and appellate courts, costs of investigation and litigation reasonably incurred, and threefold damages, against Heebe, Ward, River Birch and HWY-90, LLC, its corporate officers, directors, and/or agents, *in solido*, for claims under the Louisiana Racketeer Influenced and Corrupt Organizations Act ("RICO") La. R.S. 15:1351, et seq.;

f)  Recovery of criminal and/or civil restitution; and

g)  Any other damages proven at trial or hearing of this matter.

259.

In accordance with Louisiana Civil Code Article 2324, Heebe, Ward, River Birch and HWY-90, LLC are solidarily liable with all the actors in the above unethical and illegal acts because, upon information and belief, Heebe, Ward, River Birch and HWY-90, LLC, knowing of said actions, and knowing that the actions were unethical and/or illegal, intentionally and/or willfully colluded with said actors for the benefit of Heebe, Ward, River Birch and HWY-90, LLC.

260.

Further, in accordance with the single business enterprise doctrine all of the Defendants are solidarily liable to Petitioners for the acts of all of the co-conspirator corporations and legal entities with which they formed a single business enterprise.

261.

Further, the corporate officers, directors and/or agents of River Birch and HWY-90, LLC, including Heebe and Ward, are individually and personally liable, *in solido*, pursuant to La. R.S. 51:126 and La. R.S. 12:95.

**WHEREFORE,** Concrete Busters of Louisiana, Inc. and Waste Remediation of Plaquemines, LLC pray that after due proceedings are had, there be a judgment herein in their favor and against Defendants Fred Heebe, Jim Ward, River Birch Incorporated and HWY-90, LLC, *in solido,* in an amount that is reasonable in the premises, including treble damages, together with attorneys' fees and costs of these proceedings, legal interest thereon from the date of judicial demand until paid, as well as any and all legal and equitable relief this Court deems appropriate.

Respectfully Submitted,

**RANDALL A. SMITH, T.A.  (No. 2117)**
**STEPHEN M. GELÉ (#22385)**
-OF-
**SMITH & FAWER, L.L.C.**
201 St. Charles Ave., Suite 3702
New Orleans, LA 70170
Telephone: (504) 525-2200
Facsimile:  (504) 525-2205

*Counsel for Plaintiffs Concrete Busters of*
*Louisiana, Inc. and Waste Remediation of*
*Plaquemines, LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished to all counsel of record, via U.S. mail and/or hand delivery, this 4th day of October, 2012.

**RANDALL A. SMITH**

54

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA          *     CRIMINAL NO: 11-048

                v.                *     SECTION:   "F"

HENRY M. MOUTON                   *     VIOLATION: 18 U.S.C. § 371
                                              18 U.S.C. § 666(a)(1)(B)
                                  *

               *     *     *

FACTUAL BASIS

Should this matter proceed to trial, both the government and the defendant, HENRY M.

MOUTON, do hereby stipulate and agree that the following facts set forth a sufficient factual basis

for the crime to which the defendant is pleading guilty and that the government would prove the

following beyond a reasonable doubt at trial:

In about 1996, HENRY M. MOUTON, organized an overnight duck hunting fundraiser for

a former Louisiana governor.  At this fundraiser, MOUTON met Co-conspirator "A" who was an

attendee.   Shortly thereafter, Co-conspirator "A" contacted MOUTON and offered to pay

MOUTON $2,000.00 a month and, in exchange, MOUTON agreed to provide Co-conspirator "A"

with insider political information and access to the Governor.  MOUTON did not register as a



lobbyist for Co-conspirator "A" or for any of his entities with the State of Louisiana. Co-conspirator "A" did not request **MOUTON** to register as a lobbyist with the State of Louisiana.

In January 2003, **MOUTON** was appointed by the Governor to serve as a Commissioner on the Louisiana Department of Wildlife and Fisheries Commission. The Louisiana Department of Wildlife and Fisheries (LDWF) is a state agency responsible for the management of Louisiana's renewable resources including wildlife and aquatic life. The LDWF is an agency of the State of Louisiana that received federal assistance in excess of $10,000.00 during each of the one year periods beginning on January 1st and ending on December 31st for the years 2003 - 2009. **MOUTON** became a public official upon his appointment as a Commissioner to the LDWF. In 2003, and during all times material herein, Co-conspirator "A" owned and operated landfill companies located in Southeast Louisiana. After **MOUTON**'s appointment as Commissioner to the LDWF, **MOUTON** became a more valuable asset to Co-conspirator "A" now that he was a state public official. Accordingly, on or about April 14, 2003, **MOUTON** received the first of approximately 180 illegal payoffs/bribes from Co-conspirator "A."

**MOUTON** received hundreds of thousands of dollars in illegal bribes from Co-conspirator "A" during his appointment as Commissioner on the LDWF. Many of these bribes came from various companies owned and/or operated by Co-conspirator "A." In return for these bribes, Co-conspirator "A" sought **MOUTON**'s participation in various illegal schemes. These illegal schemes included efforts to eliminate business competitors of Co-conspirator "A" as well as the funneling of illegal campaign contributions to state and federal election campaigns. As a public official, it was illegal for **MOUTON** to receive payments from Co-conspirator "A."

- 2 -

## Old Gentilly Landfill Scheme

Shortly after Hurricane Katrina made landfall in August of 2005, Co-conspirator "A" and other Co-conspirators recognized the potential to obtain millions of dollars in revenue for the collection and disposal of storm debris from storm ravaged areas. The Federal Emergency Management Agency (FEMA) agreed to award and/or reimburse parishes in storm impacted areas for the costs associated with the collection and disposal of storm debris. A portion of these federal funds were eventually paid to Co-conspirator "A."

Co-conspirator "A" conspired with **MOUTON** to shutter the competition. The plan was to eliminate the competition and increase the revenue of Co-conspirator "A" by increasing the amount of storm debris deposited in the landfills owned by Co-conspirator "A." One such competitor was the Old Gentilly Landfill in New Orleans. Co-conspirator "A" devised a scheme that would exploit and utilize **MOUTON's** appointed position as a public official and specifically his position and title as a Commissioner on the LDWF. It was agreed that **MOUTON** would assist Co-conspirator "A" in his secret efforts to close the Old Gentilly Landfill. Because **MOUTON's** office could not directly close or deny an operational permit for the Old Gentilly Landfill, **MOUTON** and Co-conspirator "A" used the status and legitimacy of the office of the Commission of the LDWF to influence decision makers in an effort to close the Old Gentilly Landfill as well as other landfills. **MOUTON** received hundreds of thousands of dollars in illegal bribes from Co-conspirator "A" in return for these official acts as a Commissioner on the LDWF.

For example, acting on behalf of and at the direction of Co-conspirator "A", **MOUTON** contacted numerous federal officials, on multiple occasions, and sought to convince these officials that the Old Gentilly Landfill and other landfills should remain closed and/or not be allowed to open.

- 3 -

These officials included 17 United States Senators, officials with the Environmental Protection

Agency, United States Attorneys, Special Agents with the Federal Bureau of Investigation, officials

with the U. S. Army Corps of Engineers, as well as members of the news media. Co-conspirator "A"

wanted **MOUTON** to represent himself as a Commissioner on the State of Louisiana Department

of Wildlife and Fisheries Commission when contacting these officials. Co-conspirator "A" and/or

his employees acting under his direction, helped create a letterhead for **MOUTON** to use when

contacting these officials. This letterhead highlighted **MOUTON**'s position as a Commissioner with

the LDWF. In addition, Co-conspirator "A" helped author letters for **MOUTON** that discussed

reasons, in detail, to support the closure of the Old Gentilly Landfill. Many of these letters written

by Co-conspirator "A", and mailed by **MOUTON**, discussed how the re-opening of the Old Gentilly

Landfill would adversely impact wildlife and the environment. For example, in a five page letter

addressed and mailed to United States Senator John W. Warner, Co-conspirator "A" had **MOUTON**

write in part:

<div align="center">

**HENRY M. MOUTON**
**COMMISSIONER**
**LOUISIANA DEPARTMENT OF WILDLIFE AND FISHERIES**
**P. O. BOX 53097**
**LAFAYETTE, LA 70505-3097**

</div>

November 4, 2005

Senator John W. Warner
United States Senate Committee on Environment & Public Works
225 Russell Senate Office Building
Washington, DC 20510

Dear Senator Warner:

I am writing this letter to you as a member of the Louisiana
Department of Wildlife & Fisheries. As a member of the

<div align="center">- 4 -</div>

Commission, I believe I have some responsibility as a caretaker of the environment and fish and game in Louisiana. I am extremely concerned over the recent re-opening of an open dump in New Orleans, Louisiana, which was ordered closed approximately fifteen (15) years ago by the Louisiana Department of Environmental Quality ("LDEQ") because it was an imminent danger to the environment. This area is call the "Gentilly Dump."

In another five page letter written and mailed to an official with the Environmental Protection Agency, Enforcement Division, Co-conspirator "A" had **MOUTON** write in part:

<div align="center">

**HENRY W.[sic] MOUTON**
**Commissioner**
**Louisiana Department of Wildlife and Fisheries**
**Post Office Box 53097**
**Lafayette, Louisiana 70505-3097**
**Telephone: (337) 280-2616**
**E-Mail: henrymouton@star-service.com**

</div>

November 10, 2005

Mr. Greg DeAtley
Environmental Protection Agency
Enforcement Division - Region Six 6PD-UC
1445 Ross Avenue
Dallas, Texas 752002[sic]

RE:   Old Gentilly Landfill

Dear Greg:

Many thanks for taking my telephone call on Monday, November 7, 2005 relating to the Old Gentilly Landfill located in the eastern outskirts of the City of New Orleans. As a Commissioner of the Louisiana Department of Wildlife and Fisheries, I am deeply concerned over the disastrous environmental impact which the re-opening of this dump has visited upon this area and, in particular, the immediately adjacent wetlands.

Also, Co-conspirator "A" and/or his employees acting under his direction created labels for **MOUTON** to use when mailing letters written by Co-conspirator "A." Co-conspirator "A"

- 5 -

attempted to convince these officials to undertake some official action to close the Old Gentilly Landfill in New Orleans. Co-conspirator "A" highlighted **MOUTON**'s official state position in an effort to increase the likelihood that **MOUTON** would be successful in his endeavor to eliminate the competition of Co-conspirator "A."

## Two Rivers Recycling Landfill Scheme

On or about May 8, 2006, Co-conspirator "A" had **MOUTON** write a letter to Members of the Rapides Parish Police Jury in Alexandria, Louisiana in an effort to prevent the permitting of the Two Rivers Recycling Landfill (Two Rivers) in Catahoula Parish. Co-conspirator "A" was concerned that his landfills would loose revenue if Two Rivers were allowed to open because storm debris from the New Orleans area would be diverted to Two Rivers in Catahoula Parish. In the May 8, 2006 letter, **MOUTON**, acting on behalf of Co-conspirator "A," represented himself as a Commissioner on the State of Louisiana Department of Wildlife and Fisheries. In the letter, **MOUTON** sought to convince the members of the Rapides Parish Police Jury to oppose the permitting of Two Rivers and, specifically, to vote to oppose the landfill.

On or about August 16, 2006, Co-conspirator "A" paid **MOUTON** $30,000.00 to hire an advertizing/public relations firm for the purpose of creating negative public opinion about Two Rivers. Acting on behalf of and at the direction of Co-conspirator "A," **MOUTON** hired an advertizing/public relations firm located in Western Louisiana. Consequently, numerous advertisements, including several full page ads, were placed in newspapers in an effort to convince public officials and residents to oppose Two Rivers. It was further part of the scheme that none of the ads were attributed to Co-conspirator "A" or **MOUTON**. Ultimately, the permit for Two Rivers was denied.

- 6 -

It was further part of this illegal bribery scheme for **MOUTON** to conceal his relationship with Co-conspirator "A" and to conceal the fact that **MOUTON** was receiving illegal bribes from Co-conspirator "A." Accordingly, **MOUTON** did not disclose to the officials he contacted in the Old Gentilly and Two Rivers schemes that he was receiving bribes from Co-conspirator "A" nor did **MOUTON** disclose that Co-conspirator "A" was a landfill owner who stood to benefit significantly from the closure of the Old Gentilly Landfill and from the denial of operational permits for other competitor landfills such as Two Rivers.

## Illegal Campaign Contribution Scheme

Co-conspirator "A" also enlisted **MOUTON** in a scheme to commit election fraud in order to further attempt to influence decision makers and to circumvent state and federal election laws. On or about April 24, 2006, **MOUTON** agreed to help Co-conspirator "A" make approximately $11,000.00 in illegal campaign contributions to a U. S. Congressional candidate's campaign. On or about April 24, 2006, Co-conspirator "A" had another co-conspirator write $11,000.00 in checks to **MOUTON** and others known and unknown to the grand jury with the intention to make illegal campaign contributions to a federal election campaign. In addition, on or about December 27, 2006, **MOUTON** helped Co-conspirator "A" make an illegal campaign contribution to a state candidate. In both instances, Co-conspirator "A" used **MOUTON** and others so that the contributions would not be attributed to Co-conspirator "A."

## Summary of Bribes

In addition to the monthly payoffs, Co-conspirator "A" bribed **MOUTON** with payments that, in some cases, were characterized as no interest loans. In reality, these loans were a sham; no interest or payments were ever collected or paid on these loans nor were any loan documents

- 7 -

executed. In other instances, Co-conspirator "A" reimbursed **MOUTON** for lavish fishing trips, meals, and gifts for other public officials. Co-conspirator "A" made the following payments to **MOUTON** among others:

| DATE | AMOUNT |
|---|---|
| 10/27/2003 | $12,000.00 |
| 12/24/2003 | $12,000.00 |
| 07/30/2004 | $18,000.00 |
| 02/10/2005 | $18,000.00 |
| 12/16/2005 | $18,000.00 |
| 01/03/2006 | $17,000.00 |
| 04/06/2006 | $5,000.00 |
| 04/07/2006 | $7,500.00 |
| 04/25/2006 | $4,400.00 |
| 04/27/2006 | $4,400.00 |
| 05/18/2006 | $3,882.14 |
| 06/30/2006 | $5,148.78 |
| 08/02/2006 | $18,250.00 |
| 08/16/2006 | $30,000.00 |
| 09/13/2006 | $17,040.10 |
| 09/13/2006 | $12,320.00 |
| 10/06/2006 | $16,500.00 |
| 10/12/2006 | $4,000.00 |
| 12/28/2006 | $10,000.00 |
| 09/14/2007 | $21,000.00 |
| 09/14/2007 | $4,000.00 |
| 12/24/2007 | $4,000.00 |

| DATE | AMOUNT |
|------|--------|
| 12/26/2007 | $2,500.00 |
| 12/26/2007 | $2,500.00 |
| 12/26/2007 | $500.00 |

**MOUTON** resigned from his term as a Commissioner on the LDWF in November 2008 but Co-conspirator "A" continued to pay **MOUTON**, in an effort to conceal the illegal bribery scheme and election fraud. These illegal payments continued until attorneys working for Co-conspirator "A", aware that Co-conspirator "A" was under federal investigation, decided that Co-conspirator "A" should discontinue the payments to **MOUTON**. In 2011, an attorney for Co-conspirator "A" contacted **MOUTON**'s attorney and advised that no further payments would be made to **MOUTON**.

From on or about April 14, 2003, to on or about January 2011, Co-conspirator "A" paid **MOUTON** hundreds of thousands of dollars in illegal bribes and payoffs.

### Limited Nature of Factual Basis

This proffer of evidence is not intended to constitute a complete statement of all facts known by **MOUTON** and described by **MOUTON** to the government, but rather is a minimum statement of facts intended to prove the necessary factual predicate for his guilty plea. The limited purpose

- 9 -

of this factual basis is to demonstrate that there exists a sufficient legal basis for **MOUTON's** plea

of guilty to the charged offense.

_____      5-6-11
HENRY M. MOUTON                       DATE
Defendant

_____      5-6-11
MARY OLIVE PIERSON                    DATE
Counsel for Defendant

_____      5-19-11
SALVADOR PERRICONE                    DATE
Assistant United States Attorney

_____      5-19-2014
JAMES R. MANN                         DATE
Assistant United States Attorney

_____      5/17/11
BRIAN M. KLEBBA                       DATE
Assistant United States Attorney

_____      5-19-11
GREGORY KENNEDY                       DATE
Assistant United States Attorney

_____      5/17/11
WILLIAM J. QUINLAN, JR.               DATE
Assistant United States Attorney

- 10 -

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ANNE MARIE VANDENWEGHE | * | |
| **Plaintiff** | * | CASE NO.: 2:11-cv-2128 |
| VERSUS | * | SECTION: " " |
| THE PARISH OF JEFFERSON & STEVE J. THERIOT | * | JUDGE: |
| **Defendants** | * | MAGISTRATE: |
| | * | JURY TRIAL REQUESTED |

\*   \*   \*   \*   \*   \*   \*          \*   \*   \*   \*   \*   \*

## COMPLAINT

**NOW INTO COURT,** through undersigned counsel, comes plaintiff, Anne Marie Vandenweghe, a resident of the full age of majority domiciled within the County of Harrison, State of Mississippi, who respectfully represents that:

### I. PARTIES

1.

Made defendants herein are:

The Parish of Jefferson, a political subdivision organized under the laws of the State of Louisiana, having its principal place of business in the Parish of Jefferson, State of Louisiana;

Steven J. Theriot, an individual of the full age of majority residing and domiciled in the Parish of Jefferson, State of Louisiana.


EXHIBIT
B

## II. JURISDICTION AND VENUE

2.

Jurisdiction is proper in this Honorable Court under the provisions of 28 U.S.C. § 1331, for claims brought pursuant to 42 U.S.C. § 1983, the First Amendment of the Constitution of the United States of America, the Fourteenth Amendment of the Constitution of the United States of America, and pursuant to 28 U.S.C. § 1367 for all other claims pendent thereto.

3.

Venue is proper in the Eastern District of Louisiana, pursuant to 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Louisiana and defendants reside in this district.

## III. PRELIMINARY STATEMENT

Plaintiff claims that she was involved in First Amendment protected activity concerning matters of public concern, which included, but were not limited to, illegal activities of duly elected and appointed governmental officials of the Parish of Jefferson. As a result of exercising her right to freedom of speech, as guaranteed by the First and Fourteenth Amendments, plaintiff has suffered grievous retaliation by defendants, who embarked on a concerted effort to force plaintiff's involuntary resignation and/or prevent plaintiff from performing her duties properly, such that she would be terminated. Additionally, plaintiff alleges that defendants purposefully and systematically defamed her in statements to the press and at recorded meetings whereby they wrongfully and with malice accused her of "blogging" and inappropriate use of computers at the workplace, and publicly placed her on administrative leave for such alleged behavior. Inevitably, the plaintiff's employer terminated her employment from the Parish of Jefferson in retaliation for plaintiff's whistleblower activities, expressions of free and protected speech

regarding criminal activity on the part of governmental officials, and for her cooperation with the Federal Bureau of Investigation ("FBI") and United States Attorney's Office ("USAO").

## IV. FACTS AND ALLEGATIONS

4.

At all times material hereto, plaintiff, Anne Marie Vandenweghe ("plaintiff") was an employee of the Parish of Jefferson as an Assistant Parish Attorney, who was assigned to the Public Records Section of the Parish Attorney's Office, but whose job did not entail reporting of illegal activities.

5.

At all times material hereto, the Parish of Jefferson ("Parish") was the plaintiff's employer under the provisions of Louisiana Revised Statute 23:967.

6.

At all times material hereto, defendant, Steven J. Theriot ("Theriot"), was an employee of the Parish of Jefferson in the position of Interim Parish President, and who was appointed by and directly answerable to the citizens of the Parish through their duly elected representatives on the Parish Council. As Interim Parish President, Theriot had the power to appoint and remove administrative officers and employees of the parish responsible to him; or, at his discretion, authorize the head of a department or office responsible to him to appoint and remove subordinates in such department or office.

7.

Defendants, the Parish and Theriot, were acting under color of state and municipal law and were cloaked with the authority of the State of Louisiana and the Parish for purposes of 42 U.S.C. § 1983 when taking the actions against the plaintiff complained of herein.

8.

Plaintiff had a constitutionally protected right to enjoy her employment without retaliation or interference except for cause.

9.

Plaintiff had a constitutionally protected right to be free from retaliation for reporting illegal activity under Louisiana Revised Statute 23:967 and for exercising her right to free speech under the United States Constitution, First Amendment, made applicable to the state and its actors through the Fourteenth Amendment and 42 U.S.C. § 1983.

## V. VILLIO'S AND WHITMER'S ILLEGAL ACTIVITIES

10.

In August of 2009, it came to the attention of the plaintiff that Deborah Villio ("Villio"), Director of Code Enforcement for the Parish of Jefferson, had engaged in prohibited political activities in violation of the Jefferson Parish Code of Ordinances (JPCO), Section 23, in that in March of 2007, Villio "resigned" as the then-Director of the Community Justice Agency for the Parish of Jefferson to run for a state judgeship. However, upon being defeated for that judgeship position, Villio's resignation was converted to a "leave without pay" status retroactively by then-Parish Chief Administrative Officer ("CAO"), Timothy Whitmer for the sole purpose of allowing Villio to maintain her accrued service for retirement purposes. This practice was later denounced by newly-elected Parish President, John Young ("Young") as irregular and as an act that was not to repeat itself in the future.

11.

Upon learning of Villio and Whitmer's conduct, which further constituted criminal violations of Louisiana Revised Statutes 14:26 (criminal conspiracy), 14:132 (injuring a public

record), 14:133 (filing or maintaining a false public record), and 14:138 (public payroll fraud), plaintiff brought this to the attention of Assistant Parish Attorney, Louis Gruntz ("Gruntz"), the plaintiff's supervisor, who did nothing in response thereto.

12.

Furthermore, Villio, as a public employee, violated JPCO Section 23 in October of 2009, when she made a prohibited campaign contribution to the political campaign of Elton Lagasse, a candidate for public office in Jefferson Parish. Plaintiff once again brought the illegal nature of this conduct on the part of Villio to the attention of Assistant Parish Attorney Gruntz, who did nothing in response thereto.

13.

In February of 2010, Villio "resigned" from her position as Director of Code Enforcement to again run for a state judgeship in Jefferson Parish, yet prior to that time, and while in the employ of the Parish, Villio engaged in prohibited political activities by soliciting campaign contributions and participating in a fundraiser for this same judgeship position. Plaintiff brought this to the attention of Assistant Parish Attorney Gruntz, who did nothing in response thereto.

14.

Upon information and belief, the Parish of Jefferson, through its Interim Parish President, Theriot, failed to take any action in the form of discipline against Villio and Whitmer in order to stop improper use of public office, as well as the criminal violations of Louisiana law, including improper use of public property and abuse of public payroll.

15.

The Parish of Jefferson, through its Interim Parish President, Theriot, failed to take any

steps to protect plaintiff from reprisal and retaliation and to take steps to remove Villio and Whitmer from public office.

## VI. THE RIVER BIRCH CONTRACT

### 16.

In August 2009, plaintiff, the Assistant Parish Attorney in charge of responding to public records requests, received a Public Records Request ("PRR") from legal counsel for Waste Management, the operator of the public landfill for the Parish, seeking the production of any contracts which may exist between River Birch Landfill ("River Birch") and the Parish. As part of her duties, plaintiff obtained a copy of an un-executed contract between River Birch and the Parish from Eula Lopez ("Lopez"), the Clerk and Custodian of Records for the Parish Council. Shortly afterward, plaintiff received yet another contract between River Birch and the Parish, this one signed only by Parish Chairman, Thomas Capella. Upon bringing this apparent discrepancy to the attention of then-Parish Attorney, Thomas Wilkinson ("Wilkinson"), the plaintiff was ordered by Wilkinson, her ultimate supervisor, not to make any further inquiries. Wilkinson directed plaintiff that only he would personally handle this issue. Wilkinson then provided plaintiff with a fully executed copy of a contract between River Birch and the Parish. Plaintiff then brought theses blatant discrepancies in the River Birch contracts to the attention of Assistant Parish Attorney Gruntz and Parish Attorney Wilkinson, who failed to take any appropriate action thereto. Gruntz, against plaintiff's advice, issued a letter of non-production of the documents requested pursuant to the PRR.

### 17.

In preparation for a return for a Federal subpoena request, Lopez certified a return dated December 16, 2009, of a partially executed River Birch contract signed only by Jim Ward of

River Birch, knowing that there were other multiple, signed copies of the same contract in the possession of the Parish. Lopez informed plaintiff via an email that her brother-in-law, Wilkinson, had instructed her not to send it to the Council Chairman for signature. All different versions of said document were made part of plaintiff's return to the Federal Grand Jury subpoena in December of 2009.

18.

Upon information and belief, the Parish of Jefferson, through its Interim Parish President, Theriot, failed to take any action in the form of discipline against Wilkinson in order to stop improper use of public office, as well as other criminal violations of Louisiana law, including forgery, injuring public records, maintaining false public records, and malfeasance.

19.

The Parish of Jefferson, through its Interim Parish President, Theriot, failed to take any steps to protect plaintiff from reprisal and retaliation and to take steps to remove Wilkinson from public office.

## VII. TIM COULON CAMPAIGN COMMITTEE, INC.

20.

In September of 2009, plaintiff was instructed by her supervisor, Assistant Parish Attorney Gruntz, to assist in the investigation of Parish CAO Whitmer's alleged illegal insurance transactions with various Jefferson Parish entities and employees.

21.

In the course of the insurance transaction investigation, it came to plaintiff's and Gruntz's attention that both Whitmer and Wilkinson were identified as officers of the Tim Coulon Campaign Committee, Inc., corporate domicile of which was identified as the Yenni Jefferson

Parish Governmental Building.

<div align="center">22.</div>

Gruntz indicated the severity of the offense to plaintiff, representing that he would refer it to the Jefferson Parish District Attorney for further investigation and prosecution. Upon plaintiff noticing the inaction of Gruntz, plaintiff reported these offenses to the FBI and USAO, and ultimately to the Parish Personnel Board. On information and belief, plaintiff is not aware of the fact that Gruntz ever reported these offenses to the FBI, USAO or even the Jefferson Parish District Attorney.

<div align="center">23.</div>

Upon information and belief, the Parish of Jefferson, through its Interim Parish President, Theriot, failed to take any action in the form of discipline against Wilkinson and Whitmer in order to stop their improper use of public office, as well as other violations of the JPCO, including prohibited political activity by a Jefferson Parish employee.

<div align="center">24.</div>

The Parish of Jefferson, through its Interim Parish President, Theriot, failed to take any steps to protect plaintiff from reprisal and retaliation and to take steps to remove Wilkinson and Whitmer from public office.

<div align="center">**VIII. PAYROLL FRAUD**</div>

<div align="center">25.</div>

In January of 2010, as a result of a Channel 8 Fox News PRR inquiring about payroll irregularities, plaintiff uncovered that Wilkinson, with full cooperation and assistance of the office of the Parish Attorney, and then supervisor of paralegal personnel, Peggy Barton ("Barton"), committed payroll fraud in regard to three "paralegals" listed in the Parish Attorney's

office payroll. Said paralegals, Karen Parker Broussard, Kenneth Trahan, and Antoine "Tony" Thomassie were designated as such despite the lack of necessary professional credentials or training, all with Wilkinson's full knowledge. Wilkinson carried these individuals on his payroll with the knowledge that they were not working in his office, were being paid for not working at all, and were not in the performance of duties charged to a paralegal. Plaintiff made these transgressions known to her immediate supervisor, Assistant Parish Attorney Gruntz, who did nothing in response thereto.

26.

Wilkinson admitted on a television news interview that the three paralegals had been placed on his payroll while not working in the capacity for which they were being paid. Shortly after the Channel 8 Fox News PRR regarding the three paralegals was received, Wilkinson met with each one, and all three were dismissed.

27.

Barton tampered with the Jefferson Parish Attorney's organizational chart after receiving a PRR from Channel 8 Fox News. Instead of supplying the chart in place at the time of the PRR, Barton revised said chart by removing Karen Parker Broussard from under Barton's administrative control. Barton certified that Charlie Knopp ("Knopp"), Chief of Security, was Broussard's supervisor despite the fact that the organizational chart showed Broussard as under Barton's supervision since approximately 2007. Deano Bonano ("Bonano"), Director of Security for the Parish and Homeland Security Liaison, was Knopp's direct supervisor and interfered by email with Knopp's certified response to the PRR for the administrative organizational chart and information as to who was Karen Parker Broussard's supervisor, instructing Knopp not to respond until cleared with Bonano. Knopp had already submitted a

signed certification which was later followed by another with a different response. Knopp and Peggy Barton submitted conflicting certifications as to the responsible party.

28.

At all times that Barton altered public records, she conspired with others, including Wilkinson, to facilitate the alteration of public records. As a result of their actions, Barton and Wilkinson criminally conspired to commit payroll fraud, injury to public records, filing or maintaining false public records, as well as malfeasance in office.

29.

Upon information and belief, the Parish of Jefferson, through its Interim Parish President, Theriot, failed to take any action in the form of discipline against Wilkinson and Barton in order to stop improper use of public office, improper use of public property and abuse of public payroll, as well as other violations of Louisiana law, including payroll fraud, injury to public records, filing or maintaining false public records, as well as malfeasance in office. Plaintiff had apprised her supervisor, Assistant Parish Attorney Gruntz, of this illegal and criminal activity, and he did nothing in response thereto.

30.

The Parish of Jefferson, through its Interim Parish President, Theriot, failed to take any steps to protect plaintiff from reprisal and retaliation and to take steps to remove Wilkinson and Barton from public office.

## IX. ADMINISTRATIVE LEAVE, HOSTILE WORKPLACE & IMPROPER TERMINATION

31.

On February 22, 2010, the plaintiff discovered that her computer was being "mirrored" somewhere in the Parish system and reported same. The following morning, plaintiff found her

office door had been broken down, her computer and a number of files taken by unknown individuals. There was a note tacked to the wall instructing her to report to Theriot's office and within minutes of calling to advise Theriot that she was on her way, she was met by Chief of Secuity Knopp, who escorted her from the third floor office to the tenth floor, all in plain sight of her co-workers and others in the Yenni Building Government Complex. She was then confronted by Theriot and six other men.

32.

Each and every one of the above referenced individuals had been reported by plaintiff for egregious, illegal actions on a variety of issues against a variety of employees:

Feliciano "Junior "Mendoza ("Mendoza") - cover-up and attempted obstruction of an investigation into allegations of abuse made by an employee during a disciplinary hearing. Plaintiff was sent by Gruntz to investigate an altercation reported by Human Resources Department Director Mendoza and ultimately prepared a written report which contained firsthand observations by plaintiff of Mendoza and his employees, Phil Rupp ("Rupp") and William Fortenberry ("Fortenberry"), attempting to intimidate and obstruct an employee who wanted to file charges against Rupp. Mendoza, Rupp, and Fortenberry attempted to cover-up an altercation between Rupp and an African-American employee during a Disciplinary Hearing. Plaintiff, upon entering Mendoza's office, observed Mendoza on the telephone asking that the Sheriff be immediately contacted to prevent Sheriff Deputies in the Yenni Building from taking a Complaint of Assault from the aggrieved employee who was alleging that Rupp struck and threatened him, blocking his exit from the Disciplinary Hearing Room. Plaintiff immediately advised the three men to stop their obstruction, after which she contacted the Deputy on Duty and confirmed that the aggrieved employee was being allowed to file his complaint. Plaintiff's

report was submitted via email to Assistant Parish Attorney Gruntz, who did nothing in response thereto;

Bert Smith - falsifying public records, conspiracy and malfeasance in office, related to claims that he had participated in illegal activities while Director of the Jefferson Parish Animal Shelter;

Deano Bonano - falsifying public records, conspiracy, payroll fraud and malfeasance in office, related to the Bert Smith matter and to the Paralegal payroll fraud matter;

Jose Gonzalez - cover-up and attempted obstruction of an investigation into allegations of abuse made by an employee during a disciplinary hearing, while Chief Administrative Assistant of the employee being intimidated;

Clem Donelon - intimidation and attempt to obstruct employee reporting of illegal and unethical activities

Gruntz - failing to act and/or report illegal activities of Jefferson Parish employees. Due to supervisor Gruntz's inaction, plaintiff was forced to forward evidence of criminal behavior to the FBI and USAO, in compliance with their request and the Jefferson Parish Council's written instructions to cooperate and assist in the ongoing investigation of widespread political corruption in Jefferson Parish.

33.

Interim Parish President Theriot accused plaintiff of "blogging" and "internet surfing" while on the job. She was further asked to return her laptop computer, as well as former Parish President Broussard's and former CAO Whitmer's laptop computers. Broussard's and Whitmer's computers had been placed in a locked file cabinet in plaintiff's office, at the request of the FBI and the Jefferson Parish IT director. These laptops had been inspected by the State

Legislative Auditor due to the ongoing insurance fraud investigation and were scheduled to be handed over to the FBI. Plaintiff at no time during her employment with the Parish of Jefferson possessed a laptop, having been denied the use of one by Wilkinson despite the request by Gruntz that she be issued one to assist her in her duties.

34.

At this meeting on February 23, 2010, plaintiff was placed on paid administrative leave by Interim Parish President Theriot, while an investigation into her alleged inappropriate actions was conducted. Theriot then instructed Chief of Security Knopp and Director of Human Resources Mendoza to escort plaintiff to her office to collect her personal effects and to then escort her out of the building. While plaintiff was collecting her personal effects, her immediate supervisor Gruntz arrived in her office with a rolling cart on which her belongings were then placed. Plaintiff was escorted out of the building by Gruntz and Knopp (Mendoza having left to prepare paperwork) in plain sight of her co-workers, others in the Yenni Building Government Complex and passers-by in the Elmwood Shopping Center complex and surrounding apartments, offices and businesses. Plaintiff's pastor, Marion Lauricella, and many of her fellow church members contacted plaintiff upon learning in the press and other media of her removal from the Parish Attorney's office. Plaintiff's elderly mother and other family members and friends contacted her with grave concerns upon hearing the news accounts linking her removal with that of Wilkinson and with the ongoing corruption scandals in Jefferson Parish.

35.

On February 25, 2010, plaintiff filed for whistleblower protection with the Jefferson Parish Personnel Board.

36.

On March 31, 2010, Theriot ended plaintiff's paid administrative leave and reassigned her to the Recovery Section of the Parish Attorney's Office.

37.

Upon her return to work, it came to plaintiff's attention that the individual assigned to her previous position in Public Records, a younger, less experienced male, was being paid a higher salary than she had received for performing the same job duties. Moreover, due to the actions of Whitmer and Wilkinson, when plaintiff was reassigned by them in January of 2009, she was informed that she had been "red circled," such that she would not be eligible for a raise in the next seven years.

38.

Upon her return to work, plaintiff was not provided with the necessary materials to perform her tasks, such as not being provided with passwords for research or being connected to the Parish computer system, thus failing to receive information necessary to carry out her duties. Nevertheless, plaintiff was assigned the workload previously handled by five attorneys, including responsibility for a caseload of lawsuits related to recovery of damages. Plaintiff requested a Prescription List or Calendar and was told there was none. Plaintiff further requested a list of all cases in the Recovery Section for which she was responsible and was again told there was no official list. Plaintiff discovered on the day of her return to work that one of the cases in that section was due to prescribe that day and that no lawsuit had been filed. Plaintiff made all requests in emails and reported all discrepancies in emails in an effort to protect herself from what appeared to be a concerted effort on the part of Barton, then Interim Parish Attorney for Jefferson Parish, and others to sabotage her work. Plaintiff was further exposed to

confrontations and a hostile work environment that made it extremely difficult to carry out her duties, all of which were duly reported to her superiors in emails. This hostile work environment was in violation of the Civil Rights Act of 1964, §§ 701 et seq., 703(a)(1), as amended, 42 U.S.C.A. §§ 2000e et seq., 2000e-2(a)(1).

39.

Around the time newly-elected Parish President Young took office in October of 2010, plaintiff was informed by her doctor of anomalies in her heart activity, for which she had to go on sick leave. During that time, Young sent out letters demanding that all Assistant Parish Attorneys sign letters of resignation or be immediately terminated. While on sick leave, on November 2, 2010, plaintiff was presented with a termination notice at her home. Her health insurance was also terminated. Despite being out on documented medical disability, plaintiff was not afforded the opportunity of any pre-termination hearing, due process, or other administrative hearing despite the fact that Whitmer had been accorded same and that the Parish's outside counsel had advised the Parish that such was required prior to the termination of an employee. The improper termination of the plaintiff while on medical disability leave was a direct violation by the Parish of the Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq., as well as La. Rev. Stat. Ann. § 14:122 which identifies the offense of public intimidation and retaliation against a public employee with the specific intent to influence his/her conduct in relation to his/her duties.

40.

Plaintiff applied for unemployment benefits, but was turned down when the Personnel Department challenged her eligibility. The plaintiff also applied to the Parochial Retirement System for the opportunity to "buy back" service time to allow her to retire, but was informed

that it could not be done because she was not currently employed by an entity participating in said system.

<p style="text-align:center;">41.</p>

Plaintiff has since lost her home and has moved out of State due to her inability to procure a job due to her being labeled as a poor employee and whistleblower, causing her and her family great distress, humiliation, and embarrassment.

<p style="text-align:center;">42.</p>

The claims of plaintiff's blogging while on the job were not true, which Interim Parish President Theriot, and other members of the governmental authority knew. These defamatory and retaliatory statements were made by officials of the Parish of Jefferson solely to discredit the plaintiff and discourage her ongoing cooperation with the FBI and USAO. Nevertheless, no apology was ever offered to her, she was moved to a different job not involving public records release, and her name and reputation were damaged. To date, plaintiff has not been provided with the outcome of any investigation into the false allegations made by Interim Parish President Theriot, and the Parish, and was subsequently unfairly and improperly terminated. Thus, defendant, The Parish of Jefferson, through its Interim Parish President, Theriot, retaliated against plaintiff for having disclosed publicly the information regarding the illegal activities of a number of Parish officials under La. R.S. 23:967 and exercising her free speech rights under the First Amendment to the United States.

## X. RETALIATORY ACTIONS IN VIOLATION OF THE FIRST AMENDMENT

<p style="text-align:center;">43.</p>

Plaintiff asserts that her First Amendment protected activity as referenced herein was the substantial motivating factor in the actions taken against her as a concerted effort to make her

work environment so untenable as to force her to resign, or, alternatively, to make it such that plaintiff did not have the necessary tools and communications to complete her job duties properly.

44.

Plaintiff asserts that her speech involved and exposed misconduct and malfeasance in office, and involved matters which impacted the use of public funds and the use of taxpayer money. As such, this conduct involved matters of grave public concern.

45.

Plaintiff alleges that she has an established constitutional right to speak out on matters of public concern such as the proper use of funds.

46.

Plaintiff's speech was properly made within the confines of Louisiana law and was not likely to impede the defendants' general performance or operations; in fact, her speech was more likely to cause a more efficient working environment within the Parish and the Parish Attorney's Office, in that it would help expose and eliminate misconduct and malfeasance in public office.

47.

Plaintiff alleges that her interest in commenting on matters of the public concern outweighs the defendants' interests in avoiding controversy or promoting efficiency.

48.

Plaintiff alleges that defendant, The Parish of Jefferson, through its Interim Parish President, Theriot, retaliated against her by reassigning her to a lesser position not related to the disclosure of public documents. Moreover, plaintiff was directly discriminated against because of her age and her conduct as evidenced by the assignment of a younger, less qualified employee

to her former position, yet at a much higher rate of pay.

49.

The plaintiff's reassignment was directly motivated by her cooperation with the FBI and USAO in their requests for documents pertaining to the ongoing investigation into allegations surrounding former Parish President Aaron Broussard and his then-CAO, Tim Whitmer, and a blatant attempt to silence her.

50.

The plaintiff alleges that she was the subject of harassment on the job, confrontations and a hostile work environment, making it difficult to carry out her duties.

51.

Plaintiff alleges that defendant, The Parish of Jefferson, through its Parish President, Young, retaliated against her by wrongfully terminating her employment with the Parish of Jefferson and not affording the opportunity of any type of administrative hearing.

52.

The plaintiff's termination was directly motivated by her cooperation with the FBI and USAO, as well as her public statements and whistleblower activities, and was designed to terminate the plaintiff's cooperation with the government and silence her free speech.

54.

Plaintiff further alleges that defendant, The Parish of Jefferson, through its Interim Parish President, Theriot, retaliated against her by publishing defamatory statements about her, including that she was being placed on administrative leave for using office computers and taxpayer resources by "blogging" and using the internet at work inappropriately, knowing these statements to be false.

55.

Plaintiff contends that the Parish of Jefferson and Interim Parish President Theriot, knew, or should have known, that the placement of plaintiff on administrative leave was unjustified, and statements that she was placed on administrative leave to the press were known to be untrue, yet were stated for the sole purpose of damaging plaintiff's public reputation and discrediting her prior speech regarding the illegal conduct of the Parish officials, which illegal conduct had been brought to the attention of her supervisors. The defendants further made these false and defamatory statements about the plaintiff in an effort to stifle her cooperation with the FBI and USAO pertaining to the ongoing investigation into allegations surrounding former Parish President Aaron Broussard and his then-CAO, Tim Whitmer, as well as other Parish governmental officials.

56.

Plaintiff specifically alleges that these statements were included in the defamatory words stated against her by defendants as indicated.

57.

Plaintiff alleges that defendants stated these words in public hearings, recorded meetings, and to the press.

58.

Plaintiff alleges that Interim Parish President Theriot, in his individual capacity and as employee of the Parish of Jefferson and the Parish as an entity, knew the statements were false and asserts that defendants acted with actual malice in making said statements.

59.

Plaintiff alleges that such statements under these circumstances are *per se* defamatory.

60.

Accordingly, plaintiff alleges that her business and community reputation has been irreparably harmed as a public and/or private attorney. As such, defendants are liable for compensatory damages, actual damages, emotional distress damages, punitive damages, attorney's fees, and costs.

61.

Due to the above and foregoing allegations, defendants are liable unto plaintiff for retaliation in violation of the First Amendment for:

A.     Mental anguish;

B.     Humiliation and embarrassment;

C.     Loss of enjoyment of life;

D.     Legal interest;

E.     Punitive damages (against the individual defendants);

F.     Attorney's fees; and

G.     Costs of these proceedings.

62.

Plaintiff requests a trial by jury on all claims.

WHEREFORE, plaintiff, Anne Marie Vandenweghe, prays that defendants, Steve J. Theriot and the Parish of Jefferson, be duly cited to appear and answer this Complaint and Jury Demand and, after due proceedings and legal delays, there be judgment herein in favor of plaintiff and against defendants, jointly and severally, as detailed in the foregoing Complaint and Jury Demand and in an amount reasonable in the premises, together with legal interest from the

date of judicial demand, all costs of these proceedings, reasonable attorney's fees, punitive damages and any and all equitable relief deemed appropriate by this Honorable Court under the circumstances.

Respectfully submitted,

**THE TRUITT LAW FIRM**
A Limited Liability Company

*S/Jack E. Truitt*
_____
JACK E. TRUITT, BAR NO. 18476, T.A.
149 North New Hampshire Street
Covington, Louisiana 70433
Telephone: (985) 327-5266
Facsimile: (985) 327-5252
Email: mail@truittlaw.com
Counsel for plaintiff, Anne Marie Vandenweghe

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2011 DEC -2 PM 12: 12

LORETTA G. WHYTE
CLERK

# FELONY

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

### INDICTMENT FOR CONSPIRACY TO COMMIT THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS, CONSPIRACY TO COMMIT WIRE FRAUD, WIRE FRAUD AND NOTICE OF FORFEITURE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 11-299 |
| v. | * | SECTION: SECT. K MAG. 5 |
| AARON P. BROUSSARD | * | VIOLATION: 18 U.S.C. § 371 |
| KAREN PARKER | | 18 U.S.C. § 666(a)(1)(A) |
| a/k/a Karen Parker Broussard | * | 18 U.S.C. § 1343 |
| THOMAS G. WILKINSON | | 18 U.S.C. § 2 |
| | * | |

* * *

The Grand Jury charges that:

### COUNT 1

### CONSPIRACY TO COMMIT WIRE FRAUD AND THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS

A. **AT ALL TIMES MATERIAL HEREIN:**

1. Beginning in 1992, defendant **KAREN PARKER**, a/k/a Karen Parker Broussard, began working as an administrative assistant for the Jefferson Parish Council.

Fee _____ USA.
✓ Process_____
X Dktd_____
_____ CtRmDep_____
_____ Doc. No._____

EXHIBIT
C

2.     On or about July 31, 2003, defendant **KAREN PARKER**, resigned from her position as an administrative assistant for Jefferson Parish Councilman and defendant **AARON P. BROUSSARD** and began working for defendant **AARON P. BROUSSARD's** campaign for Parish President.

3.     On or about October 4, 2003, defendant **AARON P. BROUSSARD** was elected Parish President of Jefferson Parish.  On or about October 20, 2007, defendant **AARON P. BROUSSARD** was re-elected by the voters of Jefferson Parish.

4.     As Parish President, defendant **AARON P. BROUSSARD** was the chief administrative officer of the parish and was responsible for the administration and supervision of all parish departments, offices, agencies, and special districts. **BROUSSARD** also had the power to appoint and remove all administrative officers and employees responsible to him.  In addition, **BROUSSARD** had discretion to authorize parish department heads responsible to him to appoint and remove subordinate employees in those departments.

5.     On or about December 8, 2003, **AARON P. BROUSSARD** retained **THOMAS G. WILKINSON** as the Parish Attorney for Jefferson Parish for which **WILKINSON** was paid $100,000.00 per year. **WILKINSON** held the position of Parish Attorney for Jefferson Parish since 1996.

6.     As the Parish Attorney for Jefferson Parish, defendant **THOMAS G. WILKINSON** had supervisory authority over, among others, the Jefferson Parish Attorney's Office, the authority to approve the hiring of new employees, and the authority to approve pay raises for Parish Attorney's Office employees.

-2-

7.     As Parish Attorney, defendant **THOMAS G. WILKINSON** was an unclassified employee appointed by Parish President and defendant **AARON P. BROUSSARD** and, therefore, served at the pleasure of and reported directly to **BROUSSARD.**

8.     **THOMAS G. WILKINSON** also operated an outside legal practice during his term as Parish Attorney for Jefferson Parish.

9.     On or about October 28, 2003, defendant **THOMAS G. WILKINSON** approved the rescission/cancellation of **KAREN PARKER's** July 31, 2003 resignation from Jefferson Parish employment.

10.     On or about November 13, 2003, defendant **THOMAS G. WILKINSON** approved the placing of **KAREN PARKER** on leave without pay for the time period August 1, 2003, through on or about October 28, 2003, thereby eliminating any break in her employment with Jefferson Parish.

11.     Jefferson Parish provides for longevity pay raises for employees. Employees receive a step for every three years of employment after they have completed seven years of continuous employment with Jefferson Parish.  Employees receive an additional five percent compounded increase in their salary for each eligible step.

12.     Jefferson Parish employees with at least two years of continuous employment may also receive tenure awards if funding permits.  These tenure awards are calculated by multiplying the number of years of employment with Jefferson Parish by $25.00.

13.     Jefferson Parish employees with less than five years employment experience earn approximately 3.5 hours of annual leave every two weeks.  Employees with five to ten years experience earn approximately 4.38 hours of annual leave every two weeks.  An employee who has

- 3 -

worked for Jefferson Parish for more than ten years is placed in the maximum leave category and earns approximately 5.25 hours of annual leave every two weeks.

14.     When an employee resigns or retires from Jefferson Parish and is then re-hired at a later time, that employee must wait at least 90 days before they are eligible for health insurance benefits.

15.     On or about May 29, 2004, defendant **KAREN PARKER** and defendant **AARON P. BROUSSARD** were married.

16.     On or about October 28, 2003, defendant **KAREN PARKER** was given the position of Paralegal Supervisor in the Jefferson Parish Attorney's Office.   Her starting salary was approximately $48,000.00.

17.     The salary range for the position of Paralegal Supervisor for 2003 was approximately $28,838.00 to $44,737.00 according to the Executive Pay Plan for Jefferson Parish.

18.     According to the job description of Paralegal Supervisor, the essential functions of that position require that the "[i]ndividual conducts basic legal research, interviews witnesses, meets with inter-governmental personnel and members of the public, gathers evidence to formulate the Parish's position on Parish or other matters.   Individual prepares legal documents including pleadings, wills, contracts, leases, property descriptions and legal opinions setting forth the Parish's position on Parish and other matters.  Individual supervises and coordinates the activities of various support staff."

19.     The Paralegal Supervisor position is an unclassified position and, therefore, applicants are not required to take a civil service examination nor are unclassified employees subject to the

- 4 -

same annual Employment Performance Evaluation process that classified employees are required to undergo.

20.     The Jefferson Parish job description for the position of Parish Attorney's Office Paralegal Supervisor required Paralegal Supervisors to have completed paralegal training and certification.

21.     Defendant **KAREN PARKER** was not trained as a paralegal or a paralegal supervisor nor did she possess the required paralegal certification.

22.     The salary range for the position of Paralegal Supervisor for 2007 - 2010 was approximately $36,071.00 - $50,756.00 according to the Executive Pay Plan for Jefferson Parish.

23.     On or about March 8, 2004, defendant **KAREN PARKER** was assigned to work for ID Management which was located at the East Bank Regional Library.

24.     ID Management is the department responsible for issuing access badges to Jefferson Parish employees and operated independent of the Parish Attorney's Office.

25.     Jefferson Parish determined that the Parish only requires one employee to hold the position of ID/Security System Coordinator.

26.     The salary range for the parish employee with the position of ID/Security System Coordinator, who was located at the East Bank Regional Library, and was responsible for the issuance of Jefferson Parish employee access badges, was approximately $24,297.00 - $37,693.00 for the years 2004 - 2006 and was approximately $30,533.00 - $42,963.00 for the years 2007 - 2010.

27.     Despite her transfer to ID Management located at the East Bank Regional Library, defendant **KAREN PARKER** retained her job title and higher salary of Paralegal Supervisor until her dismissal on or about February 5, 2010.

28.    Defendant **KAREN PARKER** did not perform any of the duties of a Paralegal Supervisor while assigned to ID Management at the East Bank Regional Library.

29.    Under the title Paralegal Supervisor for Jefferson Parish, defendant **KAREN PARKER** was paid approximately $323,308.13 for the years 2004-2010.

30.    Jefferson Parish utilized Iberia Bank, formerly Omni Bank, for Automated Clearing House transactions (payroll) that transmitted, via wire, these payroll transactions that crossed state lines before the payroll funds were deposited into the recipient (employee) bank account.

31.    **KAREN PARKER** established direct deposit with the Jefferson Parish Employees Federal Credit Union (JPEFCU) and as a result her salary under the title Paralegal Supervisor was deposited into her JPEFCU accounts.

32.    The Jefferson Parish Attorney's Office and ID Management are both agencies of Jefferson Parish.

33.    Jefferson Parish received federal assistance in excess of $10,000.00 during each of the one year periods beginning on January 1st and ending December 31st for the years 2004, 2005, 2006, 2007, 2008, 2009, and 2010.

**B.    THE SCHEME TO DEFRAUD**

Beginning on or about July 31, 2003, and continuing to on or about February 5, 2010, in the Eastern District of Louisiana and elsewhere, defendants **AARON P. BROUSSARD, KAREN PARKER**, and **THOMAS G. WILKINSON**, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money and/or property from Jefferson Parish, to wit: approximately $410,463.00, by means of false pretenses, promises and representations thereby defrauding Jefferson Parish and its citizens of money and property.

- 6 -

It was further a part of the scheme and artifice to defraud that defendants **AARON P. BROUSSARD, KAREN PARKER** and **THOMAS G. WILKINSON**, used the Parish Attorney's Office and ID Management, and allowed the Parish Attorney's Office and ID Management to personally enrich **AARON P. BROUSSARD** and **KAREN PARKER** with taxpayer funds.

It was further a part of the scheme and artifice to defraud that defendants **AARON P. BROUSSARD** and **THOMAS G. WILKINSON** used their influence and positions in Parish government to make hiring decisions that were contrary to the best interest of the citizens of Jefferson Parish.

It was further a part of the scheme and artifice to defraud that defendants **AARON P. BROUSSARD** and **THOMAS G. WILKINSON** awarded **KAREN PARKER** with the job title of Paralegal Supervisor and allowed her to retain that position for over six years thereby allowing her to collect over $323,000.00 in taxpayer funds knowing that she was neither qualified nor performing the job of Paralegal Supervisor.

It was further a part of the scheme and artifice to defraud that on or about October 28, 2003, defendant **THOMAS G. WILKINSON**, approved the appointment of defendant **KAREN PARKER** to the position of Paralegal Supervisor in the Parish Attorney's Office knowing that she was unqualified for the position of Paralegal Supervisor and knowing that she was romantically involved with president-elect **AARON P. BROUSSARD.**

It was further a part of the scheme and artifice to defraud that on or about October 28, 2003, defendant **THOMAS G. WILKINSON** rescinded the July 31, 2003 resignation of defendant **KAREN PARKER** thereby allowing her to collect additional money and salary in the form of longevity pay, tenure awards, health insurance benefits, and annual leave.

-7-

It was further a part of the scheme and artifice to defraud that on or about October 28, 2003, defendant **THOMAS G. WILKINSON** directed a subordinate employee to cross out the pay rate for defendant **KAREN PARKER** of $28,838.00 and write $48,000.00 on an official Parish of Jefferson, Department of Human Resources, Request to Fill a Vacant Job form.

It was further a part of the scheme and artifice to defraud that when defendant **THOMAS G. WILKINSON** approved the hiring of defendant **KAREN PARKER** as a Paralegal Supervisor, the position was not advertized publicly nor was defendant **KAREN PARKER** required to take a civil service examination because the position was an unclassified position.

It was further a part of the scheme and artifice to defraud and known to **THOMAS G. WILKINSON** that defendant **KAREN PARKER** did not perform any of the "essential functions" as referenced in the job description for the position of Paralegal Supervisor.

It was further a part of the scheme and artifice to defraud that in or about December 2003, defendant **AARON P. BROUSSARD** retained **THOMAS G. WILKINSON** as Parish Attorney for Jefferson Parish, a position that paid approximately $100,000.00 per year.

It was further a part of the scheme and artifice to defraud that on or about March 8, 2004, defendant **THOMAS G. WILKINSON** approved the location transfer of defendant **KAREN PARKER** from the Parish Attorney's Office to ID Management located at the East Bank Regional Library.

It was further a part of the scheme and artifice to defraud that in 2004, 2007, and twice in 2008, defendant **THOMAS G. WILKINSON** approved Annual Evaluation Pay Raises for defendant **KAREN PARKER** that increased her annual salary.

- 8 -

It was further a part of the scheme and artifice to defraud that in 2004, 2005, three times in 2007, 2008, and 2009, defendant **AARON P. BROUSSARD** approved salary increases for defendant **THOMAS G. WILKINSON** that increased his annual salary.

It was further a part of the scheme and artifice to defraud and to conceal the scheme and artifice to defraud that on or about January 30, 2008, defendants **AARON P. BROUSSARD** and **KAREN PARKER** made a false representation on a financial document that listed **KAREN PARKER**'s position as a paralegal and which was faxed from the Parish President's Office.

It was further a part of the scheme and artifice to defraud that in or about the fall of 2008, defendant **THOMAS G. WILKINSON** attempted to use his position and perceived influence as a board member for an all boys New Orleans catholic school to assist **AARON P. BROUSSARD**'s family member during the competitive admission process for that same school.

It was further a part of the scheme and artifice to defraud that during the five year period of 2004 - 2009, defendant **AARON P. BROUSSARD** authorized pay raises for defendant **THOMAS G. WILKINSON** that increased **WILKINSON**'s salary from approximately $100,000.00 to approximately $184,000.00, knowing that this would result in an increased retirement benefit to **WILKINSON**.

It was further a part of the scheme and artifice to defraud that during the five year period of 2004 - 2009, defendant **THOMAS G. WILKINSON** authorized pay raises that increased **KAREN PARKER**'s salary from approximately $46,439.99 to approximately $63,898.36, knowing that this would result in an increased retirement benefit to **PARKER**.

It was further a part of the scheme and artifice to defraud and in an effort to conceal the scheme and artifice to defraud that on or about April 28, 2009, defendant **AARON P.**

- 9 -

BROUSSARD caused a fax to be transmitted to defendant **THOMAS G. WILKINSON** that falsely attempted to describe defendant **KAREN PARKER's** position with ID Management.

It was further a part of the scheme and artifice to defraud and in an effort to conceal the scheme and artifice to defraud that on or about May 5, 2009, defendant **AARON BROUSSARD** made false statements when answering questions about his wife's occupation, job description, and nature of services rendered pursuant to her employment when he executed a sworn Personal Financial Disclosure Statement that was filed with the Louisiana Board of Ethics.

It was further a part of the scheme and artifice to defraud and in an effort to conceal the scheme and artifice to defraud that defendants **AARON P. BROUSSARD** and **KAREN PARKER** made repeated false representations about **PARKER's** occupation on official U.S. government documents.

## C. THE CONSPIRACY

Beginning on or about July 31, 2003, and continuing to on or about February 5, 2010, in the Eastern District of Louisiana and elsewhere, the defendants, **AARON P. BROUSSARD, KAREN PARKER, a/k/a Karen Parker Broussard,** and **THOMAS G. WILKINSON,** did knowingly and willfully combine, conspire, and agree together and with each other to:

1.      Embezzle, steal, and obtain by fraud, property valued at $5,000 or more and owned by or under the care, custody, and control of the Parish of Jefferson; in violation of Title 18, United States Code, Section 666(a)(1)(A).

2.      Use and cause to be used bank wire transfers to be transmitted by means of wire communication in interstate commerce the signals and sounds in furtherance of the scheme and

artifice to defraud as set forth in Part B of Count 1; in violation of Title 18, United States Code, Section 1343.

**D.      OVERT ACTS**

On or about the following dates, in furtherance of the conspiracy and to accomplish its purposes, the defendants, **AARON P. BROUSSARD, KAREN PARKER**, a/k/a Karen Parker Broussard, and **THOMAS G. WILKINSON**, committed the following overt acts, among others, in the Eastern District of Louisiana and elsewhere:

1.      On or about October 28, 2003, defendant **THOMAS G. WILKINSON**, approved the appointment of defendant **KAREN PARKER** to the position of Paralegal Supervisor.

2.      On or about October 28, 2003, defendant **THOMAS G. WILKINSON**, rescinded the July 31, 2003 resignation of defendant **KAREN PARKER**.

3.      On or about October 28, 2003, defendant **THOMAS G. WILKINSON** directed a subordinate employee to cross out the pay rate for defendant **KAREN PARKER** of approximately $28,838.00 and write $48,000.00 on an official Parish of Jefferson, Department of Human Resources, Request to Fill a Vacant Job form.

4.      In or about December 2003, defendant **AARON P. BROUSSARD** re-appointed **THOMAS G. WILKINSON** to the position of Parish Attorney for Jefferson Parish.

5.      On or about March 8, 2004, defendant **THOMAS G. WILKINSON** approved the location transfer of defendant **KAREN PARKER** from the Parish Attorney's Office to ID Management located at the East Bank Regional Library, but allowed her to retain her Paralegal Supervisor title and salary.

6.      On or about July 1, 2004, defendant **THOMAS G. WILKINSON** approved an Annual Evaluation Pay Raise for defendant **KAREN PARKER** that increased her annual salary of approximately $51,789.00 to approximately $54,378.00.

7.      On or about July 6, 2004, defendant **AARON P. BROUSSARD** approved or directed a salary increase for defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $100,000.00 to approximately $105,000.00.

8.      Prior to on or about August 6, 2005, defendant **AARON P. BROUSSARD** approved or directed a salary increase for defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $105,000.00 to approximately $107,625.00.

9.      Prior to on or about January 6, 2007, defendant **AARON P. BROUSSARD** approved or directed the Chief Administrative Officer for Jefferson Parish to approve a salary increase for defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $107,625.00 to approximately $116,235.00.

10.     On or about June 22, 2007, defendant **AARON P. BROUSSARD** approved or directed the Chief Administrative Officer for Jefferson Parish to approve a salary increase for defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $116,235.00 to approximately $122,047.00.

11.     On or about June 25, 2007, defendant **THOMAS G. WILKINSON** approved an Annual Evaluation Pay Raise for defendant **KAREN PARKER** that increased her annual salary of approximately $58,728.00 to approximately $61,664.00.

12.     On or about December 7, 2007, defendant **AARON P. BROUSSARD** approved or directed the Chief Administrative Officer for Jefferson Parish to approve a salary increase for

- 12 -

defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $122,047.12 to approximately $134,251.75.

13.     On or about January 30, 2008, defendants **AARON P. BROUSSARD** and **KAREN PARKER** faxed a personal financial statement from the Parish President's Office to a financial institution knowing that the mortgage application document falsely listed **PARKER's** position as a Paralegal.

14.     On or about June 23, 2008, defendant **THOMAS G. WILKINSON** approved an Annual Evaluation Pay Raise for defendant **KAREN PARKER** that increased her annual salary of approximately $61,664.00 to approximately $61,778.00.

15.     On or about July 1, 2008, defendant **THOMAS G. WILKINSON** approved an additional Annual Evaluation Pay Raise for defendant **KAREN PARKER** that increased her annual salary of approximately $61,664.00 to approximately $64,747.00.

16.     On or about August 5, 2008, defendant **AARON P. BROUSSARD** approved or directed the Chief Administrative Officer for Jefferson Parish to approve a salary increase for defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $134,252.00 to approximately $147,677.00.

17.     In the Fall of 2008, defendant **THOMAS G. WILKINSON** attempted to use his position as a board member at an all boys New Orleans catholic school in order to assist one of **AARON P. BROUSSARD's** family members in the competitive admission process.

18.     On or about February 6, 2009, defendant **AARON P. BROUSSARD** approved or directed the Chief Administrative Officer for Jefferson Parish to approve a salary increase for

defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $147,677.14 to approximately $183,870.05.

      19.   On or about April 13, 2005, defendants **AARON P. BROUSSARD** and **KAREN PARKER** made a false representation about **PARKER's** occupation on an official U.S. government document.

      20.   On or about November 11, 2006, defendants **AARON P. BROUSSARD** and **KAREN PARKER** made a false representation about **PARKER's** occupation on an official U.S. government document.

      21.   On or about July 23, 2007, defendants **AARON P. BROUSSARD** and **KAREN PARKER** made a false representation about **PARKER's** occupation on an official U.S. government document.

      22.   On or about April 9, 2008, defendants **AARON P. BROUSSARD** and **KAREN PARKER** made a false representation about **PARKER's** occupation on an official U.S. government document.

      23.   On or about April 14, 2009, defendants **AARON P. BROUSSARD** and **KAREN PARKER** made a false representation about **PARKER's** occupation on an official U.S. government document.

      24.   On or about April 19, 2010, defendant **KAREN PARKER** made a false representation about **PARKER's** occupation on an official U.S. government document.

      25.   On or about April 28, 2009, defendant **AARON P. BROUSSARD** had a fax transmitted to defendant **THOMAS G. WILKINSON** that falsely attempted to describe defendant **KAREN PARKER's** position with ID Management.

- 14 -

26.     On or about May 5, 2009, defendant **AARON BROUSSARD** made false statements when answering questions about his wife's occupation, job description, and nature of services rendered pursuant to her employment when he executed a sworn Personal Financial Disclosure Statement that was filed with the Louisiana Board of Ethics.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-28

## WIRE FRAUD

A.     The allegations contained in Parts A and B of Count 1 are hereby re-alleged and incorporated herein by reference.

B.     On or about the dates listed below, in the Eastern District of Louisiana and elsewhere, the defendants, **AARON P. BROUSSARD, KAREN PARKER,** a/k/a **Karen Parker Broussard, THOMAS G. WILKINSON** and others known and unknown to the grand jury, for the purpose of executing the scheme and artifice to defraud set forth in Part B of Count 1, caused the following bank wire transfers, among others, to be transmitted in interstate commerce, by means of a wire communication:

| Count No. | Originating Bank | Recipient Bank | Wire Amount | Date of Wire Transfer |
|---|---|---|---|---|
| 2 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,450.45 | 11/3/06 |
| 3 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,450.29 | 11/17/06 |

- 15 -

| Count No. | Originating Bank | Recipient Bank | Wire Amount | Date of Wire Transfer |
|---|---|---|---|---|
| 4 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,660.75 | 12/01/06 |
| 5 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,450.29 | 12/15/06 |
| 6 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,474.58 | 12/29/06 |
| 7 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,615.09 | 10/05/07 |
| 8 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,614.93 | 10/19/07 |
| 9 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,615.09 | 11/02/07 |
| 10 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,614.93 | 11/16/07 |
| 11 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,654.05 | 11/30/07 |

| Count No. | Originating Bank | Recipient Bank | Wire Amount | Date of Wire Transfer |
|-----------|------------------|----------------|-------------|------------------------|
| 12 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,615.09 | 12/14/07 |
| 13 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,614.93 | 12/28/07 |
| 14 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,675.76 | 10/03/08 |
| 15 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,675.38 | 10/17/08 |
| 16 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,729.93 | 10/31/08 |
| 17 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $845.54 | 11/14/08 |
| 18 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,675.38 | 11/26/08 |
| 19 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,675.76 | 12/12/08 |

| Count No. | Originating Bank | Recipient Bank | Wire Amount | Date of Wire Transfer |
|---|---|---|---|---|
| 20 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,675.38 | 12/23/08 |
| 21 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,700.98 | 09/18/09 |
| 22 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,701.45 | 10/02/09 |
| 23 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,700.98 | 10/16/09 |
| 24 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,756.86 | 10/31/09 |
| 25 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,701.45 | 11/13/09 |
| 26 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,700.98 | 11/25/09 |
| 27 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,701.45 | 12/11/09 |

- 18 -

| Count No. | Originating Bank | Recipient Bank | Wire Amount | Date of Wire Transfer |
|-----------|------------------|----------------|-------------|------------------------|
| 28 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,700.98 | 12/23/09 |

all in violation of Title 18, United States Code, Section 1343.

## COUNT 29

## THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS

1.    The allegations contained in Part A of Count 1 are hereby re-alleged and incorporated herein by reference.

2.    Beginning on or about January 1, 2006, and continuing to on or about December 31, 2006, in the Eastern District of Louisiana and elsewhere, defendants **AARON P. BROUSSARD, KAREN PARKER, a/k/a Karen Parker Broussard**, and **THOMAS G. WILKINSON**, did knowingly embezzle, steal, obtain by fraud and otherwise without authority convert to the use of **KAREN PARKER**, wife of the Parish President **AARON P. BROUSSARD**, a person other than the rightful owner, property valued at $5,000.00 or more and owned by, or under the care, custody, and control of Jefferson Parish, in that **KAREN PARKER** received thousands of dollars in income that she was not entitled to because she did not perform the essential duties of a Paralegal Supervisor and because she was paid substantially more than the individual who held the position of ID/Security System Coordinator.

All in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

- 19 -

## COUNT 30

## THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS

1.     The allegations contained in Part A of Count 1 are hereby re-alleged and incorporated herein by reference.

2.     Beginning on or about January 1, 2007, and continuing to on or about December 31, 2007, in the Eastern District of Louisiana and elsewhere, defendants **AARON P. BROUSSARD, KAREN PARKER, a/k/a Karen Parker Broussard**, and **THOMAS G. WILKINSON**, did knowingly embezzle, steal, obtain by fraud and otherwise without authority convert to the use of **KAREN PARKER**, wife of the Parish President **AARON P. BROUSSARD**, a person other than the rightful owner, property valued at $5,000.00 or more and owned by, or under the care, custody, and control of Jefferson Parish, in that **KAREN PARKER** received thousands of dollars in income that she was not entitled to because she did not perform the essential duties of a Paralegal Supervisor and because she was paid substantially more than the individual who held the position of ID/Security System Coordinator.

All in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

## COUNT 31

## THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS

1.     The allegations contained in Part A of Count 1 are hereby re-alleged and incorporated herein by reference.

2.     Beginning on or about January 1, 2008, and continuing to on or about December 31, 2008, in the Eastern District of Louisiana and elsewhere, defendants **AARON P. BROUSSARD, KAREN PARKER, a/k/a Karen Parker Broussard**, and **THOMAS G. WILKINSON**, did

- 20 -

knowingly embezzle, steal, obtain by fraud and otherwise without authority convert to the use of **KAREN PARKER**, wife of the Parish President **AARON P. BROUSSARD**, a person other than the rightful owner, property valued at $5,000.00 or more and owned by, or under the care, custody, and control of Jefferson Parish, in that **KAREN PARKER** received thousands of dollars in income that she was not entitled to because she did not perform the essential duties of a Paralegal Supervisor and because she was paid substantially more than the individual who held the position of ID/Security System Coordinator.

All in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

## COUNT 32

### THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS

1.      The allegations contained in Part A of Count 1 are hereby re-alleged and incorporated herein by reference.

2.      Beginning on or about January 1, 2009, and continuing to on or about December 31, 2009, in the Eastern District of Louisiana and elsewhere, defendants **AARON P. BROUSSARD**, **KAREN PARKER, a/k/a Karen Parker Broussard**, and **THOMAS G. WILKINSON**, did knowingly embezzle, steal, obtain by fraud and otherwise without authority convert to the use of **KAREN PARKER**, wife of the Parish President **AARON P. BROUSSARD**, a person other than the rightful owner, property valued at $5,000.00 or more and owned by, or under the care, custody, and control of Jefferson Parish, in that **KAREN PARKER** received thousands of dollars in income that she was not entitled to because she did not perform the essential duties of a Paralegal Supervisor

and because she was paid substantially more than the individual who held the position of ID/Security System Coordinator.

All in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

## COUNT 33

## THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS

1.      The allegations contained in Part A of Count 1 are hereby re-alleged and incorporated herein by reference.

2.      Beginning on or about January 1, 2010, and continuing to on or about December 31, 2010, in the Eastern District of Louisiana and elsewhere, defendants **AARON P. BROUSSARD**, **KAREN PARKER, a/k/a Karen Parker Broussard**, and **THOMAS G. WILKINSON**, did knowingly embezzle, steal, obtain by fraud and otherwise without authority convert to the use of **KAREN PARKER**, wife of the Parish President **AARON P. BROUSSARD**, a person other than the rightful owner, property valued at $5,000.00 or more and owned by, or under the care, custody, and control of Jefferson Parish, in that **KAREN PARKER** received thousands of dollars in income that she was not entitled to because she did not perform the essential duties of a Paralegal Supervisor and because she was paid substantially more than the individual who held the position of ID/Security System Coordinator.

All in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

## NOTICE OF WIRE FRAUD FORFEITURE

1.      The allegations of Counts 1 through 28 of this Indictment are realleged and incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Sections 371, 1343 and 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c).

- 22 -

2.     As a result of the offenses alleged in Counts 1 through 28, defendants, **AARON P. BROUSSARD, KAREN PARKER, a/k/a Karen Parker Broussard, and THOMAS G. WILKINSON,** shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c), any and all property, real or personal, which constitutes or is derived from proceeds traceable to a violation of Title 18, United States Code, Sections 371 and 1343, including but not limited to:

     a.     $323,308.13 in United States Currency and all interest and proceeds traceable thereto.

     b.     The government specifically provides notice of its intent to seek a personal money judgment against the defendant in the amount of the fraudulently-obtained proceeds.

3.     If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

     a.     cannot be located upon the exercise of due diligence;

     b.     has been transferred or sold to, or deposited with, a third person;

     c.     has been placed beyond the jurisdiction of the Court;

     d.     has been substantially diminished in value; or

     e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

All in violation of Title 18, United States Code, Sections 371, 1343 and 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c).

## NOTICE OF FEDERAL PROGRAM FRAUD FORFEITURE

1.    The allegations of Counts 1 and 29 through 33 of this Indictment are realleged and incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Sections 371, 666 and 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c).

2.    As a result of the offenses alleged in Counts 1 and 29 through 33, defendants, **AARON P. BROUSSARD, KAREN PARKER, a/k/a Karen Parker Broussard, and THOMAS G. WILKINSON,** shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c), any and all property, real or personal, which constitutes or is derived from proceeds traceable to a violation of Title 18, United States Code, Sections 371 and 666, including but not limited to:

   a.    $323,308.13 in United States Currency and all interest and proceeds traceable thereto.

   b.    The government specifically provides notice of its intent to seek a personal money judgment against the defendant in the amount of the fraudulently-obtained proceeds.

3.    If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

   a.    cannot be located upon the exercise of due diligence;

   b.    has been transferred or sold to, or deposited with, a third person;

   c.    has been placed beyond the jurisdiction of the Court;

   d.    has been substantially diminished in value; or

   e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

- 24 -

All in violation of Title 18, United States Code, Sections 371, 666 and 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c).

A TRUE BILL:

**FOREPERSON**

**JIM LETTEN**
UNITED STATES ATTORNEY
Louisiana Bar Roll No. 8517

**JAN MASELLI MANN**
First Assistant United States Attorney
Louisiana Bar Roll No. 9020

**JAMES R. MANN**
Assistant United States Attorney
Louisiana Bar Roll No. 20513

**BRIAN M. KLEBBA**
Assistant United States Attorney
New York Bar Roll No. 2938728

**MATTHEW CHESTER**
Assistant United States Attorney
Texas Bar Roll No. 24045650

New Orleans, Louisiana
December 2, 2011

- 25 -

No. _____

UNITED STATES DISTRICT COURT
Eastern __ District of __ Louisiana __
__ Criminal __ Division

# THE UNITED STATES OF AMERICA

vs.

**AARON P. BROUSSARD**
**KAREN PARKER, a/k/a Karen Parker Broussard**
**THOMAS G. WILKINSON**

## INDICTMENT

INDICTMENT FOR CONSPIRACY TO COMMIT THEFT CONCERNING
PROGRAMS RECEIVING FEDERAL FUNDS, CONSPIRACY TO
COMMIT WIRE FRAUD, WIRE FRAUD AND NOTICE OF FORFEITURE

**VIOLATIONS: 18 U.S.C. § 2**
**18 U.S.C. § 371**
**18 U.S.C. § 1343**
**18 U.S.C. § 666(a)(1)(A)**

*A true bill.*

_____
*Foreperson*

*Filed in open court this* _____ *day of* _____
_____ *A.D. 2011.*

_____
*Clerk*

*Bail, $* _____

**BRIAN M. KLEBBA**
Assistant United States Attorney

FORM OBD-34

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA      *      CRIMINAL NO. 2:11-CR-299

v.      *      SECTION: HH

KAREN PARKER      *
a/k/a Karen Parker Broussard

     *    *    *

## FACTUAL BASIS

Should this matter have proceeded to trial, the Government would have proven, through the introduction of competent testimony and admissible evidence, the following facts, beyond a reasonable doubt, to support the allegations in the Superseding Bill of Information now pending against the defendant:

### *Background Information*

Beginning in 1992, the defendant, **KAREN PARKER, a/k/a Karen Parker Broussard** ("defendant" or "**PARKER**") began working as an administrative assistant for the Jefferson Parish Council. On or about July 31, 2003, **PARKER** resigned from her position as an administrative assistant for Jefferson Parish Councilman Aaron F. Broussard ("Broussard") and began working for Broussard's campaign for Jefferson Parish President. On or about October 4, 2003, Broussard was elected Parish President of Jefferson Parish. Approximately four years later, on or about October



20, 2007, Broussard was re-elected by the voters of Jefferson Parish.  On or about May 29, 2004, **PARKER** and Broussard were married.  Approximately three years prior to May 29, 2004, **PARKER** and Broussard had a romantic relationship.

At all times relevant to this case, Thomas G. Wilkinson, a/k/a Tom Wilkinson ("Wilkinson"), was the Parish Attorney for Jefferson Parish and in that position had supervisory authority over the Jefferson Parish Attorney's Office, the authority to approve the hiring of new employees, and the authority to approve pay raises for Parish Attorney's Office employees.

Jefferson Parish utilized Iberia Bank, formerly Omni Bank, for Automated Clearing House transactions (payroll) who transmitted, via wire, these payroll transactions that crossed state lines before the payroll funds were deposited into the recipient (employee) bank account. **PARKER** established direct deposit with the Jefferson Parish Employees Credit Union (JPEFCU) and her salary while she was employed at Jefferson Parish, as set forth below from 2004 through 2010, was deposited into her JPEFCU accounts.

The Jefferson Parish Attorney's Office is a local government agency of Jefferson Parish.  It received federal assistance in excess of $10,000.00 during each of the one year periods beginning on January 1st and ending December 31st for the years 2004, 2005, 2006, 2007, 2008, 2009, and 2010.

### *Karen Parker Becomes a "Paralegal Supervisor" at Jefferson Parish*

After his election on October 4, 2003, but prior to him taking office as the Jefferson Parish President, Broussard met with at least two Jefferson Parish officials to discuss **PARKER**'s anticipated employment with the Parish under the Broussard administration.  The parties to that decision were either current or future high-ranking Jefferson Parish officials who used their influence

and positions in Parish government to make hiring decisions that were contrary to the best interests of the citizens of Jefferson Parish. After those discussions, it was understood by the parties that **PARKER** would be hired as a "Paralegal Supervisor" under the purview of the Parish Attorney's Office in Jefferson Parish. Broussard specifically wanted to have other Parish officials, including Wilkinson, be the individuals who hired **PARKER**, because he knew that once he took over the position of Parish President, he could not hire **PARKER**, and there would be increased scrutiny as a result of their romantic relationship.

All parties to the decision to hire **PARKER** – Broussard, Wilkinson, and others – knew that **PARKER** was not qualified, trained, or certified as a Paralegal Supervisor. Despite this, on or about October 28, 2003, defendant **PARKER** was given the position of Paralegal Supervisor in the Jefferson Parish Attorney's Office. Her starting salary was approximately $48,000.00, which was higher than the salary range allowed for under the Executive Pay Plan for Jefferson Parish.

Additionally, on or about October 28, 2003, Wilkinson approved the rescission/cancellation of **PARKER**'s July 31, 2003 resignation from Jefferson Parish employment, which allowed her to collect additional money and salary in the form of longevity pay, tenure awards, health insurance benefits, and annual leave. Wilkinson also approved the placing of **PARKER** on leave without pay for the time period August 1, 2003, through October 31, 2003, thereby eliminating any break in her employment with Jefferson Parish.

Wilkinson approved the decision to hire **PARKER** as a Paralegal Supervisor, approved her salary, rescinded her resignation, and approved her leave without pay status when he executed **PARKER**'s Parish of Jefferson, Department of Human Resources Request to Fill a Vacant Job form on October 28, 2003.

3

According to the job description of Paralegal Supervisor, the essential functions of that position require that the "[i]ndividual conducts basic legal research, interviews witnesses, meets with inter-governmental personnel and members of the public, gathers evidence to formulate the Parish's position on Parish or other matters. Individual prepares legal documents including pleadings, wills, contracts, leases, property descriptions and legal opinions setting forth the Parish's position on Parish and other matters. Individual supervises and coordinates the activities of various support staff." The Paralegal Supervisor position is an unclassified position and, therefore, applicants are not required to take a civil service examination nor are unclassified employees subject to the same annual Employment Performance Evaluation process that classified employees are required to undergo. Moreover, the Jefferson Parish job description for the position of Parish Attorney's Office Paralegal Supervisor required Paralegal Supervisors to have completed paralegal training and certification.

Despite being given the position of a Paralegal Supervisor, **PARKER** was neither trained as a paralegal or a paralegal supervisor, nor did she possess the required paralegal certification. Moreover, as noted above, the parties who helped place her as a Paralegal Supervisor, including Broussard, Wilkinson, and others, knew she did not possess the required paralegal certification and that she was not trained as a paralegal.

During the period of time **PARKER** was assigned to work at the Parish Attorney's Office as a "Paralegal Supervisor," from approximately October 2003 through March 2004, **PARKER** did no work as a Paralegal Supervisor, nor did she perform any paralegal work. During this period of time, Broussard and Wilkinson were likewise aware that **PARKER** did no work as Paralegal Supervisor and the little work she did perform was not paralegal or paralegal supervisory work.

4

### Karen Parker Gets Moved to ID Management Department

On or about March 8, 2004, Wilkinson approved the transfer of defendant **PARKER** to work for ID Management which was located at the East Bank Regional Library. ID Management is the department responsible for issuing access badges to Jefferson Parish employees. Jefferson Parish determined that the Parish only requires one employee to hold the position of ID/Security System Coordinator. Despite her transfer to the East Bank Regional Library, **PARKER** retained her position and higher salary of Paralegal Supervisor until her dismissal on or about February 5, 2010.

As with her work at the Parish Attorney's Office, during the time period she worked at the East Bank Regional Library, **PARKER** did not perform any of the duties of, and did no work as, a Paralegal Supervisor while assigned to ID Management at the East Bank Regional Library. Likewise, Broussard and Wilkinson were aware, during this same period of time, that **PARKER** did not perform the duties of, and did no work as, a Paralegal Supervisor while assigned to the ID Management department. Moreover, both Broussard and Wilkinson had first-hand knowledge that **PARKER** did not appear at times at the location she was assigned (East Bank Regional Library) to work.

### Karen Parker's Salary at Jefferson Parish

Beginning in 2003, as noted above, **PARKER** was given an annual salary of approximately $48,000 as a Paralegal Supervisor, which was higher than the salary range allowed for under the Executive Pay Plan for Jefferson Parish. This salary range was approved and known by Wilkinson, as the Parish Attorney, and Broussard, as **PARKER**'s romantic interest. In 2004, 2007, and twice in 2008, **PARKER** was approved for Annual Evaluation Pay Raises by Wilkinson. These pay raises were approved by Wilkinson and known by Broussard despite the fact that both Wilkinson and

5

Broussard knew **PARKER** was not performing any of the essential functions for the position of Paralegal Supervisor and, indeed, **PARKER** was not qualified for, and did no work as, a Paralegal Supervisor. From approximately 2004 through 2009, Wilkinson authorized pay raises for **PARKER** from approximately $46,439.99 to approximately $63,898.36, knowing that these raises would additionally result in increased retirement benefits to the defendant, **PARKER**. In total, from 2004 through 2010, **PARKER** was paid approximately $323,308.13 in Jefferson Parish taxpayer funds for her salary.

### _Tom Wilkinson Benefits from Hiring Karen Parker_

In turn, after the hiring of **PARKER** as a "Paralegal Supervisor" in Jefferson Parish in October 2003, Broussard retained Wilkinson as the Parish Attorney in December 2003. As **PARKER**'s salary was annually being raised, by Wilkinson, Broussard, as Parish President, was approving annual pay increases for Wilkinson. From approximately 2004 through 2009, Broussard authorized pay increases for Wilkinson.

### _False Statements by Broussard_

In an effort to conceal the scheme and artifice noted above involving, among others, Broussard, from approximately 2005 through approximately 2010, repeatedly made false representations about **PARKER**'s occupation on multiple documents, including official U.S. government documents, such as tax returns, mortgage applications, and on sworn personal financial disclosure statements. In particular, on these documents, Broussard repeatedly represented that **PARKER** was a Paralegal or a Paralegal Supervisor when, as set forth above, **PARKER** was not qualified, trained, or certified as a Paralegal and, in fact, **PARKER** did no work as a Paralegal or as a Paralegal Supervisor in Jefferson Parish.

6

## *Broussard Uses His Public Office for Private Gain*

Additionally, from approximately 2004 through 2010, Broussard received monies, totaling hundreds of thousands of dollars, that were characterized as, among other things, "retainers," "consulting fees" or "finder's fees" with various contractors and vendors, all of whom were doing business with Jefferson Parish during the period of time Broussard was the President of Jefferson Parish. Moreover, Broussard was a majority owner in a holding company which owned an investment property in Canada. Broussard received income from this Canadian property. This property was partially funded by individuals and/or entities who were contractors and/or vendors doing business with Jefferson Parish during the period of time Broussard was the Jefferson Parish President.

## *Misprison of a Felony Regarding Theft Concerning Programs Receiving Federal Funds*

As set forth above, **PARKER**, Broussard, and Wilkinson knew, from approximately 2004 through 2010, that she was not qualified, trained, or certified to be a Paralegal Supervisor in Jefferson Parish and did not do any work as a Paralegal Supervisor in Jefferson Parish. In hiring, retaining, and paying **PARKER** as a Paralegal Supervisor, Broussard and Wilkinson intentionally stole or committed theft with Jefferson Parish taxpayer funds. Though **PARKER** was aware that she was stealing or committing theft of property valued at $5,000 or more which was owned by or under the care, custody, and control of the Parish of Jefferson (because she did not perform any work as a Paralegal Supervisor), **PARKER** did not report this crime to federal authorities and, indeed, concealed this crime from the authorities by, among other things, continuing to accept her salary and/or salary increases on an annual basis, and signing various forms, including official U.S.

7

governmental forms and personal disclosure forms, falsely representing her as a Paralegal Supervisor.

*__Limited Nature of Factual Basis__*

This proffer of evidence is not intended to constitute a complete statement of all facts known by **PARKER** and described by **PARKER** to the government, but rather is a minimum statement of facts intended to prove the necessary factual predicate for her guilty plea. The limited purpose of this factual basis is to demonstrate that there exists a sufficient legal basis for **PARKER's** plea of guilty to the charged offense.

Various records, including bank statements, financial statements, mortgage statements, employment-related documents, forms (including tax records and disclosure forms) and other records, would be introduced to prove the facts as set forth above. Testimonial evidence, including testimony from representatives of the Federal Bureau of Investigation, Internal Revenue Service, as well as other witnesses, would also be admitted to prove the facts set forth above.

BRIAN M. KLEBBA  
Assistant United States Attorney  
New York Bar Roll No. 2938728

Date 1/13/12

MATTHEW S. CHESTER  
Assistant United States Attorney  
Texas Bar No. 24045650

Date 1/13/2012

KAREN PARKER  
Defendant

Date 1/13/2012

DAVID COURCELLE  
Counsel for Defendant  
Louisiana Bar Roll No. 23696

Date 1/13/2012

8

# FELONY

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2012 FEB -3  PM 3: 48

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**SUPERSEDING INDICTMENT FOR CONSPIRACY TO COMMIT THEFT
CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS,
CONSPIRACY TO COMMIT WIRE FRAUD, WIRE FRAUD
AND NOTICE OF FORFEITURE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 11-299** |
| **v.** | * | **SECTION:** "HH" (SHF) |
| **AARON F. BROUSSARD** | * | **VIOLATION:** 18 U.S.C. § 371 |
| **THOMAS G. WILKINSON** | | 18 U.S.C. § 666(a)(1)(A) |
| | * | 18 U.S.C. § 1343 |
| | | 18 U.S.C. § 2 |
| | * | |

\*    \*    \*

The Grand Jury charges that:

## COUNT 1

### CONSPIRACY TO COMMIT WIRE FRAUD AND THEFT
### CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS

A.   **AT ALL TIMES MATERIAL HEREIN:**

1.   On or about October 4, 2003, defendant **AARON F. BROUSSARD**
("**BROUSSARD**") was elected Parish President of Jefferson Parish. On or about October 20, 2007,
defendant **BROUSSARD** was re-elected by the voters of Jefferson Parish.

Fee USA
Process
X Dktd
CtRmDep
Doc. No.


EXHIBIT
E

2.      As Parish President, defendant **AARON F. BROUSSARD** was the chief administrative officer of the parish and was responsible for the administration and supervision of all parish departments, offices, agencies, and special districts. **BROUSSARD** had the power to appoint and remove executive appointees responsible to him and **BROUSSARD** had the authority to award discretionary salary increases to those employees.

3.      On or about December 8, 2003, **AARON F. BROUSSARD** retained **THOMAS G. WILKINSON ("WILKINSON")** as the Parish Attorney for Jefferson Parish for which **WILKINSON** was paid $100,000.00 per year. **WILKINSON** held the position of Parish Attorney for Jefferson Parish since 1996.

4.      As the Parish Attorney for Jefferson Parish, defendant **THOMAS G. WILKINSON** had supervisory authority over, among others, the Jefferson Parish Attorney's Office and **WILKINSON** had the authority to approve the hiring of new employees and the authority to approve pay raises for Parish Attorney's Office employees.

5.      As Parish Attorney, defendant **THOMAS G. WILKINSON** was an unclassified employee appointed by Parish President and defendant **AARON F. BROUSSARD** and, therefore, served at the pleasure of and reported directly to **BROUSSARD**.

6.      **THOMAS G. WILKINSON** also operated an outside legal practice during his term as Parish Attorney for Jefferson Parish.

7.      Upon taking office, defendant **AARON F. BROUSSARD** retained Timothy A. Whitmer ("Tim Whitmer" or "Whitmer") as the Chief Administrative Assistant/Chief Administrative Officer ("CAO") for Jefferson Parish.

- 2 -

8.     As the CAO for Jefferson Parish, Tim Whitmer was responsible for the day-to-day operations of Jefferson Parish government.

9.     Beginning in 1992, Karen Parker, a/k/a Karen Parker Broussard, began working for the Jefferson Parish government as an administrative assistant for the Jefferson Parish Council.

10.     On or about July 31, 2003, Karen Parker began working for defendant **AARON F. BROUSSARD's** campaign for Parish President after resigning from her position as an administrative assistant for Jefferson Parish Councilman and defendant **BROUSSARD**, a position Parker held for several years.

11.     On or about October 28, 2003, defendant **THOMAS G. WILKINSON** approved the rescission of Karen Parker's July 31, 2003 resignation from Jefferson Parish employment.

12.     On or about November 13, 2003, defendant **THOMAS G. WILKINSON** approved the placing of Karen Parker on leave without pay for the time period August 1, 2003, through on or about October 28, 2003, thereby eliminating any break in her employment with Jefferson Parish.

13.     Jefferson Parish provides for longevity pay raises for employees. Employees receive a step for every three years of employment after they have completed seven years of continuous employment with Jefferson Parish.  Employees receive an additional five percent compounded increase in their salary for each eligible step.

14.     Jefferson Parish employees with at least two years of continuous employment may also receive tenure awards if funding permits.  These tenure awards are calculated by multiplying the number of years of employment with Jefferson Parish by $25.00.

15.     Jefferson Parish employees with less than five years employment experience earn approximately 3.5 hours of annual leave every two weeks.  Employees with five to ten years

- 3 -

experience earn approximately 4.38 hours of annual leave every two weeks. An employee who has worked for Jefferson Parish for more than ten years is placed in the maximum leave category and earns approximately 5.25 hours of annual leave every two weeks.

16.     When an employee resigns or retires from Jefferson Parish and is then re-hired at a later time, that employee must wait at least 90 days before they are eligible for health insurance benefits.

17.     In Jefferson Parish it is the discretion of the department head to award compensatory ("comp") time to their employees. Comp time is subject to prior approval by the department head and is approved under limited circumstances.

18.     On or about May 29, 2004, Karen Parker and defendant AARON F. BROUSSARD were married.

19.     On or about October 28, 2003, Karen Parker was given the position of Paralegal Supervisor in the Jefferson Parish Attorney's Office. Her starting salary was approximately $48,000.00.

20.     The salary range for the position of Paralegal Supervisor for 2003 was approximately $28,838.00 to $44,737.00 according to the Executive Pay Plan for Jefferson Parish.

21.     According to the job description of Paralegal Supervisor, the essential functions of that position require that the "[i]ndividual conducts basic legal research, interviews witnesses, meets with inter-governmental personnel and members of the public, gathers evidence to formulate the Parish's position on Parish or other matters. Individual prepares legal documents including pleadings, wills, contracts, leases, property descriptions and legal opinions setting forth the Parish's

- 4 -

position on Parish and other matters. Individual supervises and coordinates the activities of various support staff."

22.    The Paralegal Supervisor position is an unclassified position and, therefore, applicants are not required to take a civil service examination nor are unclassified employees subject to the same annual Employment Performance Evaluation process that classified employees are required to undergo.

23.    The Jefferson Parish job description for the position of Parish Attorney's Office Paralegal Supervisor required Paralegal Supervisors to have completed paralegal training and certification.

24.    Karen Parker was not trained as a Paralegal or a Paralegal Supervisor nor did she possess the required paralegal certification.

25.    The salary range for the position of Paralegal Supervisor for 2007 - 2010 was approximately $36,071.00 - $50,756.00 according to the Executive Pay Plan for Jefferson Parish.

26.    On or about March 8, 2004, defendant **THOMAS G. WILKINSON** approved the location transfer of Karen Parker to the East Bank Regional Library where the office of ID Management was located.

27.    ID Management is the department responsible for issuing access badges to Jefferson Parish employees and is operated independent of the Parish Attorney's Office.

28.    Jefferson Parish determined that the Parish only requires one employee to hold the position of ID/Security System Coordinator.

29.    The salary range for the parish employee with the position of ID/Security System Coordinator, who was located at the East Bank Regional Library, and was responsible for the

- 5 -



issuance of Jefferson Parish employee access badges, was approximately $24,297.00 - $37,693.00 for the years 2004 - 2006 and was approximately $30,533.00 - $42,963.00 for the years 2007 - 2010.

30.     Despite Karen Parker's transfer to the East Bank Regional Library where she was assigned to ID Management, Parker retained her job title and higher salary of Paralegal Supervisor until her dismissal on or about February 5, 2010.

31.     Karen Parker did not perform any of the duties of a Paralegal Supervisor while assigned to ID Management at the East Bank Regional Library.

32.     Under the title Paralegal Supervisor for Jefferson Parish, Karen Parker was paid approximately $323,308.13 for the years 2004-2010.

33.     Jefferson Parish utilized Iberia Bank, formerly Omni Bank, for Automated Clearing House transactions (payroll) that transmitted, via wire, these payroll transactions that crossed state lines before the payroll funds were deposited into the recipient (employee) bank account.

34.     Defendant **AARON F. BROUSSARD** and Karen Parker had approximately four joint bank accounts at various financial institutions, filed their federal income tax returns jointly, and applied together for bank loans and/or mortgages.

35.     Karen Parker established direct deposit with the Jefferson Parish Employees Federal Credit Union (JPEFCU) and as a result her salary under the title Paralegal Supervisor was deposited into her JPEFCU account.

36.     Defendant **THOMAS G. WILKINSON** established direct deposit with Iberia Bank, formerly Omni Bank, and, as a result, his salary was deposited into his Iberia/Omni Bank account.

37.     The Jefferson Parish Attorney's Office and ID Management are both agencies of Jefferson Parish.

- 6 -

38.     Jefferson Parish received federal assistance in excess of $10,000.00 during each of the one year periods beginning on January 1st and ending December 31st for the years 2004, 2005, 2006, 2007, 2008, 2009, and 2010.

## B.     THE SCHEME TO DEFRAUD

Beginning at a time unknown, but prior to on or about July 31, 2003, and continuing to on or about February 5, 2010, in the Eastern District of Louisiana and elsewhere, defendants **AARON F. BROUSSARD, THOMAS G. WILKINSON** and others did knowingly and willfully devise and intend to devise a scheme and artifice to defraud the citizens of Jefferson Parish and to obtain money and property from Jefferson Parish, to wit: **AARON F. BROUSSARD** personally enriched himself and financially benefitted other employees by means of false pretenses, promises and representations thereby defrauding Jefferson Parish and its citizens of money and property.

It was a part of the scheme and artifice to defraud that **AARON F. BROUSSARD** used taxpayer funds to reward **THOMAS G. WILKINSON** for his intercession on behalf of **BROUSSARD**'s family member in the competitive admissions process for a local private school when **BROUSSARD** awarded **WILKINSON** a discretionary pay raise of approximately $36,000 per year.

It was further a part of the scheme and artifice to defraud that **AARON F. BROUSSARD** obtained approximately $323,000 for himself and his girlfriend and then wife, Karen Parker, through the assistance of **THOMAS G. WILKINSON**, Tim Whitmer, and others.

It was further a part of the scheme and artifice to defraud that defendants **AARON F. BROUSSARD, THOMAS G. WILKINSON**, Karen Parker, and Tim Whitmer used the Parish Attorney's Office and ID Management, and allowed the Parish Attorney's Office and ID

Management to personally enrich **BROUSSARD**, **WILKINSON**, and Karen Parker with taxpayer funds.

It was further a part of the scheme and artifice to defraud that defendants **AARON F. BROUSSARD**, **THOMAS G. WILKINSON**, and others used their influence and positions in Parish government to make hiring decisions and award pay increases that were contrary to the best interest of the citizens of Jefferson Parish.

It was further a part of the scheme and artifice to defraud that defendants **AARON F. BROUSSARD**, **THOMAS G. WILKINSON**, Tim Whitmer, and another Jefferson Parish official created an additional Paralegal Supervisor position for Karen Parker and allowed her to retain that position for over six years thereby allowing her to collect over $323,000.00 in taxpayer funds knowing that she was neither qualified nor performing the job of Paralegal Supervisor.

It was further a part of the scheme and artifice to defraud that on or about October 28, 2003, defendant **THOMAS G. WILKINSON** approved the appointment of Karen Parker to the position of Paralegal Supervisor in the Parish Attorney's Office knowing that she did not meet the qualifications and/or requirements for the position of Paralegal Supervisor and knowing that she was romantically involved with president-elect **AARON F. BROUSSARD**.

It was further a part of the scheme and artifice to defraud that on or about October 28, 2003, defendant **THOMAS G. WILKINSON** rescinded the July 31, 2003 resignation of Karen Parker thereby allowing her to collect additional money and salary in the form of longevity pay, tenure awards, health insurance benefits, and annual leave.

It was further a part of the scheme and artifice to defraud that on or about October 28, 2003, defendant **THOMAS G. WILKINSON** directed a subordinate employee to cross out the pay rate

- 8 -

for Karen Parker of $28,838.00 and write $48,000.00 on an official Parish of Jefferson, Department of Human Resources, Request to Fill a Vacant Job form.

It was further a part of the scheme and artifice to defraud that when defendant **THOMAS G. WILKINSON** approved the hiring of Karen Parker as a Paralegal Supervisor, the position was not advertized publicly nor was Karen Parker required to take a civil service examination because the position was an unclassified position.

It was further a part of the scheme and artifice to defraud and known to **THOMAS G. WILKINSON** that Karen Parker did not perform any of the "essential functions" as referenced in the job description for the position of Paralegal Supervisor.

It was further a part of the scheme and artifice to defraud that in or about December 2003, defendant **AARON F. BROUSSARD** retained **THOMAS G. WILKINSON** as Parish Attorney for Jefferson Parish, a position that paid approximately $100,000.00 per year.

It was further a part of the scheme and artifice to defraud that on or about March 8, 2004, defendant **THOMAS G. WILKINSON** approved the location transfer of Karen Parker from the Parish Attorney's Office to ID Management located at the East Bank Regional Library.

It was further a part of the scheme and artifice to defraud that in 2004, 2007, and twice in 2008, defendant **THOMAS G. WILKINSON** approved Annual Evaluation Pay Raises for Karen Parker that increased her annual salary.

It was further a part of the scheme and artifice to defraud that in 2004, 2005, three times in 2007, 2008, and 2009, defendant **AARON F. BROUSSARD** directed and approved salary increases for defendant **THOMAS G. WILKINSON** that increased his annual salary.

It was further a part of the scheme and artifice to defraud and to conceal the scheme and artifice to defraud that on or about January 30, 2008, defendant **AARON F. BROUSSARD** and Karen Parker made a false representation on a financial document that listed Karen Parker's position as a Paralegal and which was faxed from the Parish President's Office.

It was further a part of the scheme and artifice to defraud that in or about the fall of 2008, defendant **THOMAS G. WILKINSON** attempted to use his position and perceived influence as a board member for a local private school to assist **AARON F. BROUSSARD's** family member during the competitive admission process for that same school.

It was further a part of the scheme and artifice to defraud that in or about 2009, defendant **AARON F. BROUSSARD** instructed Tim Whitmer to process a pay raise for defendant **THOMAS G. WILKINSON** because **BROUSSARD** believed that **WILKINSON** had been instrumental in defendant **BROUSSARD's** family member's acceptance into a local private school.

It was further a part of the scheme and artifice to defraud that Tim Whitmer told defendant **THOMAS G. WILKINSON** that defendant **AARON F. BROUSSARD** was giving **WILKINSON** a substantial discretionary pay raise because **BROUSSARD** wanted to reward **WILKINSON** for helping **BROUSSARD's** family member get accepted into a local private school.

It was further a part of the scheme and artifice to defraud that during the five year period of 2004 - 2009, defendant **AARON F. BROUSSARD** authorized pay raises for defendant **THOMAS G. WILKINSON** that increased **WILKINSON's** salary from approximately $100,000.00 to approximately $184,000.00, knowing that this would result in an increased retirement benefit to **WILKINSON**.

- 10 -

It was further a part of the scheme and artifice to defraud that during the five year period of 2004 - 2009, defendant **THOMAS G. WILKINSON** authorized pay raises that increased Karen Parker's salary from approximately $46,439.99 to approximately $63,898.36, knowing that this would result in an increased retirement benefit to Parker.

It was further a part of the scheme and artifice to defraud and in an effort to conceal the scheme and artifice to defraud that on or about April 28, 2009, defendant **AARON F. BROUSSARD** caused a fax to be transmitted to defendant **THOMAS G. WILKINSON** that falsely attempted to describe Karen Parker's position with Jefferson Parish.

It was further a part of the scheme and artifice to defraud and in an effort to conceal the scheme and artifice to defraud that on or about May 5, 2009, defendant **AARON F. BROUSSARD** made false statements when answering questions about his wife's occupation, job description, and nature of services rendered pursuant to her employment when he executed a sworn Personal Financial Disclosure Statement that was filed with the Louisiana Board of Ethics.

It was further a part of the scheme and artifice to defraud and in an effort to conceal the scheme and artifice to defraud that defendant **AARON F. BROUSSARD** made repeated false representations about Parker's occupation on official U.S. government documents.

## C. THE CONSPIRACY

Beginning at a time unknown, but prior to on or about July 31, 2003, and continuing to on or about February 5, 2010, in the Eastern District of Louisiana and elsewhere, **AARON F. BROUSSARD, THOMAS G. WILKINSON**, and others known and unknown to the grand jury, did knowingly and willfully combine, conspire, and agree together and with each other to:

- 11 -

1.      Embezzle, steal, and obtain by fraud, property valued at $5,000 or more and owned by or under the care, custody, and control of the Parish of Jefferson; in violation of Title 18, United States Code, Section 666(a)(1)(A).

2.      Use and cause to be used bank wire transfers to be transmitted by means of wire communication in interstate commerce the signals and sounds in furtherance of the scheme and artifice to defraud as set forth in Part B of Count 1; in violation of Title 18, United States Code, Section 1343.

**D.      OVERT ACTS**

On or about the following dates, in furtherance of the conspiracy and to accomplish its purposes, the defendants, **AARON F. BROUSSARD, THOMAS G. WILKINSON,** and others, including Tim Whitmer and Karen Parker, committed the following overt acts, among others, in the Eastern District of Louisiana and elsewhere:

1.      After **AARON F. BROUSSARD**'s election on or about October 4, 2003, but prior to him taking office as the President of Jefferson Parish and prior to on or about October 28, 2003, **BROUSSARD** met with defendant **THOMAS G. WILKINSON,** Tim Whitmer, and another Jefferson Parish official for the purpose of creating a position for Karen Parker.  It was decided during this meeting to create an additional Paralegal Supervisor position in the Parish Attorney's Office for Parker.

2.      Prior to on or about October 28, 2003, defendant **THOMAS G. WILKINSON** agreed to have Karen Parker assigned to the Parish Attorney's Office as a Paralegal Supervisor.

3.      On or about October 28, 2003, defendant **THOMAS G. WILKINSON** approved the appointment of defendant Karen Parker to the position of Paralegal Supervisor.

- 12 -

4.    On or about October 28, 2003, defendant **THOMAS G. WILKINSON** rescinded the July 31, 2003 resignation of Karen Parker.

5.    On or about October 28, 2003, defendant **THOMAS G. WILKINSON** directed a subordinate employee to cross out the pay rate for Karen Parker of approximately $28,838.00 and write $48,000.00 on an official Parish of Jefferson, Department of Human Resources, Request to Fill a Vacant Job form.

6.    In or about December 2003, defendant **AARON F. BROUSSARD** decided to retain **THOMAS G. WILKINSON** as the Parish Attorney for Jefferson Parish.

7.    In or about December 2003, defendant **AARON F. BROUSSARD** decided to retain Tim Whitmer as Chief Administrative Assistant/Chief Administrative Officer for Jefferson Parish.

8.    In early 2004, defendant **THOMAS G. WILKINSON** and Tim Whitmer had a conversation to discuss Karen Parker's improper requests for overtime or comp pay. As a result, defendant **AARON F. BROUSSARD** was notified that Parker was violating parish rules by attempting to collect overtime/comp pay under the circumstances described to defendant **BROUSSARD**.

9.    On or about March 8, 2004, defendant **THOMAS G. WILKINSON** approved the location transfer of Karen Parker from the Parish Attorney's Office to ID Management located at the East Bank Regional Library, but allowed her to retain her Paralegal Supervisor title and salary.

10.   On or about July 1, 2004, defendant **THOMAS G. WILKINSON** approved an Annual Evaluation Pay Raise for Karen Parker that increased her annual salary of approximately $51,789.00 to approximately $54,378.00.

- 13 -

11.     On or about July 6, 2004, defendant **AARON F. BROUSSARD** approved or directed a salary increase for defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $100,000.00 to approximately $105,000.00.

12.     Prior to on or about August 6, 2005, defendant **AARON F. BROUSSARD** approved or directed a salary increase for defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $105,000.00 to approximately $107,625.00.

13.     At some time in 2006 or 2007, defendant **THOMAS G. WILKINSON** learned that Karen Parker was observed gambling at a daiquiri establishment during work hours and, as a result, **WILKINSON** and the Jefferson Parish Sheriff's Office high ranking employee assigned to protect and chauffeur **AARON F. BROUSSARD** confronted Parker in **WILKINSON**'s office about the allegation.

14.     Prior to on or about January 6, 2007, defendant **AARON F. BROUSSARD** approved or directed Tim Whitmer to approve a salary increase for defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $107,625.00 to approximately $116,235.00.

15.     On or about June 22, 2007, defendant **AARON F. BROUSSARD** approved or directed Tim Whitmer to approve a salary increase for defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $116,235.00 to approximately $122,047.00.

16.     On or about June 25, 2007, defendant **THOMAS G. WILKINSON** approved an Annual Evaluation Pay Raise for Karen Parker that increased her annual salary of approximately $58,728.00 to approximately $61,664.00.

17.     On or about December 7, 2007, defendant **AARON F. BROUSSARD** approved or directed Tim Whitmer to approve a discretionary salary increase for defendant **THOMAS G.**

- 14 -

WILKINSON that increased his annual salary of approximately $122,047.12 to approximately $134,251.75.

18.    On or about January 30, 2008, defendant AARON F. BROUSSARD faxed a personal financial statement relative to a mortgage application from the Parish President's Office to a financial institution knowing that the document falsely listed Karen Parker's position as a Paralegal.

19.    On or about June 23, 2008, defendant THOMAS G. WILKINSON approved an Annual Evaluation Pay Raise for Karen Parker that increased her annual salary of approximately $61,664.00 to approximately $61,778.00.

20.    On or about July 1, 2008, defendant THOMAS G. WILKINSON approved an additional Annual Evaluation Pay Raise for Karen Parker that increased her annual salary of approximately $61,664.00 to approximately $64,747.00.

21.    On or about August 5, 2008, defendant AARON F. BROUSSARD approved or directed Tim Whitmer to approve a salary increase for defendant THOMAS G. WILKINSON that increased his annual salary of approximately $134,252.00 to approximately $147,677.00.

22.    In the Fall of 2008, defendant THOMAS G. WILKINSON attempted to use his position as a board member at a local private school in order to assist a family member of AARON F. BROUSSARD in the competitive admission process.

23.    In or about January 2009, defendant AARON F. BROUSSARD directed Tim Whitmer to give defendant THOMAS G. WILKINSON the maximum salary possible because WILKINSON had helped BROUSSARD's family member get into a local private school.

24.    In or about January 2009, Tim Whitmer told defendant THOMAS G. WILKINSON that defendant AARON F. BROUSSARD instructed Whitmer to give WILKINSON the maximum

- 15 -

possible salary increase because **WILKINSON** had helped get his family member into a local private school.

25.     On or about February 6, 2009, defendant **THOMAS G. WILKINSON**'s salary was increased from approximately $147,677.14 to approximately $183,870.05 based on defendant **AARON F. BROUSSARD**'s belief that **WILKINSON** had helped his family member gain admission to a local private school.

26.     On or about April 13, 2005, defendant **AARON F. BROUSSARD** made a false representation about Parker's occupation on an official U.S. government document.

27.     On or about November 11, 2006, defendant **AARON F. BROUSSARD** made a false representation about Parker's occupation on an official U.S. government document.

28.     On or about July 23, 2007, defendant **AARON F. BROUSSARD** made a false representation about Parker's occupation on an official U.S. government document.

29.     On or about April 9, 2008, defendant **AARON F. BROUSSARD** made a false representation about Parker's occupation on an official U.S. government document.

30.     On or about April 14, 2009, defendant **AARON F. BROUSSARD** made a false representation about Parker's occupation on an official U.S. government document.

31.     On or about April 28, 2009, defendant **AARON F. BROUSSARD** had a fax transmitted to defendant **THOMAS G. WILKINSON** that falsely attempted to describe Karen Parker's position with Jefferson Parish.

32.     On or about May 5, 2009, defendant **AARON F. BROUSSARD** made false statements when answering questions about his wife's occupation, job description, and nature of

services rendered pursuant to her employment when he executed a sworn Personal Financial Disclosure Statement that was filed with the Louisiana Board of Ethics.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-28

## WIRE FRAUD

A.    The allegations contained in Parts A and B of Count 1 are hereby re-alleged and incorporated herein by reference.

B.    On or about the dates listed below, in the Eastern District of Louisiana and elsewhere, the defendants, **AARON F. BROUSSARD** and **THOMAS G. WILKINSON**, and others known and unknown to the grand jury, for the purpose of executing the scheme and artifice to defraud set forth in Part B of Count 1, caused the following bank wire transfers, among others, to be transmitted in interstate commerce, by means of a wire communication:

| Count No. | Originating Bank | Recipient Bank | Wire Amount | Date of Wire Transfer |
|-----------|------------------|----------------|-------------|------------------------|
| 2 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,450.45 | 11/3/06 |
| 3 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,450.29 | 11/17/06 |
| 4 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,660.75 | 12/01/06 |

- 17 -

| Count No. | Originating Bank | Recipient Bank | Wire Amount | Date of Wire Transfer |
|---|---|---|---|---|
| 5 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,450.29 | 12/15/06 |
| 6 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,474.58 | 12/29/06 |
| 7 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,615.09 | 10/05/07 |
| 8 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,614.93 | 10/19/07 |
| 9 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,615.09 | 11/02/07 |
| 10 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,614.93 | 11/16/07 |
| 11 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,654.05 | 11/30/07 |
| 12 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,615.09 | 12/14/07 |

| Count No. | Originating Bank | Recipient Bank | Wire Amount | Date of Wire Transfer |
|---|---|---|---|---|
| 13 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,614.93 | 12/28/07 |
| 14 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,675.76 | 10/03/08 |
| 15 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,675.38 | 10/17/08 |
| 16 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,729.93 | 10/31/08 |
| 17 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $845.54 | 11/14/08 |
| 18 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,675.38 | 11/26/08 |
| 19 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,675.76 | 12/12/08 |
| 20 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,675.38 | 12/23/08 |

| Count No. | Originating Bank | Recipient Bank | Wire Amount | Date of Wire Transfer |
|---|---|---|---|---|
| 21 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,700.98 | 09/18/09 |
| 22 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,701.45 | 10/02/09 |
| 23 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,700.98 | 10/16/09 |
| 24 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,756.86 | 10/31/09 |
| 25 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,701.45 | 11/13/09 |
| 26 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,700.98 | 11/25/09 |
| 27 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,701.45 | 12/11/09 |
| 28 | Omni Bank | Karen A. Parker Jefferson Parish Employees Federal Credit Union Acct No.: 7080 | $1,700.98 | 12/23/09 |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS 29-33

## WIRE FRAUD

A.     The allegations contained in Parts A and B of Count 1 are hereby re-alleged and incorporated herein by reference.

B.     On or about the dates listed below, in the Eastern District of Louisiana and elsewhere, the defendants, **AARON F. BROUSSARD** and **THOMAS G. WILKINSON**, and others known and unknown to the grand jury, for the purpose of executing the scheme and artifice to defraud set forth in Part B of Count 1, caused the following bank wire transfers, among others, to be transmitted in interstate commerce, by means of a wire communication:

| Count No. | Originating Bank | Recipient Bank | Wire Amount | Date of Wire Transfer |
|---|---|---|---|---|
| 29 | Omni Bank | Thomas G. Wilkinson Omni Bank No.: 0068 | $4,321.17 | 11/13/09 |
| 30 | Omni Bank | Thomas G. Wilkinson Omni Bank No.: 0068 | $4,840.49 | 11/25/09 |
| 31 | Omni Bank | Thomas G. Wilkinson Omni Bank No.: 0068 | $4,321.17 | 12/11/09 |
| 32 | Omni Bank | Thomas G. Wilkinson Omni Bank No.: 0068 | $4,840.49 | 12/23/09 |
| 33 | Omni Bank | Thomas G. Wilkinson Omni Bank No.: 0068 | $4,314.07 | 1/08/10 |

- 21 -

## COUNT 34

### THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS

1.      The allegations contained in Part A of Count 1 are hereby re-alleged and incorporated herein by reference.

2.      Beginning on or about January 31, 2009, and continuing to on or about December 31, 2009, in the Eastern District of Louisiana and elsewhere, defendants **AARON F. BROUSSARD** and **THOMAS G. WILKINSON**, and others known and unknown to the grand jury, did knowingly embezzle, steal, obtain by fraud and otherwise without authority convert to the use of **WILKINSON** in that **WILKINSON** received approximately $36,000.00 in income that he was not entitled to because Parish President **AARON F. BROUSSARD** awarded him a discretionary pay raise based on **BROUSSARD's** belief that **WILKINSON** had helped his family member gain admission to a local private school.

All in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

## COUNT 35

### THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS

1.      The allegations contained in Part A of Count 1 are hereby re-alleged and incorporated herein by reference.

2.      Beginning on or about January 1, 2006, and continuing to on or about December 31, 2006, in the Eastern District of Louisiana and elsewhere, defendants **AARON F. BROUSSARD** and **THOMAS G. WILKINSON**, and others known and unknown to the grand jury, did knowingly embezzle, steal, obtain by fraud and otherwise without authority convert to the use of Karen Parker,

wife of the Parish President **AARON F. BROUSSARD**, a person other than the rightful owner, property valued at $5,000.00 or more and owned by, or under the care, custody, and control of Jefferson Parish, in that Karen Parker received thousands of dollars in income that she was not entitled to because she did not perform the essential duties of a Paralegal Supervisor and because she was paid substantially more than the individual who held the position of ID/Security System Coordinator.

All in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

<div align="center">

**COUNT 36**

**THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS**

</div>

1.      The allegations contained in Part A of Count 1 are hereby re-alleged and incorporated herein by reference.

2.      Beginning on or about January 1, 2007, and continuing to on or about December 31, 2007, in the Eastern District of Louisiana and elsewhere, defendants **AARON F. BROUSSARD** and **THOMAS G. WILKINSON**, and others known and unknown to the grand jury, did knowingly embezzle, steal, obtain by fraud and otherwise without authority convert to the use of Karen Parker, wife of the Parish President **AARON F. BROUSSARD**, a person other than the rightful owner, property valued at $5,000.00 or more and owned by, or under the care, custody, and control of Jefferson Parish, in that Karen Parker received thousands of dollars in income that she was not entitled to because she did not perform the essential duties of a Paralegal Supervisor and because she was paid substantially more than the individual who held the position of ID/Security System Coordinator.

All in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

<div align="center">

- 23 -

</div>

## COUNT 37

### THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS

1.      The allegations contained in Part A of Count 1 are hereby re-alleged and incorporated herein by reference.

2.      Beginning on or about January 1, 2008, and continuing to on or about December 31, 2008, in the Eastern District of Louisiana and elsewhere, defendants AARON F. BROUSSARD and THOMAS G. WILKINSON, and others known and unknown to the grand jury, did knowingly embezzle, steal, obtain by fraud and otherwise without authority convert to the use of Karen Parker, wife of the Parish President AARON F. BROUSSARD, a person other than the rightful owner, property valued at $5,000.00 or more and owned by, or under the care, custody, and control of Jefferson Parish, in that Karen Parker received thousands of dollars in income that she was not entitled to because she did not perform the essential duties of a Paralegal Supervisor and because she was paid substantially more than the individual who held the position of ID/Security System Coordinator.

All in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

## COUNT 38

### THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS

1.      The allegations contained in Part A of Count 1 are hereby re-alleged and incorporated herein by reference.

2.      Beginning on or about January 1, 2009, and continuing to on or about December 31, 2009, in the Eastern District of Louisiana and elsewhere, defendants AARON F. BROUSSARD and THOMAS G. WILKINSON, and others known and unknown to the grand jury, did knowingly embezzle, steal, obtain by fraud and otherwise without authority convert to the use of Karen Parker,

- 24 -

wife of the Parish President **AARON F. BROUSSARD**, a person other than the rightful owner, property valued at $5,000.00 or more and owned by, or under the care, custody, and control of Jefferson Parish, in that Karen Parker received thousands of dollars in income that she was not entitled to because she did not perform the essential duties of a Paralegal Supervisor and because she was paid substantially more than the individual who held the position of ID/Security System Coordinator.

All in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

## NOTICE OF WIRE FRAUD FORFEITURE

1.      The allegations of Counts 1 through 33 of this Superseding Indictment are realleged and incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Sections 371, 1343 and 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c).

2.      As a result of the offenses alleged in Counts 1 through 33, defendants, **AARON F. BROUSSARD and THOMAS G. WILKINSON**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c), any and all property, real or personal, which constitutes or is derived from proceeds traceable to a violation of Title 18, United States Code, Sections 371 and 1343, including but not limited to:

> a.      $359,308.13 in United States Currency and all interest and proceeds traceable thereto.

- 25 -

b.     The government specifically provides notice of its intent to seek a personal money judgment against the defendant in the amount of the fraudulently-obtained proceeds.

3.     If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third person;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

All in violation of Title 18, United States Code, Sections 371, 1343 and 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c).

## NOTICE OF FEDERAL PROGRAM FRAUD FORFEITURE

1.     The allegations of Counts 1 and 34 through 38 of this Superseding Indictment are realleged and incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Sections 371; 666 and 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c).

- 26 -

2.      As a result of the offenses alleged in Counts 1 and 34 through 38, defendants,

**AARON F. BROUSSARD and THOMAS G. WILKINSON,** shall forfeit to the United States

pursuant to Title 18, United States Code, Section 981(a)(1)(C), made applicable through Title 28,

United States Code, Section 2461(c), any and all property, real or personal, which constitutes or is

derived from proceeds traceable to a violation of Title 18, United States Code, Sections 371 and 666,

including but not limited to:

> a.      $359,308.13 in United States Currency and all interest and proceeds traceable thereto.
>
> b.      The government specifically provides notice of its intent to seek a personal money judgment against the defendant in the amount of the fraudulently-obtained proceeds.

3.      If any of the property subject to forfeiture, as a result of any act or omission of the

defendants:

> a.      cannot be located upon the exercise of due diligence;
>
> b.      has been transferred or sold to, or deposited with, a third person;
>
> c.      has been placed beyond the jurisdiction of the Court;
>
> d.      has been substantially diminished in value; or
>
> e.      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek

forfeiture of any other property of said defendants up to the value of the above forfeitable property.

All in violation of Title 18, United States Code, Sections 371, 666 and 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c).

**A TRUE BILL:**

**FOREPERSON**

**JIM LETTEN**
UNITED STATES ATTORNEY
Louisiana Bar Roll No. 8517

**JAN MASELLI MANN**
First Assistant United States Attorney
Louisiana Bar Roll No. 9020

**JAMES R. MANN**
Assistant United States Attorney
Louisiana Bar Roll No. 20513

**BRIAN M. KLEBBA**
Assistant United States Attorney
New York Bar Roll No. 2938728

**MATTHEW CHESTER**
Assistant United States Attorney
Texas Bar Roll No. 24045650

New Orleans, Louisiana
February 3, 2012

- 28 -

No. 11-299 "HH"

UNITED STATES DISTRICT COURT

Eastern _____ District of _____ Louisiana

_____ Criminal _____ Division

THE UNITED STATES OF AMERICA

vs.

AARON F. BROUSSARD
THOMAS G. WILKINSON

SUPERSEDING INDICTMENT

SUPERSEDING INDICTMENT FOR CONSPIRACY TO COMMIT THEFT
CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS,
CONSPIRACY TO COMMIT WIRE FRAUD, WIRE FRAUD AND
NOTICE OF FORFEITURE

VIOLATIONS: 18 U.S.C. § 2
18 U.S.C. § 371
18 U.S.C. § 1343
18 U.S.C. § 666(a)(1)(A)

A true bill.

_____
Foreperson

Filed in open court this _____ day of
_____ A.D. 2012.

_____
Clerk

Bail, $ _____

BRIAN M. KLEBBA
Assistant United States Attorney



FELONY

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUIS...
20 AM 8: 58
LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

### BILL OF INFORMATION
### FOR MISPRISION OF A FELONY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 12-46 |
| v. | * | SECTION: SECT. S MAG. 3 |
| TIMOTHY A. WHITMER a/k/a Tim Whitmer | * | VIOLATION: 18 U.S.C. § 4 |

\* \* \*

The U. S. Attorney charges that:

### COUNT 1

Beginning at a time unknown and continuing to on or about March 4, 2010, in the Eastern District of Louisiana and elsewhere, the defendant, **TIMOTHY A. WHITMER, a/k/a Tim Whitmer,** having knowledge of the actual commission of a felony cognizable by a court of the United States, to wit: wire fraud, theft concerning programs receiving federal funds, and other federal criminal violations, did conceal the same by participating in: 1) the hiring of certain parish employees, 2) the awarding of salary increases to certain parish employees, and 3) the contract

Fee _U SA_
Process_____
X Dktd _____
CRmDep_____
Doc. No._____



EXHIBIT
F

selection processes that were all contrary to the best interests of the citizens of Jefferson Parish, and did not as soon as possible make known the same to some judge or other person in civil or military authority under the United States; all in violation of Title 18, United States Code, Section 4.

JIM LETTEN (8517)
UNITED STATES ATTORNEY

JAN MASELLI MANN (9020)
First Assistant United States Attorney

SALVADOR R. PERRICONE (10515)
Assistant United States Attorney

JAMES R. MANN (20513)
Assistant United States Attorney

GREGORY KENNEDY (20896)
Assistant United States Attorney

MATTHEW CHESTER (TX 24045650)
Assistant United States Attorney

BRIAN M. KLEBBA (NY 2938728)
Assistant United States Attorney

January 20, 2012
New Orleans, Louisiana

2

No. _____

# United States District Court

FOR THE

EASTERN _____ DISTRICT OF _____ LOUISIANA

UNITED STATES OF AMERICA

vs.

TIMOTHY A. WHITMER
a/k/a Tim Whitmer

BILL OF INFORMATION FOR
MISPRISION OF A FELONY

Violation(s):  18 U.S.C. § 4

Filed _____ 20 12 __

_____ Clerk.

By _____

_____ Deputy

_____

BRIAN M. KLEBBA
Assistant United States Attorney

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2012 MAR 22  PM 3: 31

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 12-046 |
| v. | * | SECTION: "S" |
| TIMOTHY A. WHITMER<br>a/k/a Tim Whitmer | * | |
| | * * * | |

## FACTUAL BASIS

Should this matter have proceeded to trial, the Government would have proven, through the introduction of competent testimony and admissible evidence, the following facts, beyond a reasonable doubt, to support the allegations in the Bill of Information now pending against the defendant:

## I. *BACKGROUND INFORMATION*

Beginning in 1998, **TIMOTHY A. WHITMER, a/k/a Tim Whitmer ("WHITMER")** was named Chief Administrative Officer/Chief Administrative Assistant ("CAO") for Jefferson Parish. As CAO, **WHITMER** was responsible for the day-to-day operations of Jefferson Parish. **WHITMER** left the position of CAO after Hurricane Katrina because of job-related stress and because he became frustrated by the culture of corruption that occurred under the Aaron F. Broussard ("Broussard") administration. Despite these serious issues, **WHITMER** agreed to return to the

____Fee _____
____Process_____
_X__Dktd _____
____CtRmDep_____
____Doc. No._____



position of CAO when Parish President Aaron F. Broussard promised him a significant raise in salary. **WHITMER** remained CAO until he resigned in January 2010.

Beginning in 1992, Karen Parker, a/k/a Karen Parker Broussard ("Parker") began working as an administrative assistant for the Jefferson Parish Council. On or about July 31, 2003, Parker resigned from her position as an administrative assistant for then Jefferson Parish Councilman Aaron Broussard and began working for Broussard's campaign for Jefferson Parish President. On or about October 4, 2003, Broussard was elected Parish President of Jefferson Parish. Approximately four years later, on or about October 20, 2007, Broussard was re-elected by the voters of Jefferson Parish. On or about May 29, 2004, Parker and Broussard were married.

At all times relevant to this case, Thomas G. Wilkinson, a/k/a Tom Wilkinson ("Wilkinson"), was the Parish Attorney for Jefferson Parish and in that position had supervisory authority over the Jefferson Parish Attorney's Office, the authority to approve the hiring of new employees, and the authority to approve pay raises for Parish Attorney's Office employees.

The government would present evidence at trial to establish that Jefferson Parish utilized Iberia Bank, formerly Omni Bank, for Automated Clearing House transactions (payroll) who transmitted, via wire, these payroll transactions that crossed state lines before the payroll funds were deposited into the recipient (employee) bank account. Parker established direct deposit with the Jefferson Parish Employees Credit Union (JPEFCU) and her salary while she was employed at Jefferson Parish, as set forth below from 2004 through 2010, was deposited into her JPEFCU accounts. Wilkinson also established direct deposit with Iberia Bank, formerly Omni Bank, and, as a result, his salary was deposited into his Iberia/Omni Bank account.

2

Further, the government would present evidence that the Jefferson Parish Attorney's Office is a local government agency of Jefferson Parish. Jefferson Parish received federal assistance in excess of $10,000.00 during each of the one year periods beginning on January 1st and ending December 31st for the years 2004, 2005, 2006, 2007, 2008, 2009, and 2010.

## II. BROUSSARD USES HIS PUBLIC OFFICE AND TAX DOLLARS FOR HIS PERSONAL BENEFIT

### A. The Creation of Karen Parker's "Paralegal Supervisor" Position With Jefferson Parish

#### 1. The Secret Meeting

After his election on October 4, 2003, but prior to him taking office as the Jefferson Parish President, Broussard set up a meeting with **TIM WHITMER**, Tom Wilkinson, and one other high-ranking Jefferson Parish official to discuss creating a new and unnecessary position for Parker with the Parish under the Broussard administration. During this meeting, it was understood by the parties that Parker would be hired as a "Paralegal Supervisor" under the purview of the Parish Attorney's Office in Jefferson Parish. The Paralegal Supervisor position is an unclassified position and, therefore, Karen Parker was not required to take a Civil Service examination, nor was she subject to the strict hiring requirements and safeguards associated with Civil Service positions. Broussard specifically wanted to have other Parish officials, including Wilkinson, be the individuals who hired Parker, because he knew that once he took over the position of Parish President, he could not hire Parker, and there would be increased scrutiny as a result of their romantic relationship.

**WHITMER** knew that on or about October 28, 2003, Wilkinson approved the rescission/cancellation of Parker's July 31, 2003 resignation from Jefferson Parish employment, which allowed her to collect additional money and salary in the form of longevity pay, tenure awards,

3

health insurance benefits, and annual leave. **WHITMER** also knew that Wilkinson approved the placing of Parker on leave without pay for the time period August 1, 2003, through October 31, 2003, thereby eliminating any break in her employment with Jefferson Parish.

The government would present evidence to establish that all parties to the decision to hire Parker – Broussard, Wilkinson, **WHITMER**, and one other official – knew or should have known that Parker was not qualified, trained, or certified as a "Paralegal Supervisor." Despite this, on or about October 28, 2003, Parker was given the position of "Paralegal Supervisor" in the Jefferson Parish Attorney's Office. Her starting salary was approximately $48,000.00, which was higher than the salary range allowed for the position of Paralegal Supervisor under the Executive Pay Plan for Jefferson Parish.

Wilkinson approved the decision to hire Parker as a "Paralegal Supervisor," approved her salary, rescinded her resignation, and approved her leave without pay status when he executed Parker's Parish of Jefferson, Department of Human Resources Request to Fill a Vacant Job form on October 28, 2003.

According to the job description of Paralegal Supervisor, the essential functions of that position require that the "[i]ndividual conducts basic legal research, interviews witnesses, meets with inter-governmental personnel and members of the public, gathers evidence to formulate the Parish's position on Parish or other matters. Individual prepares legal documents including pleadings, wills, contracts, leases, property descriptions and legal opinions setting forth the Parish's position on Parish and other matters. Individual supervises and coordinates the activities of various support staff." Moreover, the Jefferson Parish job description for the position of Parish Attorney's Office Paralegal Supervisor required Paralegal Supervisors to have completed paralegal training and certification.

4

Despite being given the position of a "Paralegal Supervisor," Parker was neither trained as a Paralegal or a Paralegal Supervisor, nor did she possess the required paralegal certification. Moreover, as noted above, the parties who helped place her as a "Paralegal Supervisor," including Broussard, Wilkinson, **WHITMER**, and the other parish official knew or should have known that she did not possess the required paralegal certification and that she was not trained as a Paralegal.

During the period of time Parker was assigned to work at the Parish Attorney's Office as a "Paralegal Supervisor," from approximately October 2003 through March 2004, Parker did no work as a Paralegal Supervisor, nor did she perform any paralegal work. During this period of time, Broussard, Wilkinson, and others were likewise aware that Parker did no work as Paralegal Supervisor and the little work she did perform was not paralegal or paralegal supervisory work.

### 2. _Karen Parker Gets Moved to ID Management Department_

The government would present evidence that on or about March 8, 2004, Wilkinson approved the transfer of Parker to work for ID Management which was located at the East Bank Regional Library. ID Management is the department responsible for issuing access badges to Jefferson Parish employees. Jefferson Parish determined that the Parish only requires one employee to hold the position of ID/Security System Coordinator. Despite her transfer to the East Bank Regional Library, Parker retained her position and higher salary of "Paralegal Supervisor" until her dismissal on or about February 5, 2010.

As with her work at the Parish Attorney's Office, during the time period she worked at the East Bank Regional Library, Parker did not perform any of the duties of, and did no work as, a "Paralegal Supervisor." Likewise, Broussard, Wilkinson, and **WHITMER** were aware, during this same period of time, that Parker did not perform the duties of, and did no work as, a "Paralegal

5

Supervisor" while assigned to the ID Management department. Moreover, both Broussard and Wilkinson had first-hand knowledge that Parker did not appear at times at the location she was assigned (East Bank Regional Library) to work.

As Parish President, Broussard utilized a full-time employee with the title Executive Protection Specialist ("EPS"). The EPS was traditionally a ranking member of the Jefferson Parish Sheriff's Office. The primary responsibility of the EPS was to act as a bodyguard and to pick up the Parish President at his home in the mornings and chauffeur him throughout the day and return him home after the conclusion of his evening's activities. The EPS was not a parish employee and, therefore, was not permitted to supervise Jefferson Parish government employees. Nevertheless, under Aaron Broussard's administration, the EPS became the defacto supervisor of Karen Parker, along with Tom Wilkinson. As a result, the EPS, who was Broussard's driver/bodyguard, was put in the position of monitoring Karen Parker, wife of the Parish President.

3.  *Karen Parker's Salary at Jefferson Parish Benefits Aaron Broussard*

Evidence would be introduced at trial to establish that Karen Parker and Aaron Broussard had approximately four joint bank accounts, including accounts for their condominium in Perdido Key, Florida. In addition, Karen Parker and Aaron Broussard filed their federal income tax returns jointly and applied for bank loans and/or mortgages jointly. Accordingly, Parker's salary benefitted not only Parker, but also her husband, Aaron Broussard.

The government would introduce evidence at trial that beginning in 2003, as noted above, Parker was given an annual salary of approximately $48,000 as a "Paralegal Supervisor," which was higher than the salary range allowed for that position under the Executive Pay Plan for Jefferson Parish. This salary range was approved and known by Wilkinson, as the Parish Attorney, and

Broussard, as Parker's romantic interest. In 2004, 2007, and twice in 2008, Parker was approved for Annual Evaluation Pay Raises by Wilkinson. These pay raises were approved by Wilkinson and known by Broussard and **WHITMER** despite the fact that **WHITMER**, Wilkinson and Broussard knew Parker was not performing any of the essential functions for the position of "Paralegal Supervisor" and, indeed, Parker was not qualified for, and did no work as, a "Paralegal Supervisor." From approximately 2004 through 2009, Wilkinson authorized pay raises for Parker from approximately $46,439.99 to approximately $63,898.36, knowing that these raises would result in increased retirement benefits to Parker. In total, from 2004 through 2010, Parker was paid approximately $323,308.13 in Jefferson Parish taxpayer funds for her salary.

### 4.   *Broussard Abuses His Public Office*

In or around 2004, newly-elected Jefferson Parish President Aaron Broussard informed **WHITMER** and Wilkinson that he filed a letter in the Clerk of Council's Office stating that he was going to recuse himself from any and all parish business involving, among others, Company A. The reason for this recusal, according to Broussard, was because Broussard was receiving monies from, among others, Company A, as a "consulting fee" or a "retainer." Indeed, from in or around 2005 through in or around 2007, Broussard received over $40,000 from Company A. Despite Broussard's supposed "recusal," Broussard repeatedly directed **WHITMER** to do whatever he could to steer Jefferson Parish business to Company A. **WHITMER** and Wilkinson were aware that, though Broussard claimed to have recused himself from dealings involving, among others, Company A, his recusal was a sham.

For example, despite his supposed recusal, in or about 2007, Jefferson Parish sought to hire a company for a particular project via a Request for Proposal ("RFP") process. In that same year,

7

Broussard approached **WHITMER** and gave him a draft RFP for this project. **WHITMER** knew this draft RFP provided to him by Broussard was tailored so that Company A would win the RFP and indeed, Broussard expressly told **WHITMER**, in or around late 2007 or early 2008, that he had committed to Company A's owner that he would steer the contract for this project to Company A. Ultimately, despite Broussard's efforts, Company A did not win this contract, though Company A did receive other work in Jefferson Parish.

### 5. *Broussard's Use of Campaign Funds for Personal Gain*

In addition, the government would introduce evidence that Broussard repeatedly used his campaign funds to pay for personal expenses and vacations. It was known by **WHITMER** that Broussard would have "fundraisers" in Lake Tahoe, Nevada and would use these "fundraisers" as the mechanism to pay for the trip. In addition, Broussard used his campaign account and campaign donations to help fund his and Karen Parker's honeymoon to France and for numerous other personal expenses.

### B. *Aaron Broussard Improperly Diverts Taxpayer Funds for the Benefit of Tom Wilkinson*

#### 1. *Aaron Broussard Rewards Tom Wilkinson for Hiring and Keeping Karen Parker*

After the hiring of Parker as a "Paralegal Supervisor" in Jefferson Parish in October 2003, Broussard retained Wilkinson as the Parish Attorney in December 2003. As Parker's salary was annually being raised by Wilkinson, Broussard, as Parish President, was approving annual pay raises for Wilkinson. From approximately 2004 through 2009, Broussard authorized pay increases for Wilkinson. In early 2004, Wilkinson advised **WHITMER** of Karen Parker's improper requests for overtime and/or comp pay. As a result of Wilkinson's and **WHITMER**'s conversation, Broussard was notified that Parker was violating parish rules by attempting to collect overtime/comp pay under

8

the circumstances described to Broussard. When Broussard was informed by **WHITMER** that Karen Parker could not collect overtime/comp pay while working from home, Broussard responded in a dismissive manner and wasn't concerned. **WHITMER** then explained to Broussard that it was against Jefferson Parish policy for an employee to collect overtime/comp pay while working from home.

2. _Tom Wilkinson Receives a $36,000 Pay Raise for Helping Broussard With a Private Family Matter_

Another example of Aaron Broussard using taxpayer funds for his personal gain occurred near the end of 2008 and throughout 2009. In the Fall of 2008, Wilkinson attempted to use his position as a board member at a local private school in order to assist a family member of Broussard in the competitive admission process. In January 2009, approximately two weeks after Broussard's family member was accepted into the school that Wilkinson intervened on his behalf, Broussard directed **WHITMER** to give Wilkinson the maximum salary possible because Broussard believed that Wilkinson had helped Broussard's family member get into the local private school. After receiving Broussard's instructions to max-out Wilkinson's salary, **WHITMER** told Wilkinson that Broussard had instructed **WHITMER** to give Wilkinson the maximum possible salary increase because Broussard believed Wilkinson had helped get his family member into school. As a direct result, Wilkinson's salary was increased from approximately $147,677.14 to approximately $183,870.05. The only reason/justification given for this $36,000 raise was that Wilkinson had helped Broussard in a private family affair. It was improper and illegal for Broussard to award a raise to Wilkinson for personal reasons and likewise it was also illegal for Wilkinson to accept the $36,000 salary increase knowing Broussard's justification for the raise. **WHITMER** was aware that

9

Wilkinson began to draw the higher salary as soon as the paperwork was processed and that the raise would result in increased retirement benefits to Wilkinson.

### C.    *WHITMER and His Business Partners Pay Broussard*

WHITMER, along with two other business partners, operated an insurance business that sold insurance policies to various businesses and municipalities. In 2009, WHITMER approached Broussard and asked Broussard if he would be willing to assist WHITMER in securing additional insurance business. WHITMER and his partners agreed to pay Broussard $1,000 per month for Broussard's assistance. The payments continued for five months and were discontinued when media reports began to investigate WHITMER's insurance dealings. Neither WHITMER nor Broussard sought Jefferson Parish Council approval for their self-dealings.

## III.    *MISPRISON OF A FELONY REGARDING THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS*

### A.    *The Misprision of Parker's, Broussard's and Wilkinson's Theft*

As set forth above, WHITMER, Broussard, and Wilkinson knew, from approximately 2004 through 2010, that Parker was not qualified, trained, or certified to be a Paralegal Supervisor in Jefferson Parish and did not do any work as a Paralegal Supervisor in Jefferson Parish. In hiring, retaining, and paying Parker as a "Paralegal Supervisor," Broussard and Wilkinson intentionally stole or committed theft with Jefferson Parish taxpayer funds. Though WHITMER was aware that Broussard and Parker were stealing or committing theft of property valued at $5,000 or more which was owned by or under the care, custody, and control of the Parish of Jefferson (because Parker did not perform any work as a Paralegal Supervisor), WHITMER did not report this crime to federal authorities and, indeed, concealed this crime from the authorities by, among other things, allowing

10

Parker to continue to accept her higher salary as a "Paralegal Supervisor" and allowing her to continue to be classified as a "Paralegal Supervisor."

**B.**     *The Misprision of Wilkinson's Theft of $36,000*

In addition, **WHITMER** knew that Broussard and Wilkinson were committing other felonies when Broussard gave, and Wilkinson accepted, a $36,000 pay raise solely for Wilkinson's intercession on behalf of Broussard's family member in the competitive admissions process for a local private school.

**C.**     *The Misprision of Broussard's Crimes Involving the Awarding and/or Negotiation of Jefferson Parish Contracts*

**WHITMER** was also aware that Broussard and others committed additional felonies related to the awarding of contracts entered into and/or negotiated on behalf of Jefferson Parish. Specifically, **WHITMER** was aware that Broussard would improperly interject himself into contract negotiations and would secretly advocate on behalf of certain businesses including, but not limited to, Company A, as set forth above.

**IV.**     *LIMITED NATURE OF FACTUAL BASIS*

This proffer of evidence is not intended to constitute a complete statement of all facts known by **WHITMER** and described by **WHITMER** to the government, but rather is a minimum statement of facts intended to prove the necessary factual predicate for his guilty plea. The limited purpose of this factual basis is to demonstrate that there exists a sufficient legal basis for **WHITMER**'s plea of guilty to the charged offense.

Various records, including bank statements, financial statements, mortgage statements, employment-related documents, forms (including tax records and disclosure forms) and other records, would be introduced to prove the facts as set forth above.

11

Testimonial evidence, including testimony from representatives of the Federal Bureau of Investigation, Internal Revenue Service, as well as other witnesses, would also be admitted to prove the facts set forth above.


_____          _____
BRIAN M. KLEBBA                           Date    3/19/12
Assistant United States Attorney
New York Bar Roll No. 2938728


_____          _____
MATTHEW S. CHESTER                        Date    3/19/2012
Assistant United States Attorney
Texas Bar No. 24045650


_____          _____
GREGORY KENNEDY                           Date    3/19/2012
Assistant United States Attorney
Louisiana Bar No. 20896


_____          _____
TIMOTHY A. WHITMER                        Date    3-22-12
Defendant


_____          _____
PATRICK FANNING                           Date    3-22-12
Counsel for Defendant
Louisiana Bar Roll No. 5441


12

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 11-CR-299 |
| v. | * | SECTION: HH |
| AARON F. BROUSSARD | * | |
| THOMAS G. WILKINSON | * | |
| | * * * | |

RESPONSE IN OPPOSITION TO DEFENDANT BROUSSARD'S MOTION FOR
DISCOVERY

NOW INTO COURT, through the undersigned Assistant United States Attorneys, comes

the United States of America who respectfully submits this Response in Opposition to Defendant

Aaron Broussard's Motion for Discovery (Rec. Doc. No. 75) (the "Motion"):

## I.   INTRODUCTION & SUMMARY OF ARGUMENT

### A.   SUMMARY OF ARGUMENT

Broussard's Motion plainly seeks irrelevant materials not permitted under the rules and

authorities governing federal criminal discovery.  His request – seeking internal and confidential

personnel and human resource records from the U.S. Attorney's Office currently adverse to him –

is not permitted under the applicable avenues of criminal discovery, including Rule 16, *Jencks*,

*Giglio*, or *Brady*. Even if Broussard's request were permitted under the law, the documents he seeks

are wholly irrelevant to the disputed issues in this case and his request should be denied for that



EXHIBIT
H

separate and independent reason. Finally, though improperly styled as a request under the Freedom of Information Act, Broussard, in reality, seeks to uncover these confidential materials in an effort to enlarge the scope of criminal discovery and make a "back door" prosecutorial misconduct argument for selective prosecution at trial. Such a tactic is prohibited under the applicable case law. Broussard's Motion should accordingly be denied.

**B.      FACTUAL BACKGROUND[1]**

### Broussard's Rise To Power in Jefferson Parish

In the summer of 2003, defendant Karen Parker ("Parker") was working as an administrative assistant to then-Jefferson Parish councilman, defendant Aaron Broussard ("Broussard"). At that time, Broussard began campaigning for Parish President of Jefferson Parish and his love interest, Parker, resigned her administrative assistant role to work for Broussard's campaign. Upon being elected in the fall of 2003, Broussard held the powerful position of Jefferson Parish President, responsible for the administration and supervision of all parish departments, offices, agencies, and special districts, including employment decisions regarding department heads. From 2003 through his resignation in 2010, Broussard sought to use his public office for private gain in a myriad of ways, including securing a sinecure position for his love interest and later-wife, defendant Parker.

### Broussard Seeks Employment for his Love Interest, Parker

After his election, Broussard sought to obtain employment for Parker, his then-girlfriend. To reach that goal, Broussard, in concert with others, including defendant Thomas G. Wilkinson ("Wilkinson") identified the Jefferson Parish Attorney's Office as an office that could employ his wife at a substantial salary. A little over three weeks after his election, Broussard, with the help and

---

[1]This background is generally contained in the Indictment. *See* Rec. Doc. No. 53 at 1-17.

cooperation of Wilkinson, placed Parker in that office in the role of "paralegal supervisor." Despite not being qualified or certified as a paralegal, Parker was given special benefits as a result of her relationship with Broussard: she was classified as a non-civil service employee (which allowed her to avoid taking a civil service examination), she was given a starting salary higher than the salary range approved by Jefferson Parish, and her resignation was "rescinded," which essentially allowed her to continue to accrue tenure, annual leave, and other salary and employment-related benefits.

### Wilkinson is Retained as Jefferson Parish Attorney

Just two months after hiring Broussard's love interest as a "paralegal supervisor" in his office, and agreeing to the rescinding of her resignation, Wilkinson, the holdover Parish Attorney from the prior Jefferson Parish President's administration, was retained by Broussard. Wilkinson was paid a hefty salary of approximately $100,000 upon his retention, a salary that increased to over $183,000 under Broussard. In his role as Parish Attorney, Wilkinson had authority, discretion, and supervision over all employees in the Parish Attorney's Office, including Parker.

### Parker is Promoted in Jefferson Parish

Over the course of the next several years, from 2003 through 2010, despite doing little to no work as a "paralegal supervisor," Parker received annual pay increases, as well as increases in other employment-related benefits (health care benefits, annual leave, retirement benefits, etc.), culminating in a salary of nearly $64,000 paid during her last year of employment. Her salary increases were approved by the Parish Attorney and her boss, Wilkinson. Despite being informed of Parker's lack of work for the years she was paid as a "paralegal supervisor," Wilkinson continued to retain Parker as a non-civil service employee and approved her substantial increases in salary.

- 3 -

### *Wilkinson is Promoted in Jefferson Parish*

In turn, Wilkinson, beginning in 2004 through 2009, received substantial pay increases (approximately 84%) as Parish Attorney, all of which were approved by Parker's husband,[2] Broussard. These pay increases resulted in increases in other employment-related benefits for Wilkinson, such as retirement benefits. While Broussard was lining Wilkinson's pockets with hefty raises, Wilkinson repeatedly ignored requests to discipline and/or dismiss Parker based on her lack of work and, instead, authorized the substantial increases in pay approved by Broussard.

### *The Defendants Cover-Up Parker's "Sham" Job*

Throughout the years of her employment, the defendants undertook repeated efforts to conceal Parker's theft of funds, due to her "sham" job as a "paralegal supervisor" at the Parish Attorney's Office. Wilkinson and Broussard, during the years of their conspiracy, repeatedly misrepresented Parker's work history, title, and status as a "paralegal supervisor" in the Parish Attorney's Office. Broussard and his wife, Parker, also falsely listed her occupation and job title on numerous government documents, including State of Louisiana Ethics Disclosures, as well as Federal Income Tax Returns. In 2009 and 2010, Wilkinson and Broussard resigned amid allegations relating to this investigation and, 2010, Parker was dismissed from her employment.

### C.   Procedural Background

The Government has steadfastly adhered to its discovery obligations in this case. Immediately after the return of the first Grand Jury Indictment, the Government produced four binders containing approximately 1,531 pages of discovery materials to Broussard and the other defendants, materials which the Government believes will be introduced in its case-in-chief. In

---

[2]Parker and Broussard married in 2004 and were divorced in 2009.

addition, at that same time and in an abundance of caution, the Government produced tens of thousands of pages of materials that arguably qualified as Rule 16 materials, including materials relevant to the case, but that the Government may not use in its case-in-chief.  Hundreds of other pages were produced in two productions by the Government in March 2012,[3] materials that, again, may not be utilized in the Government's case-in-chief, but that may have some arguable bearing on the facts of the case.[4]  Though the tens of thousands of pages produced by the Government in this case were not necessarily required to be produced under Rule 16, the Government has, nonetheless, produced them in an abundance of caution.  The Court has set September 10, 2012 (three weeks in advance of trial) as the deadline for the Government to produce *Brady*, *Giglio*, and *Jencks* Act materials.  *See* Rec. Doc. No. 73 (Scheduling Order) at 1-2.

## II.    ARGUMENT AND AUTHORITIES

### A.    Broussard's Request for Human Resource Records Is Not Permitted under Rule 16 of the Federal Rules of Criminal Procedure.

Federal Rules of Criminal Procedure 16 requires, among other things, that the Government produce to the defendant the following items:

- The defendant's statements (oral, written, or recorded);

- The defendant's prior criminal record;

- Documents and objects, in the possession of the United States, that (i) are material to the preparation of the defense; (ii) the Government intends to use at trial; or (iii) belong to the defendant;

---

[3] As of today's date, neither defendant has picked up the most recent discovery production, which was produced in late March 2012.

[4] It is noteworthy that, with each production, the Government has requested, in writing, reciprocal discovery from the defendants in this case.  To date, neither Broussard nor Wilkinson have produced discovery to the Government.

- Reports of examinations or tests, in the possession of the Government, that are material to preparing the defense or that the Government intends to use in its case-in-chief;

- Materials relating to expert witnesses.

FED. R. CR. P. 16(1)(A)-(G). If the discovery sought does not fall within these parameters, it is not discoverable under Rule 16.[5] Broussard's improper request, seeking internal and confidential human resource and personnel records, does not qualify as (1) the defendant's statement; (2) the defendant's prior criminal record; (3) a report or examination of a test; or (4) materials relating to expert witnesses. *See id.* The requested materials are also not documents belonging to Broussard, and the Government does not intend to rely on these requested records in its case-in-chief.

For a defendant to be entitled to items "material to preparing the defense," *see* FED. R. CR. P. 16(A)(1)(E)(i), he must make a *prima facie* showing of reasonableness and materiality. *See, e.g. United States v. Buckley*, 586 F.2d 498, 506 (5th Cir. 1978); *United States v. White*, 450 F.2d 264, 267 (5th Cir. 1971). "Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case." *United States v. Ross*, 511 F.2d 757, 762 (5th Cir. 1975) (citation omitted). To demonstrate materiality, the pretrial disclosure of the evidence must "significantly alter the quantum of proof in [the defendant's] favor." *Id.* at 763. The Court should also consider the extensiveness of the materials already produced by the Government. *See id.* To demonstrate reasonableness, the defendant's request must not be unduly burdensome to the Government and must be specifically framed. *See id.* Generally, the "kind of documents discoverable are [] those that relate to the defendant and the charge against him, not to third

---

[5]There are other theories of discovery in federal criminal law as discussed in this opposition brief, *see infra* Part II.B, but, as the Court is well aware, "[a]s a matter of general construction '[t]he measure of discovery permitted by the Rules of Criminal Procedure is not intended to be as broad as a civil case.'" *United States v. Ross*, 511 F.2d 757, 762 (5th Cir. 1975) (citations omitted).

persons." *See United States v. Murdock*, 548 F.2d 599, 600 (5th Cir. 1977). In short, Broussard is "not [] allowed to conduct a fishing expedition." *White*, 450 F.2d at 268 (no citation).

Here, Broussard's request is neither reasonable nor material and is, in fact, a fishing expedition. As to materiality, the disclosure of internal personnel policies and human resource records relating to the "management" and "discretion of management" regarding employment at the U.S. Attorney's Office will not "alter the quantum of proof in his favor." *Ross*, 511 F.2d at 762-63 (holding that documents requested by the defendant in tax case, which tended to show defendant's net worth were not material and therefore, not discoverable under federal criminal discovery rules); *Buckley*, 586 F.2d at 506 (holding that where defendant failed to make showing of materiality, he was not entitled to internal FBI investigative files). Disclosure of the internal workings of the prosecution or its office has *no bearing* on the disputed facts in this case and, in fact, does not relate to Broussard in any way or the charges against him. *See Murdock*, 548 F.2d at 600; *United States v. Jasper*, 2003 WL 21709447, at *3-4 & n.6 (S.D.N.Y. July 23, 2003) (unpublished) (rejecting defendant's discovery request for witness's e-mails that had no relevance to the facts at issue). Broussard's request – seeking 30 specific types of document categories – is likewise unreasonable. Requiring the Government to gather these documents, some of which request documents from over thirty years ago,[6] would be unduly burdensome and onerous. *See Ross*, 511 F.2d at 763 (requiring that a discovery request be reasonable). Broussard's request should accordingly be denied.

**B.     Broussard's Discovery Request Is Not Permitted Under Any Other Theory of Criminal Discovery.**

As the Court knows, in addition to the obligations flowing from Rule 16 of the Federal Rules of Criminal Procedure, the Government has a duty to produce records (1) required pursuant to *Brady*

---

[6]*See* Motion at 2 (Request No. 17(1)), requesting information on the number of U.S. Attorney's Office personnel that have received an elimination of their break in service since 1980).

*v. Maryland*, 373 U.S. 83 (1963); (2) required to be provided under the *Jencks* Act (18 U.S.C. § 3500); and (3) required to be produced under *Giglio v. United States*, 450 U.S. 105 (1972). Broadly, *Brady v. Maryland*, 373 U.S. 83 (1963) requires the Government to produce evidence favorable to the accused relating to guilt or punishment. *See* 373 U.S. 83, 87 (1963); *United States v. Davis*, 609 F.3d 663, 698 (5th Cir. 2010). Here, Broussard's request seeks internal human resource records from the U.S. Attorney's Office; such information *does not in any way* relate to any issue of guilt or punishment with respect to Broussard. The disclosure of this material does not, for example, make it more or less probable that Broussard and others intentionally crafted employment for his wife in Jefferson Parish knowing her employment was a theft of taxpayer funds; this information would likewise not shed any light on whether Broussard's retention of, and salary increases awarded to, Wilkinson was motivated by Wilkinson's acquiescence in Parker's employment. It simply has no bearing on the issues relating to guilt in this case and, as such, does not qualify as *Brady* material.

The *Jencks* Act, 18 U.S.C. § 3500, generally requires the production statements made by *witnesses* that relate to the subject matter on which the witness has testified. *See* 18 U.S.C. § 3500(b), (e)(1); *United States v. Naranjo*, 309 Fed. Appx. 859, 865 (5th Cir. 2009) (unpublished). Again, by the very words of the statute, the *Jencks* Act only requires the production of *witness* statements; here, Broussard seeks institutional documents, not witness statements. Thus, the *Jencks* Act does not compel the production of this material. *See id.*

Finally, *Giglio v. United States*, 405 U.S. 150 (1972) requires the Government to produce evidence useful to the defense for impeachment purposes. *See, e.g.* 405 U.S. 150; *United States v. Scott*, 245 Fed. Appx. 391, 395 (5th Cir. 2007) (unpublished). Such a requirement necessarily presupposes that the impeachment material at issue relates to an individual called as a Government witness. Here, again, Broussard seeks information relating to witnesses that would not be called by

- 8 -

the Government. Such information is thus not discoverable under *Giglio*. Accordingly, because no

theory of federal criminal discovery supports his request, Broussard's Motion should be denied.[7]

### C.   FOIA Does Not Permit Broussard's Discovery Request.

In a desperate attempt to justify his request, Broussard makes passing reference to the

Freedom of Information Act ("FOIA"), insinuating that this law permits his discovery request. *See*

Motion at 1. The Fifth Circuit, among other courts, disagrees. In *United States v. Murdock*, 548

F.2d 599 (5th Cir. 1977), a defendant, who was convicted of tax crimes, argued on appeal that the

trial court improperly denied his discovery request for government documents. *See* 548 F.2d at 599.

After rejecting his argument that Rule 16 required production of these documents, the defendant

advanced FOIA as a mechanism to justify his request. *See Murdock*, 548 F.2d at 600-01. Citing the

Supreme Court's pronouncement that "the Freedom of Information Act was not intended to serve

as a substitute for criminal discovery,"[8] the Fifth Circuit concluded that the defendant's request

could not be justified under FOIA:

> Although information obtained through the FOIA may be useful in a criminal trial,
> we find that the FOIA was not intended as device to delay ongoing litigation or to
> enlarge the scope of discovery beyond that already provided by the Federal Rules of
> Criminal Procedure.

*Id.* at 602; *see Buckley*, 586 F.2d at 506. Broussard's request here, like the defendant's request in

*Murdock*, is not permitted under the federal rules of criminal discovery. *See supra*, Parts II.A-B.

---

[7] Broussard's request is, in reality, clearly an attempt to conjure up a prosecutorial misconduct motion, in which he would seek to use internal human resource documents from the U.S. Attorney's Office to argue at trial about the qualifications of paralegals. The Fifth Circuit has roundly criticized the abuse of the criminal discovery process for this purpose. *See, e.g. Murdock*, 548 F.2d at 599-601 (noting the defendant's heavy burden in making a selective prosecution claim and upholding the denial of discovery intended to support that argument).

[8] *Murdock*, 548 F.2d at 601 (quoting *Renegotiation Bd. v. Bannercraft Clothing Co., Inc.*, 415 U.S. 1 (1974)).

Because FOIA does not permit a criminal defendant to enlarge the scope criminal discovery, *see*

*Murdock*, 548 F.2d at 600-03, Broussard's request should be denied.[9]

## III.    CONCLUSION

WHEREFORE, for the reasons outlined above, the United States respectfully moves this

Court to deny Broussard's Motion.

Dated: April 20, 2012                                       Respectfully Submitted,


                                                           JIM LETTEN
                                                           UNITED STATES ATTORNEY


                                                           /s/ Matthew S. Chester
                                                           MATTHEW S. CHESTER
                                                           Texas Bar No. 24045650
                                                           BRIAN M. KLEBBA
                                                           New York Bar Roll No. 2938728
                                                           Assistant United States Attorneys
                                                           United States Attorney's Office - E.D. La.
                                                           650 Poydras Street, Suite 1600
                                                           New Orleans, Louisiana 70130
                                                           Telephone: (504) 680-3000

---

[9] Even if FOIA were a proper vehicle for Broussard's request, certain exemptions would prohibit disclosure of the documents in question, including the FOIA privacy interest exemption. *See* 5 U.S.C. § 552(b)(6) (exempting from disclosure "personnel [] files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.").

- 10 -

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Matthew S. Chester
Matthew S. Chester
Assistant U.S. Attorney

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2012 JUL 27   PM 1: 42

LORETTA G. WHYTE
CLERK

**FELONY**

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**SECOND SUPERSEDING INDICTMENT FOR CONSPIRACY TO COMMIT BRIBERY
CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS, CONSPIRACY TO
COMMIT THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS,
CONSPIRACY TO COMMIT WIRE FRAUD, BRIBERY, WIRE FRAUD, THEFT,
AND NOTICE OF FORFEITURE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 11-299 |
| v. | * | SECTION:   "HH" (SHF) |
| AARON F. BROUSSARD | * | VIOLATION: 18 U.S.C. § 371 |
| THOMAS G. WILKINSON | | 18 U.S.C. § 666(a)(1)(B) |
| | * | 18 U.S.C. § 666(a)(1)(A) |
| | | 18 U.S.C. § 1343 |
| | * | 18 U.S.C. § 2 |

\*     \*     \*

The Grand Jury charges that:

## COUNT 1

**CONSPIRACY TO COMMIT BRIBERY AND THEFT CONCERNING PROGRAMS
RECEIVING FEDERAL FUNDS AND  CONSPIRACY TO COMMIT WIRE FRAUD**

A.     **AT ALL TIMES MATERIAL HEREIN:**

*Defendant - AARON F. BROUSSARD*

1.     On or about October 4, 2003, defendant **AARON F. BROUSSARD**

("**BROUSSARD**") was elected Parish President of Jefferson Parish, Louisiana.  On or about

October 20, 2007, defendant **BROUSSARD** was re-elected by the voters of Jefferson Parish.

Fee USA
Process
X_Dktd
CtRmDep
Doc. No.



EXHIBIT
1

2.      As Jefferson Parish President, defendant **AARON F. BROUSSARD** was the chief administrative officer and an agent of Jefferson Parish and was responsible for the administration and supervision of all Jefferson Parish departments, offices, agencies, and special districts. **BROUSSARD** had the power to appoint and remove executive appointees responsible to him and **BROUSSARD** had the authority to award discretionary salary increases to those employees.

### *Defendant - THOMAS G. WILKINSON*

3.      On or about December 8, 2003, **AARON F. BROUSSARD** retained defendant **THOMAS G. WILKINSON** ("**WILKINSON**") as the Parish Attorney for Jefferson Parish for which **WILKINSON** was paid approximately $100,000.00 per year. **WILKINSON** held the position of Parish Attorney for Jefferson Parish since 1996.

4.      As the Parish Attorney for Jefferson Parish, defendant **THOMAS G. WILKINSON** had supervisory authority over, among others, the Jefferson Parish Attorney's Office and **WILKINSON** had the authority to approve the hiring of new employees and the authority to approve pay raises for Jefferson Parish Attorney's Office employees. As the Jefferson Parish Attorney, **WILKINSON** and his office also negotiated, reviewed, and finalized contracts with Parish vendors.

5.      As Jefferson Parish Attorney, defendant **THOMAS G. WILKINSON** was an unclassified employee appointed by Jefferson Parish President and defendant **AARON F. BROUSSARD** and, therefore, served at the pleasure of, and reported directly to, **BROUSSARD**.

6.      Defendant **THOMAS G. WILKINSON** established direct deposit with Iberia Bank, formerly Omni Bank, and, as a result, his salary was deposited into his Iberia/Omni Bank account.

- 2 -

7.      **THOMAS G. WILKINSON** also operated an outside legal practice during his term as Parish Attorney for Jefferson Parish.

### Other Jefferson Parish Employees

8.      Upon taking office, defendant **AARON F. BROUSSARD** retained Timothy A. Whitmer ("Tim Whitmer" or "Whitmer") as the Chief Administrative Assistant/Chief Administrative Officer ("CAO") for Jefferson Parish.

9.      As the CAO for Jefferson Parish, Tim Whitmer was responsible for the day-to-day operations of Jefferson Parish government.

10.     Prior to 2004, Karen Parker, a/k/a Karen Broussard Parker ("Parker") worked for defendant **AARON F. BROUSSARD** as an administrative assistant. As set forth below, after **AARON F. BROUSSARD**'s election as Parish President, Parker was given a parish position in the **BROUSSARD** administration.

### Jefferson Parish Contractors

11.     First Communications Company ("FCC") was a telecommunications company that provided, among other things, telecommunications services to commercial customers, including businesses, governments, and governmental organizations. FCC was founded by William P. Mack ("Mack") in or around 1982. Since 1982 through in or around July 2012, Mack was an owner and/or president of FCC.

12.     During the tenure of Jefferson Parish President **AARON F. BROUSSARD**, Mack, through his company, FCC, sought and received telecommunications work and contracts from Jefferson Parish.

- 3 -

*Parker's Employment, Resignation, and Re-Hiring*

13.     Beginning in 1992, Parker began working for the Jefferson Parish government as an administrative assistant for the Jefferson Parish Council.

14.     On or about July 31, 2003, Karen Parker began working for defendant **AARON F. BROUSSARD's** campaign for Jefferson Parish President after resigning from her position as an administrative assistant for Jefferson Parish Councilman and defendant **BROUSSARD**, a position Parker held for several years.

15.     On or about October 28, 2003, defendant **THOMAS G. WILKINSON** approved the rescission of Karen Parker's July 31, 2003 resignation from Jefferson Parish employment which, as set forth below, permitted Parker to obtain certain employment benefits under the rules and regulations of Jefferson Parish.

16.     On or about November 13, 2003, defendant **THOMAS G. WILKINSON** approved the placing of Karen Parker on leave without pay for the time period August 1, 2003, through on or about October 28, 2003, thereby eliminating any break in her employment with Jefferson Parish.

17.     On or about May 29, 2004, Karen Parker and defendant **AARON F. BROUSSARD** were married.

18.     On or about October 28, 2003, Karen Parker was given the position of Paralegal Supervisor in the Jefferson Parish Attorney's Office.  Her starting salary was approximately $48,000.00.

19.     The salary range for the position of Paralegal Supervisor for 2003 was approximately $28,838.00 to $44,737.00 according to the Executive Pay Plan for Jefferson Parish.

- 4 -

20.     According to the job description of Paralegal Supervisor, the essential functions of that position require that the "[i]ndividual conducts basic legal research, interviews witnesses, meets with inter-governmental personnel and members of the public, gathers evidence to formulate the Parish's position on Parish or other matters. Individual prepares legal documents including pleadings, wills, contracts, leases, property descriptions and legal opinions setting forth the Parish's position on Parish and other matters. Individual supervises and coordinates the activities of various support staff."

21.     The Paralegal Supervisor position is an unclassified position and, therefore, applicants are not required to take a civil service examination nor are unclassified employees subject to the same annual Employment Performance Evaluation process that classified employees are required to undergo.

22.     The Jefferson Parish job description for the position of Jefferson Parish Attorney's Office Paralegal Supervisor required Paralegal Supervisors to have completed paralegal training and certification.

23.     Karen Parker was not trained as a Paralegal or a Paralegal Supervisor nor did she possess the required paralegal certification.

24.     The salary range for the position of Paralegal Supervisor for 2007 - 2010 was approximately $36,071.00 - $50,756.00 according to the Executive Pay Plan for Jefferson Parish.

25.     On or about March 8, 2004, defendant **THOMAS G. WILKINSON** approved the location transfer of Karen Parker to the East Bank Regional Library where the office of ID Management was located.

26.     ID Management is the department responsible for issuing access badges to Jefferson Parish employees and is operated independent of the Jefferson Parish Attorney's Office.

27.     Jefferson Parish determined that the Parish only requires one employee to hold the position of ID/Security System Coordinator.

28.     The salary range for the Jefferson Parish employee with the position of ID/Security System Coordinator, who was located at the East Bank Regional Library, and was responsible for the issuance of Jefferson Parish employee access badges, was approximately $24,297.00 - $37,693.00 for the years 2004 - 2006 and was approximately $30,533.00 - $42,963.00 for the years 2007 - 2010.

29.     Despite Karen Parker's transfer to the East Bank Regional Library where she was assigned to ID Management, Parker retained her job title and higher salary of Paralegal Supervisor until her dismissal on or about February 5, 2010.

30.     Karen Parker did not perform any of the duties of a Paralegal Supervisor while assigned to ID Management at the East Bank Regional Library.

31.     Under the title Paralegal Supervisor for Jefferson Parish, Karen Parker was paid approximately $323,308.13 for the years 2004-2010, which was approximately $129,000.00 more than the employee who held the position of ID/Security System Coordinator.

32.     Jefferson Parish utilized Iberia Bank, formerly Omni Bank, for Automated Clearing House transactions (payroll) that transmitted, via wire, these payroll transactions that crossed state lines before the payroll funds were deposited into the recipient (employee) bank account.

33.     Defendant **AARON F. BROUSSARD** and Karen Parker had approximately four joint bank accounts at various financial institutions, filed their federal income tax returns jointly, and applied together for bank loans and/or mortgages.

- 6 -

34.     Karen Parker established direct deposit with the Jefferson Parish Employees Federal Credit Union (JPEFCU) and as a result her salary under the title Paralegal Supervisor was deposited into her JPEFCU account.

### *Jefferson Parish Employment Rules and Regulations*

35.     Jefferson Parish provides for longevity pay raises for employees.  Employees receive a step for every three years of employment after they have completed seven years of continuous employment with Jefferson Parish.  Employees receive an additional five percent compounded increase in their salary for each eligible step.

36.     Jefferson Parish employees with at least two years of continuous employment may also receive tenure awards if funding permits.  These tenure awards are calculated by multiplying the number of years of employment with Jefferson Parish by $25.00.

37.     Jefferson Parish employees with less than five years employment experience earn approximately 3.5 hours of annual leave every two weeks.  Employees with five to ten years experience earn approximately 4.38 hours of annual leave every two weeks.  An employee who has worked for Jefferson Parish for more than ten years is placed in the maximum leave category and earns approximately 5.25 hours of annual leave every two weeks.

38.     When an employee resigns or retires from Jefferson Parish and is then re-hired at a later time, that employee must wait at least 90 days before they are eligible for health insurance benefits.

39.     In Jefferson Parish it is the discretion of the department head to award compensatory ("comp") time to their employees.  Comp time is subject to prior approval by the department head and is approved under limited circumstances.

*Jefferson Parish Government*

40.     The Jefferson Parish Attorney's Office and ID Management are both agencies of Jefferson Parish.

41.     Jefferson Parish is a local government/political subdivision of the State of Louisiana that received federal assistance in excess of $10,000.00 during each of the one year periods beginning on January 1st and ending December 31st for the years 2004, 2005, 2006, 2007, 2008, 2009, and 2010.

**B.      THE SCHEME TO DEFRAUD**

Beginning at a time unknown, but prior to on or about July 31, 2003, and continuing to on or about February 5, 2010, in the Eastern District of Louisiana and elsewhere, the defendants, **AARON F. BROUSSARD** and **THOMAS G. WILKINSON**, along with others, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud the citizens of Jefferson Parish and to obtain money and property from Jefferson Parish.

It was further a part of the scheme and artifice to defraud that, from at least July 31, 2003, and continuing to on or about February 5, 2010, in the Eastern District of Louisiana and elsewhere, **AARON F. BROUSSARD** sought to and did abuse his political office, with the assistance of others, including defendant **THOMAS G. WILKINSON**, in an effort to personally enrich himself by, among other things, (1) wrongfully obtaining parish employment for individuals including but not limited to his girlfriend and later-wife, Karen Parker, for jobs they were not qualified for and did not perform, and (2) unlawfully using taxpayer funds to reward individuals for undertaking personal favors for **BROUSSARD**.

- 8 -

It was further a part of the scheme and artifice to defraud that, from in or about July 2003, through in or about February 2010, **AARON F. BROUSSARD** personally enriched himself and financially benefitted other employees including defendant **THOMAS G. WILKINSON** by means of false pretenses, promises and representations thereby defrauding Jefferson Parish and its citizens of money and property.

It was further a part of the scheme and artifice to defraud that **AARON F. BROUSSARD** used taxpayer funds to reward **THOMAS G. WILKINSON** for his intercession on behalf of **BROUSSARD's** family member in the competitive admissions process for a local private school when **BROUSSARD** awarded **WILKINSON** a discretionary pay raise of approximately $36,000.00 per year.

It was further a part of the scheme and artifice to defraud that **AARON F. BROUSSARD** obtained approximately $323,000.00 for himself and his girlfriend and then wife, Karen Parker, through the assistance of **THOMAS G. WILKINSON**, Tim Whitmer, and others, which was approximately $129,000.00 more than the employee who held the position of ID/ Security System Coordinator.

It was further a part of the scheme and artifice to defraud that defendants **AARON F. BROUSSARD, THOMAS G. WILKINSON**, Karen Parker, and Tim Whitmer used the Parish Attorney's Office and ID Management, and allowed the Parish Attorney's Office and ID Management to personally enrich **BROUSSARD, WILKINSON**, and Karen Parker with taxpayer funds.

It was further a part of the scheme and artifice to defraud that defendants **AARON F. BROUSSARD, THOMAS G. WILKINSON**, and others used their influence and positions in

- 9 -

Jefferson Parish government to make hiring decisions involving various friends, family members, and political allies and award pay increases that were contrary to the best interest of the citizens of Jefferson Parish.

It was further a part of the scheme and artifice to defraud that defendants **AARON F. BROUSSARD, THOMAS G. WILKINSON,** Tim Whitmer, and another Jefferson Parish official created an additional Paralegal Supervisor position for Karen Parker and allowed her to retain that position for over six years thereby allowing her to collect over $323,000.00 in taxpayer funds knowing that she was neither qualified nor performing the job of Paralegal Supervisor when in fact, she was assigned to ID Management and was paid approximately $129,000.00 more than the employee who held the position of ID/ Security System Coordinator.

It was further a part of the scheme and artifice to defraud that on or about October 28, 2003, defendant **THOMAS G. WILKINSON** approved the appointment of Karen Parker to the position of Paralegal Supervisor in the Jefferson Parish Attorney's Office knowing that she did not meet the qualifications and/or requirements for the position of Paralegal Supervisor and knowing that she was romantically involved with president-elect **AARON F. BROUSSARD.**

It was further a part of the scheme and artifice to defraud that on or about October 28, 2003, defendant **THOMAS G. WILKINSON** rescinded the July 31, 2003 resignation of Karen Parker thereby allowing her to collect additional money and salary in the form of longevity pay, tenure awards, health insurance benefits, and annual leave.

It was further a part of the scheme and artifice to defraud that on or about October 28, 2003, defendant **THOMAS G. WILKINSON** and/or a subordinate employee crossed out the pay rate for Karen Parker of $28,838.00 and wrote $48,000.00 on an official Parish of Jefferson,

- 10 -

Department of Human Resources, Request to Fill a Vacant Job form.

It was further a part of the scheme and artifice to defraud that when defendant **THOMAS G. WILKINSON** approved the hiring of Karen Parker as a Paralegal Supervisor, the position was not advertized publicly nor was Karen Parker required to take a civil service examination because the position was an unclassified position.

It was further a part of the scheme and artifice to defraud and known to **THOMAS G. WILKINSON** that Karen Parker did not perform any of the "essential functions" as referenced in the job description for the position of Paralegal Supervisor.

It was further a part of the scheme and artifice to defraud that in or about December 2003, defendant **AARON F. BROUSSARD** retained **THOMAS G. WILKINSON** as Parish Attorney for Jefferson Parish, a position that paid approximately $100,000.00 per year.

It was further a part of the scheme and artifice to defraud that on or about March 8, 2004, defendant **THOMAS G. WILKINSON** approved the location transfer of Karen Parker from the Jefferson Parish Attorney's Office to ID Management located at the East Bank Regional Library.

It was further a part of the scheme and artifice to defraud that in 2004, 2007, and twice in 2008, defendant **THOMAS G. WILKINSON** approved Annual Evaluation Pay Raises for Karen Parker that increased her annual salary.

It was further a part of the scheme and artifice to defraud that in 2004, 2005, three times in 2007, 2008, and 2009, defendant **AARON F. BROUSSARD** directed and approved salary increases for defendant **THOMAS G. WILKINSON** that increased his annual salary.

It was further a part of the scheme and artifice to defraud and to conceal the scheme and artifice to defraud that on or about January 30, 2008, defendant **AARON F. BROUSSARD** and

- 11 -

Karen Parker made a false representation on a financial document that listed Karen Parker's position as a Paralegal and which was faxed from the Jefferson Parish President's Office.

It was further a part of the scheme and artifice to defraud that in or about the fall of 2008, defendant **THOMAS G. WILKINSON** attempted to use his position and perceived influence as a board member for a local private school to assist **AARON F. BROUSSARD**'s family member during the competitive admission process for that same school.

It was further a part of the scheme and artifice to defraud that in or about 2009, defendant **AARON F. BROUSSARD** instructed Tim Whitmer to process a pay raise for defendant **THOMAS G. WILKINSON** because **BROUSSARD** believed that **WILKINSON** had been instrumental in defendant **BROUSSARD**'s family member's acceptance into a local private school.

It was further a part of the scheme and artifice to defraud that Tim Whitmer told defendant **THOMAS G. WILKINSON** that defendant **AARON F. BROUSSARD** was giving **WILKINSON** a substantial discretionary pay raise because **BROUSSARD** wanted to reward **WILKINSON** for helping **BROUSSARD**'s family member get accepted into a local private school.

It was further a part of the scheme and artifice to defraud that during the five year period of 2004 - 2009, defendant **AARON F. BROUSSARD** authorized pay raises for defendant **THOMAS G. WILKINSON** that increased **WILKINSON**'s salary from approximately $100,000.00 to approximately $184,000.00, knowing that this would result in an increased retirement benefit to **WILKINSON**.

- 12 -

It was further a part of the scheme and artifice to defraud that during the five year period of 2004 - 2009, defendant **THOMAS G. WILKINSON** authorized pay raises that increased Karen Parker's salary from approximately $46,439.99 to approximately $63,898.36, knowing that this would result in an increased retirement benefit to Parker.

It was further a part of the scheme and artifice to defraud and in an effort to conceal the scheme and artifice to defraud that on or about April 28, 2009, defendant **AARON F. BROUSSARD** caused a fax to be transmitted to defendant **THOMAS G. WILKINSON** that falsely attempted to describe Karen Parker's position with Jefferson Parish.

It was further a part of the scheme and artifice to defraud and in an effort to conceal the scheme and artifice to defraud that on or about May 5, 2009, defendant **AARON F. BROUSSARD** made false statements when answering questions about his wife's occupation, job description, and nature of services rendered pursuant to her employment when he executed a sworn Personal Financial Disclosure Statement that was filed with the Louisiana Board of Ethics.

It was further a part of the scheme and artifice to defraud and in an effort to conceal the scheme and artifice to defraud that defendant **AARON F. BROUSSARD** made repeated false representations about Parker's occupation on official U.S. government documents.

## C.    THE CONSPIRACY

Beginning at a time unknown, but prior to on or about July 31, 2003, and continuing to on or about February 5, 2010, in the Eastern District of Louisiana and elsewhere, **AARON F. BROUSSARD, THOMAS G. WILKINSON,** and others known and unknown to the grand jury, did knowingly and willfully combine, conspire, and agree together and with each other to:

- 13 -

1. Corruptly accept and agree to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction, and series of transaction involving anything of value of $5,000.00 or more of an organization, government, or agency that receives more than $10,000.00 under a federal program during a one year period; in violation of Title 18, United States Code, Section 666(a)(1)(B).

2. Embezzle, steal, and obtain by fraud, property valued at $5,000.00 or more and owned by or under the care, custody, and control of the Parish of Jefferson; in violation of Title 18, United States Code, Section 666(a)(1)(A).

3. Use and cause to be used bank wire transfers to be transmitted by means of wire communication in interstate commerce the signals and sounds in furtherance of the scheme and artifice to defraud as set forth in Part B of Count 1; in violation of Title 18, United States Code, Section 1343.

**D.    OVERT ACTS**

On or about the following dates, in furtherance of the conspiracy and to accomplish its purposes, the defendants, **AARON F. BROUSSARD, THOMAS G. WILKINSON,** and others, including Tim Whitmer, Karen Parker, and Bill Mack, committed the following overt acts, among others, in the Eastern District of Louisiana and elsewhere:

1. After **AARON F. BROUSSARD**'s election on or about October 4, 2003, but prior to him taking office as the President of Jefferson Parish and prior to on or about October 28, 2003, **BROUSSARD** met with defendant **THOMAS G. WILKINSON,** Tim Whitmer, and another Jefferson Parish official for the purpose of creating a position for Karen Parker. It was decided during this meeting to create an additional Paralegal Supervisor position in the Jefferson Parish Attorney's Office for Parker.

- 14 -

2.      Prior to on or about October 28, 2003, defendant **THOMAS G. WILKINSON** agreed to have Karen Parker assigned to the Jefferson Parish Attorney's Office as a Paralegal Supervisor.

3.      On or about October 28, 2003, defendant **THOMAS G. WILKINSON** approved the appointment of defendant Karen Parker to the position of Paralegal Supervisor.

4.      On or about October 28, 2003, defendant **THOMAS G. WILKINSON** rescinded the July 31, 2003 resignation of Karen Parker.

5.      On or about October 28, 2003, defendant **THOMAS G. WILKINSON** and/or a subordinate employee crossed out the pay rate for Karen Parker of approximately $28,838.00 and wrote $48,000.00 on an official Parish of Jefferson, Department of Human Resources, Request to Fill a Vacant Job form.

6.      In or about December 2003, defendant **AARON F. BROUSSARD** decided to retain **THOMAS G. WILKINSON** as the Parish Attorney for Jefferson Parish.

7.      From in or around 2003 through in or around 2010, defendant **THOMAS G. WILKINSON** allowed numerous political and personal friends and associates of defendant **AARON F. BROUSSARD** to be hired and put on the payroll of the Jefferson Parish Attorney's Office and would describe them, in conversations, as "deadheads" who worked for him.

8.      In or about December 2003, defendant **AARON F. BROUSSARD** decided to retain Tim Whitmer as Chief Administrative Assistant/Chief Administrative Officer for Jefferson Parish.

9.      From in or around January 2004 through on or about November 13, 2007, Mack made approximately forty-one (41) payoffs and kickbacks totaling approximately $66,000.00 to

- 15 -

defendant **AARON F. BROUSSARD** in exchange for **BROUSSARD**'s efforts and official acts to try to help steer, among other things, Jefferson Parish telecommunications work, as well as telecommunications work from private vendors, including other Jefferson Parish vendors, to FCC.

10. On or about January 13, 2004, defendant **AARON F. BROUSSARD** signed a "recusal" letter, purportedly recusing himself from official Jefferson Parish business involving particular industries, including the telecommunications industry which would include FCC. This recusal letter was sent to the Jefferson Parish Council, as well as defendant **THOMAS G. WILKINSON**.

11. In or around early 2004, defendant **THOMAS G. WILKINSON** and Tim Whitmer had a conversation regarding **BROUSSARD**'s purported recusal where both parties, including defendant **WILKINSON**, discussed **BROUSSARD**'s recusal letter as being a sham and not being enforced or adhered to by **BROUSSARD**.

12. From in or around early 2004 through in or around 2010, despite his purported "recusal," defendant **AARON F. BROUSSARD** improperly interjected himself into the drafting, letting, selection, and awarding of Jefferson Parish contracts, including but not limited to FCC.

13. Beginning at least in early 2004 and continuing through in or around 2009, defendant **AARON F. BROUSSARD** would regularly meet with Mack, the owner of FCC, to pick up his payoffs and bribes and to discuss, among other things, telecommunications work he could assist Mack in obtaining.

14. In early 2004, defendant **THOMAS G. WILKINSON** and Tim Whitmer had a conversation to discuss Karen Parker's improper requests for overtime or comp pay. As a result,

- 16 -

defendant **AARON F. BROUSSARD** was notified that Parker was violating Jefferson Parish rules by attempting to collect overtime/comp pay under the circumstances described to defendant **BROUSSARD**.

15.     On or about March 8, 2004, defendant **THOMAS G. WILKINSON** approved the location transfer of Karen Parker from the Jefferson Parish Attorney's Office to ID Management located at the East Bank Regional Library, but allowed her to retain her Paralegal Supervisor title and salary.

16.     On or about May 26, 2004, Mack and his company, FCC, who simultaneously paid kickbacks to defendant **AARON F. BROUSSARD**, was awarded two Jefferson Parish telecommunications contracts worth a total of approximately $30,000.00 by the Jefferson Parish Council in a council meeting where defendant **THOMAS G. WILKINSON**, who was aware of the improper relationship between Mack and **BROUSSARD**, was present. **WILKINSON**, as Parish Attorney, failed to notify the council at that meeting of the improper relationship between Mack and **BROUSSARD**.

17.     In or about early- to mid-2004, the contracts awarded by the Jefferson Parish Council to FCC and its owner, Mack, who was simultaneously and corruptly making payoffs to defendant **AARON F. BROUSSARD**, were reviewed and negotiated by the office of defendant **THOMAS G. WILKINSON**, on behalf of Jefferson Parish.

18.     On or about July 1, 2004, defendant **THOMAS G. WILKINSON** approved an Annual Evaluation Pay Raise for Karen Parker that increased her annual salary of approximately $51,789.00 to approximately $54,378.00.

- 17 -

19.     On or about July 6, 2004, defendant **AARON F. BROUSSARD** approved or directed a salary increase for defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $100,000.00 to approximately $105,000.00.

20.     On or about August 25, 2004, defendant **THOMAS G. WILKINSON**, who was aware of defendant **BROUSSARD**'s improper relationship with Mack and sham recusal, was present at a Jefferson Parish council meeting when a resolution was passed involving FCC concerning a telecommunications contract that was awarded to Mack and his company, FCC. **WILKINSON** failed to notify the council at that meeting of the improper relationship between Mack and **BROUSSARD**.

21.     Prior to on or about August 6, 2005, defendant **AARON F. BROUSSARD** approved or directed a salary increase for defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $105,000.00 to approximately $107,625.00.

22.     On or about August 31, 2005, FCC and its owner, Mack, who was simultaneously paying kickbacks to defendant **AARON F. BROUSSARD**, was awarded a Jefferson Parish telecommunications contract worth approximately $7,000.00 by the Jefferson Parish Council.

23.     In or about early- to mid-2005, the contract awarded by the Jefferson Parish Council to FCC and its owner, Mack, who was simultaneously and corruptly making payoffs to defendant **AARON F. BROUSSARD**, was reviewed and negotiated by the office of defendant **THOMAS G. WILKINSON**, on behalf of Jefferson Parish.

24.     At some time in 2006 or 2007, defendant **THOMAS G. WILKINSON** learned that Karen Parker was observed gambling at a daiquiri establishment during work hours and, as a result, **WILKINSON** and the Jefferson Parish Sheriff's Office high ranking employee assigned

- 18 -

to protect and chauffeur AARON F. BROUSSARD confronted Parker in WILKINSON's office about the allegation.

25.     Prior to on or about January 6, 2007, defendant AARON F. BROUSSARD approved or directed Tim Whitmer to approve a salary increase for defendant THOMAS G. WILKINSON that increased his annual salary of approximately $107,625.00 to approximately $116,235.00.

26.     On or about June 22, 2007, defendant AARON F. BROUSSARD approved or directed Tim Whitmer to approve a salary increase for defendant THOMAS G. WILKINSON that increased his annual salary of approximately $116,235.00 to approximately $122,047.00.

27.     On or about June 25, 2007, defendant THOMAS G. WILKINSON approved an Annual Evaluation Pay Raise for Karen Parker that increased her annual salary of approximately $58,728.00 to approximately $61,664.00.

28.     In or around November 2007, defendant AARON F. BROUSSARD sought to conceal and legitimize his relationship with, and the payoffs he had been receiving from, Mack by claiming the payoffs were for legal services rendered.  In reality, as set forth above, Mack had made payoffs to BROUSSARD for his influence, as Parish President, to steer, among other things, telecommunications work to FCC.

29.     On or about December 7, 2007, defendant AARON F. BROUSSARD approved or directed Tim Whitmer to approve a discretionary salary increase for defendant THOMAS G. WILKINSON that increased his annual salary of approximately $122,047.12 to approximately $134,251.75.

30.     In or about June 2008, Mack and his company, FCC, who had corruptly made payoffs to defendant **AARON F. BROUSSARD**, obtained telecommunications work with Jefferson Parish worth approximately $10,000.00.

31.     On or about January 30, 2008, defendant **AARON F. BROUSSARD** faxed a personal financial statement relative to a mortgage application from the Jefferson Parish President's Office to a financial institution knowing that the document falsely listed Karen Parker's position as a Paralegal.

32.     In or about late 2007 or early 2008, defendant **AARON F. BROUSSARD** corruptly undertook official acts in an effort to steer a Request for Proposal ("RFP") sought to be released by the Jefferson Parish Council to FCC and its owner, Mack, in exchange for the payoffs he had previously been receiving.

33.     On or about June 23, 2008, defendant **THOMAS G. WILKINSON** approved an Annual Evaluation Pay Raise for Karen Parker that increased her annual salary of approximately $61,664.00 to approximately $61,778.00.

34.     On or about July 1, 2008, defendant **THOMAS G. WILKINSON** approved an additional Annual Evaluation Pay Raise for Karen Parker that increased her annual salary of approximately $61,664.00 to approximately $64,747.00.

35.     On or about August 5, 2008, defendant **AARON F. BROUSSARD** approved or directed Tim Whitmer to approve a salary increase for defendant **THOMAS G. WILKINSON** that increased his annual salary of approximately $134,252.00 to approximately $147,677.00.

36.     In the Fall of 2008, defendant **THOMAS G. WILKINSON** attempted to use his position as a board member at a local private school in order to assist a family member of

- 20 -

as, a Paralegal Supervisor";[15]

- The defendants were aware that, after Parker moved locations, she "did not perform the duties of, and did no work as, a Paralegal Supervisor";[16]

- The defendants "had first-hand knowledge that Parker did not appear at times at the location she was assigned [] to work";[17]

- The defendants approved Parker's pay raises despite knowing that she "was not performing any of the essential functions for the position of Paralegal Supervisor and, indeed, [] was not qualified for, and did not work as, a Paralegal Supervisor";[18] and

- Repeated and numerous false statements regarding the occupation and nature of services provided by Parker as an effort to conceal the scheme.[19]

Quite simply, the defendants willingly ignored the job qualifications for the unnecessary position they created for Parker's job; by placing Parker into this position knowing she was not qualified for it, and allowing her to retain a hefty salary of taxpayer funds, the defendants engaged in fraud on the Parish.[20] This is a far cry from mere "patronage," as Wilkinson suggests – this amounted to intentional actions, including mischaracterizations, misrepresentations, and fraud, for the purpose

---

[15]*Id.* at 5.

[16]*Id.*

[17]*Id.*

[18]*Id.* at 6.

[19]*Id.*

[20]Similarly, as the charges relating to the bonus Wilkinson received as a result of his intercession of a Broussard family member at a local school, dishonest conduct surely was present: while the Parish and the taxpaying citizens can certainly expect its officials to award bonuses, they are entitled to a measure of quality performance for those monies. In this case, the bonus awarded to Wilkinson, the money and property of the Parish as alleged in the Indictment, was strictly for his personal favor to Broussard and his family. The false pretense for, and dishonest conduct present, in this episode is sufficient to deny the Motion as to these charges.

of enriching the defendants with taxpayer and Parish funds.  Moreover, the defendants reiterated their fraud each and every time Parker's name appeared on official Parish documents as a "Paralegal Supervisor."  These misrepresentations were material in every sense of the word: the defendants' payroll-related crimes would not have been possible without their fraudulent actions and thus, the Indictment sufficiently alleges that element of the charges.[21]  *See United States v. De Rong Shang*, 2012 WL 693031, at *10 (D. Nev. Jan. 26, 2012) (unpublished) (denying motion to dismiss indictment where indictment alleged material scheme to defraud despite not including the specific false statements or the word "material").  Whether or not the word material appears in the Indictment is not dispositive.[22]  *See id.*

While Wilkinson attempts to distinguish another employee-patronage case, *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008), his argument is unpersuasive.  While *Sorich* involved a hiring scheme through a civil service office, which required falsified interview forms and falsified

---

[21]This is not a case like *United States v. Josten*, 704 F. Supp. 841 (N.D. Ill. 1989), which dismissed an indictment for lack of specificity.  In *Josten*, the district court held "the indictment does not state the allegedly false representations, nor does it name the victims of the allegedly improper conduct or the accounts to which it pertained, nor does it give any specific dates upon which the challenged activity took place."  704 F. Supp. at 844.  The court concluded: "[i]t may be that none of these omissions would, standing alone, require dismissal.  The combination, however, leaves the presumably innocent defendant speculating as to which of the many transactions and representations... are the subject of his indictment."  *Id.* (alterations not in original).  Here, as set forth above, no speculation required – Wilkinson is adequately apprised of the conduct, as well as its many specifics, with which he is charged.

[22]In any event, even if this Court requires more specificity than the detailed amount already set forth in the Indictment, the remedy would be the seeking of another superseding indictment.  *See United States v. Gormley*, 2006 WL 5811898, at *3 (S.D. W.Va. June 22, 2006) (denying ineffective assistance of counsel petition based on failure of trial counsel to challenge wire fraud counts in the absence of particular false statements and noting that "a motion to dismiss the wire fraud charges would, at most, have required the United States to seek a superseding indictment.").

14

certifications, *Sorich*, like the present case, involved an illegitimate shadow hiring scheme based on patronage and cronyism that included misrepresentations. *See United States v. Sorich*, 523 F.3d 702, 711 (7th Cir. 2008). What *Sorich* does not have, which *is* present in this case, is the Indictment's allegation that Wilkinson, Broussard, and others placed the employees in question in positions they were not qualified for, were not certified for, and, most importantly, did not perform *at all. See* Indictment at 10-11. Indeed, because Parker (and the other employees at issue) did not perform their jobs, the scheme in this case is arguably *worse* that the one present in *Sorich. See id.* In upholding the fraud convictions, the Seventh Circuit in *Sorich*, consistent with precedent, rightly stated that the "money or property" obtained by fraud was the jobs given and salaries awarded to the employees. *See Sorich*, 523 F.3d at 713 (citing cases). Similarly here, the defendants' scheme included the placement of Parker in her sham position, one that rewarded her with a job and a salary she would otherwise not have attained without the actions of the defendants. *See* Indictment at 8, 10-11. *Sorich*, despite Wilkinson's protestations, is thus analogous.

Moreover, Wilkinson ignores the legions of other cases with analogous fraudulent payroll schemes that have upheld convictions. *See Schmitz*, 634 F.3d at 1260, 2364-65 (upholding fraud convictions in payroll fraud scheme where employee received newly-created position and produced virtually no work product); *United States v. Swan*, 250 F.3d 495, 500 (7th Cir. 2001) (upholding fraud convictions based on employee payroll scheme); *United States v. Dvorak*, 115 F.3d 1339 (7th Cir. 1997) (upholding fraud conviction based on employee payroll scheme where employees did little or no work); *see also United States v. Weaver*, 220 Fed. Appx. 88 (3d Cir. Mar. 22, 2007) (unpublished) (upholding fraud convictions); *United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999) (reversing order of dismissal of indictment on limitations grounds in payroll fraud case). The

15

defendants' use of their positions to enrich themselves at the expense of the taxpayers has thus been widely recognized as an accepted theory of prosecution. *See id.*

The defendants instead focus their time analogizing this case to *United States v. Ratcliff*, 488 F.3d 639 (5th Cir. 2007). *Ratcliff*, however, is clearly distinguishable – it involved a public official seeking the office of parish president who committed election fraud in order to obtain that office and thereby receive salary benefits. *See* 488 F.3d at 641-43. In upholding the dismissal of the indictment, the Fifth Circuit held that the indictment there alleged a scheme to defraud the voters and the Board of Ethics (based on the candidate's frauds in connection with the campaign), not the Parish in question.[23] *See id.* at 645. Notably, the Fifth Circuit expressly stated that "it cannot be said that the parish would be deprived of [the salary] by means of [the defendant's] misrepresentations, *as the financial benefits budgeted for the parish president go to the winning candidate regardless of who that person is.*" *Id.* (emphasis added). The same cannot be said for the instant case – it was only through the fraudulent actions of Broussard, Wilkinson, and others that Parker was able to obtain her job, benefits, and salary,[24] one that she has admitted she did not earn. *See* Indictment at 8, 10-11. In other words, unlike *Ratcliff*, Jefferson Parish would not have paid Parker's salary without the defendants' scheme. *See id.* Thus, *Ratcliff* is inapposite.[25]

---

[23]Here, unlike in *Ratcliff*, the Government is not alleging that Broussard's own salary was obtained by fraud.

[24]The Fifth Circuit expressly stated in *Ratcliff* that "salary and other financial employment benefits can constitute 'money or property' under" the fraud statutes. *See Ratcliff*, 488 F.3d at 644 (citing cases).

[25]For the same reasons as mentioned above relating to the payroll fraud counts, Wilkinson's argument for partial dismissal of the conspiracy count, *see* Motion at 16-17, should be rejected. His argument is premised on the assertion that the Indictment fails to allege falsehoods or fraud in connection with the objects of the conspiracy. *See id.* As noted above, the

16

3.    **Wilkinson's reliance on the "bona fide" salary exception to the theft charges does not warrant dismissal.**

Wilkinson argues that the Indictment should be dismissed because the salaries paid to Parker

and Wilkinson that form the theft charges are "bona fide" wages, an exception to the theft statute.

*See* Motion at 14-15 (citing 18 U.S.C. § 666(c)). As an initial matter, Wilkinson concedes a well-

established point decided by the Fifth Circuit: "[w]hether wages are bona fide and earned in the usual

course of business is a *question of fact for the jury to decide.*" Motion at 14-15 (citing *United States*

*v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007)) (emphasis added). Case law is clear that this defense

is one to be raised at trial, not in a pre-trial motion to dismiss. *See United States v. Lupton*, 620 F.3d

790, 802 (7th Cir. 2010) (affirming Section 666 conviction noting that "bona fide" wages exception

was decided by factfinder); *United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007); *United*

*States v. Dwyer*, 238 Fed. Appx. 631, 647 (1st Cir. 2007) (citation omitted); *United States v. Bryant*,

2009 WL 1559796, at *13 (D.N.J. May 28, 2009) (unpublished) (denying motion for judgment of

acquittal and noting that whether "bona fide" wages exception applied was a question of fact for the

jury). Accordingly, Wilkinson's argument should be denied. *See id.*

In any event, the allegations of the Indictment are clear – the wages paid to Parker and the

bonus paid to Wilkinson were not "bona fide" and therefore, this exception would not apply. *See,*

*e.g. Williams*, 507 F.3d at 908-09 (noting that a salary is not "bona fide" or earned in the usual course

of business "if the employee is not entitled to the money") (citing cases); *United States v. Cornier-*

---

argument improperly invites this Court to go beyond the allegations of the Indictment, which
tracks the statutory language, and thus, it should be rejected. *See supra*, Part IV.B.1.  Moreover,
even if the Court were to weigh the Government's evidence, it is clear that the Indictment
alleges, and the Government intends to prove, numerous falsehoods, false statements, or fraud, in
connection with the objects of the conspiracy, as stated above. *See supra*, Part IV.B.2.
Accordingly, Wilkinson's argument for dismissal of the conspiracy count should be rejected.

17

*Ortiz*, 361 F.3d 29, 36 (1st Cir. 2004) (affirming theft convictions and holding that payments made to consultant, who had no expertise or knowledge in the subject matter at issue, were not "bona fide"); *United States v. Grubb*, 11 F.3d 426, 434 (4th Cir. 1993) (wages paid to employee who performed little work were not "bona fide" in bribery case); *United States v. Stout*, 1994 WL 90025, at *5 (E.D. Pa. Mar. 21, 1994) (unpublished) (compensation paid to consultants who performed no services were not "bona fide"). In other words, as the Indictment alleges and as Parker herself has already admitted, she did not perform the job she was given; she was not qualified or certified for the position; and the wages she did earn were not in the usual course of business.[26] *See* Indictment at 8-11.

Wilkinson's only authority to support his argument is inapplicable. In *United States v. Harloff*, a district court in New York dismissed two counts of theft from an indictment based on defendant-employees accepting wages despite "working fewer hours than he or she is supposed to work." *See United States v. Harloff*, 815 F. Supp. 618, 619 (W.D.N.Y. 1993). *Harloff*, however, noted that 18 U.S.C. 666(c), the exception relied upon by Wilkinson, "would not preclude a prosecution involving wages which are clearly not 'bona fide.'" *Id.* Here, Wilkinson's bonus, and Parker's wages, as she has stated in her factual basis and as is alleged in the Indictment, are not "bona fide." *See* Indictment at 8-11. The Government intends to prove this allegation at trial and, as such, consistent with analogous case law, dismissal is not warranted. *See Williams*, 507 F.3d at 908-09; *Cornier-Ortiz*, 361 F.3d at 36; *Grubb*, 11 F.3d at 434; *Stout*, 1994 WL 90025, at *5.

---

[26]Similarly, the bonus paid to Wilkinson, as alleged in the Indictment, was not in the ordinary course of business. While the payment was discretionary, Broussard improperly, and in a fraudulent manner, paid that bonus strictly for the personal favor that Wilkinson gave him. Surely, the payment of a bonus – taxpayer and Parish funds – by a corrupt public official to another for a personal favor cannot be considered "in the usual course of business."

18

4.    **Wilkinson's other arguments for dismissal are unpersuasive.**

Throughout the Motion, Wilkinson argues that policy requires the dismissal of the Indictment. Specifically, he argues that this is a case of Government over-reaching, asserting that if the allegations in the Indictment are sufficient to constitute crimes, "the government's power to prosecute activities in state government offices is virtually unlimited." Motion at 14. Terming the actions in this case as "personnel or employee management issues," Wilkinson argues for dismissal. *Id.* As noted above, however, Wilkinson ignores scores of cases that have held defendants criminally accountable for similar employee-payroll fraud schemes in analogous contexts. *Schmitz*, 634 F.3d at 1260, 2364-65 (upholding fraud convictions in payroll fraud scheme where employee received newly-created position and produced virtually no work product); *Swan*, 250 F.3d at 500 (upholding fraud convictions based on employee payroll scheme); *Dvorak*, 115 F.3d 1339 (upholding fraud conviction based on employee payroll scheme where employees did little or no work); *see also Weaver*, 220 Fed. Appx. 88 (upholding fraud convictions); *Cornier-Ortiz*, 361 F.3d at 36 (affirming theft convictions and holding that payments made to consultant, who had no expertise or knowledge in the subject matter at issue, were not "bona fide"); *Grubb*, 11 F.3d at 434 (wages paid to employee who performed little work were not "bona fide" in bribery case); *Stout*, 1994 WL 90025, at *5 (E.D. Pa. Mar. 21, 1994) (compensation paid to consultants who performed no services were not "bona fide"). Indeed, as it relates to the theft charges, Congress's intention in passing 18 U.S.C. § 666 was to reach the type of scheme charged by the Grand Jury here. *See, e.g. United States v. Marmolejo*, 89 F.3d 1185, 1192 (5th Cir. 1996) (Congress designed Section 666 "to fill a gap in the then-current federal bribery and theft statutes..." and, to accomplish its goal, "Congress 'cast a broad net to encompass local officials who may administer federal funds...'") (citing S.Rep. No. 225, 98th Cong.,

19

2d Sess. 370 (1984)). In this case, Jefferson Parish received millions of dollars in federal funds and had a corrupt steward, advised by a corrupt attorney, making decisions on how best to use those funds – decisions that ultimately enriched the defendants. The Indictment sufficiently alleges the elements of the crimes of theft and wire fraud; it tracks the statutory language of those provisions; and provides sufficient (if not detailed) facts to enable the defendants to understand the charges against them. *See* Indictment at 8-29.   It is the jury's determination to decide whether the Government meets its burden and, accordingly, dismissal is not appropriate. *See supra*, Part IV.B.1.

Wilkinson lastly argues that, as applied in this case, the theft charge is unconstitutionally vague. *See* Motion at 15-16. In a few sentences, he asserts that the conduct charged here fails to give a person of ordinary intelligence fair notice of what is legal activity when it comes to hiring employees for sham positions. *See id.* This argument should be denied. Absent of First Amendment claim, "vagueness challenges must be evaluated in light of the facts of the individual case before the court..." and "an as-applied vagueness challenge 'may be overcome in any specific case where reasonable persons would know that their conduct is at risk.'" *United States v. Edgar*, 304 F.3d 1320, 1327 (11th Cir. 2002) (citing and quoting *Marynard v. Cartwright*, 486 U.S. 356, 361 (1988)). Additionally, courts must view as applied vagueness challenges in light of the knowledge and experience of the defendants asserting it. *See id.* at 1328.

The facts of this case – among other things, a sham employment position created for the girlfriend of the Parish President who was not qualified or certified for it and who did not perform the job, and who has, indeed, admitted her salary was a theft of taxpayer funds – does not make it difficult for a person of ordinary intelligence to understand what is prohibited. *See Edgar*, 304 F.3d at 1327-28 (rejecting vagueness challenge to 18 U.S.C. § 666 where hospital's president engaged

20

in pattern of fraud and theft in an effort to enrich himself); *United States v. Urlacher*, 979 F.2d 935 (2d Cir. 1992) (rejecting vagueness challenge to 18 U.S.C. § 666 where police chief utilized public funds for personal purposes). This is especially true given Wilkinson's position – *the Parish attorney and its chief lawyer charged with ensuring its law-abidingness* – as well as Broussard's position, the Parish President. *See* Indictment at 1-3. Indeed, as noted above, other cases, with analogous payroll fraud schemes, have upheld similar fraud and/or theft convictions. *See supra*, Parts IV.B.2 and IV.B.3 (and cases cited therein). Accordingly, Wilkinson's vagueness challenge should be rejected.

## V. A HEARING ON THE MOTION IS NOT NECESSARY.

Wilkinson has requested a hearing on the Motion. *See* Rec. Doc. No. 128. As this Court is well aware, the decision as to whether to grant a hearing on a particular pre-trial motion is discretionary. *See, e.g. United States v. O'Keefe*, 2005 WL 1578625, at *1 n. 2 (E.D. La. June 29, 2005) (unpublished); *United States v. Cannon*, 2003 WL 21406180, at *1 (E.D. La. June 16, 2003) (unpublished). The assertions set forth by Wilkinson have been exhaustively briefed. Given the extraordinary and disfavored remedy sought by Wilkinson, *see supra* Part IV.B.1, and the ample evidence refuting his assertions, *see supra*, Part IV.B.2-4, the Government submits a hearing is not necessary. *See Cannon*, 2003 WL 21406180, at *1 (denying request for evidentiary suppression hearing where defendant's allegations were conclusory).

## VI.    CONCLUSION

   **WHEREFORE**, for the reasons set forth above, the United States respectfully requests the

Court deny Wilkinson's Motion.

Dated: August 23, 2012

<div style="margin-left:40%">

Respectfully Submitted,
JIM LETTEN
UNITED STATES ATTORNEY

/s/ Matthew S. Chester
MATTHEW S. CHESTER
Texas Bar No. 24045650
BRIAN M. KLEBBA
New York Bar Roll No. 2938728
DANIEL P. FRIEL
Massachusetts Bar No. 660583
Assistant United States Attorneys
U.S. Attorney's Office - E.D. La.
650 Poydras St., Suite 1600
New Orleans, Louisiana  70130
Telephone:  (504) 680-3000

</div>

22

## CERTIFICATE OF SERVICE

     I hereby certify that on August 23, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

<div style="text-align:right">

/s/ Matthew S. Chester
Matthew S. Chester
Assistant U.S. Attorney

</div>

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA     *    CRIMINAL NO. 11-299

      v.                    *    SECTION:    "HH" (SHF)

AARON F. BROUSSARD        *
THOMAS G. WILKINSON      *
                       *     *     *

## GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE INTRINSIC EVIDENCE OR, ALTERNATIVELY, NOTICE OF "OTHER ACT" EVIDENCE PURSUANT TO RULE 404(b) OF THE FEDERAL RULES OF EVIDENCE

NOW INTO COURT, through the undersigned Assistant United States Attorneys, comes the United States, and hereby notifies the defendants of its intent to introduce intrinsic evidence of other crimes, wrongs, and acts, in its case-in-chief, or alternatively, notifies the defendants of its intent to introduce other crimes, wrongs, and acts in its case-in-chief pursuant to Rule 404(b) of the Federal Rules of Evidence.

## I.    INTRODUCTION & SUMMARY OF ARGUMENT

From in or around 2002 through 2010, defendant Aaron F. Broussard ("Broussard"), the former Jefferson Parish President, with the assistance of others, including defendant Thomas G. Wilkinson ("Wilkinson") engaged in widespread pattern of abusing his political office for private gain in a number of different ways. The pending indictment alleges three ways in which Broussard

1





sought to enrich or benefit himself or his family by abusing his office: (1) accepting bribes and

payoffs from, among others, Bill Mack ("Mack") of First Communications Company ("FCC"), a

Jefferson Parish vendor, in exchange for his influence and official acts to steer Parish and other

business to FCC; (2) devising a scheme to employ, among others, his girlfriend and later-wife, Karen

Parker ("Parker") with a job paid for by the taxpaying citizens of Jefferson Parish that she was not

qualified and, in fact, did not perform; and (3) rewarding Wilkinson for, among other things,

undertaking personal favors for Broussard including Wilkinson's efforts to use his influence at a

local private school to assist a Broussard family member with the competitive admissions process.

In each of these episodes, Broussard benefitted, including by his family collecting hundreds of

thousands of dollars in unearned salary due to Parker's employment, and tens of thousands of dollars

in bribes from his bribe payor(s). Likewise defendant Wilkinson, the Parish Attorney, benefitted

from the conspiracy he had with Broussard as he enjoyed, among other things, Broussard's retention

as Parish Attorney upon his taking office, and an approximately 84% increase in salary during

Broussard's tenure.

These three instances, however, are not the only instances where Broussard, with the

assistance and/or knowledge of others including Wilkinson, abused his position for private gain. In

fact, Broussard had been using his influence as the Parish President to enrich himself for years –

evidence which, among other things, harmonizes with the charged conspiracy and reflects the corrupt

intent and pattern of conduct of the former Parish President and which the Government intends to

introduce at trial, including:

- Broussard's receipt of other things of value from Jefferson Parish contractors,

> including obtaining a large ownership interest in a company holding Canadian resort property for little or no capital contribution and having the Parish vendors supply the capital to maintain the company and its holdings;

- Misusing thousands of dollars in campaign funds and spending those funds his personal uses; and

- Factual allegations, including abuse of office, relating to charges brought against Broussard by the Louisiana Board of Ethics relating Broussard's tenure as Parish President.

As set forth in more detail below, the nearly identical characteristics (including purpose, time, personnel, and subject matter) between the above-listed wrongful conduct and the charged conduct reflects the intrinsic nature of this evidence – they are merely unlisted overt acts in furtherance of the charged conspiracy. *See infra*, Parts IV.A-C. Under controlling Fifth Circuit law, this evidence is intrinsic to the Indictment and is accordingly admissible. *See id.* Alternatively, these wrongful acts are also admissible under Rule 404(b) of the Federal Rules of Evidence to prove Broussard's intent, knowledge, common plan, and pattern of conduct relating to his repeated abuse of political office. *See infra*, Parts V.A-B.

## II. FACTUAL BACKGROUND

The Court is well aware of the facts of this case and therefore, they will only be repeated to the extent necessary for purposes of this Notice. A more detailed summary of the facts can be found in the pending Indictment and the Government's Opposition to defendant Thomas G. Wilkinson's Motion to Dismiss. *See* Rec. Doc. Nos. 117 (Indictment) and 142 (Opposition to Wilkinson's Motion to Dismiss).

## III. NOTICE OF EVIDENCE OF ADDITIONAL ACTS

Through this pleading, the Government puts the defendants on notice of its intent to admit

3

evidence of the following wrongful acts, all of which are relevant, probative, and necessary to

provide the jury with a complete picture of the overarching conspiracy set forth in the Indictment:[1]

- *Broussard's receipt of a major ownership interest in a company holding Canadian resort property for little or no capital contribution, which was instead supplied by various Parish vendors*

Beginning in or around 2002, a company named Nova Scotia Enterprises, LLC ("NSE"), was

formed. *See* Exhibit A at 1-5 (Articles of Organization and Initial Report of NSE). NSE was a

holding company for several pieces of vacation rental property located in the Canadian province of

Nova Scotia. *See* Ex. A at 11 (Operating Agreement of NSE at Section 2.3, noting purpose of

company is to acquire and own real property). At various times from 2002 through 2010, there were

up to twelve partners in NSE – many of which were Jefferson Parish contractors or prospective

contractors. *See id.* at 32-34 (attachments to NSE Operating Agreement). Broussard was also a

partner in NSE. *See id.* at 34. However, unlike almost every other partner in NSE, Broussard was

given a large, *42% interest* in NSE for a small capital contribution to the company. *See id.* at 34

(reflecting Broussard's ownership interest) & 56 (NSE spreadsheet reflecting contributions made by

NSE partners and noting that Broussard's contribution as approximately $782.60). By contrast,

nearly $50,000 was contributed by several other NSE partners for the upkeep and maintenance of

properties. *See id.* at 56. Significantly, many of the NSE investors who supplied the vast majority

of the funds obtained a much *smaller* ownership interest than Broussard in NSE. *See id.* at 32-34

(reflecting 3% or 6% interest obtained by other partners in NSE). Most importantly and not

coincidentally, during Broussard's tenure, many of the NSE partners, through their various

---

[1]If applicable, a representative sample of some of the documentary evidence the Government seeks to admit relating to these acts is attached here. Additionally, for each of the wrongful acts, the Government anticipates presenting testimonial evidence at trial.

4

corporations, received contracts with, and work in, Jefferson Parish, worth millions of dollars, at the same time they were funding NSE and Broussard's corporate interest in it. Finally, Broussard sought, at the conclusion of his tenure as Parish President, to sell his ownership share in NSE – which was purchased for very little – for nearly $200,000, an extraordinary return on the minimal investment supplied by Broussard. *See id.* at 57-60 (correspondence and promissory note regarding Broussard sale). Thus, in sum, the Government will present evidence reflecting that various Jefferson Parish vendors (who sought and received work when Broussard was Parish President) supplied investments (a thing of value) for a company owned, in large part, and managed by, Broussard. *See* Exhibit A at 1-60.

- *Broussard's misuse of thousands of dollars in campaign contributions to pay for personal expenses*

From 2003, when he was first elected, through 2007, when he was re-elected, Broussard ran a political campaign that took in thousands of dollars annually from contributors. By law, such contributions are made for the purpose of supporting, opposing or otherwise influencing the nomination or election of a person to public office. *See* LSA-R.S 18:1483(6)(a). Broussard was prohibited by law from expending contributions for any personal use unrelated to a political campaign or the holding of public office or party position. *See* LSA-R.S. 18:1505.2(I)(1). Broussard was also required to report, on his annual campaign finance report, all legitimate campaign expenditures, which are defined as payments made for the purpose of supporting election to public office and included monies spent for general operating expenses. *See* LSA-R.S. 18:1483(9)(a). During this period of time (2003-2007), though being prohibited from doing so, Broussard spent tens of thousands of dollars in campaign contributions for personal expenses, all unrelated to political

campaigns or the holding of public office. For example, Broussard spent thousands of dollars, donated by voters, for an annual Lake Tahoe trip/vacation unrelated to his holding of office. *See* Exhibit B at 1-8 (campaign checks for annual Lake Tahoe trip). Broussard likewise spent over $1,000 on maintenance of a fish tank from contributors' wallets. *See id.* at 9-10. Thousands of dollars were also spent by Broussard from his campaign account for the purchase of Mardi Gras tickets and accessories. *See id.* at 11-18 (campaign checks for Mardi Gras purhcases). Broussard also used his campaign account to purchase tens of thousands of dollars in framing and artwork, along with thousands of dollars for sports tickets and wedding, holiday, and other gifts for friends. *See id.* at 19-34 (campaign checks for art expenses), 35-42 (campaign checks for miscellaneous gifts).

- *Broussard's receipt of things of value from Jefferson Parish contractors*

The pending Indictment specifically alleges a bribery scheme between Broussard and Bill Mack, a Jefferson Parish vendor, whereby Mack would corruptly pay Broussard approximately $1,500.00 per month in exchange for Broussard's efforts to steer Mack and his company, First Communications Company, telecommunications work. The Indictment also alleges Wilkinson's knowledge of, and role in, the Broussard-Mack bribery. Broussard's receipt of monies from Mack, however, was not the only time Broussard received things of value from Jefferson Parish vendors. At trial, the Government seeks to present testimonial evidence that Broussard, during his tenure as Parish President, received other things of value from Jefferson Parish contractors including dinners, gifts, and other things of value totaling thousands of dollars.

- *Pending ethics charges against Broussard due to misuse of office*

In December 2010, the Louisiana Board of Ethics filed several charges against Broussard for

6

misusing his office in a form similar to the evidence noted above. On December 17, 2010, the Louisiana Board of Ethics charged Broussard with a violation of Louisiana Revised Statute 42:1111A for receiving an improper thing of value from a Jefferson Parish employee. *See* Exhibit C at 1-3. On that same date, the Louisiana Board of Ethics filed additional charges against Broussard for misuing his political office – specifically, with receiving compensation from a Jefferson Parish contractor. *See* Exhibit C at 4-6. These ethics charges, like the evidence noted above, reflect Broussard's corrupt intent, the same state of mind required for the charged scheme in this case.

## IV.   THE DEFENDANTS' WRONGFUL ACTS ARE INTRINSIC EVIDENCE

In determining whether to admit relevant evidence, courts must first determine whether such evidence is "intrinsic" or "extrinsic." *See, e.g., United States v. Crawley*, 533 F.3d 349, 354 (5th Cir. 2008); *United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005). Generally, evidence of other acts is intrinsic "when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." *Freeman*, 434 F.3d at 374 (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)). Where the evidence is "intrinsic" to the offenses charged, Rule 404(b) does not apply and the evidence is admitted with no further analysis. *See, e.g. Crawley*, 533 F.3d at 354; *United States v. Sumlin*, 489 F.3d 683, 689 (5th Cir. 2007); *Powers*, 168 F.3d at 749-50.

Evidence is also considered intrinsic if a conspiracy is alleged and the Government seeks to admit evidence of wrongful acts of the conspirators not specifically listed in the indictment, but committed in furtherance of the conspiracy. *See, e.g., Watkins*, 591 F.3d at 784-85; *Powers*, 168 F.3d at 749; *Garcia Abrego*, 141 F.3d at 174-76; *see also United States v. Quesada*, 512 F.2d 1043,

1046 (5th Cir. 1975). Such evidence may be admissible as intrinsic evidence as part of the Government's proof to show how the conspiracy came about, how it was structured, the purpose and modus operandi of the conspiracy, and how the defendants became members. *See, e.g., Watkins*, 591 F.3d at 784-85 (citations omitted); *Garcia Abrego*, 141 F.3d at 175 (citations omitted); *United States v. Coleman*, 78 F.3d 154, 156-57 (5th Cir. 1996); *see also* 22 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5239, at 450-51 (1978) ("[i]n cases where the incident offered is a part of the conspiracy alleged in the indictment, the evidence is admissible... because it is not an 'other' crime."). Unlisted acts committed in furtherance of the charged conspiracy are admissible if they are factually similar – *in subject matter, purpose, personnel, and time* – to the specifically listed acts contained in the indictment. *See, e.g., Watkins*, 591 F.3d at 784-85; *United States v. Carvajal*, 206 Fed. Appx. 391, 394 (5th Cir. 2006) (unpublished) (in drug conspiracy, non-pled drug deliveries to co-conspirator, which were then sold to others as part of the charged conduct, created logical link with the charged conspiracy and were thus intrinsic); *Garcia Abrego*, 141 F.3d at 175 (non-pled murders committed by defendant in drug conspiracy case were intrinsic because they were committed in furtherance of the charged enterprise); *see also United States v. Lucas*, 516 F.3d 316, 347 (5th Cir. 2008) (in environmental case involving discharge from septic tanks contained on lots sold by real estate developer, evidence of the developer's bribes to county supervisor in obtaining environmental approvals were overt acts in furtherance of the overall conspiracy and thus admissible).

For example, in *United States v. Watkins*, 591 F.3d 780 (5th Cir. 2009), the Fifth Circuit held that two prior acts of transporting drugs – although not pled in the indictment – were nonetheless admissible as intrinsic evidence to the charged conspiracy because of their similarities. *See* 591 F.3d

8

at 784-86.  Specifically, the Fifth Circuit in *Watkins* noted that the two uncharged drug transports
(1) utilized the same conspirators; (2) involved nearly identical modus operandi; (3) were similar in
execution; and (4) were temporally proximate to the charged conspiracy. *See id.* at 785.  The Fifth
Circuit thus concluded the other acts were done in furtherance of the charged conspiracy and were
accordingly intrinsic.  *Id.*; *see Powers*, 168 F.3d at 749 (non-pled energy transactions between
defendants were intrinsic because of their similarities in structure and because they reflected the
conspiratorial relationship between the defendants); *United States v. Nichols*, 750 F.2d 1260, 1264-
65 (5th Cir. 1985) (non-pled evidence of defendants' earlier efforts to import drugs was intrinsic
evidence based on the similarities between the non-pled acts and the charged conduct); *see also*
*United States v. Matthews*, 1994 WL 660543, at *1-2 (E.D. La. 1994) (non-pled drug transactions
were admissible as overt acts based on their similarities with the listed overt acts).[2]

As applied here, the three episodes of wrongful conduct the Government seeks to admit –
Broussard's improper ownership of NSE paid for by Parish vendors and receipt of other things of
value from Jefferson Parish vendors; Broussard's misuse of his campaign funds; and the pending
ethics charges – are acts committed by Broussard and others (including co-conspirators who will
testify in this case) in furtherance of the charged conspiracy and these acts are therefore intrinsic and

---

[2]This rationale is not just limited to drug cases; in *United States v. McCormick*, 2010 WL
2616624 (3d Cir. 2010) (unpublished), the Third Circuit, in a corruption case involving extortion
and bribes, held that an earlier payment by a city contractor to a public official – which was not
pled in the indictment – was, again, nonetheless admissible as intrinsic evidence. *See* 2010 WL
2616624, at *1-2.  In *McCormick*, the Third Circuit upheld the district court's ruling that the
uncharged bribe payment was intrinsic to the conspiracy charge because it provided important
proof regarding the defendant's membership, purpose, and participation in the charged
conspiracy. *See id.* at *2; *see also United States v. Plaskett*, 2008 WL 441938, at *1 (D.V.I. Feb.
8, 2008) (in corruption case, non-pled evidence of kickback scheme was intrinsic because it
established the defendant's participation in the charged conspiracy).

9

admissible.

### A.    Ownership of Canadian Resort Property & Receipt of Things of Value from Contractors

Broussard's receipt of things of value from Jefferson Parish contractors – including his receipt of an ownership interest in NSE for little contribution – mirrors his acceptance of bribes from Mack, conduct charged in the pending Indictment. *Compare* Exhibit A at 11-60 *with* Rec. Doc. No. 117 at 14-20, 22-23 (allegations and overt acts involving Broussard bribery with Mack). As to subject matter, Broussard's receipt of his ownership interest in NSE – paid for by Jefferson Parish contractors – is no different than the payoffs he was receiving from Mack, albeit in a different, corporate form, as opposed to the individual checks he received from Mack. *Compare* Exhibit A at 11-60 *with* Rec. Doc. No. 117 at 14-20, 22-23. His receipt of dinner, gifts, and other items from Jefferson Parish vendors, again, is no different than his receipt of monies from Mack. As to the temporal relationship, like the charged conduct with Mack, Broussard's relationship with NSE began in 2002, when it was formed. *See* Ex. A at 1-5. The value and ownership Broussard received from NSE (paid for by Parish vendors) took place from in or around 2002 through in or around 2010, which includes the very years Broussard was receiving payoffs from Mack. *See* Ex. A at 1-60. Similarly, the value of the dinners, gifts, etc. Broussard was receiving from vendors took place during his tenure as Parish President, just like the charged conduct. Finally, both the wrongful conduct involved with NSE and other gifts from Parish vendors, on the one hand, and Mack/FCC, on the other hand, involves the same modus operandi: a public official (Broussard) receiving things of value (payoffs/gifts or ownership interests in corporate interests) where the payors receive work from the Parish under Broussard's purview. *Compare* Ex. A at 11-60 *with* Rec. Doc. No. 117 at 14-

10

20, 22-23. The many similarities reflect that Broussard's receipt of things of value from vendors (such as his NSE corporate interest, paid for by vendors seeking and obtaining work in Jefferson Parish), is merely an overt act – and thus admissible as intrinsic evidence – committed in furtherance of the charged conspiracy. *See, e.g., Watkins*, 591 F.3d at 784-85; *Powers*, 168 F.3d at 749-50 (similarities in structure, timing, and personnel between non-pled business transactions and the charged transactions reflected that the non-pled acts were overt acts committed to further the conspiracy); *see also McCormick*, 2010 WL 2616624, at *1-2; *Plaskett*, 2008 WL 441938, at *1; *Matthews*, 1994 WL 660543, at *1-2 (non-pled drug transactions were similar in time, personnel, and execution, and they were thus overt acts committed in furtherance of the charged conspiracy).

**B.      Personal Expenses paid by Campaign Funds**

Likewise, Broussard's improper use of his campaign funds is admissible as an overt act in furtherance of the charged conspiracy. The conspiracy alleges that Broussard "sought to and did abuse his political office... in an effort to personally enrich himself." *See* Rec. Doc. No. 117 at 8. Concomitantly, the pending Indictment alleges that Broussard, with the assistance of others, sought to defraud the Parish and its citizens. *See id.* His misuse of campaign funds – funds derived from donors, including Parish constituents – is exactly the same subject matter as the charged indictment, just with a different payoff mechanism. The personnel between this wrongful episode and the charged conduct includes overlapping personnel, including defendant Broussard and one of his co-conspirators who has now pled guilty, Karen Parker. Additionally, Broussard's co-defendant, Wilkinson, was participated in some of Broussard's events paid for by campaign funds, including the Lake Tahoe trip. Temporally, Broussard's misuse of campaign funds occurred during the same time period as the charged conduct. *See* Ex. B at 1-42. Finally, the purpose between the charged

11

conduct and the misuse of his campaign funds was undoubtedly the same: to enrich Broussard through the abuse of his political office. *See id.* As with his receipt of monies and other things of value from Parish vendors, the similarities between his misuse of campaign funds and the charged conduct reflect that it is an intrinsic overt act in furtherance of the charged conspiracy and, as such, is admissible. *See, e.g., Watkins*, 591 F.3d at 784-85; *Powers*, 168 F.3d at 749-50; *see also McCormick*, 2010 WL 2616624, at *1-2; *Plaskett*, 2008 WL 441938, at *1; *Matthews*, 1994 WL 660543, at *1-2 (non-pled drug transactions were similar in time, personnel, and execution, and they were thus overt acts committed in furtherance of the charged conspiracy).

### C.     Broussard's Ethics Charges

The pending ethics charges lodged against Broussard, along with the substance of those charges, are also overt acts in furtherance of the charged conspiracy. Both involve similar personnel (including Broussard as the hub of the wrongful conduct); subject matter (the pending ethics charges detail Broussard's wrongful receipt of things of value from Parish employees and contractors, just like the bribery charges); timing (the substance of the ethics charges took place from 2007 through 2009, the same years in which Broussard was executing his bribery and fraud scheme); and purpose (again, Broussard seeking to use his political office for personal enrichment). *Compare* Exhibit C at 1-6 *with* Rec. Doc. No. 117. Like the other wrongful conduct noted above, the ethics charges are thus admissible as overt acts in furtherance of the charged conspiracy. *See, e.g., Watkins*, 591 F.3d at 784-85; *Powers*, 168 F.3d at 749-50; *see also McCormick*, 2010 WL 2616624, at *1-2; *Plaskett*, 2008 WL 441938, at *1; *Matthews*, 1994 WL 660543, at *1-2 (non-pled drug transactions were similar in time, personnel, and execution, and they were thus overt acts committed in furtherance of the charged conspiracy).

12

## V.   RULE 404(b) ALTERNATIVELY PERMITS THE ADMISSION OF EVIDENCE OF THE DEFENDANTS' WRONGFUL ACTS

If the Court finds the evidence of the other wrongful acts to be "extrinsic," it must evaluate the admissibility of that evidence through the prism of Rule 404(b) which provides that evidence of "other crimes, wrongs, or acts" may be admissible to show, among other things, "intent, preparation, plan, [and] knowledge." FED. R. EVID. 404(b).  In analyzing the admissibility of Rule 404(b) evidence, the Fifth Circuit follows the two-part test developed in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978).  *See, e.g., United States v. Sanders*, 343 F.3d 511, 517-18 (5th Cir. 2003).  The first prong of the *Beechum* test is to determine whether the evidence is "relevant to an issue other than the defendant's character," such as intent, knowledge, plan, pattern of conduct, or motive.  *See, e.g., United States v. Schmidt*, 229 F.3d 1148, 2000 WL 1239189, at *9-10 (5th Cir. 2000) (unpublished); *Beechum*, 582 F.2d at 911.  If satisfied, the second prong of the *Beechum* test is to determine whether the evidence "possess[es] probative value that is not substantially outweighed by its undue prejudice and... meet[s] the other requirements of rule 403." *Beechum*, 582 F.2d at 911.  The Fifth Circuit has held that "all probative evidence is by its very nature prejudicial" and as a result, should only be excluded "sparingly." *Powers*, 168 F.3d at 459 (citations omitted).

### A.   The Wrongful Schemes Are Admissible to Prove the Defendants' Intent.

Where a conspiracy is charged and the defendants raise the issue of intent—as the defendants have done here[3]—the Fifth Circuit routinely admits extrinsic act evidence because the Government is entitled to introduce the evidence to rebut the defendants' contentions regarding alleged lack of

---

[3] *See* Paul Rioux, *Broussard denies slate of 6 charges; Ex-Jefferson leader: 'It's a beautiful day,'* NEW ORLEANS TIMES-PICAYUNE, February 29, 2012 at B1 (Broussard's attorney stating "[b]ut the thing about it is that [Broussard] didn't do anything improper.") (attached as Exhibit D).

13

intent, especially given the difficulties associated with proving conspiracy charges:

> "[c]harges of conspiracy involve considerations not present in other criminal prosecutions... In every conspiracy case, ... a not guilty plea renders the defendant's intent a material issue and imposes a difficult burden on the government. Evidence of such extrinsic offenses as may be probative of a defendant's state of mind is admissible unless he 'affirmatively takes the issue of intent out of the case.'"

*United States v. Roberts*, 619 F.2d 379, 382-83 (5th Cir. 1980) (alterations not in original) (citations omitted); *Schmidt*, 2000 WL 1239189, at *10 (citation omitted); *see also United States v. Sanders*, 343 F.3d 511, 518 (5th Cir. 2003); *United States v. Gordon*, 780 F.2d 1165, 1174 (5th Cir. 1986); *United States v. Zeuli*, 725 F2d 813, 816 (1st Cir. 1984). Where the extrinsic acts are factually proximate to the charged conduct -- especially as it relates to the issue of intent -- the extrinsic evidence is relevant. *See, e.g., Sanders*, 343 F.3d at 518; *Gordon*, 780 F.2d at 1173 (citing *Beechum*, 582 F.2d at 911); *United States v. Bailey*, 990 F.2d 119, 124 (3d Cir. 1993).

For example, in *United States v. Bailey*, 990 F.2d 119 (3d Cir. 1993), the Third Circuit, in a public official bribery scheme, admitted extrinsic evidence of a non-pled bribe accepted by the defendant, a state legislator, in exchange for official acts, including the public official's support and assistance of a bill pending in the state legislature. *See* 990 F.2d at 124. In determining relevancy, the Third Circuit analyzed the temporal relationship between the non-pled bribe and the charged conduct; the similarities between the two schemes; and whether the defendant placed intent at issue. *See id.* Ultimately, the Third Circuit found the non-pled bribe closely related to the charged conduct because they bore a temporal relationship (both bribes took place during the same legislative session) and were similar in factual matter, since both bribes involved the acceptance of money for the defendant's use of his political office. *See id.* Because the government was required to prove the

14

public official's intent, the Third Circuit held that "[t]he evidence of a prior similar act of accepting money for his actions as a legislator was admissible to show intent and absence of mistake" and, indeed, its admission was "necessary to counter [the defendant's] claim of lack of intent." *Id.* (citation omitted). Scores of other cases, with analogous facts, have reached the same conclusion.[4]

Moreover, in fraud-based cases, courts analyzing relevancy of evidence under *Beechum* have held that where the state of mind required for the charged conduct and the state of mind of the "other acts" is the same, the relevancy test under *Beechum* is met. *See Crawley*, 553 F.3d at 354-55 (citations omitted); *Sanders*, 343 F.3d at 518; *Gordon*, 780 F.2d at 1173-74 ("[a] finding that the offenses involved the same state of mind renders the extrinsic evidence relevant to an issue other than character because it lessens the likelihood that the defendant acted with lawful intent in connection with the charged offense."). Here, as set forth below, the three episodes of wrongful conduct the Government seeks to admit are admissible to prove the intent of Broussard and others because they contain many, and in some cases, identical, parallels with the charged conduct and reflect the defendants' deceitful intent.

## 1. Ownership of Canadian Resort Property

Broussard's receipt of his NSE ownership interest – paid for by Parish vendors – reflects the

---

[4] *See, e.g., United States v. Weston*, 962 F.2d 8, 1992 WL 90554, at *3-4 (4th Cir. 1992) (in corruption case, evidence of other bribery scheme, which was not charged in the indictment, was admissible to prove intent); *United States v. Bruno*, 809 F.2d 1097, 1106 (5th Cir. 1987) (in public corruption case, admission of prior non-pled bribery schemes was relevant to prove intent); *United States v. Jenkins*, 785 F.2d 1387, 1395 (9th Cir. 1986) (in insurance fraud conspiracy, evidence of uncharged, fraudulent actions in connection with prior loans was admissible under Rule 404(b) to prove, among others, intent); *see also United States v. Saada*, 212 F.3d at 223-24 (3d Cir. 2000) (evidence of defendant's involvement in another fraud is admissible to prove, among others things, intent to defraud); *United States v. Primrose*, 718 F.2d 1484, 1491-92 (10th Cir. 1983) (evidence of 45 non-pled kickbacks received by defendant public official was admissible to show intent) (citations omitted).

15

same fraudulent and corrupt intent he had in perpetrating the schemes charged in the indictment. Indeed, the similarities are striking – they involved the same purpose (Broussard to enriching himself based on the abuse of his political office); mode of execution (receiving payoffs/things of value from Parish vendors); personnel (Broussard and various Parish vendors); and time period (Broussard's receipt of these things of value took place from 2002-2010). *Compare* Ex. A at 1-60 *with* Rec. Doc. No. 117 at 14-20, 22-23. His receipt of an ownership interest in NSE is "not tenuous to the charges in the indictment because it involve[s] the acceptance of money for the use of his political office." *Bailey*, 990 F.2d at 124. Moreover, just like Broussard's illegal arrangement with Mack, he sought to structure the NSE deal in a way that "legitimizes" the transaction as a business transaction, as opposed to the corrupt one that it was – a fact that cuts against any anticipated argument by Broussard that he was mistaken in his belief that monies from contractors was prohibited by law. *See, e.g. Jenkins*, 785 F.2d at 1395 ("[t]he fact that [the defendant] used fraudulent means [in a prior bad act] is probative on issues of intent, knowledge, good faith and absence of mistake..."). The intent necessary for Broussard to seek and receive payoffs from Parish vendors like Mack is the identical state of mind necessary for his receipt of a hefty ownership interest in NSE paid for by Parish vendors. The similarities in conduct reflects this corrupt intent and, because Rule 404(b) permits the introduction of wrongful act evidence to prove Broussard's intent, his receipt of an ownership interest in NSE – a thing of value paid for by Parish vendors – is admissible. *See Bailey*, 990 F.2d at 124; *Weston*, 1992 WL 90554, at *2-3; *Bruno*, 809 F.2d at 1106; *Jenkins*, 785 F.2d at 1385; *Primrose*, 718 F.2d at 1491-92.

2.      **Personal Expenses paid by Campaign Funds**

Broussard's fraudulent and corrupt intent, as charged in the Indictment, is further proven by

16

his solicitation of funds from campaign contributors for the ostensible purpose of supporting his election when, in reality, Broussard would use these funds for myriad personal reasons. *See* Exhibit B at 1-42. This uncharged conduct is relevant because it is factually proximate to the charged conduct: it required the same fraudulent intent, during the same time period, as the conduct alleged in the Indictment. Accordingly, under Rule 404(b) of the Federal Rules of Evidence, it is admissible. *See Crawley*, 553 F.3d at 354-55 (where state of mind in perpetrating the non-pled conduct is the same as the charged conduct, extrinsic act evidence is admissible) (citations omitted); *Sanders*, 343 F.3d at 518; *Gordon*, 780 F.2d at 1173-74; *Davis*, 2003 WL 1837708, at *2 (where the extrinsic evidence is similar to the charged conduct, relevancy is "heighten[ed].").

### 3. Broussard's Receipt of Things of Value from Jefferson Parish Vendors

Like his ownership interest in NSE, Broussard's receipt of other things of value from Jefferson Parish vendors reflects the same corrupt and fraudulent intent he had when perpetrating the charged scheme. As with the above-listed wrongful conduct, it is factually proximate – Broussard's already been charged with receiving bribes and payoffs from Bill Mack; the 404(b) evidence the Government seeks to admit here is his receipt of bribes and payoffs, in several forms, from various other Jefferson Parish contractors. The timing is similar – both took place during the years of his parish presidency. Finally, and perhaps most important is that Broussard's state of mind is identical – in receiving bribes from Parish vendors in exchange for his official acts, Broussard employed a corrupt state of mind, as he did with the scheme alleged in the Indicmtnent. Accordingly, under Rule 404(b) and applicable case law, the Government's evidence of Broussard's receipt of things of value is admissible. *See Bailey*, 990 F.2d at 124; *Weston*, 1992 WL 90554, at *2-3; *Bruno*, 809 F.2d at 1106; *Jenkins*, 785 F.2d at 1385; *Primrose*, 718 F.2d at 1491-92.

### 4.   Broussard's Ethics Charges

Like his receipt of an ownership interest in NSE, the pending ethics charges — which detail Broussard's improper receipt of things of value from Parish vendors or employees — reflect many similarities with the charged conduct.   These similarities include the same purpose; mode of execution; personnel; and timing. Because Broussard required the same fraudulent to undertake his bribery scheme with Mack as he did with the substance of the ethics charges, this evidence is admissible to demonstrate Broussard's intent under Rule 404(b).  *See Crawley*, 553 F.3d at 354-55 (where state of mind in perpetrating the non-pled conduct is the same as the charged conduct, extrinsic act evidence is admissible) (citations omitted); *Sanders*, 343 F.3d at 518; *Gordon*, 780 F.2d at *1173-74; *Davis*, 2003 WL 1837708, at *2 (where the extrinsic evidence is similar to the charged conduct, relevancy is "heighten[ed].").

### B.   The Wrongful Schemes Are Also Admissible to Prove the Defendants' Knowledge and Pattern of Conduct.

Courts also routinely admit evidence of non-pled schemes to prove the knowledge of the defendants, including knowledge of a particular industry or knowledge of how the charged scheme or operation functioned.  *See, e.g. United States v. Marti*, 294 Fed. Appx. 439, 446-47 (11th Cir. 2008) (unpublished) (in healthcare fraud and kickback scheme, admitting extrinsic evidence of separate, non-pled scheme to prove the defendant's knowledge of doctors and healthcare clinics); *United States v. Nguyen*, 504 F.3d 561, 574 (5th Cir. 2007) (admitting extrinsic evidence of real estate scheme to prove intent and knowledge in charged real estate scheme); *United States v. Williams*, 900 F.2d 823, 825-27 (5th Cir. 1990) (admitting extrinsic evidence of similar offense to prove, among other things, knowledge of the scheme). For example, in *United States v. Nguyen*, 504

18

F.3d 561 (5th Cir. 2007), the Fifth Circuit admitted evidence of two fraudulent and non-pled real estate transactions to show that the charged real estate scam followed a similar pattern and demonstrated the defendant's intent and knowledge of the industry and the charged operation. *See* 504 F.3d at 574. Even though the uncharged real estate transactions were separate transactions, the *Nguyen* court found that "the evidence of [the uncharged real estate scams] demonstrated how the operation worked and therefore established [the defendant's] knowledge and intent." *Id.* at 574.

Courts have additionally admitted evidence of non-pled schemes to prove that the defendants employed a common plan or pattern of conduct charged in the indictment. *See United States v. Aguilar*, 59 Fed. Appx. 326, 329, 2003 WL 509671, at *3 (10th Cir. 2003) (unpublished) (in case charging defendant with aiding and abetting marriage for the purpose of evading immigration laws, evidence of defendant's prior advice and other attempts to arrange marriages for illegal aliens was admissible to prove common plan); *United States v. Murphy*, 768 F.2d 1518, 1535 (7th Cir. 1985) (in extortion case involving state judge who extorted defendants and accepted bribes in connection with fixing cases, evidence that judge had received envelopes of cash on a monthly basis was admissible prove a common plan); *United States v. Adcock*, 558 F.2d 397, 401-02 (8th Cir. 1977) (in extortion and tax case, testimony concerning genesis of extortion scheme was admissible to show common plan); *United States v. Sims*, 430 F.2d 1089, 1092 (6th Cir. 1970) (in bribery case, testimony implicating the defendant in similar bribery schemes was admissible to show common design). As set forth below, all three episodes of wrongful conduct are relevant to prove Broussard's knowledge and employment of a common plan or pattern of conduct.

### 1.    Ownership of Canadian Resort Property & Receipt of Other Things of Value From Jefferson Parish Vendors

As noted above, Broussard sought to obtain things of value from Jefferson Parish vendors in a concealed manner. The indictment alleges one way in which Broussard did this: receiving monthly checks from a vendor in which he sought to mask the purpose of the payments. *See* Rec. Doc. No. 117 at 14-20, 22-23. His receipt of an ownership interest in NSE, as well as his receipt of other things of value (gifts, etc.) from vendors are other forms of the same conduct: receiving something of value paid for by Jefferson Parish vendors. *See* Ex. A at 1-60. This conduct reflects Broussard's knowledge of concealment of his illegality, as well as his employment of a similar pattern or plan of conduct to abuse his office for private gain while attempting to mask the purpose of the payoffs in an effort to hide the wrongfulness of his arrangements. *See Aguilar*, 59 Fed. Appx. at 329, 2003 WL 509671, at *3; *Murphy*, 768 F.2d at 1535; *Adcock*, 558 F.2d at 401-02; *Sims*, 430 F.2d at 1092 (in bribery case, testimony implicating the defendant in similar bribery schemes was admissible to show common design). Accordingly, because it reflects Broussard's knowledge and pattern of conduct, it is admissible under Rule 404(b). *See id.*

### 2.    Personal Expenses paid by Campaign Funds

The wrongful spending of campaign funds for personal uses demonstrates the knowledge of Broussard in abusing the trust placed in him as a public official in a way that continued to enrich Broussard, just as he did in the charged conspiracy. *See Marti*, 294 Fed. Appx. at 447; *Nguyen*, 504 F.3d at 574. Additionally, the expenditures of personal funds from campaign contributors, just like the placement of his unqualified love interest in a specially-created job funded by taxpayer monies, fits a plan or pattern of conduct employed by Broussard: abuse his office in a way that enriches him.

20

Such a structure reflects a plan or pattern of conduct Broussard implemented to achieve his corrupt intentions. *See Aguilar*, 59 Fed. Appx. at 329, 2003 WL 509671, at *3; *Murphy*, 768 F.2d at 1535; *Adcock*, 558 F.2d at 401-02; *Sims*, 430 F.2d at 1092.

### 3.   Broussard's Ethics Charges

As with his ownership in NSE, the substance of Broussard's ethics charges – his receipt of things of value from Jefferson Parish vendors and employees – demonstrates the overarching purpose and pattern of conduct in this case: a public official seeking to abuse his office for private gain. Once again, the knowledge of *how* to structure a transaction to mask its illegality is demonstrated by the ethics charges, just as he attempted to do with the payoffs he was receiving from Mack and his company, FCC. *See Aguilar*, 59 Fed. Appx. at 329, 2003 WL 509671, at *3; *Murphy*, 768 F.2d at 1535; *Adcock*, 558 F.2d at 401-02; *Sims*, 430 F.2d at 1092. Similarly, the pattern of conduct between this episode and the charged conduct is the same. *See id.* Accordingly, this evidence is admissible. *See id.*

### C.   Evidence of the Defendants' Acts is More Probative Than Prejudicial.

Probative evidence is, by its very nature, prejudicial; it is only when the prejudicial effect *substantially outweighs* the probative value of the evidence that it should be excluded. *See, e.g.* FED. R. EVID. 403; *Beechum*, 582 F.2d at 911-18 (emphasis added). Indeed, probative evidence should only be excluded when it is of such an "inflammatory nature that [it] could lead the jury to decide the case on an improper basis." *United States v. Dowl*, 2009 WL 1507412, at *7 (E.D. La. 2009). The Fifth Circuit has held that, when making a determination under Rule 403 as to extrinsic evidence, trial courts should review the similarities between the non-pled evidence and the charged scheme; the more factually proximate the evidence is, the more likely the probative value outweighs

any prejudicial effect. *See, e.g. United States v. Mendoza*, 587 F.3d 682, 689 (5th Cir. 2009);

*Beechum*, 582 F.2d at 915. Here, the highly probative nature of the four types of wrongful conduct

– which include nearly identical schemes and conduct as those charged in the Indictment[5] –

unquestionably outweighs any prejudicial effect the defendants may assert. *See United States v.*

*Wolford*, 2010 WL 2802404, at *3-4 (5th Cir. July 15, 2010) (unpublished) (evidence of

pornographic images of children, as well as transcripts of anonymous online internet chats relating

to the defendant's interest in having sex with minor children, were more probative than prejudicial

in case against defendant charged with enticing a minor to have sex) (citation omitted); *Mendoza*,

587 F.3d at 689 (in drug case, evidence of defendant's prior involvement in conspiracy to sell drugs

was more probative than prejudicial, particularly because the defendant placed his intent at issue and

because of the factual and temporal similarities between the uncharged conduct and the charged

conduct) (citations omitted); *United States v. Shows*, 307 Fed. Appx. 818, 822, 2009 WL 139575,

at *3-4 (5th Cir. 2009) (unpublished) (in tax evasion case, evidence of defendant's lack of prior year

tax returns were more probative than prejudicial because, in part, they negated the defendant's good

faith defense) (citation omitted); *United States v. Roberts*, 619 F.2d 379, 383-84 (5th Cir. 1980) (in

gambling prosecution, prior convictions of defendant for crimes identical to those for which he was

on trial were more probative than prejudicial).[6] Given the high hurdles of proving the Government's

---

[5] *See supra*, Parts IV.A-C.

[6] *See also Bailey*, 990 F.2d at 124-25 (evidence of public official's acceptance of a bribe was more probative than prejudicial and "was not the sort which excites emotionalism in a jury so as to lead [] to an irrational verdict"); *United States v. Zeuli*, 725 F.2d 813, 816-17 (1st Cir. 1984) (in extortion case, evidence of uncharged extortion scheme was more probative than prejudicial because it was relevant to intent and it would not lead to a genuine risk that the "emotions of the jury will be excited to irrational behavior").

22

case, the many similarities between the non-pled conduct and the charged scheme,[7] and controlling Fifth Circuit case law, the probative nature of this evidence outweighs any prejudicial effect. *See id.* Moreover, to the extent the Court is concerned about this evidence, the Fifth Circuit has repeatedly approved the use of limiting instructions to ward off any potential prejudice. *See, e.g. Shows,* 307 Fed. Appx. at 822, 2009 WL 139575, at *3-4; *Crawley,* 533 F.3d at 355; *Nguyen,* 504 F.3d at 574; *Sanders,* 343 F.3d at 518; *United States v. Cihak,* 137 F.3d 252, 258 (5th Cir. 1998). Accordingly, Rule 403 does not serve as a basis to exclude the probative evidence described herein.

## VI.   THE EVIDENCE MAY BE ADMITTED WITHOUT A PRE-TRIAL HEARING

In *Huddleston v. United States,* 485 U.S. 681 (1988), the Supreme Court concluded that a court may issue a ruling on evidence seeking to be admitted under Rule 404(b) without a pre-trial hearing. *See* 485 U.S. at 687-88. In that case, the Court held that "the district court need not itself make a preliminary finding that the Government has proved the 'other act' by a preponderance of the evidence before it submits 'similar acts' and other Rule 404(b) evidence to the jury." *Id.* In that opinion, the Court admitted similar prior property crimes, without proof thereof by a preponderance of the evidence, to show guilty knowledge, system, and intent. *See Huddleston,* 485 U.S. at 687-88 ("[t]he text ... [of Rule 404(b)] ... contains no intimation ... that *any preliminary showing* is necessary before such evidence may be introduced for a proper purpose.") (emphasis added). To meet its low burden under *Huddleston,* the government need only provide "*some evidence that the defendant committed the bad act.*" *United States v. Crawley,* 533 F.3d 349, 354 (5th Cir. 2008); *United States v. Gonzalez-Lira,* 936 F.2d 184, 189 (5th Cir. 1991); *see also Beechum,* 582 F.2d at 913 (if a jury could "reasonably find" the fact to exist, that fact may be admitted into evidence).

---

[7] *See supra,* Part IV.

Here, a pre-trial hearing as to the proof of these acts is unnecessary for several reasons. First, the substantial amount of evidence attached hereto clearly meets the low burden that *Huddleston* and *Beechum* set; that is, the evidence establishes that, among others, Broussard committed or assisted in committing, these wrongful acts. *See, e.g.,* Exs. A at 1-60 (NSE corporate records reflecting Broussard's role); B at 1-42 (Broussard's campaign checks); C at 1-6 (Ethics charges pending against Broussard). Additionally, all of the attached evidence has been produced in discovery in this case or is otherwise publicly-available. Consequently, the Court can readily determine the admissibility of the items attached before trial and without conducting a pre-trial hearing. *See, e.g. Huddleston,* 485 U.S. at 690-91; *Crawley,* 533 F.3d at 354; *Dowl,* 2009 WL 1507412, at *4-7 (admitting intrinsic and extrinsic evidence without a pre-trial hearing).[8]

---

[8]Moreover, to the extent Broussard testifies in his own defense, the rules of evidence and applicable authorities permit the cross-examination of his with respect to these bad acts. *See, e.g.* FED. R. EVID. 608(b) (permitting the introduction of specific instances of conduct for cross-examination purposes if the acts concern the witness's character for truthfulness); FED. R. EVID. 611(b) (cross-examination can concern matters affecting the credibility of the witness); *United States v. Akpan,* 407 F.3d 360, 373 (5th Cir. 2005) (a defendant "forfeit[s] the protection of Rule 404(b) when [the defendant] place[s] his character at issue by testifying at trial.") (alterations not in original). Here, the wrongful acts noted above clearly concern Broussard's credibility and character for truthfulness. *See, e.g. United States v. Oriyomi,* 449 Fed. Appx. 681, 682 (9th Cir. Aug. 29, 2011) (unpublished) "[e]vidence of prior frauds is considered probative of the witness's character for truthfulness or untruthfulness" under Rule 608(b)) (citation omitted); *Akpan,* 407 F.3d at 373 (perjury, fraud, swindling, forgery, bribery, and embezzlement are instances of misconduct clearly probative of truthfulness) (citation omitted).

24

## VII.    CONCLUSION

For the reasons mentioned above, the United States respectfully submits that the evidence

of the defendants' acts, as set forth above, should be admitted during its case-in-chief as being

relevant and extremely probative as they relate to the acts charged in the pending Indictment.

Dated: August 31, 2012                        Respectfully Submitted,


                                              JIM LETTEN
                                              UNITED STATES ATTORNEY


                                              /s/ Matthew S. Chester
                                              MATTHEW S. CHESTER
                                              Texas Bar No. 24045650
                                              BRIAN M. KLEBBA
                                              New York Bar No. 2938728
                                              DANIEL P. FRIEL
                                              Massachusetts Bar No. 660583
                                              Assistant United States Attorneys
                                              650 Poydras Street, Suite 1600
                                              New Orleans, Louisiana 70130
                                              Telephone: (504) 680-3000

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Matthew S. Chester
Matthew S. Chester
Assistant U.S. Attorney

26

# EXHIBIT A



# UNITED STATES OF AMERICA
## State of Louisiana

### Fox McKeithen
#### SECRETARY OF STATE

As Secretary of State, of the State of Louisiana, I do hereby Certify that

a copy of the Articles of Organization and Initial Report of

**NOVA SCOTIA ENTERPRISES, L.L.C.**

Domiciled at KENNER, LOUISIANA,

Was filed and recorded in this Office on May 20, 2002,

And all fees having been paid as required by law, the limited liability company is authorized to transact business in this State, subject to the restrictions imposed by law, including the provisions of R.S. Title 12, Chapter 22.

In testimony whereof, I have hereunto set my hand and caused the Seal of my Office to be affixed at the City of Baton Rouge on,

May 20, 2002



BFR 35274067K
*Secretary of State*

CERTIFICATE SS 102 S (R-3/88)

FOX MCKEITHEN
Secretary of State.
Received & Filed
DATE  MAY 2 0 2002

ARTICLES OF ORGANIZATION

OF

NOVA SCOTIA ENTERPRISES, L.L.C.

UNITED STATES OF AMERICA

STATE OF LOUISIANA

PARISH OF JEFFERSON

**************************************************************************

BE IT KNOWN, that on this 9th day of May, 2002, before me, the undersigned, a Notary Public, in and for the Parish of Jefferson, State of Louisiana, duly commissioned and qualified, personally came and appeared, AARON F. BROUSSARD, a person of the full age of majority and domiciled in the Parish of Jefferson, State of Louisiana of who declared under oath and to me, Notary, in the presence of the undersigned competent witnesses, that he hereby avails himself of the provisions of the Louisiana Limited Liability Company Law (LSA R.S. 12:1301, et seq.), and does hereby organize a limited liability company pursuant to said law, under and in accordance with the following Articles of Organization to-wit:

## ARTICLE I

The name of this limited liability company is NOVA SCOTIA ENTERPRISES, L.L.C.

## ARTICLE II

The purpose of this limited liability company is to engage in any lawful activity for which limited liability companies may be formed under Chapter 22 of Title 12 of the Louisiana Revised Statutes Annotated.

## ARTICLE III

The company shall be managed by a manager or managers.

## ARTICLE IV

NOVA SCOTIA ENTERPRISES, L.L.C., is organized for a term beginning with the effective date of the organization of NOVA SCOTIA ENTERPRESES, L.L.C. and ending on December 31, 2099.

## ARTICLE V

The full name and street address of the organizer is AARON F. BROUSSARD, 3329 Florida Avenue, Kenner, Louisiana 70065.

THUS DONE AND PASSED, in multiple originals, in the Parish of Jefferson, State of Louisiana, on the date, herein first above written, in the presence of the undersigned competent witnesses who have hereto signed their names with the said appearer and me, Notary, after due reading of the whole.

WITNESSES:

_____
AARON F. BROUSSARD

_____
NOTARY PUBLIC

# INITIAL REPORT

## OF

## NOVA SCOTIA ENTERPRISES, L.L.C.

1. The name of this Limited Liability Company is NOVA SCOTIA ENTERPRISES, L.L.C.

2. The location and Municipal Address of this limited liability company's registered office is 3329 Florida Avenue, Kenner, Louisiana 70065.

3. The full name and Municipal Address of the limited liability company's registered agent is: AARON F. BROUSSARD, 3329 Florida Avenue, Kenner, Louisiana 70065.

4. The full name and Municipal Address of the limited liability company's first manager is:

   A.   AARON F. BROUSSARD
        3329 Florida Avenue
        Kenner, Louisiana 70065

The organizer hereby places his signature on this Initial Report on this 9th day of May, 2002.

AARON F. BROUSSARD

## AFFIDAVIT OF ACKNOWLEDGMENT
## AND ACCEPTANCE OF APPOINTMENT BY
## DESIGNATED REGISTERED AGENT

STATE OF LOUISIANA

PARISH OF JEFFERSON

On this 9th day of May, 2002, before me, a Notary Public in and for the State and

Parish as aforesaid, personally came and appeared, AARON F. BROUSSARD, a person

of the full age of majority and domiciled in the Parish of Jefferson, State of Louisiana,

who is to me known, and who, being duly sworn, did hereby acknowledge to me that he

does hereby accept the appointment of Registered Agent for and on behalf of NOVA

SCOTIA ENTERPRISES, L.L.C., which is a limited liability company authorized to

transact business in the State of Louisiana pursuant to the provisions of the Title 12,

Chapter 22 of the revised statutes of the State of Louisiana.

_____
NOVA SCOTIA ENTERPRISES, L.L.C.

SWORN TO AND SUBSCRIBED BEFORE ME
THIS 9TH DAY OF MAY, 2002

_____
NOTARY PUBLIC

MAY-20-2002  16:51                504 467 1866                 96%                  P.03

# OPERATING AGREEMENT OF NOVA SCOTIA ENTERPRISES, L.L.C.

THIS OPERATING AGREEMENT (the "Agreement") is entered into on this 24th day of July, 2002, by and between Nova Scotia Enterprises, L.L.C., and the Members of the Company.

WHEREAS, on May 20, 2002, the Company was formed as a limited liability company pursuant to the provisions of the Louisiana Limited Liability Law; and

WHEREAS, the Company was formed for the purpose of engaging in any lawful activity of business permitted to a limited liability company formed under the Act, including but not limited to the acquisition, rental, and management, of real estate, more particularly, certain real estate located in the Province of Nova Scotia, Country of Canada.

NOW, THEREFORE, in consideration of the premises, and of good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereby mutually agree to be legally bound as follows:

## SECTION I
## Defined Terms

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"*Adjusted Capital Account Deficit*" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

    (i)    the deficit shall be decreased by the amounts which the Interest Holder is obligated to restore pursuant to Section 4.4.2 or is deemed obligated to restore pursuant to Regulation Sections 1.704-2(g)(1) and (i)(5) (i.e., the Interest Holder's share of Minimum Gain and Member Minimum Gain); and

    (ii)    the deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"*Adjusted Capital Balance*" means, as of any day, an Interest Holder's total Capital Contributions less all amounts actually distributed to the Interest Holder pursuant to Sections 4.2.3.4.1 and 4.4 hereof. If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance relates to the Interest transferred.

"*Agreement*" means this Operating Agreement, as amended from time to time.

1

"*Capital Account*" means the account to be maintained by the Company for each Interest Holder in accordance with the following provisions:

(i)     an Interest Holder's Capital Account shall be credited with the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's allocable share of Profit and any item in the nature of income or gain specially allocated to the Interest Holder pursuant to the provisions of Section IV (other than Section 4.3.3); and

(ii)    an Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder, the Interest Holder's allocable share of Loss, and an item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Section IV (other than Section 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 4.3.3, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted in a manner consistent with that Regulation.

"*Capital Contribution*" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"*Capital Proceeds*" means the gross receipts by the Company from a Capital Transaction.

"*Capital Transaction*" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds.

"*Cash Flow*" means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as

026

determined by the Manager.  Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

"*Code*" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"*Company*" means the limited liability company formed in accordance with this Agreement.

"*Interest*" means a Person's share of the Profits and Losses of, and the right to receive distributions and allocations from, the Company.

"*Interest Holder*" means any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member.

"*Involuntary Withdrawal*" means, with respect to any Member, the occurrence of any of the following events:

     (i)     the Member makes an assignment for the benefit of creditors;

     (ii)     the Member files a voluntary petition or bankruptcy;

     (iii)     the Member is adjudged bankruptcy or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

     (iv)     the Member files a petition seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

     (v)     the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

     (vi)     Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

     (vii)     any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii)   if the Member is an individual, the Member's death or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

(ix)   if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(x)   if the Member is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(xi)   if the Member is a corporation, the dissolution of the corporation or the revocation of its charter;

(xii)   if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the Company; or

(xiii)   the Member fails to make an Initial Capital Contribution, or Additional Capital Contribution as provided for in Sections 3.1 and 3.2.

"*Member*" means each Person signing this Agreement and any Person who subsequently is admitted as a Member of the Company.

"*Member Loan Nonrecourse Deductions*" means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Regulation Section 1.704-2(i).

"*Member Minimum Gain*" has the meaning set forth in Regulation Section 1.704-2(i) for "partner nonrecourse debt minimum gain".

"*Membership Rights*" means all of the rights of a Member in the Company, including a Member's: (i) Interest; (ii) right to inspect the Company's books and records; and (iii) right to vote on matters coming before the Company.

"*Minimum Gain*" has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

"*Negative Capital Account*" means a Capital Account with a balance of less than zero.

"*Nonrecourse Deductions*" has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions of a taxable year of the Company equals the excess, if any, of net increase, if any, in the amount of distributions during such year of proceeds of a Nonrecourse Liability that are allocable to an increase in Minimum Gain, determined according to the provisions of Regulation Section 1.704-2(c).

4

028

"*Nonrecourse Liability*" has the meaning set forth in Regulation Section 1.704-2(b)(3).

"*Percentage*" means, as to a Member, the Percentage set forth after the Member's name on Exhibit A, as amended from time to time, and, as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest.

"*Person*" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"*Positive Capital Account*" means a Capital Account with a balance greater than zero.

"*Profit*" and "*Loss*" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i)     all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

(ii)     any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; and

(iii)     any expenditures of the Company described in Code Section 705(a)(2)(B), (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

(iv)     gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

(v)     in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi)     notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit and Loss.

"*Regulation*" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

5

029

*"Secretary"* means the Secretary of State of Louisiana.

*"Transfer"* means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, disposition, or other transfer, and, when used as a verb, means voluntary to sell, hypothecate, pledge, assign, dispose of, or otherwise transfer.

*"Voluntary Withdrawal"* means a Member's disassociation with the Company by means other than a Transfer or an Involuntary Withdrawal.

## SECTION II
### Formation and Name: Office; Purpose; Term

2.1 *Organization.* The parties have organized a limited liability company pursuant to the LLC Law and the provisions of this Agreement.

2.2 *Name of the Company.* The name of the Company shall be Nova Scotia Enterprises, L.L.C. The Company may do business under that name and under any other name or names which the Manager selects. If the Company does business under a name other than that set forth in its Articles of Organization, then the Company shall file a trade name certificate as required by law.

2.3 *Purpose.* The Company is organized to purchase, acquire, buy, sell, own, trade in, hold, develop, lease, manage, subdivide, and otherwise deal in and with real property and improvements and to do any and all things necessary, convenient, or incidental to that purpose.

2.4 *Term.* The term of the Company shall begin upon the date of the Articles of Organization and Initial Report by the Secretary and shall continue until December 31, 2099, unless its existence is sooner terminated pursuant to Section VII of this Agreement.

2.5 *Registered Office.* The registered office of the Company in the State of Louisiana shall be located at 3329 Florida Avenue, Suite 220, Kenner, Louisiana 70065 or at any other place within the State of Louisiana which the Manager selects.

2.6 *Registered Agent.* The name and address of the Company's registered agent in the State of Louisiana shall be Aaron F. Broussard, 3329 Florida Avenue, Suite 220, Kenner, Louisiana 70065.

2.7 *Members.* The name, present business address, taxpayer identification number, Class, and Percentage of each Member are set forth on Exhibit A.

2.7.1 The Class A Members shall have a 54% Membership Interest collectively and shall be accorded the rights and abide by the obligations of Class A Members as contained in this Agreement.

6

030

2.7.2   The Class B Members shall have a 46% Membership Interest collectively and shall be accorded the rights and abide by the obligations of Class B Members as contained in this Agreement.

## SECTION III
### Members; Capital; Capital Accounts

3.1   *Initial Capital Contributions.*  Upon the execution of this Agreement, the Class A Members shall contribute to the Company cash in the amounts respectively set forth on Exhibit A.

3.2   *Additional Capital Contributions.*

3.2.1 If the Manager at any time or from time to time determines that the Company requires additional Capital Contributions, then the Manager shall give notice to each Interest Holder of (i) the total amount of additional Capital Contributions required, (ii) the reason the additional Capital Contribution is required, (iii) each Interest Holder's proportionate share of the total additional Capital Contribution (determined in accordance with this Section), and (iv) the date each Interest Holder's additional Capital Contribution is due and payable, which date shall be thirty (30) days after the notice has been given. It is anticipated that Capital Contributions shall be required from the Class A Members beginning in the year 2002 through the year 2011.  At that time, the Promissory Note given to the Seller for the purchase price of that certain property known as "Riverbend Lodge", shall be paid in full.  Subsequent thereto, and beginning in the year 2012, all Class A and Class B Members, shall be required to make Capital Contributions, if required, in proportion to the Ownership Interest of each Interest Holder.

3.2.2 Except as provided in Section 3.2.1, no Interest Holder shall be required to contribute any additional capital to the Company, and no Interest Holder shall have any personal liability for any obligation of the Company.

3.2.3 If an Interest Holder fails to pay when due all or any portion of any Capital Contribution, the Manager shall request the nondefaulting Interest Holder's Capital Contribution (the "Unpaid Contribution"). To the extent the Unpaid Contribution is contributed by any other Interest Holder, the defaulting Interest Holder's Percentage shall be reduced and the Percentage of each Interest Holder who makes up the Unpaid Contribution shall be increased, so that each Interest Holder's Percentage is equal to a fraction, the numerator of which is that Interest Holder's total Capital Contribution and the denominator of which is the total Capital Contributions of all Interest Holders.  The Manager shall amend Exhibit A accordingly.  This remedy is in addition to any other remedies allowed by law or by this Agreement.  Additionally, if an Interest Holder fails to pay when due, all or any portion of any Capital Contribution, the Manager, may undertake the sale of the Interest of that Member, to any Person, firm, or entity, including any other Interest Holder, at a reasonable price.  The Interest Holder who fails to pay when due, all or any portion of any Capital Contribution, hereby consents to the transfer of that Interest Holder's Percentage.  The Interest Holder acquiring the prior Interest

7

031

Holder's Percentage shall become a new Member and the Manager shall amend Exhibit A accordingly.

     3.3   *No Interest on Capital Contributions.* Interest Holders shall not be paid interest on their Capital Contributions.

     3.4   *Return of Capital Contributions.* Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive any return of any Capital Contribution.

     3.5   *Form of Return of Capital.* If an Interest Holder is entitled to receive a return of a Capital Contribution, the Interest Holder shall not have the right to receive anything but Cash in return of the Interest Holder's Capital Contribution.

     3.6   *Capital Accounts.* A separate Capital Account shall be maintained for each Interest Holder.

     3.7   *Loans.* Any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Company and the Member agree.

<div align="center">

**SECTION IV**
**Profit, Loss, and Distributions**

</div>

     4.1   *Distributions of Cash Flow and Allocations of Profit or Loss Other Than Capital Transactions.*

     4.1.1 *Profit or Loss Other Than from a Capital Transaction.* After giving effect to the special allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with the provisions of Sections 4.2.1 and 4.2.2) shall be allocated to the Interest Holders designated as Class A Members in full for the taxable years 2002 through 2011. Subsequent thereto, and beginning in the year 2012, Profit or Loss shall be allocated to all Interest Holders in proportion to their Percentage Ownership Interest.

     4.1.2 *Cash Flow.* Cash Flow for each taxable year of the Company from 2002 through 2011 shall be distributed in full to the Interest Holders designated as Class A Members no later than forty-five (45) days after the end of the taxable year. Subsequent thereto, and beginning in the year 2012, Cash Flow shall be distributed to the Interest Holders in proportion to their Percentage Ownership Interest.

     4.2   *Distributions of Capital Proceeds and Allocation of Profit or Loss from a Capital Transaction.*

<div align="center">

8

032

</div>

4.2.1 *Profit.*  After giving effect to the special allocations set forth in Sections 4.3, profit from a Capital Transaction shall be allocated as follows:

4.2.1.1     If one or more Interest Holders has a Negative Capital Account, to those Interest Holders, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been reduced to zero.

4.2.1.2     Any profit not allocated pursuant to Section 4.2.1.1 shall be allocated to the Interest Holders so that their Capital Account Balances shall be in proportion to, and to the extent of, the amounts distributable to them pursuant to Sections 4.2.3.4.1 and 4.2.3.4.2.

4.2.1.3     Any profit in excess of the foregoing allocations shall be allocated to the Interest Holders in proportion to their Percentages.

4.2.2 *Loss.*  After giving effect to the special allocations set forth in Section 4.3, loss from a Capital Transaction shall be allocated as follows:

4.2.2.1     If one or more Interest Holders has a Positive Capital Account, to those Interest Holders, in proportion to their Positive Capital Accounts, until all Positive Capital Accounts have been reduced to zero.

4.2.2.2     Any loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 4.2.2.1 shall be allocated to the Interest Holders in proportion to their Percentages.

4.2.3 *Capital Proceeds.*  Capital Proceeds shall be distributed and applied by the Company in the following order and priority:

4.2.3.1     to the payment of all expenses of the Company incident to the Capital Transaction; then

4.2.3.2     to the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Interest Holder); then

4.2.3.3     to the establishment of any reserves which the Manager deems necessary for liabilities or obligations of the Company; then

4.2.3.4     the balance shall be distributed as follows:

4.2.3.4.1   to the Interest Holders in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

4.2.3.4.2   the balance, to the Interest Holders in proportion to their Percentages.

9

033

4.3    *Regulatory Allocations.*

4.3.1    *Qualified Income Offset.*  No Interest Holder shall be allocated Losses or deductions if the allocation causes the Interest Holder to have an Adjusted Capital Account Deficit.  If an Interest Holder received (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible.  This Section 4.3.1 is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.3.2    *Minimum Gain Chargeback.*  Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain or Member Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Section IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share (i) of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g)(2), or (ii) Member Minimum Gain, computed in accordance with Regulation Section 1.704-2(i)(5).  Allocations of gross income and gain pursuant to this Section 4.3.2 shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain or Member Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year.  It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2 shall constitute a "minimum gain chargeback" under Regulation Sections 1.704-2(f) or 1.704(i)(4), as applicable.

4.3.3    *Contributed Property and Book-Ups.*  In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution).  If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder.  Any elections or other decisions relating to such Code Section 704(c) allocations shall be made by the Manager.  Allocations pursuant to this Section 4.3.3 are solely for purposes of federal, state and local taxes and shall not be taken into

10

034

account in computing any Interest Holder's Capital Account or share of Profit or Loss or any other item in the nature of income or gain or expense or loss.

4.3.4 *Code Section 754 Adjustment.* To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3.5 *Nonrecourse Deductions.* Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages.

4.3.6 *Member Loan Nonrecourse Deductions.* Any Member Loan Nonrecourse Deduction for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deduction is attributable in accordance with Regulation Section 1.704-2(b).

4.3.7 *Guaranteed Payments.* To the extent any compensation paid to any Member by the Company, including any fees payable to any Member pursuant to Section 5.3 hereof, is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

4.3.8 *Unrealized Receivables.* If an Interest Holder's Interest is reduced (provided the reduction does not result in a complete termination of the Interest Holders' Interest), the Interest Holder's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Interest Holder, be specially allocated among the Interest Holders in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture. Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the Manager.

4.4 *Liquidation and Dissolution.*

11

035

4.4.1   If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to Sections 4.1 or 4.2 and any items in the nature of income, gain. Losses or deductions specially allocated in accordance with Section 4.3, if any, and distributions, if any, of cash or property pursuant to Sections 4.1 and 4.2.3.

4.4.2   No Interest Holder shall be obligated to restore a Negative Capital Account.

4.5   *General.*

4.5.1   Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Manager.

4.5.2   If any assets of the Company are distributed in kind to the Interest Holders, other assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest in indivision with all other Interest Holders so entitled.  Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Manager.  The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 or Section 4.3, as applicable, and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the distribution of the assets in liquidation pursuant to Section 4.4.

4.5.3   All Profit and Loss shall be allocated, and all distributions shall be made to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss, or proceeds attributable to a Capital Transaction or to any other extraordinary nonrecurring items of the Company.

4.5.4   The Manager is hereby authorized, upon the advice of the Company's tax counsel, to amend this Section IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to an Interest Holder without the Interest Holder's prior written consent.

4.5.5   *Withholding.*  All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, or local tax law shall be

12

treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

## SECTION V
### Management: Rights, Powers, and Duties

5.1   *Management.*

5.1.1   *Manager.*   The Company shall be managed by a Manager, who may, but need not, be a Member. Aaron F. Broussard is hereby designated to serve as the initial Manager.   The initial Manager is a Class B Member, and shall provide management services to the Company without cash compensation from the Company.

5.1.2   *General Powers.*   The Manager shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including, without limitation, for Company purposes, the power to:

5.1.2.1   acquire by purchase, lease, or otherwise, any property, whether movable or immovable, corporeal or incorporeal;

5.1.2.2   construct, operate, maintain, finance, and improve, and to own, mortgage, or lease any property, whether movable or immovable, corporeal or incorporeal;

5.1.2.3   sell, dispose, trade, or exchange Company assets in the ordinary course of the Company's business;

5.1.2.4   enter into agreements and contracts and to give receipts, releases and discharges;

5.1.2.5   purchase liability and other insurance to protect the Company's properties and business;

5.1.2.6   borrow money for and on behalf of the Company, and, in connection therewith, execute and deliver instruments including mortgages, pledges, and other security instruments containing the usual and customary Louisiana security clauses including confession of judgment, the right to executory process, waiver of appraisal and the pact de non alienando;

5.1.2.7   execute or modify leases with respect to any part or all of the assets of the Company;

5.1.2.8   prepay, in whole or in part, refinance, amend, modify, or extend any mortgages (including mortgages containing the usual and customary

13

∩ЗҶ

waiver of appraisal and the pact de non alienando) or deeds of trust which may affect any asset of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals, or modifications of such mortgages or deeds of trust;

5.1.2.9 execute any and all other instruments and documents which may be necessary or in the opinion of the Manager desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Company;

5.1.2.10 make any and all expenditures which the Manager, in its sole discretion, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting, and other related expenses incurred in connection with the organization and financing and operation of the Company;

5.1.2.11 enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company; and

5.1.2.12 invest and reinvest Company reserves in short-term instruments or money market funds.

5.1.3 *Extraordinary Transactions.* Notwithstanding anything to the contrary in this Agreement, the Manager shall not undertake any of the following without the approval of the Members:

5.1.3.2 any Capital Transaction;

5.1.3.2 the Company's lending of its money;

5.1.3.3 the admission of additional Members to the Company;

5.1.3.4 the Company's engaging in business in any jurisdiction which does not provide for the registration of limited liability companies; except for the acquisition and operations of the Company in Nova Scotia, Canada.

5.1.3.5 the Company's electing to exercise any Purchase Option pursuant to Sections 6.1.4 or 6.4.

5.1.4 *Limitation on Authority of Members.*

5.1.4.1 No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

14

038

5.1.4.2 This Section 5.1 supersedes any authority granted to the Members pursuant to Section 1318(B) of the LLC Law. Any Member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expense incurred by the Company harmless with respect to the loss or expense.

5.1.5 *Removal of Manager.* The Class A Members holding 54% of the Ownership Interest shall have the right to remove the Manager then acting, and elect a new Manager. The Class A Members, shall, before removal of the Manager, consider the credentials of the then existing Manager, and the Performance of the Manager, as it relates to the attainment of the stated activity of the Company.

5.2 *Meetings of and Voting by Members.*

5.2.1 A meeting of the Members may be called at any time by the Manager or by those Members holding at least 36% of the Percentages then held by Members. Meetings of Members shall be held at the Company's principal place of business or at any other place designated by the Person calling the meeting. Not less the than ten (10) or more than ninety (90) days before each meeting, the Person calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than 36% of Percentages then held by Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact.

5.2.2 Except as otherwise provided in this Agreement, the affirmative vote of Members holding at least 36% of the Percentages then held by Members shall be required to approve any matter coming before the Members, including a decision to sell, exchange or liquidate the real property owned by the Company.

5.2.3 In lieu of holding a meeting, the Members may vote to otherwise take action by a written instrument indicating the consent of Members holding a majority of the Percentages then held by Members.

5.2.4 Except as otherwise provided in this Agreement, wherever the LLC Law requires unanimous consent to approve or take any action, that consent shall mean, in all cases, rather than the consent of all Members, the consent of Members holding 54% or more of the Percentages then held by Members.

5.3 *Personal Services.*

15

039

5.3.1   A Class A Member may perform legal, consulting, or other professional services for the Company upon approval by the Manager, and shall be compensated for said services, including the reimbursement of expenses. The Class B Member having a 4% Ownership Interest shall perform accounting services for the Company, prepare the Company's tax returns for each taxable year, prepare the K-1 Statements for each Member, and shall provide other accounting services to the Company. This Class B Member shall receive no cash compensation for these services from the Company. The Manager is authorized and empowered to hire a management company for rental of the real estate owned by the Company, as well as a law firm for legal representation and an Accounting Firm for accounting and tax advice in Nova Scotia, Canada.

5.3.2   The Manager shall not be entitled to compensation for services performed for the Company. The initial Manager, who shall be a Class B Member owning a 42% Ownership Interest, shall provide management services to the Company under the terms and conditions of this Operating Agreement.

5.4   *Duties of Parties.*

5.4.1   The Manager shall not be liable, responsible, or accountable in damages or otherwise to the Company or to any Member for any action taken or any failure to act on behalf of the Company within the scope of the authority conferred on the Manager by this Agreement or by law, unless the action was taken or omission was made fraudulently or in bad faith or unless the action or omission constituted gross negligence.

5.4.2   Except as otherwise expressly provided in Section 5.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of any Manager or Member, or of any Affiliate of any Manager or Member, to conduct any other business or activity whatsoever, and no Manager or Member shall be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to the Manager's and Members' respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of the Manager or any other Member or the Manager's or any Member's Affiliates.

5.4.3   Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with the Manager or with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

5.5   *Liability and Indemnification.*

16

040

5.5.1   The Manager or any Member shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Manager or any Member within the scope of the authority conferred on the Manger or any Member by this Agreement, except for fraud, gross negligence, or an intentional breach of this Agreement.

5.5.2   The Company shall indemnify the Manager or any Member for any act performed by the Manager or any Member within the scope of the authority conferred on the Manager or any Member by this Agreement, except for fraud, gross negligence, or an intentional breach of this Agreement.   The Company shall promptly notify the Members whenever the Manger or any Member has been indemnified by the Company for any act, matter, or thing whatsoever.

5.6   *Power of Attorney.*

5.6.1   *Grant of Power of Attorney.*   Each Member hereby irrevocably constitutes and appoints the Manager (with full power of substitution and resubstitution) as the Member's true and lawful attorney and agent with full power and authority in the Member's name, place, and stead to execute, swear to, acknowledge, deliver, file, and record in the appropriate public offices:

5.6.1.1 Articles of Organization and all such certificates that the Manager considers necessary or appropriate to form, qualify or continue the Company as a limited liability company or conduct the business of the Company in the jurisdictions in which the Company may conduct business or own or lease property;

5.6.1.2 All amendments to this Agreement, amendments to the Articles of Organization of the Company, and other instruments that the Manager considers necessary or appropriate to effect a change or modification of the Company in accordance with the terms of this Agreement, including, without limitation, those amendments relating to the admission of additional or substitute Members or the withdrawal of Members and amendments approved pursuant to the provisions hereof;

5.6.1.3 One or more fictitious or trade name certificates; and

5.6.1.4 All articles and certificates of dissolution, conveyances, and other instruments that the Manager considers necessary or appropriate to effect the acquisition, disposition, pledge, mortgage, hypothecation, encumbrance, or exchange or any assets of the Company, or the dissolution and termination of the Company.

5.6.2   *Irrevocable Nature of Power of Attorney.*   The power of attorney granted herein shall be considered to be coupled with an interest, shall be irrevocable, and, to the extent permitted by applicable law, shall survive the death, interdiction, withdrawal, resignation, retirement, expulsion, bankruptcy, dissolution, or termination of existence of a Member or Interest Holder.   It shall also survive the Transfer of an Interest,

17

041

except that if the Transferee is admitted as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Manager, as attorney in fact, to execute, acknowledge, and file any documents needed to effectuate the substitution. Each Member shall be bound by any representations made by the Manager as attorney in fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate, or disaffirm the action of the Manager as attorney in fact taken in good faith under this power of attorney. Any person dealing with the Company may conclusively presume and rely upon the fact that any such instrument executed by the Manager as attorney in fact and agent herein appointed is valid and binding without further inquiry.

## SECTION VI
### Transfer of Interests and Withdrawals of Members

6.1     *Transfers.*

6.1.1   No Person may Transfer all or any portion of or any interest or rights in the Person's Membership Rights or Interest unless the following conditions ("Conditions of Transfer") are satisfied:

6.1.1.1 The Transfer will not require registration or Interests or Membership Rights under any federal or state securities laws;

6.1.1.2 The transferee delivers to the Company a written agreement to be bound by the terms of Section VI of this Agreement;

6.1.1.3 The Transfer will not result in the termination of the Company pursuant to Code Section 708;

6.1.1.4 The Transfer will not result in the Company being subject to the Investment Company LLC Act of 1940, as amended;

6.1.1.5 The Transferor or the Transferee delivers the following information to the Company: (i) the transferee's taxpayer identification number, and (ii) the transferee's initial tax basis in the Transferred Interest;

6.1.1.6 The Transferor complies with the provisions set forth in Section 6.1.4; and

6.1.1.7 The Transferee of the Interest is approved by at least 51% of the Ownership Interest of the Members.

6.1.2   If the Conditions of Transfer are satisfied, then a Member or Interest Holder may Transfer all or any portion of that Person's Interest. The Transfer of an Interest pursuant to this Section 6.1 shall not result, however, in the Transfer of any of the Transferor's other Membership Rights, if any, and the Transferee of the Interest shall

ი42

have no right to: (i) become a Member, or (ii) exercise any Membership Rights other than those specifically pertaining to the ownership of an Interest.

6.1.3   Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 6.1 in view of the purposes of the Company and the relationship of the Members. The Transfer of any Membership Rights or Interests in violation of the prohibition contained in this Section 6.1 shall be deemed invalid, null, and void, and of no force or effect. Any Person to whom Membership Rights are attempted to be transferred in violation of this Section shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, receive distributions from the Company, or have any other rights in or with respect to the Membership Rights.

6.1.4   *Right of First Offer.*

6.1.4.1 If an Interest Holder (a "Transferor") desires to Transfer all or any portion of, or any interest or rights in, the Transferor's Interest (the "Transferor Interest"), the Transfer shall notify the Company of that desire (the "Transfer Notice"). The Transfer Notice shall describe the Transferor Interest. The Company shall have the option (the "Purchase Option") to purchase all of the Transferor Interest for a price (the "Purchase Price") equal to the amount the Transferor would receive if the Company were liquidated and an amount equal to the Appraised Value (as determined pursuant to Section 6.4) were available for distribution to the Members pursuant to Section 4.4.

6.1.4.2 The Purchase Option shall be and remain irrevocable for a period (the "Transfer Period") ending at 11:59 P.M. local time at the Company's principal office on the sixtieth (60th) day following the date the Transfer Notice is given to the Company.

6.1.4.3 At any time during the Transfer Period, the Company may elect to exercise the Purchase Option by giving written notice of its election to the Transferor. The Transferor shall not be deemed a Member for the purpose of voting on whether the Company shall elect to exercise the Purchase Option.

6.1.4.4 If the Company elects to exercise the Purchase Option, the Company's notice of its election shall fix a closing date (the "Transfer Closing Date") for the purchase, which shall not be earlier than five (5) days after the date of the notice of election or more than thirty (30) days after the expiration of the Transfer Period.

6.1.4.5 If the Company elects to exercise the Purchase Option, the Purchase Price shall be in cash on the Transfer Closing Date.

6.1.4.6 If the Company fails to exercise the Purchase Option, the Transferor shall be permitted to offer and sell the Transferor Interest to any Class A or Class B Member for a period of ninety (90) days (the "Free Transfer Period") after the expiration of the Transfer Period at a price not less than the Purchase Price. If the

19

Transferor does not Transfer the Transfer Interest pursuant to this Section shall cease and terminate.

6.1.4.7 Any Transfer of the Transferor Interest made after the last day of the Free Transfer Period or without strict compliance with the terms, provisions, and conditions of this Section and other terms, provisions, and conditions of this Agreement, shall be null and void and of no force or effect.

6.2     *Voluntary Withdrawal.*   No Member shall have the right or power to Voluntarily Withdraw from the Company.

6.3     *Involuntary Withdrawal.*   Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become an Interest Holder but shall not become a Member.   Neither the Member who has involuntarily withdrawn nor the successor to such Member's Interest shall be entitled to receive in liquidation of the Interest the fair market value of the Member's Interest as of the date the Member involuntarily withdrew from the Company.

6.4     *Appraisal Value.*

6.4.1   The term "Appraised Value" means the appraised value of the equity of the Company's assets as hereinafter provided.  Within fifteen (15) days after demand by either one to the other, the Company and the Transferor (as the Transferor is defined in Section 6.1.4) shall each appoint an appraiser to determine the value of the equity of the Company's assets.  If the two appraisers agree upon the equity value of the Company's assets, they shall jointly render a single written report stating that value.  If the two appraisers cannot agree upon the equity value of Company's assets, they shall each render a separate written report and shall appoint a third appraiser, who shall appraise the Company's assets and determine the value of the equity therein, and shall render a written report of his opinion thereon.  Each party shall pay the fees and other costs of the appraiser appointed by that party, and the fees and other costs of the third appraiser shall be shared equally by both parties.

6.4.2   The equity value contained in the aforesaid joint written report or written report of the third appraiser, as the case may be, shall be the Appraised Value; provided, however, that if the value of the equity contained in the appraisal report of the third appraiser is more than the higher of the first two appraisals, the higher of the first two appraisals shall govern; and provided, further, that if the value of the equity contained in the appraisal report of the third appraiser is less than the lower of the first two appraisals, the lower of the first two appraisals shall govern.

## SECTION VII
### Dissolution, Liquidation, and Termination of the Company

7.1     *Events of Dissolution.*   The Company shall be dissolved upon the happening of any of the following events:

20

D44

7.1.1   when the period fixed for its duration in Section 2.4 has expired; or

7.1.2   upon the unanimous written agreement of the Members.

7.2   *Procedure for Winding Up and Dissolution.*   If the Company is dissolved, the Manager shall wind up its affairs.   On winding up the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with Section 4.4.

7.3   *Filing of Certification That Company Has Been Liquidated and Dissolved.* If the Company is dissolved, the Manager shall promptly file with the Secretary that Certificate described in LLC Law Section 1340(A)(1).   If there is no Manager, then the Certificate shall be filed by the remaining Members; if there are no remaining Members, the Certificate shall be filed by the last Person to be a Member; if there is no Manager, remaining Members, or a Person who last was a Member, the Certificate shall be filed by the legal or personal representatives of the Person who last was a Member.

**SECTION VIII**
**Books, Records, Accounting, and Tax Elections**

8.1   *Bank Accounts.*   All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name.   The Manager shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

8.2   *Books and Records.*

8.2.1   The Manager shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business.   The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company for the last three most recent years; a copy of the Articles of Organization and Operating Agreement and all amendments to the Articles and Operating Agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state, and local tax returns for the last three most recent years.

8.2.2   The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

21

8.2.3   Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

8.3   *Annual Accounting Period.*   The annual accounting period of the Company shall be its taxable year.  The Company's taxable year shall be selected by the Manager, subject to the requirements and limitations of the Code.

8.4   *Reports.*   Within seventy-five (75) days after the end of each taxable year of the Company, the Manager shall cause to be sent to each Person who was a Member at any time during the taxable year then ended; (i) an annual compilation report, prepared by the Company's independent accountants in accordance with standards issued by the American Institute of Certified Public Accountants; and (ii) a report summarizing the fees and other remuneration paid by the Company to any Member, the Manager, or any Affiliate in respect of the taxable year.  In addition, with seventy-five (75) days after the end of each taxable year of the Company, the Manager shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year.  At the request of any Member, and at the Member's expense, the Manager shall cause an audit of the Company's books and records to be prepared by independent accountants for the period requested by the Member.

8.5   *Tax Matters Partner.*   Lawrence W. Stoulig, Jr. shall be the Company's tax matters partner ("Tax Matters Partner").  The Tax Matters Partner shall have all powers and responsibilities provided in Code Section 6221, *et seq.*  The Tax Matters Partner shall keep all Members informed of all notices from government taxing authorities which may come to the attention of the Tax Matters Partner.  A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company.  The Tax Matters Partner shall not compromise any dispute with the Internal Revenue Service without the approval of the Class A Members.

8.6   *Tax Elections.*   The Manager shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754.  The decision to make or not make an election shall be at the Manger's sole and absolute discretion.

8.7   *Title to Company Property.*

8.7.1   Except as provided in Section 8.7.2, all property (whether movable or immovable, corporeal or incorporeal) acquired by the Company shall be acquired by the Company in its name.

8.7.2   The Manager may direct that legal title to all or any portion of the Company's property be acquired or held in a name other than the Company's name.

22

046

Without limiting the foregoing, the Manager may cause title to be acquired and held in his name or in the names of the trustees, nominees, or straw parties of the Company. It is expressly understood and agreed that the manner of holding title to the Company's property (or any part thereof) is solely for the convenience of the Company and all of that property shall be treated as Company property.

## SECTION IX
## General Provisions

9.1  *Assurances.*  Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules and regulations relating to the acquisition, operation, or holding of the property of the Company.

9.2  *Notifications.*  Any notice, demand, consent, election, offer approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested.  Any notice to be given hereunder by the Company shall be given by the Manager.  A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company.  A notice to the Company must be addressed to the Company's principal office.  A notice that is sent by mail will be deemed given three (3) business days after it is mailed.  Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notice are to be directed to those substitute addresses or addressees.

9.3  *Specific Performance.*  The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury.  Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4  *Amendment.*  Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

9.5  *Applicable Law.*  All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Louisiana. All questions as to the ownership, rental, or management of the real property in Nova Scotia, Canada shall be governed by the internal law of that Jurisdiction.

047

9.6   *Section Titles.*   The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

9.7   *Binding Provisions.*   This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

9.8   *Jurisdiction and Venue.*   Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court for the Eastern District of Louisiana or any Louisiana State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

9.9   *Terms.*   Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person may in the context require.

9.10   *Separability of Provisions.*   Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid, illegal, or unenforceable, the same shall not impair the operation of or affect any other portions of this Agreement, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had never been contained herein. Notwithstanding the foregoing, however, no provision shall be severed if it is clearly apparent under the circumstances that the parties would not have entered into this Agreement without such provision.

9.11   *Counterparts.*   This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

9.12   *Estoppel Certificate.*   Each Member shall, within ten (10) days after written request by the Manager, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by the requesting Person, or if there is a default, the nature and extent thereof. If the certificate is not received within that ten (10) day period, the Manager shall execute and deliver the certificate on behalf of the requested Member, without qualification, pursuant to the power of attorney granted in Section 5.6.

9.13   For as long as that certain property known as "Riverbend Lodge", is owned by the Company, each Member shall be entitled to occupy said property, for a period of two (2) weeks, during the "off-peak" rental season without payment of rent to

period of two (2) weeks, during the "off-peak" rental season without payment of rent to the Company. However, each Member will be responsible for any usual and customary costs incurred for cleaning of the property and for preparation for the next occupant. It is anticipated that a meeting of the Members will be held in December of each year, in order to allocate the occupancy time in one (1) week segments through a lottery system. The Manager, shall conduct a lottery, and shall provide the allocation of occupancy time to each Member.

   **IN WITNESS WHEREOF**, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

<div align="center">(SIGNATURES TO FOLLOW)</div>

<div align="center">25

049</div>

**CLASS A MEMBERS**                    **CLASS B MEMBERS**




NOVA SCOTIA ENTERPRISES, L.L.C.

BY:
    MANAGER

26

o50

EXHIBIT A

TO OPERATING AGREEMENT OF NOVA SCOTIA ENTERPRISES, L.L.C.

<u>Class A Member, Capital and Percentages</u>

| | | Initial Capital Contribution | Percentage |
|---|---|---|---|
| 1. | Name: | $6,550.00 | 3% |
| | Address: | | |
| | Tax ID No.: | | |
| 2. | Name: | $6,550.00 | 3% |
| | Address: | | |
| | Tax ID No.: | | |
| 3. | Name: | $6,550.00 | .6% |
| | Address: | | |
| | Tax ID No.: | | |
| 4. | Name: | $6,550.00 | 6% |
| | Address: | | |
| | Tax ID No.: | | |
| 5. | Name: | $6,550.00 | 6% |
| | Address: | | |
| | Tax ID No.: | | |

27

051

|  |  | Initial Capital Contribution | Percentage |
|---|---|---|---|
| 6. | Name:<br>Address:<br>Tax ID No.: | $6,550.00 | 6% |
| 7. | Name:<br>Address:<br>Tax ID No.: | $6,550.00 | 6% |
| 8. | Name:<br>Address:<br>Tax ID No.: | $6,550.00 | 6% |
| 9. | Name:<br>Address:<br>Tax ID No.: | $6,550.00 | 6% |
| 10. | Name:<br>Address:<br>Tax ID No.: | $6,550.00 | 6% |

28

**EXHIBIT B**

**TO OPERATING AGREEMENT OF NOVA SCOTIA ENTERPRISES, L.L.C.**

<u>Class B Members, Capital, and Percentage</u>

|   |   | Initial Capital Contribution | Percentage |
|---|---|---|---|
| 1. | Name: Aaron F. Broussard | $0 | 42% |
|   | Address: 3329 Florida Avenue, Suite 220 Kenner, LA 70065 |   |   |
|   | Tax ID No.: ███8950 |   |   |
| 2. | Name: ████████ | $0 | 4% |
|   | Address: ████████ |   |   |
|   | Tax ID No: ████████ |   |   |

29

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name:

Address:

Social Security Number:

Signature:

I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 3% Ownership Interest.

I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name: ███████████████████████████

Address: ██████████████████████████

Social Security Number: ███████████████

Signature: ████████████████████████

    I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

    I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name: ████████████████████████████

Address: ████████████████████████████

Social Security Number: ████████████████████

Signature: ___█████████████████_____

     I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

     I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name:

Address:

Social Security Number:

Signature:

I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

057

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name:

Address



Social Security Number:

Signature: _

    I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

    I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name:

Address:

Social Security Number:



Signature: _____

    I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 3% Ownership Interest.

    I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name:

Address:

Social Security Number:

Signature: _____

I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

060

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name:

Address:



Social Security Number:

Signature: _____

I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

061

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name:

Address:

Social Security Number:

Signature: 

    I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

    I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

062

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name: ██████████████████████

Address: ██████████████████████

Social Security Number: ██████████████

Signature: ██████████████████████

I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

063

June 14, 2005

**Re:  Nova Scotia Enterprises, L.L.C.**
    **Notice to Waive Right of First Offer (Section 6.1.4.)**

Dear

    Please accept this notification as my formal waiver of exercising my option under Section 6.1.4. of our Operating Agreement to match the offer tendered to Aaron F. Broussard for his Membership Interest as outlined in his letter and attachment dated June 14, 2005; AND FURTHER, I am not recommending that the Company, Nova Scotia Enterprises, L.L.C., match said offer or acquire the interest of Aaron F. Broussard.

MEMBER

DATE  6/16/05

June 14, 2005



Re: *Nova Scotia Enterprises, L.L.C.*
    *Notice to Waive Right of First Offer (Section 6.1.4.)*

Dear ▮▮▮:

    Please accept this notification as my formal waiver of exercising my option under Section 6.1.4. of our Operating Agreement to match the offer tendered to Aaron F. Broussard for his Membership Interest as outlined in his letter and attachment dated June 14, 2005; AND FURTHER, I am not recommending that the Company, Nova Scotia Enterprises, L.L.C., match said offer or acquire the interest of Aaron F. Broussard.

                                          ▮▮▮▮▮▮▮▮▮

                                          MEMBER

                                          6/16/05
                                          DATE

065



**ATTN.** AARON BROUSSARD

Fax Number 94671866

Phone Number

**FROM** ▓▓▓▓▓▓▓▓

Fax Number ▓▓▓▓▓▓▓

Phone Number ▓▓▓▓▓▓

**SUBJECT**

Number of Pages **2**

Date 6/17/2005

**MESSAGE**

066

06/17/05  FRI 10:59  [TX/RX NO 7499]  ☑001

June 14, 2005

█████████████

*Re: Nova Scotia Enterprises, L.L.C.*
*Notice to Waive Right of First Offer (Section 6.1.4.)*

Dear ████

    Please accept this notification as my formal waiver of exercising my option under Section 6.1.4. of our Operating Agreement to match the offer tendered to Aaron F. Broussard for his Membership Interest as outlined in his letter and attachment dated June 14, 2005; AND FURTHER, I am not recommending that the Company, Nova Scotia Enterprises, L.L.C., match said offer or acquire the interest of Aaron F. Broussard.

████████████████████

_____
MEMBER

_____
DATE   6/21/05

067

June 14, 2005

████████████

Re: *Nova Scotia Enterprises, L.L.C.*
    *Notice to Waive Right of First Offer (Section 6.1.4.)*

Dear ███

    Please accept this notification as my formal waiver of exercising my option under Section 6.1.4. of our Operating Agreement to match the offer tendered to Aaron F. Broussard for his Membership Interest as outlined in his letter and attachment dated June 14, 2005; AND FURTHER, I am not recommending that the Company, Nova Scotia Enterprises, L.L.C., match said offer or acquire the interest of Aaron F. Broussard.

                                            ████████████████

                                            MEMBER

                                          June 15, 2005

                                          DATE

068

June 14, 2005

<div style="background:black"> </div>

Re: *Nova Scotia Enterprises, L.L.C.*
*Notice to Waive Right of First Offer (Section 6.1.4.)*

Dear ▮ :

    Please accept this notification as my formal waiver of exercising my option under Section 6.1.4. of our Operating Agreement to match the offer tendered to Aaron F. Broussard for his Membership Interest as outlined in his letter and attachment dated June 14, 2005; AND FURTHER, I am not recommending that the Company, Nova Scotia Enterprises, L.L.C., match said offer or acquire the interest of Aaron F. Broussard.

MEMBER

_____
6/16/05
DATE

069

June 14, 2005

███████████

Re: *Nova Scotia Enterprises, L.L.C.*
Notice to Waive Right of First Offer (Section 6.1.4.)

Dear ████:

Please accept this notification as my formal waiver of exercising my option under Section 6.1.4. of our Operating Agreement to match the offer tendered to Aaron F. Broussard for his Membership Interest as outlined in his letter and attachment dated June 14, 2005; AND FURTHER, I am not recommending that the Company, Nova Scotia Enterprises, L.L.C., match said offer or acquire the interest of Aaron F. Broussard.

MEMBER ████████████████

6/17/05

DATE

070

June 14, 2005

███████████

Re: *Nova Scotia Enterprises, L.L.C.*
*Notice to Waive Right of First Offer (Section 6.1.4.)*

Dear ███:

Please accept this notification as my formal waiver of exercising my option under Section 6.1.4. of our Operating Agreement to match the offer tendered to Aaron F. Broussard for his Membership Interest as outlined in his letter and attachment dated June 14, 2005; AND FURTHER, I am not recommending that the Company, Nova Scotia Enterprises, L.L.C., match said offer or acquire the interest of Aaron F. Broussard.

███████████████████████

MEMBER ████████████

_____6-15-05_____
DATE

071

June 14, 2005

███████████

Re:  Nova Scotia Enterprises, L.L.C.
     Notice to Waive Right of First Offer (Section 6.1.4.)

Dear ███:

    Please accept this notification as my formal waiver of exercising my option under Section 6.1.4. of our Operating Agreement to match the offer tendered to Aaron F. Broussard for his Membership Interest as outlined in his letter and attachment dated June 14, 2005; AND FURTHER, I am not recommending that the Company, Nova Scotia Enterprises, L.L.C., match said offer or acquire the interest of Aaron F. Broussard.

                              ███████████
                              /MEMBER            ███████████

                              6-15-05
                              DATE

072

June 14, 2005

██████████████

Re: *Nova Scotia Enterprises, L.L.C.*
    *Notice to Waive Right of First Offer (Section 6.1.4.)*

Dear ██:

      Please accept this notification as my formal waiver of exercising my option under Section 6.1.4. of our Operating Agreement to match the offer tendered to Aaron F. Broussard for his Membership Interest as outlined in his letter and attachment dated June 14, 2005; AND FURTHER, I am not recommending that the Company, Nova Scotia Enterprises, L.L.C., match said offer or acquire the interest of Aaron F. Broussard.

████████████████████

MEMBER

6.16.05
_____
DATE

073

June 14, 2005

███████████

Re: *Nova Scotia Enterprises, L.L.C.*
*Notice to Waive Right of First Offer (Section 6.1.4.)*

Dear ███:

Please accept this notification as my formal waiver of exercising my option under Section 6.1.4. of our Operating Agreement to match the offer tendered to Aaron F. Broussard for his Membership Interest as outlined in his letter and attachment dated June 14, 2005; AND FURTHER, I am not recommending that the Company, Nova Scotia Enterprises, L.L.C., match said offer or acquire the interest of Aaron F. Broussard.

███████████████████

MEMBER

*6/20/05*
DATE

074

315

| | | | | | | | | | | | Broussard | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2002-2003** | | | | | | | | | | | | | |
| Summer | $ 6,550.00 | $ 6,550.00 | $ 6,550.00 | $ 6,550.00 | $ 6,550.00 | $ 3,276.00 | $ 3,276.00 | $ 6,550.00 | | | | | $ 6,550.00 |
| Winter | $ 782.60 | $ 782.60 | $ 782.60 | $ 782.60 | $ 782.60 | $ 425.98 | $ 391.30 | $ 782.60 | | | $ 782.60 | $ 713.28 | $ 782.60 |
| **2003-2004** | | | | | | | | | | | | | |
| Summer | $ 6,871.00 | $ 6,871.02 | $ 6,871.02 | $ 6,871.02 | $ 6,871.02 | $ 3,435.51 | $ 3,435.51 | $ 6,871.02 | | | | | $ 6,871.02 |
| Winter | $ 2,104.48 | $ 2,104.48 | $ 2,104.48 | $ 2,104.48 | $ 2,104.48 | $ 1,052.24 | $ 1,052.24 | $ 2,104.48 | | | | | $ 2,104.48 |
| **2004-2005** | | | | | | | | | | | | | |
| Summer | $ 6,357.45 | $ 6,357.45 | $ 6,357.46 | $ 6,357.45 | $ 6,357.45 | $ 3,178.72 | $ 3,178.72 | $ 6,357.45 | | | | | $ 6,357.45 |
| Winter | $ 2,114.42 | $ 2,144.42 | $ 2,114.42 | $ 2,114.42 | $ 2,114.42 | $ 1,057.21 | $ 1,057.21 | $ 2,114.42 | | | | | $ 2,114.42 |
| 2005 | $ 5,332.05 | $ 5,332.05 | $ 5,332.05 | $ 5,332.05 | $ 5,332.05 | $ 2,666.02 | $ 2,666.02 | $ 5,332.05 | | | | | $ 5,332.05 |
| 2006 | $ 7,350.00 | $ 7,350.00 | $ 7,350.00 | $ 7,350.00 | $ 7,350.00 | $ 3,675.00 | $ 3,675.00 | | | | | | |
| 2007 | $ 9,873.50 | $ 9,873.50 | $ 9,873.50 | $ 9,873.50 | $ 9,873.50 | $ 4,936.75 | $ 4,936.75 | | $ 9,873.50 | $ 9,873.50 | | | |
| **TOTAL** | $47,335.50 | $47,335.52 | $47,335.52 | $47,335.52 | $47,335.52 | $23,702.41 | $23,667.75 | $30,112.02 | $ 9,873.50 | $ 9,873.50 | $ 782.60 | $ 713.28 | $47,335.52 |

Nova Justice Enterprises
member contributions

June 13, 2005

Aaron F. Broussard
3329 Florida Ave.
Kenner, LA 70065

RE:  Offer to Purchase 42% interest
in Nova Scotia Enterprises, L.L.C.

Dear Aaron:

Pursuant to our conversation, ████████████████ I hereby tender an offer to acquire your forty-two (42%) percent membership interest in Nova Scotia Enterprises, L.L.C. for the amount of One Hundred Ninety-Seven Thousand Two Hundred Forty Two and 50/100 ($197,242.50) Dollars to be paid in the form of a non-interest bearing promissory note due and payable on December 31, 2011.

Please notify me of your acceptance of this offer and verification that said transfer is authorized by Nova Scotia Enterprises, L.L.C.

Awaiting your reply, I remain

Sincerely,

# AARON F. BROUSSARD

June 20, 2005



Re: *Offer to Purchase 42% Interest*
*in Nova Scotia Enterprises, L.L.C.*
by ▇▇▇▇▇▇

Dear ▇▇▇▇:

I received your offer of June 13, 2005 and accept your offer to transfer to you the entirety of my 42% Membership Interest in Nova Scotia Enterprises, L.L.C., for the amount of $197,242.50, payable in the form of a non-interest bearing Promissory Note, due and payable on December 31, 2011.

Please be advised that all other Members of Nova Scotia Enterprises, L.L.C., have been informed of this transfer, and under the terms and conditions of the Operating Agreement, have waived the exercising of their option both individually and on behalf of Nova Scotia Enterprises, L.L.C., to acquire any of my Membership Interest.

I have enclosed a Transfer, which evidences my transfer of the Membership Interest to ▇▇▇▇▇▇, along with the Promissory Note to be signed by that Limited Liability Company.

Thank you for your cooperation.

Sincerely,

AARON F. BROUSSARD

# TRANSFER OF MEMBERSHIP INTEREST

**THIS TRANSFER OF MEMBERSHIP INTEREST** is entered into on June 20, 2005.

This Transfer of Membership Interest is made pursuant to the offer to purchase dated June 13, 2005, on behalf of ▮▮▮▮▮▮▮▮ and the "Right of First Offer" under Section 6.1.4 of the Operating Agreement. The undersigned hereby states that all other Members of Nova Scotia Enterprises, L.L.C. have waived their option to acquire the Membership Interest both individually and on behalf of the Company.

I, Aaron F. Broussard, hereby grant, bargain, sell, transfer, and convey, into ▮▮▮▮▮▮▮ L.L.C., the entirety of my 42% Membership Interest in Nova Scotia Enterprises, L.L.C.

The consideration for this transfer is one certain Promissory Note dated June 20, 2005, in the original principal sum of $197,242.50, bearing no interest, with the entirety of the amount of principal due and payable on December 31, 2011.

This Transfer of Membership Interest is pursuant to my Acceptance Letter dated June 20, 2005, sent to ▮▮▮▮▮▮▮

This Transfer of Membership Interest is entered into on this 20th day of June, 2005.

AARON F. BROUSSARD
Transferor

Sworn to and subscribed before me on this 20th day of June, 2005.

PROMISSORY NOTE

$197,242.50

June 20, 2005

For value received, I/We promise to pay to the order of Aaron F. Broussard the sum of. ONE HUNDRED NINTY SEVEN THOUSAND TWO HUNDRED FORTY TWO AND 50/100 DOLLARS ($197,242.50) with interest at the rate of zero (0%) per cent per annum, payable at 3329 Florida Avenue, Kenner, Louisiana 70065 in 1 final installment of principal which is due and payable on December 31, 2011.

Failure to pay any installment on this note as herein provided shall render, at the option of the holder hereof, all remaining installments at once due and exigible without any putting in default.

In the event it becomes necessary to place this note, or any renewal thereof, in the hand of an attorney for collection or suit, I/We agree to pay twenty-five (25%) per cent on the amount of this note as attorney's fees, which fees are agreed to be part of the principal obligation of this note.

In the event of the death, insolvency, act of bankruptcy, or any bankruptcy proceedings by or against, application for a respite or receiver by or against any party to this note, in any capacity, this note shall immediately mature and be exigible, at the option of the holder hereof without notice or demand, any agreement or extension notwithstanding.

The makers of this note and the endorsers, guarantors and sureties hereon hereby severally waive presentment for payment, demand, notice of non-payment, protest, and all pleas of division and discussion, confess judgment in favor of mortgagee and agree that the time of payment hereof may be extended from time to time, one or more times, without notice of such extension or extensions and without previous consent hereby binding themselves, in solido, unconditionally and as original promisors, for the payment thereof in principal, interest, cost and attorney's fees.

All parties hereto further severally agree that this note evidences and sets forth their entire agreement with the holder hereof, that they hereby consent to all the terms and conditions hereof, and that no modification hereof shall be binding unless hereon endorsed in writing and signed by the parties.

No delays on the part of the holder hereof in exercising any rights hereunder shall operate as a waiver of such rights.

BY: 

6-22-05

AARON IS PUTTING ORIGINAL
NOTE IN HIS PERSONAL
SAFETY DEPOSIT BOX.

728

# EXHIBIT B

4941

AARON BROUSSARD, PARISH PRESIDENT
CAMPAIGN COMMITTEE, INC.
PO Box 931
METAIRIE, LA 70004-0931

**FIRST BANK**
A N D   T R U S T
909 Poydras Street, New Orleans, Louisiana
Fast Bank By Phone (504) 561-1005

14-228-650

4/28/2009

PAY
TO THE
ORDER OF   Mardi Gras Productions                                    $ **5,546.78

Five Thousand Five Hundred Forty-Six and 78/100***********************************************   DOLLARS

Mardi Gras Productions
1201 Annunciation Street
New Orleans, LA  70130

_Donna B Gordon_
AUTHORIZED SIGNATURE

MEMO   Reimbursement for Tahoe Ski Trip

⑈004941⑈ ⑆                    ⑆                0214⑈

DDA Debits - 05/04/2009 -        0214 - 4941 - $5,546.78

FOR DEPOSIT ONLY
HANCOCK BANK
8513
COMMERCIAL CHECKING

DDA Debits - 05/04/2009 -        0214 - 4941 - $5,546.78



DDA Debits - 04/09/2009 - ████0214 - 4897 - $2,497.03

DDA Debits - 04/09/2009 - ████0214 - 4897 - $2,497.03



DDA Debits - 04/09/2009 - ███0214 - 4897 - $2,497.03

DDA Debits - 04/09/2009 - ███0214 - 4897 - $2,497.03

4852

AARON BROUSSARD, PARISH PRESIDENT
CAMPAIGN COMMITTEE, INC.
PO Box 931
METAIRIE, LA 70004-0931

▲ FIRST BANK
A N D   T R U S T
700 Poydras Street, New Orleans, Louisiana
First Bank By Phone (504) 556-5900

14-228-650

2/18/2009

PAY
TO THE
ORDER OF        Rada's World of Travel                                    $  **4,313.06

Four Thousand Three Hundred Thirteen and 06/100***************************************** DOLLARS

Rada's World of Travel
903 Williams Blvd.
Kenner, LA 70065

MEMO
        Inv. 33735                                          Donna B. Gordon
                                                            AUTHORIZED SIGNATURE

⑈004852⑈ ⑆        ⑉ ⑈      0214⑈          ⑊0000431306⑊

DDA Debits – 02/20/2009 –    0214 – 4852 – $4,313.06

DDA Debits – 02/20/2009 –    0214 – 4852 – $4,313.06



DDA Debits - 02/19/2009 - ████0214 - 4847 - $3,826.00

DDA Debits - 02/19/2009 - ████0214 - 4847 - $3,826.00



AARON BROUSSARD, PARISH PRESIDENT
CAMPAIGN COMMITTEE, INC.
PO Box 931
METAIRIE, LA 70004-0931

FIRST BANK
14-22650

3343

11/14/05

PAY TO THE
ORDER OF     Rader Travel                          $ 2,505.00
522787781 12 111505: 4652561727

Twentyfive hundred five and 00/100                    DOLLARS

MEMO: travel expenses /Miss 30234
500(6

Donna Gordon

⑈003343⑈ I⸬                ⸬ 0214⑈        ⑈0000 250 500⑈





**AARON BROUSSARD, PARISH PRESIDENT
CAMPAIGN COMMITTEE, INC.**
PO Box 931
METAIRIE, LA 70004-0931

FIRST BANK
14-228/659

3317

8/19/2005

PAY TO THE
ORDER OF    Rada's World of Travel                          $ **2,100.00

Two Thousand One Hundred and 00/100************************************************** DOLLARS

Rada's World of Travel
903 Williams Blvd.
Kenner, LA 70065

MEMO:   Invoice # 30270                          Donna Gordon





AARON BROUSSARD, PARISH PRESIDENT
CAMPAIGN COMMITTEE, INC.
PO Box 931
METAIRIE, LA 70004-0931

FIRST BANK

3142

2/17/2005

PAY TO THE
ORDER OF     Rada's World of Travel                    $ **1,915.00

One Thousand Nine Hundred Fifteen and 00/100************************************************ DOLLARS

Rada's World of Travel
903 Williams Blvd.
Kenner, LA 70065

MEMO:
        Lake Tahoe trip                    J. Boudreau



DDA Debits – 03/16/2006 – ████0214 – 3416 – $900.00



DDA Debits – 03/16/2006 – ████0214 – 3416 – $900.00







DDA Debits – 02/12/2007 – ███ 0214 – 3622 – $700.00



DDA Debits – 02/12/2007 – ███ 0214 – 3622 – $700.00



**AARON BROUSSARD, PARISH PRESIDENT**
**CAMPAIGN COMMITTEE, INC.**
PO Box 931
METAIRIE, LA 70004-0931

FIRST BANK
14-020A30

3115

1/24/2005

PAY TO THE
ORDER OF      Krewe of Endymion                                      $ **280.00

Two Hundred Eighty and 00/100************************************************************************      DOLLARS

Krewe of Endymion
58 Chateau Latour
Kenner, LA 70065

MEMO:    Tickets to Extravaganza                         Jennifer A Broussard

⑈003115⑈  :⬛⬛⬛⬛⬛:  ⬛0214⬛  ⑈00000 28000⑈

DDA Debits - 02/16/2005 - ⬛⬛⬛0214 - 3115 - $280.00



DDA Debits - 02/16/2005 - ⬛⬛⬛0214 - 3115 - $280.00



**AARON BROUSSARD, PARISH PRESIDENT CAMPAIGN COMMITTEE, INC.**
PO Box 931
METAIRIE, LA 70004-0931

FIRST BANK
& TRUST
14-824/650

3639

1/22/2007

PAY TO THE
ORDER OF    Krewe of Argus                                    $  **300.00

Three Hundred and 00/100******************************************************    DOLLARS

Krewe of Argus
5860 Citrus Blvd., #D
Box 169
River Ridge, LA  70123

MEMO:        Dues

Donna B. Gordon

⑈003639⑈  ⑆          ⑆   0214⑈   ⑈00000 30000⑈

DDA Debits - 01/29/2007 - ████0214 - 3639 - $300.00



DDA Debits - 01/29/2007 - ████0214 - 3639 - $300.00



DDA Debits - 02/09/2007 -  0214 - 3650 - $250.00



DDA Debits - 02/09/2007 -  0214 - 3650 - $250.00



AARON BROUSSARD, PARISH PRESIDENT
CAMPAIGN COMMITTEE, INC.
PO Box 931
METAIRIE, LA 70004-0931

FIRST BANK

3658

2/9/2007

PAY TO THE
ORDER OF    Krew of Argus                                    $ **400.00

Four Hundred and 00/100************************************************************ DOLLARS

Krew of Argus

MEMO:  4 tickets to Argus Ball                              Donna B. Gordon

DDA Debits - 03/01/2007 - ▓▓▓0214 - 3658 - $400.00



DDA Debits - 03/01/2007 - ▓▓▓0214 - 3658 - $400.00



DDA Debits - 02/09/2009 - ▮▮▮0214 - 4814 - $300.00



DDA Debits - 02/09/2009 - ▮▮▮0214 - 4814 - $300.00



AARON BROUSSARD, PARISH PRESIDENT
CAMPAIGN COMMITTEE, INC.
PO Box 931
METAIRIE, LA 70004-0531

▲ FIRST BANK
AND TRUST
909 Poydras Street, New Orleans, Louisiana
First Bank By Phone (504) 584-5506

14-228-650

4851

2/16/2009

PAY TO THE ORDER OF   Endymion                                $ **390.00

Three Hundred Ninety and 00/100*************************************************** DOLLARS

Endymion
333 Edwards Avenue
Harahan, LA 70123

MEMO   2 tickets

Donna B Gordon
AUTHORIZED SIGNATURE

⑆004851⑆ ⑈ ■■■■■■ ⑆ ■■■ 0214⑆ ⑆0000039000⑆

DDA Debits - 03/05/2009 - ■■■0214 - 4851 - $390.00



DDA Debits - 03/05/2009 - ■■■0214 - 4851 - $390.00



DDA Debits - 04/22/2009 - ████ 0214 - 4913 - $320.00

DDA Debits - 04/22/2009 - ████ 0214 - 4913 - $320.00







**AARON BROUSSARD, PARISH PRESIDENT CAMPAIGN COMMITTEE, INC.**
PO Box 931
METAIRIE, LA 70004-0931

FIRST BANK
14-2281059

3292

8/1/2005

PAY TO THE ORDER OF    Welldone    $ **2,920.16

Two Thousand Nine Hundred Twenty and 16/100************************************************************** DOLLARS

Welldone
10515 Lyons Street
River Ridge, LA 70123

MEMO: Professional Art Services

J Boudreau

⑈003292⑈ ⑆ ⑆ 0214⑆ ⑈0000292016⑈

DDA Debits - 08/10/2005 - ███0214 - 3292 - $2,920.16



DDA Debits - 08/10/2005 - ███0214 - 3292 - $2,920.16



AARON BROUSSARD, PARISH PRESIDENT
CAMPAIGN COMMITTEE, INC.
PO Box 931
METAIRIE, LA 70004-0931

FIRST BANK
14-226/620

3686

2/23/2007

PAY TO THE
ORDER OF   Welldone                                      $ **796.17

Seven Hundred Ninety-Six and 17/100************************************************   DOLLARS

Welldone
10515 Lyons Street
River Ridge, LA  70123

MEMO:
Professional Art Services                    Donna B Gordon

DDA Debits - 03/01/2007 -     0214 - 3686 - $796.17



DDA Debits - 03/01/2007 -     0214 - 3686 - $796.17



DDA Debits - 06/20/2007 - ___0214 - 3903 - $4,632.85



DDA Debits - 06/20/2007 - ___0214 - 3903 - $4,632.85



DDA Debits - 06/27/2007 - ███0214 - 3939 - $1,337.87



DDA Debits - 06/27/2007 - ███0214 - 3939 - $1,337.87



DDA Debits – 06/29/2007 – ████0214 – 3960 – $2,210.95



DDA Debits – 06/29/2007 – ████0214 – 3960 – $2,210.95



DDA Debits - 07/11/2007 - [redacted]0214 - 3994 - $2,793.75



DDA Debits - 07/11/2007 - [redacted]0214 - 3994 - $2,793.75



DDA Debits - 08/01/2007 - ████0214 - 4051 - $3,248.58



DDA Debits - 08/01/2007 - ████0214 - 4051 - $3,248.58



DDA Debits – 08/20/2007 – 0214 – 4091 – $3,967.61



DDA Debits – 08/20/2007 – 0214 – 4091 – $3,967.61



DDA Debits - 01/29/2009 - ▮▮▮0214 - 4813 - $1,187.27



DDA Debits - 01/29/2009 - ▮▮▮0214 - 4813 - $1,187.27



AARON BROUSSARD, PARISH PRESIDENT
CAMPAIGN COMMITTEE, INC.
PO Box 931
METAIRIE, LA 70004-0931

**FIRST BANK**
A N D   T R U S T
909 Poydras Street, New Orleans, Louisiana
Park Bank By Phone (504) 534-9906

4838

14-228-650

2/11/2009

PAY
TO THE
ORDER OF   Welldone                                                        $  **7,528.08

Seven Thousand Five Hundred Twenty-Eight and 08/100*************************************   DOLLARS

Welldone
10515 Lyons Street
River Ridge, LA 70123

MEMO
Professional Art Services-Inv.#090117-ABC-1                    *Donna B Gordon*
                                                              AUTHORIZED SIGNATURE

⑆004838⑆   ⑆         ⑆   ⑆ 0214⑆              ⑆0000752808⑆

DDA Debits - 02/13/2009 - ▓▓▓▓0214 - 4838 - $7,528.08

DDA Debits - 02/13/2009 - ▓▓▓▓0214 - 4838 - $7,528.08



DDA Debits - 04/20/2009 - ████0214 - 4909 - $855.73

DDA Debits - 04/20/2009 - ████0214 - 4909 - $855.73



4927

**AARON BROUSSARD, PARISH PRESIDENT**
**CAMPAIGN COMMITTEE, INC.**
PO Box 931
METAIRIE, LA 70004-0631

**FIRST BANK**
AND TRUST
909 Perdue Street, New Orleans, Louisiana
Next Bank By Phone (504) 584-5900

14-228-650

4/22/2009

PAY
TO THE
ORDER OF    The Frame Shoppe                                    $  **1,138.22

One Thousand One Hundred Thirty-Eight and 22/100************************************  DOLLARS

The Frame Shoppe
1401 West Esplanade Avenue
Kenner, LA 70065

_Donna B. Gordon_
AUTHORIZED SIGNATURE

MEMO   Framing for Saints HOF (959.49) & Misc. Prints

⑈004927⑈ ⑆              ⑈          ⑆ ⑈ 0214⑈

DDA Debits – 04/28/2009 – ▓▓0214 – 4927 – $1,138.22



METAIRIE LA

DDA Debits – 04/28/2009 – ▓▓0214 – 4927 – $1,138.22



DDA Debits – 10/13/2009 – ■0214 – 5067 – $1,250.45



DDA Debits – 10/13/2009 – ■0214 – 5067 – $1,250.45



DDA Debits - 02/01/2010 - █████0214 - 5150 - $763.81

DDA Debits - 02/01/2010 - █████0214 - 5150 - $763.81



DDA Debits - 02/10/2010 - ████0214 - 5155 - $200.00



DDA Debits - 02/10/2010 - ████0214 - 5155 - $200.00



115886

**AARON BROUSSARD, PARISH PRESIDENT**
**CAMPAIGN COMMITTEE, INC.**
PO Box 931
METAIRIE, LA 70004-0931

FIRST BANK

3266

7/5/2005

PAY TO THE
ORDER OF   New Orleans Hornets                                    $ **645.00

Six Hundred Forty-Five and 00/100**********************************************************   DOLLARS

New Orleans Hornets

MEMO:
2005-2006 Season Tickets                          J Boudreau

⑈003266⑈  ⁚  0214⑈  ⑈00000064500⑈

DDA Debits - 08/10/2005 - ⬛0214 - 3266 - $645.00



DDA Debits - 08/10/2005 - ⬛0214 - 3266 - $645.00



DDA Debits - 08/10/2005 - ████ 0214 - 3273 - $645.00



DDA Debits - 08/10/2005 - ████ 0214 - 3273 - $645.00



DDA Debits - 07/17/2006 - ▇0214 - 3481 - $360.00



DDA Debits - 07/17/2006 - ▇0214 - 3481 - $360.00



DDA Debits - 05/10/2005 - ▇▇0214 - 3198 - $120.70

DDA Debits - 05/10/2005 - ▇▇0214 - 3198 - $120.70



DDA Debits – 10/25/2005 – ████0214 – 3307 – $145.17



DDA Debits – 10/25/2005 – ████0214 – 3307 – $145.17



DDA Debits – 10/25/2005 – ▮▮0214 – 3311 – $110.83



DDA Debits – 10/25/2005 – ▮▮0214 – 3311 – $110.83



DDA Debits - 10/25/2005 - ███0214 - 3315 - $82.73



DDA Debits - 10/25/2005 - ███0214 - 3315 - $82.73



AARON BROUSSARD, PARISH PRESIDENT
CAMPAIGN COMMITTEE, INC.
PO Box 931
METAIRIE, LA 70004-0931

FIRST BANK
AND TRUST

14-228-650

5123

12/23/2009

PAY
TO THE
ORDER OF    Holiday Sweets                              $   **1,250.00

One Thousand Two Hundred Fifty and 00/100************************************* DOLLARS

Holiday Sweets by Gail
5513 David Drive
Kenner, LA 70065

MEMO    50 boxes                                        Donna B. Gordon
                                                        AUTHORIZED SIGNATURE

⑆005123⑆ ⑈            ⑆0214⑆            ⑆0000125000⑈

DDA Debits - 12/29/2009 -    0214 - 5123 - $1,250.00



DDA Debits - 12/29/2009 -    0214 - 5123 - $1,250.00

**EXHIBIT C**



STATE OF LOUISIANA
DIVISION OF ADMINISTRATIVE LAW

| LOUISIANA BOARD OF ETHICS | * | DOCKET NO. |
|---|---|---|

IN THE MATTER OF

AARON BROUSSARD

AGENCY TRACKING NO. 2010-029

F I L E D
STATE OF LOUISIANA

DEC 17 2010

DIVISION OF ADMINISTRATIVE LAW

## CHARGES

The Louisiana Board of Ethics ( "Board"), acting pursuant to La. R.S. 42:1141C and a majority vote of its members at its meeting on the 16th day of December, 2010, files the following charges against Aaron Broussard, Respondent:

### Count I.

At a time when Aaron Broussard served as Parish President for Jefferson Parish he violated La. R.S. 42:1111A when, for the years of 2007 through 2009, he received a thing of economic value in the form of a gift certificate valued at $4500 from the personal funds of Jefferson Parish employees, an amount that he was not entitled to receive by his employees for the performance of his public duties.

In accordance with La. R.S. 42:1141C (3)(b)(iv), the Board designates Aneatra Boykin as the Board's trial attorney in this matter.

**WHEREFORE,** the Louisiana Board of Ethics requests that the Ethics Adjudicatory Board (a) conduct a hearing on the foregoing charges; (b) determine that Aaron Broussard has violated La. R.S. 42:1111A with respect to each of the foregoing counts; and (c) assess an appropriate penalty

in accordance with the recommendation of the Louisiana Board of Ethics to be submitted at the hearing.

Frank P. Simoneaux
Chair, Louisiana Board of Ethics
P.O. Box 4368
Baton Rouge, LA 70821
Telephone: (225) 219-5600
Facsimile: (225) 381-7271

## CERTIFICATE:

I hereby certify that a copy of this document has been forwarded to the Respondent by

registered/certified mail in accordance with La. R.S. 42:1141E(1)(a), on this 18th day of December,

2010.


Aneatra P. Boykin
Trial Attorney

STATE OF LOUISIANA
DIVISION OF ADMINISTRATIVE LAW

| | | |
|---|---|---|
| LOUISIANA BOARD | * | |
| OF ETHICS | * | DOCKET NO. |
| | * | |
| | * | |
| IN THE MATTER OF | * | |
| | * | |
| | * | AGENCY TRACKING NO. 2010-707 |
| AARON BROUSSARD | * | |

F I L E D
STATE OF LOUISIANA

DEC 17 2010

DIVISION OF ADMINISTRATIVE LAW

## CHARGES

The Louisiana Board of Ethics ( "Board"), acting pursuant to La. R.S. 42:1141C and a majority vote of its members at its meeting on the 16th day of December, 2010, files the following charges against Aaron Broussard, Respondent:

### Count I.

At a time when Aaron Broussard, served as President of Jefferson Parish, he violated La. R.S. 42:1111C(2)(d) when, in 2009, he received a thing of economic value in the form of payments from Lagniappe Industries, LLC for or in consideration of services rendered or to be rendered to or for Lagniappe Industries, LLC at a time when Lagniappe Industries, LLC, had a contractual or other business or financial relationship with his agency, Jefferson Parish.

### Or, in the Alternative

### Count II.

At a time when Aaron Broussard, served as President of Jefferson Parish, he violated La. R.S. 42:1115A(1) when, in 2009, he received a thing of economic value in the form of a gift or gratuity from Lagniappe Industries, LLC at a time when Lagniappe Industries, LLC, had a contractual or other business or financial relationship with his agency, Jefferson Parish.

Page 1 of 2

In accordance with La. R.S. 42:1141C (3)(b)(iv), the Board designates Alesia Ardoin and Michael Dupree as the Board's trial attorneys in this matter.

**WHEREFORE,** the Louisiana Board of Ethics requests that the Ethics Adjudicatory Board (a) conduct a hearing on the foregoing charges; (b) determine that Aaron Broussard has violated La. R.S. 42:1111C(2)(d) or in the alternative R.S. 42:1115A(1) with respect to either of the foregoing counts; and (c) assess an appropriate penalty in accordance with the recommendation of the Louisiana Board of Ethics to be submitted at the hearing.

Frank P. Simoneaux
Chair, Louisiana Board of Ethics
P.O. Box 4368
Baton Rouge, LA 70821
Telephone: (225) 219-5600
Facsimile: (225) 381-7271

## CERTIFICATE:

I hereby certify that a copy of this document has been forwarded to the Respondent by registered/certified mail in accordance with La. R.S. 42:1141E(1)(a), on this 16th day of December, 2010.

Alesia Ardoin
Trial Attorney

Page 2 of 2

Case 2:10-cv-02296-BBD-tmp Document 1-4 Filed 08/31/11 Page 1 of 4

# EXHIBIT D

Westlaw

NewsRoom

2/29/12 NOTPCN B

Page 1

2/29/12 Times-Picayune B
2012 WLNR 4341159
Loaded Date: 02/29/2012

New Orleans Times Picayune

Copyright 2012 The Times-Picayune Publishing Corporation. All Rights Reserved. Used by NewsBank with Permission.

February 29, 2012

Section: METRO

## Broussard denies slate of 6 charges
### Ex-Jefferson leader: 'It's a beautiful day'

Paul Rioux West Bank bureau

Former Jefferson Parish President Aaron Broussard and former Parish Attorney Tom Wilkinson pleaded not guilty Tuesday to six new charges in the sweeping federal investigation of Broussard's administration.

The theft, fraud and conspiracy charges outlined in a Feb. 3 superseding indictment accuse Broussard of giving Wilkinson a $36,000 raise in 2009 after a relative of Broussard's was admitted to a private school where Wilkinson served on the board.

The indictment doesn't identify the school or Broussard's relative. But Wilkinson used to be chairman of Christian Brothers School in New Orleans.

While waiting for their joint arraignment to begin, Broussard and Wilkinson sat in separate areas of the courtroom and did not converse with each other.

Broussard maintained his upbeat public demeanor as he entered the Hale Boggs Federal Building in New Or- leans.

"It's a beautiful day," Broussard said Tuesday as he walked past reporters and TV news cameras. "I feel nothing but the breeze in my face and the wonderment of this day."

Wilkinson and Broussard declined to comment after their brief court appearance.

"You know we can't talk about the case," Broussard's attorney, Robert Jenkins, said. "But the thing about it is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:11-cr-00299-BBD Document 146 Filed 08/31/12 Page 3 of 4

that he didn't do anything improper."

The new charges are in addition to 32 counts of conspiracy and theft that Broussard and Wilkinson face from a Dec. 2 indictment alleging a payroll fraud scheme that benefitted Broussard's ex-wife, Karen Parker.

Parker was paid as a paralegal supervisor from October 2003 to February 2010 even though she wasn't qualified for the job and was actually assigned to another department to process employee identification cards, a job that should have paid her about $22,000 less.

Parker has pleaded guilty to covering up a felony and is cooperating with prosecutors.

Broussard's former top aide, Tim Whitmer, who also is cooperating with investigators, allegedly told Wilkinson the $36,000 raise was a reward for helping Broussard's relative, according to the superseding indictment.

Whitmer had received similar outsized raises from Broussard at a time when the parish was cutting expenses to deal with a budget crunch.

The raises prompted the Parish Council to pass an ordinance limiting discretionary raises for parish executives to 5 percent and requiring council approval.

Whitmer, who initially pleaded innocent, is expected to plead guilty to failing to report a felony when he is re-arraigned March 22.

The trial for Broussard and Wilkinson has been set for May 14.

If convicted of all charges, they each face 695 years in prison and more than $9.5 million in fines, although maximum sentences are rarely meted out for first-time federal offenders.

. . . . . . . .

Paul Rioux can be reached at prioux@timespicayune.com or 504.826.3785.

---- INDEX REFERENCES ---

NEWS SUBJECT: (Corruption, Bribery & Embezzlement (1EM51); Crime (1CR87); Criminal Law (1CR79); Financial Fraud (1FI18); Fraud (1FR30); Government Litigation (1GO18); Legal (1LE33); Social Issues (1SO05))

REGION: (Americas (1AM92); Louisiana (1LO72); North America (1NO39); U.S. Southeast Region (1SO88); USA (1US73))

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2/29/12 NOTPCN B

Page 3

Language: EN

OTHER INDEXING: (Aaron Broussard; Karen Parker; Parish Attorney Tom Wilkinson; Robert Jenkins; Tim Whitmer; Tom Wilkinson)

Word Count: 433
2/29/12 NOTPCN B
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    SEP 2 4 2012

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 11-299 |
| v. | * | SECTION: "HH" (SHF) |
| THOMAS G. WILKINSON | * | |
| | * * * | |

### FACTUAL BASIS

Should this matter have proceeded to trial, the Government would have proven, through the introduction of competent testimony and admissible evidence, the following facts, beyond a reasonable doubt, to support the allegations in the Superseding Bill of Information now pending against the defendant:

Beginning in 1996, THOMAS G. WILKINSON, a/k/a TOM WILKINSON ("WILKINSON"), was named the Parish Attorney for Jefferson Parish and in that position had supervisory authority over the Jefferson Parish Attorney's Office, the authority to approve the hiring of new employees, and the authority to approve pay raises for Parish Attorney's Office employees.

Beginning in 1998, Timothy A. Whitmer, a/k/a Tim Whitmer ("Whitmer") was named Chief Administrative Officer/Chief Administrative Assistant ("CAO") for Jefferson Parish. As CAO,

____ Fee_____
____ Process_____
__X__ Dktd_____
____ CtRmDep_____
____ Doc. No._____



EXHIBIT

Whitmer was responsible for the day-to-day operations of Jefferson Parish.   Whitmer remained CAO until he resigned in January 2010.

Beginning in 1992, Karen Parker, a/k/a Karen Parker Broussard ("Parker") began working as an administrative assistant for the Jefferson Parish Council.  On or about July 31, 2003, Parker resigned from her position as an administrative assistant for then Jefferson Parish Councilman Aaron F. Broussard ("Broussard") and began working for Broussard's campaign for Jefferson Parish President. On or about October 4, 2003, Broussard was elected Parish President of Jefferson Parish. Approximately four years later, on or about October 20, 2007, Broussard was re-elected by the voters of Jefferson Parish.  On or about May 29, 2004, Parker and Broussard were married.

After his election on October 4, 2003, but prior to him taking office as the Jefferson Parish President, Broussard, who was still Parish Council President, set up a meeting with WILKINSON, Tim Whitmer, and one other high-ranking Jefferson Parish official to discuss creating a new and unnecessary position for Parker with the Parish under the Broussard administration.  During this meeting, it was understood by the parties that Parker would be hired as a "Paralegal Supervisor" under the purview of the Parish Attorney's Office in Jefferson Parish.  The Paralegal Supervisor position is an unclassified position and, therefore, Karen Parker was not required to take a Civil Service examination, nor was she subject to the strict hiring requirements and safeguards associated with Civil Service positions. Broussard specifically wanted to have other Parish officials, including WILKINSON and Whitmer, be the individuals who hired Parker, because he knew that once he took over the position of Parish President, he could not hire Parker, and there would be increased scrutiny as a result of their romantic relationship.

2

On or about October 28, 2003, WILKINSON and others approved the rescission/cancellation of Parker's July 31, 2003 resignation from Jefferson Parish employment, which allowed her to collect additional money and salary in the form of longevity pay, tenure awards, health insurance benefits, and annual leave. In addition, WILKINSON and others approved the placing of Parker on leave without pay for the time period August 1, 2003, through October 31, 2003, thereby eliminating any break in her employment with Jefferson Parish.

The government would present evidence to establish that all parties to the decision to hire Parker – Broussard, WILKINSON, Whitmer, and one other official – knew or should have known that Parker was not qualified, trained, or certified as a "Paralegal Supervisor." Despite this, on or about October 28, 2003, Parker was given the position of "Paralegal Supervisor" in the Jefferson Parish Attorney's Office. Her starting salary was approximately $48,000.00, which was higher than the salary range allowed for the position of Paralegal Supervisor under the Executive Pay Plan for Jefferson Parish.

WILKINSON and others approved the decision to hire Parker as a "Paralegal Supervisor," approved her salary, rescinded her resignation, and approved her leave without pay status when he executed Parker's Parish of Jefferson, Department of Human Resources Request to Fill a Vacant Job form on October 28, 2003.

According to the job description of Paralegal Supervisor, the essential functions of that position require that the "[i]ndividual conducts basic legal research, interviews witnesses, meets with inter-governmental personnel and members of the public, gathers evidence to formulate the Parish's position on Parish or other matters. Individual prepares legal documents including pleadings, wills, contracts, leases, property descriptions and legal opinions setting forth the Parish's position on Parish

3

and other matters. Individual supervises and coordinates the activities of various support staff."
Moreover, the Jefferson Parish job description for the position of Parish Attorney's Office Paralegal
Supervisor required Paralegal Supervisors to have completed paralegal training and certification.

During the period of time Parker was assigned to work at the Parish Attorney's Office as a
"Paralegal Supervisor," from approximately October 2003 through March 2004, Parker did no work
as a Paralegal Supervisor, nor did she perform any paralegal work. During this period of time,
Broussard, WILKINSON, and others were likewise aware that Parker did no work as Paralegal
Supervisor and the little work she did perform was not paralegal or paralegal supervisory work.

The government would present evidence that on or about March 8, 2004, WILKINSON and
others approved the transfer of Parker to work for ID Management which was located at the East
Bank Regional Library. ID Management is the department responsible for issuing access badges to
Jefferson Parish employees. Jefferson Parish determined that the Parish only requires one employee
to hold the position of ID/Security System Coordinator. Despite her transfer to the East Bank
Regional Library, Parker retained her position and higher salary of "Paralegal Supervisor" until her
dismissal on or about February 5, 2010.

As with her work at the Parish Attorney's Office, during the time period she worked at the
East Bank Regional Library, Parker did not perform any of the duties of, and did no work as, a
"Paralegal Supervisor." Likewise, Broussard, WILKINSON, and Whitmer were aware, during this
same period of time, that Parker did not perform the duties of, and did no work as, a "Paralegal
Supervisor" while assigned to the ID Management department. Moreover, both Broussard and
WILKINSON had first-hand knowledge that Parker did not appear at times at the location she was
assigned (East Bank Regional Library) to work.

4

The government would present evidence that as Parish President, Broussard utilized a full-time employee with the title Executive Protection Specialist ("EPS"). The EPS was traditionally a ranking member of the Jefferson Parish Sheriff's Office. The primary responsibility of the EPS was to act as a bodyguard and to pick up the Parish President at his home in the mornings and chauffeur him throughout the day and return him home after the conclusion of his evening's activities. The EPS was not a parish employee and, therefore, was not permitted to supervise Jefferson Parish government employees. Nevertheless, under Aaron Broussard's administration, the EPS became the defacto supervisor of Karen Parker, along with WILKINSON. As a result, the EPS, who was Broussard's driver/bodyguard, was put in the position of monitoring Karen Parker, wife of the Parish President.

Evidence would be introduced at trial to establish that Karen Parker and Aaron Broussard had approximately four joint bank accounts, including accounts for their condominium in Perdido Key, Florida. In addition, Karen Parker and Aaron Broussard filed their federal income tax returns jointly and applied for bank loans and/or mortgages jointly. Accordingly, Parker's salary benefitted not only Parker, but also her husband, Aaron Broussard.

The government would introduce evidence at trial that beginning in 2003, as noted above, Parker was given an annual salary of approximately $48,000 as a "Paralegal Supervisor," which was higher than the salary range allowed for that position under the Executive Pay Plan for Jefferson Parish. This salary range was approved and known by WILKINSON and Broussard. In 2004, 2007, and twice in 2008, Parker was approved for Annual Evaluation Pay Raises by WILKINSON. These pay raises were approved by WILKINSON and known by Broussard and Whitmer despite the fact that Whitmer, WILKINSON and Broussard knew Parker was not performing any of the essential

5

functions for the position of "Paralegal Supervisor" and, indeed, Parker was not qualified for, and did no work as, a "Paralegal Supervisor." From approximately 2004 through 2009, WILKINSON authorized pay raises for Parker from approximately $46,439.99 to approximately $63,898.36, knowing that these raises would result in increased retirement benefits to Parker. In total, from 2004 through 2010, Parker was paid approximately $323,308.13 in Jefferson Parish taxpayer funds for her salary.

After the hiring of Parker as a "Paralegal Supervisor" in Jefferson Parish in October 2003, Broussard retained WILKINSON as the Parish Attorney in December 2003. As Parker's salary was annually being raised by WILKINSON, Broussard, as Parish President, was approving annual pay raises for WILKINSON. From approximately 2004 through 2009, Broussard authorized significant pay increases for WILKINSON increasing his salary to $183,870.05. In one such instance, in January 2009, Broussard directed Whitmer to max-out WILKINSON's salary, improperly giving WILKINSON a $36,192.91 annual raise based on a matter unrelated to WILKINSON's job as Parish Attorney.

In early 2004, WILKINSON advised Whitmer of Karen Parker's improper requests for overtime and/or comp pay. As a result of WILKINSON's and Whitmer's conversation, Broussard was notified that Parker was violating parish rules by attempting to collect overtime/comp pay under the circumstances described to Broussard. When Broussard was informed by Whitmer that Karen Parker could not collect overtime/comp pay while working from home, Broussard responded in a dismissive manner and wasn't concerned. Whitmer then explained to Broussard that it was against Jefferson Parish policy for an employee to collect overtime/comp pay while working from home.

6

Broussard's nonchalant attitude towards the situation caused Whitmer to instruct WILKINSON to take care of the issue with Parker.

As set forth above, WILKINSON joined the conspiracy when in approximately 2004, he signed off on official Jefferson Parish documents that created a "Paralegal Supervisor" position for Karen Parker even though he knew that Parker was not qualified, trained, or certified to be a Paralegal Supervisor in Jefferson Parish and did not do any work as a Paralegal Supervisor. Though WILKINSON was aware that Broussard and Parker were stealing or committing theft of property valued at $5,000 or more which was owned by or under the care, custody, and control of the Parish of Jefferson (because Parker did not perform any work as a Paralegal Supervisor), WILKINSON did not report this crime to federal authorities and, indeed, concealed this crime from the authorities by, among other things, allowing Parker to continue to accept her salary and/or salary increases on an annual basis, allowing her to continue to be classified as a "Paralegal Supervisor," and by permitting Parker to draw her Paralegal Supervisor salary knowing that she was not qualified for that position and was not doing any paralegal work for Jefferson Parish.

This proffer of evidence is not intended to constitute a complete statement of all facts known by WILKINSON and described by WILKINSON to the government, but rather is a minimum statement of facts intended to prove the necessary factual predicate for his guilty plea. The limited purpose of this factual basis is to demonstrate that there exists a sufficient legal basis for WILKINSON's plea of guilty to the charged offense.

Various records, including bank statements, financial statements, mortgage statements, employment-related documents, forms (including tax records and disclosure forms) and other records, would be introduced to prove the facts as set forth above.

Testimonial evidence, including testimony from representatives of the Federal Bureau of Investigation, Internal Revenue Service, as well as other witnesses, would also be admitted to prove the facts set forth above.

_____
BRIAN M. KLEBBA (NY 2938728)
Assistant United States Attorney

Date _____9/19/2012_____

_____
MATTHEW S. CHESTER (TX 24045650)
Assistant United States Attorney

Date _____9/19/2012_____

_____
DANIEL P. FRIEL (MA #660583)
Assistant United States Attorney

Date _____9/19/2012_____

_____
THOMAS G. WILKINSON
Defendant

Date _____9-18-2012_____

_____
RALPH WHALEN (LA 8319)
Counsel for Defendant

Date _____9/18/2012_____

_____
RICHARD WESTLING (LA 20027)
Counsel for Defendant

Date _____9/18/2012_____



U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED   SEP 2 5 2012

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA          *          CRIMINAL NO. 11-299

v.                                *          SECTION: "HH"

AARON F. BROUSSARD                 *

          *     *     *

## FACTUAL BASIS

Should this matter have proceeded to trial, the Government would have proven, through the introduction of competent testimony and admissible evidence, the following facts, beyond a reasonable doubt, to support the allegations in the Second Superseding Indictment now pending against the defendant:

### *INTRODUCTION*

Beginning in 1992, Karen Parker, a/k/a Karen Parker Broussard ("Parker") began working as an administrative assistant for the Jefferson Parish Council. On or about July 31, 2003, Parker resigned from her position as an administrative assistant for then Jefferson Parish Councilman **AARON F. BROUSSARD ("BROUSSARD")** and began working for **BROUSSARD**'s campaign for Jefferson Parish President. On or about October 4, 2003, **BROUSSARD** was elected Parish President of Jefferson Parish. Approximately four years later, on or about October 20, 2007,

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____



EXHIBIT

BROUSSARD was re-elected by the voters of Jefferson Parish. On or about May 29, 2004, Parker and BROUSSARD were married.

At all times relevant to this case, Thomas G. Wilkinson, a/k/a Tom Wilkinson ("Wilkinson"), was the Parish Attorney for Jefferson Parish and in that position had supervisory authority over the Jefferson Parish Attorney's Office, the authority to approve the hiring of new employees, and the authority to approve pay raises for Parish Attorney's Office employees. Timothy A. Whitmer, a/k/a Tim Whitmer ("Whitmer") was the Chief Administrative Officer/Chief Administrative Assistant ("CAO") for Jefferson Parish.

The government would present evidence at trial to establish that Jefferson Parish utilized Iberia Bank, formerly Omni Bank, for Automated Clearing House transactions (payroll) who transmitted, via wire, these payroll transactions that crossed state lines before the payroll funds were deposited into the recipient (employee) bank account. Parker established direct deposit with the Jefferson Parish Employees Credit Union (JPEFCU) and her salary while she was employed at Jefferson Parish, as set forth below from 2004 through 2010, was deposited into her JPEFCU accounts.

Further, the government would present evidence that the Jefferson Parish Attorney's Office is a local government agency of Jefferson Parish. Jefferson Parish received federal assistance in excess of $10,000.00 during each of the one year periods beginning on January 1st and ending December 31st for the years 2004, 2005, 2006, 2007, 2008, 2009, and 2010.

2

### THE CONSPIRACY TO COMMIT BRIBERY, THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS, AND WIRE FRAUD (COUNT 1) AND THEFT CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS (COUNT 27)

After his election on October 4, 2003, but prior to him taking office as the Jefferson Parish President, **BROUSSARD** set up a meeting with Tim Whitmer, Tom Wilkinson, and one other high-ranking Jefferson Parish official to discuss creating a new and unnecessary position for Parker with the Parish under the **BROUSSARD** administration. During this meeting, it was understood by the parties that Parker would be hired as a "Paralegal Supervisor" under the purview of the Parish Attorney's Office in Jefferson Parish. The Paralegal Supervisor position is an unclassified position and, therefore, Karen Parker was not required to take a Civil Service examination, nor was she subject to the strict hiring requirements and safeguards associated with Civil Service positions. **BROUSSARD** specifically wanted to have other Parish officials, including Wilkinson, be the individuals who hired Parker, because he knew that once he took over the position of Parish President, he could not hire Parker, and there would be increased scrutiny as a result of their romantic relationship.

**BROUSSARD** knew that on or about October 28, 2003, Wilkinson approved the rescission/cancellation of Parker's July 31, 2003 resignation from Jefferson Parish employment, which allowed her to collect additional money and salary in the form of longevity pay, tenure awards, health insurance benefits, and annual leave. **BROUSSARD** also knew that Wilkinson approved the placing of Parker on leave without pay for the time period August 1, 2003, through October 31, 2003, thereby eliminating any break in her employment with Jefferson Parish.

The government would present evidence to establish that all parties to the decision to hire Parker – **BROUSSARD**, Wilkinson, Whitmer, and one other official – knew or should have known

3

that Parker was not qualified, trained, or certified as a "Paralegal Supervisor." Despite this, on or about October 28, 2003, Parker was given the position of "Paralegal Supervisor" in the Jefferson Parish Attorney's Office. Her starting salary was approximately $48,000.00, which was higher than the salary range allowed for the position of Paralegal Supervisor under the Executive Pay Plan for Jefferson Parish.

Wilkinson approved the decision to hire Parker as a "Paralegal Supervisor," approved her salary, rescinded her resignation, and approved her leave without pay status when he executed Parker's Parish of Jefferson, Department of Human Resources Request to Fill a Vacant Job form on October 28, 2003.

According to the job description of Paralegal Supervisor, the essential functions of that position require that the "[i]ndividual conducts basic legal research, interviews witnesses, meets with inter-governmental personnel and members of the public, gathers evidence to formulate the Parish's position on Parish or other matters. Individual prepares legal documents including pleadings, wills, contracts, leases, property descriptions and legal opinions setting forth the Parish's position on Parish and other matters. Individual supervises and coordinates the activities of various support staff." Moreover, the Jefferson Parish job description for the position of Parish Attorney's Office Paralegal Supervisor required Paralegal Supervisors to have completed paralegal training and certification.

Despite being given the position of a "Paralegal Supervisor," Parker was neither trained as a Paralegal or a Paralegal Supervisor, nor did she possess the required paralegal certification. Moreover, as noted above, the parties who helped place her as a "Paralegal Supervisor," including BROUSSARD, Wilkinson, Whitmer, and the other parish official knew or should have known that she did not possess the required paralegal certification and that she was not trained as a Paralegal.

4

During the period of time Parker was assigned to work at the Parish Attorney's Office as a "Paralegal Supervisor," from approximately October 2003 through March 2004, Parker did no work as a Paralegal Supervisor, nor did she perform any paralegal work. During this period of time, **BROUSSARD**, Wilkinson, and others were likewise aware that Parker did no work as Paralegal Supervisor and the little work she did perform was not paralegal or paralegal supervisory work.

The government would present evidence that on or about March 8, 2004, Wilkinson and others approved the transfer of Parker to work for ID Management which was located at the East Bank Regional Library. ID Management is the department responsible for issuing access badges to Jefferson Parish employees. Jefferson Parish determined that the Parish only requires one employee to hold the position of ID/Security System Coordinator. Despite her transfer to the East Bank Regional Library, Parker retained her position and higher salary of "Paralegal Supervisor" until her dismissal on or about February 5, 2010.

As with her work at the Parish Attorney's Office, during the time period she worked at the East Bank Regional Library, Parker did not perform any of the duties of, and did no work as, a "Paralegal Supervisor." Likewise, **BROUSSARD**, Wilkinson, and Whitmer were aware, during this same period of time, that Parker did not perform the duties of, and did no work as, a "Paralegal Supervisor" while assigned to the ID Management department. Moreover, both **BROUSSARD** and Wilkinson had first-hand knowledge that Parker did not appear at times at the location she was assigned (East Bank Regional Library) to work.

As Parish President, **BROUSSARD** utilized a full-time employee with the title Executive Protection Specialist ("EPS"). The EPS was traditionally a ranking member of the Jefferson Parish Sheriff's Office. The primary responsibility of the EPS was to act as a bodyguard and to pick up the

5

Parish President at his home in the mornings and chauffeur him throughout the day and return him home after the conclusion of his evening's activities.  The EPS was not a parish employee and, therefore, was not permitted to supervise Jefferson Parish government employees.  Nevertheless, under **BROUSSARD**'s administration, the EPS became the defacto supervisor of Karen Parker, along with Tom Wilkinson.  As a result, the EPS, who was **BROUSSARD**'s driver/bodyguard, was put in the position of monitoring Karen Parker, wife of the Parish President.

Evidence would be introduced at trial to establish that Karen Parker and **BROUSSARD** had approximately four joint bank accounts, including accounts for their condominium in Perdido Key, Florida.  In addition, Karen Parker and **BROUSSARD** filed their federal income tax returns jointly and applied for bank loans and/or mortgages jointly.  Accordingly, Parker's salary benefitted not only Parker, but also her husband, **BROUSSARD**.

The government would introduce evidence at trial that beginning in 2003, as noted above, Parker was given an annual salary of approximately $48,000 as a "Paralegal Supervisor," which was higher than the salary range allowed for that position under the Executive Pay Plan for Jefferson Parish.  This salary range was approved and known by Wilkinson, as the Parish Attorney, and **BROUSSARD**, as Parker's romantic interest.  In 2004, 2007, and twice in 2008, Parker was approved for Annual Evaluation Pay Raises by Wilkinson.  These pay raises were approved by Wilkinson and known by **BROUSSARD** and Whitmer despite the fact that Whitmer, Wilkinson and **BROUSSARD** knew Parker was not performing any of the essential functions for the position of "Paralegal Supervisor" and, indeed, Parker was not qualified for, and did no work as, a "Paralegal Supervisor."  From approximately 2004 through 2009, Wilkinson authorized pay raises for Parker from approximately $46,439.99 to approximately $63,898.36, knowing that these raises would result

6

in increased retirement benefits to Parker. In total, from 2004 through 2010, Parker was paid approximately $323,308.13 in Jefferson Parish taxpayer funds for her salary, which was approximately $129,176.41 more than the individual who held the position of ID/Security System Coordinator.

After the hiring of Parker as a "Paralegal Supervisor" in Jefferson Parish in October 2003, BROUSSARD retained Wilkinson as the Parish Attorney in December 2003. As Parker's salary was annually being raised by Wilkinson, BROUSSARD, as Parish President, was approving annual pay raises for Wilkinson. From approximately 2004 through 2009, BROUSSARD authorized significant pay increases for Wilkinson increasing his salary to $183,870.05. In one such instance, in January 2009, BROUSSARD directed Whitmer to max-out Wilkinson's salary, improperly giving Wilkinson a $36,192.91 annual raise.

In early 2004, Wilkinson advised Whitmer of Karen Parker's improper requests for overtime and/or comp pay. As a result of Wilkinson's and Whitmer's conversation, BROUSSARD was notified that Parker was violating parish rules by attempting to collect overtime/comp pay under the circumstances described to BROUSSARD. When BROUSSARD was informed by Whitmer that Karen Parker could not collect overtime/comp pay while working from home, BROUSSARD responded in a dismissive manner and wasn't concerned. Whitmer then explained to BROUSSARD that it was against Jefferson Parish policy for an employee to collect overtime/comp pay while working from home. BROUSSARD's nonchalant attitude towards the situation caused Whitmer to instruct Wilkinson to take care of the issue with Parker.

Beginning in or around 1982 through in or around July 2012, William Mack ("Mack"), was an owner and/or President of First Communications Company ("FCC"), a company that provided

7

telecommunications services and equipment for commercial customers, including governments and municipalities. From at least in or around 2004 through in or about 2007, Mack's company, FCC, bid on and received several contracts let by Jefferson Parish for telecommunications services and equipment.

Beginning in or around 2002, Mack met **BROUSSARD**, then a sitting Jefferson Parish council member. Around this time, in 2002, Mack began paying **BROUSSARD** approximately $1,500.00 per month in exchange for **BROUSSARD**'s official acts, as a Parish councilman and later Parish President, to, among other things, steer telecommunications work to FCC.

From at least in or around 2004 through in or about November 2007, Mack and the Jefferson Parish President, **BROUSSARD**, reached an arrangement where Mack would corruptly give **BROUSSARD** monthly installments of money in exchange for, among other things, **BROUSSARD**'s efforts, as Parish President, to steer Parish telecommunications work to Mack's company, FCC. During this time period, Mack's company, FCC, provided **BROUSSARD** with approximately $66,000.00, paid in monthly installments of approximately $1,500.00, intending to influence **BROUSSARD** in connection with his official duties as Jefferson Parish President. From in or around 2004 through in or around 2008, in exchange for the money he was receiving and had been receiving from Mack, **BROUSSARD** undertook official actions as Jefferson Parish President to steer Parish work to FCC and FCC did, in fact, receive multiple contracts for telecommunications services in Jefferson Parish, collectively worth approximately $40,000.00. **BROUSSARD** also undertook other official actions as Jefferson Parish President, ultimately unsuccessful, to steer more lucrative Parish telecommunications work, including a 2008 Request for Proposal released by Jefferson Parish, to Mack's company, FCC.

8

Additionally, **BROUSSARD** and Mack, on several occasions in between 2004 and 2007, sought to conceal their improper relationship and the illegal payoffs by masking the purpose of the payoffs to make them appear legitimate.

As set forth above, **BROUSSARD**, Whitmer, and Wilkinson knew, from approximately 2004 through 2010, that Parker was not qualified, trained, or certified to be a Paralegal Supervisor in Jefferson Parish and did not do any work as a Paralegal Supervisor in Jefferson Parish. In hiring, retaining, and paying Parker as a "Paralegal Supervisor," **BROUSSARD** and Parker intentionally stole or committed theft with Jefferson Parish taxpayer funds. **BROUSSARD** and Parker stole and committed theft of property valued at $5,000 or more which was owned by or under the care, custody, and control of the Parish of Jefferson (because Parker did not perform any work as a Paralegal Supervisor). Specifically, in 2009, **BROUSSARD** and Thomas G. Wilkinson, and others known and unknown to the grand jury, did knowingly embezzle, steal, obtain by fraud and otherwise without authority convert to the use of Karen Parker, wife of the Jefferson Parish President **AARON F. BROUSSARD**, a person other than the rightful owner, property valued at $5,000.00 or more and owned by, or under the care, custody, and control of Jefferson Parish, in that Karen Parker received approximately $28,157.69 in income that she was not entitled to because she did not perform the essential duties of a Paralegal Supervisor and because she was paid substantially more than the individual who held the position of ID/Security System Coordinator.

In addition, as discussed *supra,* the defendant, **AARON F. BROUSSARD**, agrees that he committed all of the elements of the crimes of conspiracy and theft concerning programs receiving federal funds and that he committed the overt acts listed in the Second Superseding Indictment in furtherance of the conspiracy.

9

This proffer of evidence is not intended to constitute a complete statement of all facts known by **BROUSSARD** and described by **BROUSSARD** to the government, but rather is a minimum statement of facts intended to prove the necessary factual predicate for his guilty plea. The limited purpose of this factual basis is to demonstrate that there exists a sufficient legal basis for **BROUSSARD**'s plea of guilty to the charged offense.

Various records, including bank statements, financial statements, mortgage statements, employment-related documents, forms (including tax records and disclosure forms) and other records, would be introduced to prove the facts as set forth above.

10

Testimonial evidence, including testimony from representatives of the Federal Bureau of Investigation, Internal Revenue Service, as well as other witnesses, would also be admitted to prove the facts set forth above.


_____
BRIAN M. KLEBBA
Assistant United States Attorney
New York Bar Roll No. 2938728

_____
Date  9/25/12


_____
MATTHEW S. CHESTER
Assistant United States Attorney
Texas Bar No. 24045650

_____
Date  9/25/2012


_____
DANIEL P. FRIEL
Assistant United States Attorney
Massachusetts Bar No. 660583

_____
9-25-12
Date


_____
AARON F. BROUSSARD
Defendant

_____
9-25-12
Date


_____
ROBERT JENKINS
Counsel for Defendant
Louisiana Bar Roll No. 19256

_____
9-25-12
Date


11

# DIV. F

JUDGE
PATRICK J. McCABE

STATE OF LOUISIANA

PARISH OF JEFFERSON

24th JUDICIAL DISTRICT COURT

SUIT NO. 715·024                                    DIVISION

THE LOUISIANA BOARD OF ETHICS
ACTING IN ITS CAPACITY AS THE
SUPERVISORY COMMITTEE ON CAMPAIGN FINANCE DISCLOSURE

VERSUS

RIVER BIRCH, INC., WESTSIDE CONSTRUCTION SERVICES, INC.,
DOMINICK J. FAZZIO, BIG BANG PROPERTIES, LLC,
ANNE'S PROPERTIES, LLC, DANGLE & ASSOCIATES, LLC,
B&C CONTRACTORS, LLC, WATER FRONT PROPERTIES, LLC,
RING ASSOCIATES, LLC, and N.C. GENERAL CONTRACTORS, INC.

---

## PETITION:

NOW INTO COURT, through undersigned counsel, comes Petitioner, the Louisiana Board

of Ethics (the "Board"), acting in its capacity as the Supervisory Committee on Campaign Finance

Disclosure, who respectfully represents:

1.

Petitioner is an agency of the State of Louisiana domiciled in East Baton Rouge Parish.

2.

Made defendants herein are:

1.  **RIVER BIRCH, INC.:** A corporate entity domiciled and doing business in the
    Parish of Jefferson, State of Louisiana, whose agent for Service of Process is Heebe
    & Heebe (PLC), 2000 Belle Chasse Hwy., Third Floor, Terrytown, LA 70056
    (Hereinafter sometimes referred to as "River Birch");

2.  **WESTSIDE CONSTRUCTION SERVICES, INC.:** A corporate entity domiciled
    in the Parish of St. Tammany, State of Louisiana, whose agent for Service of Process
    is Dominick J. Fazzio, 1625 Lake Maurepas, Harvey, LA 70058  (Hereinafter
    sometimes referred to as "Westside").

3.  **DOMINICK J. FAZZIO:** an individual over the age of majority, resident of the
    State of Louisiana, residing at 1625 Lake Maurepas, Harvey, LA 70058, who can be
    served through his Attorney of Record, Stephen London, 2950 Entergy Center, 1100
    Poydras Street, New Orleans, LA 70163;

4.  **BIG BANG PROPERTIES, LLC:** A corporate entity domiciled and doing business
    in the Parish of Jefferson Parish, State of Louisiana, whose agent for Service of
    Process is Richard P. Richter, 909 Poydras St., 28th Floor, New Orleans, LA 70112;

IMAGED    MAY 18 2012

EXHIBIT
P

.Case 2:12-cv-02596-SRD-KWR   Document 1-4   Filed 10/25/12   Page 366 of 373

Page 2 of 9

5.   **ANNE'S PROPERTIES, LLC:** A corporate entity domiciled and doing business in the Parish of Jefferson Parish, State of Louisiana, whose agent for Service of Process is Richard P. Richter, 909 Poydras St., 28th Floor, New Orleans, LA 70112;

6.   **DANGLE & ASSOCIATES, LLC:** A corporate entity domiciled and doing business in the Parish of Jefferson Parish, State of Louisiana, whose agent for Service of Process is Richard P. Richter, 909 Poydras St., 28th Floor, New Orleans, LA 70112;

7.   **B&C CONTRACTORS, LLC:** A corporate entity domiciled and doing business in the Parish of Jefferson Parish, State of Louisiana, whose agent for Service of Process is Richard P. Richter, 909 Poydras St., 28th Floor, New Orleans, LA 70112;

8.   **WATER FRONT PROPERTIES, LLC:** A corporate entity domiciled and doing business in the Parish of Jefferson Parish, State of Louisiana, whose agent for Service of Process is Richard P. Richter, 909 Poydras St., 28th Floor, New Orleans, LA 70112;

9.   **RING ASSOCIATES, LLC:** A corporate entity domiciled and doing business in the Parish of Jefferson Parish, State of Louisiana, whose agent for Service of Process is Richard P. Richter, 909 Poydras St., 28th Floor, New Orleans, LA 70112, and

10.   **N.C. GENERAL CONTRACTORS, INC.:** A corporate entity domiciled and doing business in the Parish of Jefferson Parish, State of Louisiana, whose agent for Service of Process is Douglas P. Caldarera, 1125 Wyndham S., Gretna, LA 70056.

3.

Pursuant to La. R.S. 18:1511.7, venue is proper in this Court.

4.

Pursuant to La. R.S. 13:4521, the State of Louisiana, or its agencies, are not required to prepay the court costs associated with the filing of this Petition.

5.

La. R.S. 18:1505.2A prohibits a person from giving, furnishing, or contributing monies, materials, supplies, or making loans to or in support of a candidate or to any political committee, through or in the name of another, directly or indirectly.

## I. RIVER BIRCH, INC.

6.

River Birch is a corporate entity engaged in the waste management business, domiciled in Jefferson Parish, Louisiana.

7.

Defendant Dominic Fazzio is the CEO of River Birch. Mr. Fazzio is responsible for the day to day operations of River Birch, and has the authority to sign checks and distribute River Birch funds during the ordinary course of business.

IMAGED   MAY 18 2012

715012

8.

Upon information and belief, during the years 2009 to the present, River Birch knowingly and willfully gave, furnished or contributed money to or in support of candidates and political committees, through or in the name of another, directly or indirectly, in violation of La. R.S. 18:1505.2A.

9.

Upon information and belief, during the years 2009 to the present, River Birch knowingly and willfully deposited funds into the account of Defendant Westside, which would then, knowingly and willfully transfer the funds to one of seven (7) "straw man entities", who would then, knowingly and willfully, make separate campaign donations to various candidates or political committees, favored by River Birch.

10.

Upon information and belief, Dominic Fazzio, CEO of River Birch, incorporated and controlled the following four (4) companies in order to knowingly and willfully make campaign contributions to candidates or political committees in the name of another. The following entities are also named defendants in this lawsuit and are hereinafter referred to as "straw man entities":

1. Big Bang Properties, LLC;
2. Anne's Properties, LLC;
3. Dangle and Associates, LLC, and
4. Ring Associates, LLC.

11.

Upon information and belief, Dominic Fazzio, CEO of River Birch, controlled the day to day operations and finances of the following three (3) companies, which knowingly and willfully made campaign contributions to candidates or political committees in the name of another. The following entities are also named defendants in this lawsuit and are referred to hereinafter as "straw man entities":

1. B&C Contractors, LLC;
2. Water Front Properties, LLC, and
3. N.C. General Contractors, Inc.

12.

Upon information and belief, the "straw man entities" exist, for no other substantial reason than to distribute River Birch funds in the form of campaign contributions to candidates or political committees.

IMAGED   MAY 18 2012      Page 3 of 9                    715012

13.

During the years 2009 to the present, the plaintiff believes that approximately 34 separate transactions have occurred whereupon River Birch has knowingly and willfully furnished, or contributed monies, materials, supplies, or made loans to or in support of candidates or political committees, **through or in the name of another.**

## II. WESTSIDE CONSTRUCTION SERVICES, INC.

14.

In 2006, Defendant Dominic Fazzio incorporated Defendant Westside Construction Servies, Inc. Mr. Fazzio is the owner and director of Defendant Westside.

15.

Upon information and belief, Defendant Westside exists for no other substantial reason than to knowingly and willfully distribute funds, which are deposited by River Birch, into Westside's accounts, to candidates or political committees.

16.

Upon information and belief, during the years 2009 to the present, Defendant Westside knowingly and willfully gave, furnished or contributed money to or in support of candidates and political committees, through or in the name of another, directly or indirectly, in violation of La. R.S. 18:1505.2A.

17.

Upon information and belief, during the years 2009 to the present, Westside, knowingly and willfully authorized its funds, received from River Birch, to be distributed as contributions to various candidates or political committees, favored by River Birch.

18.

Upon information and belief, during the years 2009 to the present, Westside, knowingly and willfully authorized funds to be transferred to one of the seven (7) named "straw man entities[1]", who would then, knowingly and willfully, make separate campaign contributions to various candidates or political committees, favored by River Birch and/or Westside.

---

[1] The "straw man entities" referenced in this paragraph of the Plaintiff's Petition are described with specificity in Paragraphs 9 and 10 of the Plaintiff's Petition.

19.

During the years 2009 to the present, the plaintiff believes that approximately 34 separate transactions have occurred whereupon Westside knowingly and willfully furnished, or contributed monies, materials, supplies, or made loans to or in support of candidates or political committees, **through or in the name of another.**

### III. DOMINICK J. FAZZIO

20.

Upon information and belief, Defendant Dominick Fazzio, during the years 2009 to the present, knowingly and willfully gave, furnished or contributed money to or in support of candidates and political committees, through or in the name of another, directly or indirectly, in violation of La. R.S. 18:1505.2A.

21.

Upon information and belief, during the years 2009 to the present, Dominick Fazzio, knowingly and willfully authorized the funds of River Birch and/or Westside to be transferred to one of the seven (7) named "straw man entities[2]", who would then, knowingly and willfully, make separate campaign contributions to candidates or political committees favored by Dominick Fazzio, River Birch and/or Westide.

22.

During the years 2009 to the present, the plaintiff believes that approximately 34 separate transactions have occurred whereupon Dominick Fazzio knowingly and willfully furnished, or contributed monies, materials, supplies, or made loans to or in support of a candidate or to any political committee, **through or in the name of another.**

### IV. BIG BANG PROPERTIES, LLC

23.

During the years 2009 to the present, the plaintiff believes that Big Bang Properties, LLC, knowingly and willfully, furnished, or contributed monies, materials, supplies, or made loans to or in support of a candidate or political committee, **through or in the name of another.**

---

[2] The "straw man entities" referenced in this paragraph of the Plaintiff's Petition are described with specificity in Paragraphs 9 and 10 of the Plaintiff's Petition.

IMAGED   MAY 18 2012          Page 5 of 9                    715012

## V. ANNE'S PROPERTIES, LLC

### 24.

During the years 2009 to the present, the plaintiff believes that Anne's Properties, LLC, knowingly and willfully, on approximately 2 distinct occasions, furnished, or contributed monies, materials, supplies, or made loans to or in support of a candidate or political committee, through or in the name of another.

## VI. DANGLE & ASSOCIATES, LLC

### 25.

During the years 2009 to the present, the plaintiff believes that Dangle & Associates, LLC, knowingly and willfully, on approximately 6 distinct occasions, furnished, or contributed monies, materials, supplies, or made loans to or in support of a candidate or political committee, through or in the name of another.

## VII. RING ASSOCIATES, LLC

### 26.

During the years 2009 to the present, the plaintiff believes that Ring Associates, LLC, knowingly and willfully, on approximately 6 distinct occasions, furnished, or contributed monies, materials, supplies, or made loans to or in support of a candidate or political committee, through or in the name of another.

## VIII. B&C CONTRACTORS, LLC

### 27.

During the years 2009 to the present, the plaintiff believes that B&C Contractors, LLC, knowingly and willfully, on approximately 4 distinct occasions, furnished, or contributed monies, materials, supplies, or made loans to or in support of a candidate or political committee, through or in the name of another.

## IX. WATER FRONT PROPERTIES, LLC

### 28.

During the years 2009 to the present, the plaintiff believes that Water Front Properties, LLC, knowingly and willfully, on approximately 4 distinct occasions, furnished, or contributed monies, materials, supplies, or made loans to or in support of a candidate or political committee, through or in the name of another.

## X. N.C. General Contractors, Inc.

29.

During the years 2009 to the present, the plaintiff believes that N.C. General Contractors, Inc., knowingly and willfully, furnished, or contributed monies, materials, supplies, or made loans to or in support of a candidate or political committee, **through or in the name of another.**

30.

Upon information and belief, the system created and implemented by the Defendants, in an effort to make contributions to candidates or political committees through or in the name of another, existed prior to 2009.

31.

The plaintiff is of the belief that prior to 2009, approximately 46 separate transactions occurred, wherein the Defendants used the created system of straw man entities to make contributions to candidates or political committees through or in the name of another.

32.

Pursuant to La. R.S. 18:1505.2A(2)(a) any person who violates the provisions of La. R.S. 18:1505.2A knowingly and willfully shall be assessed a penalty equal to twice the amount of the contribution.

**WHEREFORE,** Petitioner prays that:

A.   After due proceedings are had, the Defendants RIVER BIRCH, INC., WESTSIDE CONSTRUCTION SERVICES, INC., DOMINICK J. FAZZIO, BIG BANG PROPERTIES, LLC, ANNE'S PROPERTIES, LLC, DANGLE & ASSOCIATES, LLC, B&C CONTRACTORS, LLC, WATER FRONT PROPERTIES, LLC, RING ASSOCIATES, LLC, and N.C. GENERAL CONTRACTORS, INC., be found in violation of the provisions of the Campaign Finance Disclosure Act (La. R.S. 42:18:1481 *et seq.*).

B.   After due proceedings are had the Defendants RIVER BIRCH, INC., WESTSIDE CONSTRUCTION SERVICES, INC., DOMINICK J. FAZZIO, BIG BANG PROPERTIES, LLC, ANNE'S PROPERTIES, LLC, DANGLE & ASSOCIATES, LLC, B&C CONTRACTORS, LLC, WATER FRONT PROPERTIES, LLC, RING ASSOCIATES, LLC, and N.C. GENERAL CONTRACTORS, INC., be assessed appropriate penalties in accordance La. R.S. La. R.S. 18:1505.2A.

C.   After due proceedings are had the Defendants RIVER BIRCH, INC., WESTSIDE CONSTRUCTION SERVICES, INC., DOMINICK J. FAZZIO, BIG BANG PROPERTIES, LLC, ANNE'S PROPERTIES, LLC, DANGLE & ASSOCIATES, LLC, B&C CONTRACTORS, LLC, WATER FRONT PROPERTIES, LLC, RING ASSOCIATES, LLC, and N.C. GENERAL CONTRACTORS, INC., be assessed with all costs associated with these proceedings including legal interest from date of judicial demand.

IMAGED   MAY 18 2012

715012

D.  After due proceedings are had, the State of Louisiana, and Louisiana Board of Ethics acting in its capacity as the Supervisory Committee on Campaign Finance Disclosure are entitled to all equitable and just relief.

Respectfully submitted,

**Louisiana Board of Ethics acting in its capacity as the Supervisory Committee on Campaign Finance Disclosure**

By :

Kathleen M. Allen (Bar Roll 24277)
Michael Dupree (Bar Roll 26870)
Aaron Brooks (Bar Roll 18743)
P. O. Box 4368
Baton Rouge, LA 70821
Telephone: (225) 219-5600
Facsimile: (225) 381-7271
*Counsel for the Louisiana Board of Ethics acting in its capacity as the Supervisory Committee on Campaign Finance Disclosure*

**Please Serve the Following:**

1.  **RIVER BIRCH, INC.**
    Through its agent for Service of Process
    Heebe & Heebe (PLC),
    2000 Belle Chasse Hwy.
    Third Floor
    Terrytown, LA 70056

2.  **WESTSIDE CONSTRUCTION SERVICES, INC.**
    Through its agent for Service of Process
    Dominick J. Fazzio
    1625 Lake Maurepas
    Harvey, LA 70058

3.  **DOMINICK J. FAZZIO**
    Through his Attorney of Record,
    Stephen London
    2950 Entergy Center
    1100 Poydras Street
    New Orleans, LA 70163

4.  **BIG BANG PROPERTIES, LLC**
    Through its agent for Service of Process
    Richard P. Richter
    909 Poydras St., 28th Floor
    New Orleans, LA 70112

5.  **ANNE'S PROPERTIES, LLC**
    Through its agent for Service of Process
    Richard, P. Richter
    909 Poydras St., 28th Floor
    New Orleans, LA 70112

IMAGED   MAY 1 8 2012        Page 8 of 9                    715012

6.    **DANGLE & ASSOCIATES, LLC**
      Through its agent for Service of Process
      Richard P. Richter
      909 Poydras St., 28th Floor
      New Orleans, LA 70112

7.    **B&C CONTRACTORS, LLC**
      Through its agent for Service of Process
      Richard, P. Richter
      909 Poydras St., 28th Floor
      New Orleans, LA 70112

8.    **WATER FRONT PROPERTIES, LLC**
      Through its agent for Service of Process
      Richard P. Richter
      909 Poydras St., 28th Floor
      New Orleans, LA 70112

9.    **RING ASSOCIATES, LLC**
      Through its agent for Service of Process
      Richard P. Richter
      909 Poydras St., 28th Floor
      New Orleans, LA 70112

10.   **N.C. GENERAL CONTRACTORS, INC.**
      Through its agent for Service of Process
      Douglas P. Caldarera
      1125 Wyndham S.
      Gretna, LA 70056

IMAGED   MAY 18 2012

715012